UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

YASSIN ABDULLAH KADI
Yassin A. Kadi Establishment
Farsi Center - West Tower
11th Floor, Suite 1103
Wally Al-Ahd Street
Ruwais District, P.O. Box 214
Jeddah 21411 Saudi Arabia

Plaintiff,

v.

HENRY M. PAULSON, in his official capacity
Secretary of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

ADAM J. SZUBIN, in his official capacity
U.S. Department of the Treasury
Director
Office of Foreign Assets Control
1500 Pennsylvania Avenue, N.W.
Treasury Annex
Washington, D.C. 20220

THE UNITED STATES DEPARTMENT OF THE TREASURY,
OFFICE OF FOREIGN ASSETS CONTROL
General Counsel
1500 Pennsylvania Avenue, N.W.
Treasury Annex
Washington, D.C. 20220

Defendants.

Case No.

**Complaint**

**Jury Trial Demanded**

Case: 1:09-cv-00108
Assigned To : Bates, John D.
Assign. Date : 1/16/2009
Description: Admn. Agency Review

I.

INTRODUCTION

1. This lawsuit arises from defendant Office of Foreign Assets Control's ("OFAC") wrongful and unconscionable designation of Plaintiff Yassin Abdullah Kadi ("Mr. Kadi"), a prominent Saudi Arabian businessman and philanthropist, as a "specially designated global terrorist" ("SDGT") and freezing of Mr. Kadi's assets in the immediate aftermath of 9/11 on October 12, 2001, and his continued wrongful designation thereafter.

2. As explained herein, following the horrific attacks of September 11, 2001 -- attacks that Mr. Kadi has always steadfastly condemned -- defendant OFAC, a division of the Department of Treasury (the "U.S. Treasury"), designated Mr. Kadi as a SDGT on October 12, 2001, and blocked, or froze, Mr. Kadi's assets.

3. In or about March 2004, OFAC issued a final Memorandum ("OFAC Memorandum") which purported to specify the evidence and bases for designating Mr. Kadi as a SDGT and for freezing his assets. However, the actual administrative record and the allegedly "classified" information alluded to in the OFAC Memorandum supposedly supporting OFAC's claims has never been released to Mr. Kadi or his attorneys.

4. As a result, despite the fact that Mr. Kadi and his counsel have never been provided with the actual information in the administrative record upon which OFAC allegedly made its determination that Mr. Kadi is a "terrorist", or even any summary of the allegedly "classified" information, much less any specification of any charges against him to which he might have responded, Mr. Kadi remains a designated SDGT without access to his assets.

5. Defendant Adam J. Szubin, the director of the U.S. Treasury's Office of Foreign Assets Control has stated that the U.S. government "found that [Mr. Kadi] is a supporter of terror." Mr. Szubin, however, has conceded that OFAC has "not found Mr. Kadi guilty of

anything." Indeed, to date, defendants have not presented Mr. Kadi with any evidence whatsoever linking him to terrorism, and have continually denied Mr. Kadi any meaningful hearing in an independent tribunal to determine the appropriateness of his designation as a SDGT or of the blocking of his assets. Notably, the most senior U.S. Treasury Department lawyer at the time, General Counsel David Aufhauser, was quoted in regards to Treasury and OFAC's designations immediately after 9/11 as saying, it was "almost comical"…"We just listed as many of the usual suspects as we could and said, 'Let's go freeze some of their assets.'"

6. The foregoing continuing gross injustice has caused Mr. Kadi, his family, his businesses, and his reputation incalculable damage and suffering. Accordingly, Mr. Kadi seeks revocation of his designation on the grounds that the designation is not supported by the administrative record, and that the designation and review process violated his First, Fourth, and Fifth Amendment rights, the International Emergency Economic Powers Act ("IEEPA") and the Administrative Procedure Act ("APA"), by failing to provide him with adequate notice of the legal or factual basis for the government's above described actions, the charges against him or a meaningful opportunity to defend himself from the horrific charge that he is somehow connected to terrorism. Mr. Kadi further seeks declaratory and injunctive relief to unfreeze his assets and to permit him to engage in First Amendment-protected activity without fear of prosecution or designation for doing so.

## II.

## PARTIES

7. Plaintiff Mr. Kadi is a prominent Saudi businessman and philanthropist who has carried out business and charitable activities at an international level. As further explained below, Mr. Kadi has never supported or intended to support the activities of any terrorist

group or individual whether through commercial, investment or charitable activities or in any manner whatsoever.

8.   Defendant United States Department of the Treasury is responsible for implementing and administering the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594, and, through OFAC, for designating entities and individuals as SDGTs, and enforcing economic sanctions against designated individuals and entities.

9.   Defendant Henry M. Paulson, Jr., is being sued in his official capacity as Secretary of the Treasury.  He is responsible for designating individuals and entities, in consultation with the Secretary of State, the Attorney General, and the Secretary of Homeland Security, and is responsible for administering and enforcing the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594.

10.   Defendant OFAC, a division of the U.S. Treasury, is responsible for implementing and administering the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594, for designating entities and individuals as a SDGT, and for enforcing economic sanctions against designated individuals and entities.

11.   Defendant Adam J. Szubin is being sued in his official capacity as the Director of OFAC.  He is responsible for designating individuals and entities, in consultation with the Secretary of Treasury, the Secretary of State, the Attorney General, and the Secretary of Homeland Security, and is responsible for administering and enforcing the Global Terrorism Sanctions regulations, 31 C.F.R. Part 594

## III.

## JURISDICTION AND VENUE

12. This action arises under the United States Constitution, IEEPA, 50 U.S.C. §§ 1701-1707, and the APA, 5 U.S.C. § 551 et seq. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

13. This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Fed. R. Civ. P. Rule 57. This Court may grant injunctive relief pursuant to Fed. R. Civ. P. Rule 65.

14. Venue lies in the District of Columbia, the federal judicial district in which the actions complained of occurred.

## IV.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Statutory and Regulatory Framework

15. The IEEPA authorizes the President to declare a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). When the President has declared such an emergency, he "may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise ... block ... regulate ... nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, or with respect to *any* property, subject to the jurisdiction of the United States ... " 50 U.S.C. § 1702(a)(1)(B).

16.  On September 23, 2001, President George W. Bush issued Executive Order 13,224, 66 Fed. Reg. 49079 ("E.O. 13,224"), declaring a national emergency in connection with the September 11, 2001, terrorist attacks.  Section 2(a) of E.O. 13,224 states that "any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order."  E.O. 13,224 initially designated 27 individuals and entities, and also authorized the Secretary of the Treasury to designate other groups or individuals for engaging in terrorism, for providing material support to anyone on the designated list - regardless of the purpose of the support - and even for being "otherwise associated" with an entity or individual on the list.  OFAC has admitted to designating individuals or groups based solely on a finding that they were "otherwise associated" with other groups on the list.  On information and belief, OFAC has also relied on the "otherwise associated" provision in conjunction with other provisions to designate groups or individuals.  Because OFAC issues no formal statement of reasons for any of its designations, Mr. Kadi had not received from OFAC any of the alleged legal, factual, or evidential basis of his designation until the OFAC Memorandum was issued in March 2004, three years after Mr. Kadi's initial designation as a SDGT.  The IEEPA authorizes the Secretary of the Treasury to freeze the assets of an individual or entity pending investigation, without specifying any standard of suspicion necessary for such a freeze, and without requiring that the entity be provided with notice or a meaningful opportunity to contest the freeze.  *See* IEEPA § 1702.

17. There is no definition in IEEPA of the term "Specially Designated Global Terrorist," the designation used against Mr. Kadi.

18. Regulations implementing E.O. 13,224 were promulgated by the U.S. Treasury on June 6, 2003 ("regulations"). *See* 68 Fed. Reg. 34,196. The regulations, entitled the "Global Terrorism Sanctions Regulations," are located at 31 C.F.R. Part 594, and follow the model of E.O. 13,244 with little added detail. Neither IEEPA, the regulations, nor E.O. 13,224 require the Secretary of the Treasury to provide any statement of reasons for a designation. Nor do IEEPA, the regulations, or E.O. 13,224 require that entities or individuals be provided with notice of the specific provisions under which they have been designated.

19. 31 C.F.R. § 501.807 sets forth procedures governing removal of names from OFAC's Listing of Specially Designated Global Terrorists and authorizes designated entities or persons to seek administrative reconsideration with OFAC. However, these procedures impose no limits or standards whatsoever on OFAC for its review of a petitioner's request for administrative reconsideration and create no procedural safeguards for the review process.

**2. OFAC'S Designation Of Mr. Kadi And Asset Freeze; A Kafkaesque Journey Without Due Process**

20. On or about October 12, 2001, the U.S. Treasury and U.K. Treasury issued simultaneous press releases, with substantially identical terms, instructing financial institutions to freeze the assets of Mr. Kadi held in the U.S. and the U.K. The effect of these measures was to prevent Mr. Kadi from doing any form of business in the U.S. and the U.K. and to brand him as a supporter of terrorism. However, as explained herein, neither the U.S. or U.K Treasuries have ever provided any adequate statement of reasons, evidence, or findings in support of their initial designations.

21. Because neither the U.S nor the U.K. had provided any reason whatsoever for the designation, the next business day, on or about October 15, 2001, Mr. Kadi's counsel wrote to Sir Andrew Turnball, Permanent Secretary of the U.K. Treasury to complain about the defamatory nature of the U.K. press release, to request that, among other things, Mr. Kadi's name be removed from the list indicating that his assets should be frozen, to provide information and evidence by which Mr. Kadi was included on the list, and to inquire about the source of the U.K.'s information.

22. On or about October 19, 2001, the U.K. Treasury replied, stating that its decision was "on the basis of intelligence information provided to [the U.K. Treasury] by the U.S. Treasury," which the U.K. Treasury refused to provide claiming it was confidential, and that, if Mr. Kadi persuaded the U.S. Treasury to revoke its decision to freeze Mr. Kadi's U.S. assets, then the U.K. Treasury was "very likely" to terminate the measures it had taken in relation to Mr. Kadi.

23. Immediately thereafter, Mr. Kadi submitted an application for permission for judicial review in the High Court in London. On or about November 12, 2001, the then head of the Administrative Court in the High Court of Justice in London, Mr. Justice Scott-Baker, unhesitatingly granted Mr. Kadi permission to proceed with his action for judicial review and ordered the U.K. Treasury to provide Mr. Kadi with its evidence on an expedited basis about the alleged basis for its decision to instruct all financial institutions to freeze his assets. Mr. Justice Scott-Baker further stated that "... the validity of this draconian order is being challenged and, on the face of it, with some reason at the moment ... in my view, this case is very important because it is crucial that when there are question marks about orders of this kind and draconian nature, they are properly tested in the Courts."

24.  As a result, in compliance with Mr. Justice Scott-Baker's order, on or about November 16, 2001, Joseph Halligan, Assistant Secretary of the U.K. Treasury made a statement to the Court in the U.K. proceedings.  Mr. Halligan stated that he received a two-page fax from the U.S. Treasury department dated October 11, 2001 ("the Two-Page Fax"), which included details about Mr. Kadi.  Notably, it has been subsequently shown that the Two-Page Fax is substantially erroneous that it is based upon press articles, websites, and similar non-evidential sources, and that it contains allegations which are totally false.

25.  On or about May 23, 2002, Mr. Kadi, his counsel, Richard Newcomb, then-Director of OFAC, and other OFAC staff met at the U.S. Embassy in Riyadh, Saudi Arabia. At this meeting, OFAC denied all knowledge of the Two-Page Fax, but promised to investigate its origin.  Furthermore, when Mr. Kadi and his counsel refuted the contents of the Two-Page Fax in their formal submissions to OFAC, OFAC denied all knowledge of the Two-Page Fax, and claimed that the Two-Page Fax did not come from OFAC.

26.  Upon information and belief, although OFAC initially denied all knowledge of the Two-Page Fax, it was later proved to have been transmitted from an office within U.S. Treasury.  For example, a directory of telephone and fax numbers in Washington D.C. later confirmed that the Two-Page Fax was, in fact, transmitted from a fax number belonging to an office within the U.S. Treasury.

27.  Upon information and belief, having been proved to have misrepresented that the Two-Page fax did not originate from the government, OFAC then claimed not to be bound by the terms of the Two-Page Fax.  Mr. Newcomb further claimed that OFAC relied on material and information beyond the information contained in the Two-Page Fax for Mr. Kadi's

designation. However, OFAC never specified nor identified any of that purported information, despite repeated requests from Mr. Kadi to OFAC.

28. Upon information and belief OFAC has expressly acknowledged and admitted that the Two-Page Fax contains fundamentally false statements and allegations concerning Mr. Kadi. On or about December 17, 2001, in the first of many witness statements that Mr. Kadi voluntarily submitted to OFAC, Mr. Kadi refuted all the allegations in the Two-Page Fax, including the patently false claim therein that he has a brother, which only served to emphasize the U.S. government's failure to even know who it was they were actually abusing by their arbitrary behavior.

29. After Mr. Kadi affirmatively and comprehensively refuted the contents of the Two-Page Fax, OFAC continued to provide nothing to him in support of its decision to designate him a SDGT. On the contrary, OFAC instead pressed Mr. Kadi for further detailed information based upon what he had already provided concerning his businesses, and charitable activities in numerous jurisdictions, and his links with leading Saudi businessmen. As a result, Mr. Kadi has on numerous occasions voluntarily submitted written statements and provided oral presentations to OFAC, containing detailed explanations about his charitable and business activities and his relations with other Saudi Arabian businessmen, together with providing extensive supplemental explanations and material, all of which demonstrate his innocence of any alleged support for terrorism.

30. In or about March, 2004, Mr. Newcomb issued a Memorandum through Mark D. Roberts, Chief of the Foreign Terrorist Programs Divisions (the "OFAC Memorandum") stating that after reconsideration of Mr. Kadi's designation as a SDGT under E.O. 13,224, the evidence, "which includes both publicly available material and classified evidence, that is not

appropriately releasable to the public for several reasons, including preventing harm to the

national security of the United States," clearly supports the determination that Mr. Kadi was

properly designated under E.O. 13,224.

31. Neither Mr. Kadi nor his counsel have ever been provided with the allegedly

"classified" information in the administrative record nor the actual administrative record upon

which OFAC made its determination that Mr. Kadi is a "terrorist", nor any summary of the

allegedly "classified information", or any specification of any charges against him, if any, to

which he might have responded. Indeed the OFAC Memorandum is the only formal written

statement that he ever received from the U.S. government and this in itself is a hopelessly

inadequate statement of reasons. It contains none of the actual evidence relied on against Mr.

Kadi, refers to documents which have never been supplied to Mr. Kadi and contains vague

and nebulous assertions against him which have never been properly particularized.

32. Defendants' designation of Mr. Kadi and the freezing of his assets without a

hearing was unlawful and unconstitutional. In the alternative, if the statutes on which OFAC

relies actually authorize the foregoing, the statutes themselves are unconstitutional because

they are vague and overbroad and the process that resulted in Mr. Kadi's designation has

failed to afford Mr. Kadi adequate notice of the charges against him, a meaningful opportunity

to respond, or any meaningful hearing in an independent tribunal to determine the

appropriateness of his designation as a SDGT or the blocking of his assets.

**3. Had Defendants Provided Mr. Kadi With A Reasonable Opportunity To Defend Himself, It Would Be Obvious That Defendants Improperly Have Labeled Mr. Kadi A Terrorist" And Frozen His Assets Without Any Legitimate or Rational Basis.**

33. As explained below, to the extent that defendants have provided Mr. Kadi with

limited information relating to his designation as a SDGT, it is clear that most of the purported

bases for defendants' designation of Mr. Kadi as a SDGT and the related freezing of his assets arise from creative, but false, allegations based on specious concepts such as guilt by association, inference upon inference, drawing a negative generalization from an accumulated series of unconnected negative claims, and the reliance upon uncorroborated media and press articles. As the March 2004 OFAC memo, in a desperate attempt to use generalization to justify the designation, stated "no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that [Mr. Kadi] has been providing support to terrorists through his actions." Additionally, in keeping with this illogical and insubstantive approach, in a fit of circular reasoning, one of the individuals whose relationship with Mr. Kadi was allegedly the basis for Mr. Kadi's designation – OFAC freely utilizing the concept of guilt by association -- was himself designated on the same day as Mr. Kadi -- based upon his relationship with Mr. Kadi. In fact, much of the limited information provided by OFAC has already been determined to be false, or where true, does not in fact support the designation of Mr. Kadi as a SDGT.

34. In sum, at no time did Mr. Kadi act as a conduit or channel for funds being passed to any terrorist group. Contrary to OFAC's claims, at no time was Mr. Kadi aware of any link or connection between any person associated with any of his charitable or business endeavors and any terrorist activities or groups. Despite OFAC's unwillingness and refusal to provide substantive information or access to the administrative record and/or allegedly "classified" information, Mr. Kadi has obtained from the Swiss government some materials relevant to OFAC's claims. These U.S. government-generated materials are contrary to OFAC's claims and positions and contain yet further examples of mistaken identity. In fact, they reflect no evidence of support for terrorism on Mr. Kadi's part.

4. **Kadi Is Finally Heard (But Not In the USA), And Is Vindicated**

35. Upon information and belief, the U.S. government is the source of Mr. Kadi being erroneously investigated for alleged terrorism and/or having his assets frozen in other parts of the world. Following Mr. Kadi's listing by OFAC in the U.S., the U.S. government requested that he be listed at the United Nations. On or about October 19, 2001, at the request of the U.S., Mr. Kadi was included on the United Nations' Consolidated List of All Entities/Individuals Whose Accounts Should be Frozen in Accordance with the United Nations Security Council Resolutions Relating to Afghanistan (Taliban & Usama Bin Laden) or Terrorism ("U.N. List") and had his assets frozen pursuant to paragraph 8(c) of Resolution 1333. This paragraph mandates all States to take further measures to freeze, without delay, funds and other financial assets of Usama bin Laden and individuals and entities alleged to be associated with him as designated by the U.N. Security Council Committee. In purported compliance with the U.N. Resolution, the European Union froze Mr. Kadi's assets pursuant to Council Regulation (EC) No. 467/2001 "imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaida network and the Taliban" ("contested freezing regulation").

36. Upon information and belief, Mr. Kadi's inclusion on the U.N. List prompted a number of countries around the world to begin investigating Mr. Kadi. Yet, in contrast to Mr. Kadi's efforts in the United States of America to defend himself, to shed the false SDGT designation, and to obtain access to his property and assets, other countries whose interest in Mr. Kadi was precipitated by the dissemination of OFAC's spurious claims beyond the U.S. borders have either discontinued their investigations, or in the case of the European Court of Justice ("ECJ") in a landmark judgement described by one leading academic commentator as

"the most important judgment ever delivered by the ECJ on the relationship between EC and international law and one of its most important judgments on fundamental rights have definitively reaffirmed that Mr. Kadi be permitted to exercise his procedural and due process rights. The result is that, in contrast to the position taken by the government in the U.S., world-wide Mr. Kadi has been vindicated and/or his rights to seek redress and prove his innocence have been affirmed.

37. For example, in 2001 the Office of the Attorney General of Switzerland commenced a criminal investigation against Mr. Kadi based upon his inclusion in the "Bush List," that is to say the U.S. OFAC list. After more than six years of thorough investigation, in which the Swiss sought the cooperation of many countries including the U.S., the Swiss abandoned the investigation of Mr. Kadi.

38. Also, the 14 judges of the ECJ, the highest Court of the European Union, ruled in an unappealable decision that an earlier judgment of the EU Court of First Instance must be set aside and the EU's contested freezing regulation must be annulled insofar as it relates to Mr. Kadi. In their decision, the ECJ ruled that: (1) it has jurisdiction to review whether the contested freezing regulation complies with fundamental human rights, (2) the provisions of the European treaty do not authorize any derogation from the principles of liberty, democracy and respect for human rights and fundamental freedoms, which are enshrined as a foundation of the European Union, (3) Mr. Kadi's fundamental right to be heard and his right to effective judicial review were "patently not respected," (4) the contested freezing regulation constitutes an unjustified restriction of Mr. Kadi's right to property and Mr. Kadi's plea that his fundamental right to his property has been infringed is also "therefore well founded", and (5)

the infringements of Mr. Kadi's fundamental rights to property, his right to a fair hearing, and his right to effective judicial review have not been remedied.

39.   In addition to annulling the contested freezing regulation insofar as it relates to Mr. Kadi, the Council of the EU and the Commission of the European Communities were also ordered to pay Mr. Kadi's legal costs both before the Court of First Instance and in his successful appeal before the ECJ.

40.   Notably, the ruling of the ECJ was preceded by an opinion on or about January 16, 2008, by Advocate General Miguel Poiares Maduro.  Advocate General Maduro delivered a bold and forceful opinion where he rejected the proposition that judicial review by the courts would be inappropriate because of the "political" nature of the issues, considering that "the claim that a measure is necessary for the maintenance of international peace and security cannot operate so as to silence the general principles of Community law and deprive individuals of their fundamental rights."  Advocate General Maduro further considered that:

- when the risks to public security are believed to be extraordinarily high the pressure is particularly strong to take measures that disregard individual rights, especially in respect of individuals who have little or no access to the political process. Therefore in those instances the courts should fulfill their duty to uphold the rule of law with increased vigilance.

- still the Community institutions refuse to grant him [Mr. Kadi] an opportunity to dispute the grounds for his continued inclusion on the list. They have, in effect, levelled extremely serious allegations against him and have, on that basis, subjected him to severe sanctions. Yet, they entirely reject the notion of an independent tribunal assessing the fairness of these allegations and the reasonableness of these sanctions. As a result of this denial, there is a real possibility that the sanctions taken against the appellant [Mr. Kadi] within the Community may be disproportionate or even misdirected, and might nevertheless remain in place indefinitely. The Court has no way of knowing whether that is the case in reality, **but the mere existence of that possibility is anathema in a society that respects the rule of law** *[emphasis added]*.

41. Following this opinion by Advocate General Maduro, on September 3, 2008, as noted above, the 14 judges of the ECJ overturned the lower court's ruling that had supported Europe's right to freeze Mr. Kadi's assets.

42. Further, on or about December 24, 2004, the prosecution authorities in Turkey formally discontinued their investigation into Mr. Kadi, stating that "... there is no evidence or sign implying that [Mr. Kadi] has relations with or assisted the illegal terrorist organization [Al-Qaida] ... [and] that following a review of the companies established and operated by the accused persons ... there is no need to press legal proceedings as there are no components indicating a crime present." Likewise, on or about December 28, 2006, following additional complaint petitions submitted by the Turkish Public Prosecutor on July 7, 2006 and August 2, 2006 to initiate a criminal investigation under Turkish anti-terrorism laws, the Public Prosecutor's Office refused to initiate any criminal investigation on the ground of a lack of evidence against Mr. Kadi.

43. Also, on or about December 26, 2004, the prosecution authorities of Albania formally decided to terminate a penal prosecution against Mr. Kadi. Aleksander Goga, the Prosecutor of the Attorney General's office, in terminating the investigation stated that, "... according to the examination of sequestered documents it cannot be achieved the conclusion that [Mr. Kadi] has transferred funds for supporting terrorist activities through commercial companies owned by him in Albania. Being in these circumstances, when we have no sources of evidence against a citizen under investigation, [Mr. Kadi], ... I value that the penal prosecution has to be terminated."

5.   **The Instant Action**

44.   The European Court of Justice has recognized the governmental obligations to abide by the minimal procedural and substantive due processes to protect basic human rights. In contrast, to date various U.S. government defendants have breached Mr. Kadi's same due process rights and other rights, and ignored their own duties by not providing Mr. Kadi with the information in the administrative record upon which OFAC made its determination that Mr. Kadi is a "terrorist", any of the allegedly "classified" information, or any specification of any charges against him to which he might have responded. As a result, Mr. Kadi remains a designated SDGT without access to his assets.

45.   As an initial matter, given that the OFAC Memorandum itself claims it relies upon allegedly "classified" information, Mr. Kadi could not and, to date, has not been able to address the purported allegations and claimed findings therein. Mr. Kadi's has made clear to OFAC that he would agree to any reasonable and appropriate confidentiality and security procedures and requirements which OFAC believes are necessary to effect access to the "classified" information, yet these requests have never been met. Among other things, the alleged evidence supporting OFAC's initial designation of Mr. Kadi in October 2001 is absent. Similarly, record information allegedly supporting the "findings based upon information available to the U.S. government" has never been identified or made available. At a minimum, the fact that the OFAC Memorandum contains an abundance of allegations that are unreliable and/or have already been rebutted, raises critical questions about the accuracy and adequacy of the allegedly "classified" information upon which OFAC relies. Finally, remarkably, it appears that OFAC also relied upon "open source press releases,"

without identifying the alleged source, the basis for any conclusions, or considering the reliability of such information.

46. In keeping with his efforts to obtain relevant information, Mr. Kadi, on a number of occasions over the past five years, has caused Freedom of Information Act ("FOIA") requests, pursuant to 5 U.S.C. § 552 and 31 C.F.R. § 1.5, to be submitted to the U.S. Treasury and other appropriate federal agencies and bureaus to obtain the release of the non-privileged, non-exempt relevant records. This has included seeking documents that OFAC used or relied upon in the initial designation and in its subsequent preparation of the OFAC Memorandum that related to Mr. Kadi's designation as a SDGT. Pursuant to 5 U.S.C. § 552(a)(6)(A)(i) and 31 C.F.R. § 1.5(h)(1), the U.S. Treasury and other government entities were required to respond to these FOIA Requests years ago. To date, the required response from the U.S. Treasury, or any other of the FOIA'd agencies or bureaus holding relevant records has not been forthcoming.

47. As a result of the foregoing, and particularly, the absence of any meaningful notice of the basis for OFAC's designation, notice of the charges, if any, against him, and preclusion of access to the actual administrative record or the allegedly "classified" evidence, Mr. Kadi, after nearly eight years, remains a SDGT and his assets remain frozen. Mr. Kadi seeks a reasonable and lawful opportunity to correct this bizarre situation.

48. When Mr. Kadi learned of the vindication of his right to seek redress by the ECJ, he stated "I am an innocent man. Whenever I have been given a fair opportunity to state my case I have been able to show that the allegations against me are untrue." Incredibly, however, the United States of America has not afforded Mr. Kadi any such fair opportunity.

**COUNT I**

**THE DESIGNATION OF MR. KADI AND SEIZURE OF HIS ASSETS WERE
UNSUPPORTED BY SUBSTANTIAL
EVIDENCE AND WAS ARBITRARY AND CAPRICIOUS UNDER THE
INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT AND THE
ADMINISTRATIVE PROCEDURE ACT.**

49.  Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 48 above.

50.  Defendants' designation of Mr. Kadi as a SDGT and the seizure of Mr. Kadi's assets pursuant to the OFAC Memorandum constitute a "final agency action" under 5 U.S.C. § 704.

51.  Defendants' designation of Mr. Kadi as a SDGT and the seizure of Mr. Kadi's assets were unsupported by substantial evidence, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 701, et seq., IEEPA, 50 U.S.C. § 1701(a), and E.O. 13,224, because OFAC's administrative record contained no evidence that Mr. Kadi engaged in terrorist activity or knowingly provided material support to terrorism or to any designated entity or individual.

52.  Defendants' designation of Mr. Kadi as a SDGT and their seizure of Mr. Kadi's assets are contrary to constitutional right, power, privilege, or immunity. 5 U.S.C. § 706 (2)(B).

53.  Defendants' designation of Mr. Kadi as a SDGT and the seizure of Mr. Kadi's assets were done without observance of procedure established by law. 5 U.S.C. § 706 (2)(D).

54.  Defendants' designation of Mr. Kadi as a SDGT and the seizure of Mr. Kadi's assets are unwarranted by the facts. 5 U.S.C. § 706 (2)(F).

**COUNT II**

**THE BLOCKING OF MR. KADI'S ASSETS AND HIS DESIGNATION VIOLATED HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS AND IS ARBITRARY AND CAPRICIOUS.**

55. Plaintiff hereby incorporates as though restated each of the allegations in paragraphs 1 through 54 above.

56. By designating Mr. Kadi as a SDGT and seizing Mr. Kadi's assets, defendants acted arbitrarily and capriciously and deprived Mr. Kadi of his property.

57. Defendants violated Mr. Kadi's Fifth Amendment due process rights by, *inter alia*, failing to provide Mr. Kadi with adequate notice of the charges against him, by not affording him adequate time to respond to the administrative record, by failing to provide any thorough statement of reasons for OFAC's decision, by failing to explain its assessment of Mr. Kadi's submitted evidence or its own administrative record materials, by relying on allegedly "classified" evidence that afforded Mr. Kadi no meaningful opportunity to respond, by failing, in violation of FOIA, to provide Mr. Kadi with the information used or relied upon by OFAC in preparation of the OFAC Memorandum, by failing to afford Mr. Kadi the opportunity to cross-examine any witnesses and by continually failing to provide any independent tribunal for Mr. Kadi to plead his case.

**COUNT III**

**THE FREEZING OF MR. KADI'S ASSETS VIOLATES MR. KADI'S FIFTH AMENDMENT RIGHT TO JUST COMPENSATION FOR THE TAKING OF MR. KADI'S PROPERTY.**

58. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 57 above.

59. By freezing Mr. Kadi's assets and denying his request to remove his designation as a SDGT, defendants have deprived and continue to deprive Mr. Kadi from using his property in any reasonable way.

60. The provisions of IEEPA, E.O. 13,224, and the implementing regulations provide no mechanism for Mr. Kadi to further contest his designation or the blocking of his assets, thus permanently depriving him access to his property.

61. Defendants have not provided plaintiff with any compensation, let alone just compensation, thus depriving plaintiff of his rights under the takings clause of the Fifth Amendment.

**COUNT IV**

**THE DESIGNATION OF MR. KADI VIOLATED HIS FIRST AMENDMENT RIGHTS TO FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION BECAUSE THE DESIGNATION WAS IMPERMISSIBLY BASED ON MR. KADI'S CHARITABLE AND BUSINESS ASSOCIATIONS.**

62. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 61 above.

63. Upon information and belief, defendants' designation of Mr. Kadi as a SDGT was based on Mr. Kadi's protected First Amendment activities and to that extent violated his First Amendment rights of free speech and free association.

64. Mr. Kadi does not have a knowing affiliation with any terrorist group or individual including Osama bin Laden or Al-Qaeda or any other organization or person possessing unlawful aims or goals. Mr. Kadi did not and does not have a specific intent to further the illegal aims of any terrorist group or individual.

65. By designating Mr. Kadi as a SDGT and seizing Mr. Kadi's assets, defendants substantially interfered with the rights of Mr. Kadi to freedom of speech and freedom of association under the First Amendment of the United States Constitution.

66. The substantial interference with the rights of Mr. Kadi to freedom of speech and freedom of association does not serve a compelling governmental interest.

67. Designating Mr. Kadi as a SDGT and seizing Mr. Kadi's assets is not the least restrictive means of accomplishing any compelling governmental interest.

**COUNT V**

**THE FREEZING OF MR. KADI'S ASSETS WITHOUT PROBABLE CAUSE OR A WARRANT VIOLATED THE FOURTH AMENDMENT.**

68. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 67 above.

69. Defendants initially froze or blocked Plaintiff's assets in October 2001, without reasonable suspicion, probable cause or warrant and without specifying their reasons for doing so.

70. Defendants have continued to freeze or block Plaintiff's assets without providing him with the information in the administrative record upon which OFAC made its determination that Mr. Kadi is a "terrorist", any summary of the allegedly "classified" information, or any specification of any charges against him to which he might have responded.

71. The freezing or blocking of Mr. Kadi's assets constitute an unreasonable search and seizure without probable cause, in violation of the Fourth Amendment of the United States Constitution.

**COUNT VI**

**THE DESIGNATION OF MR. KADI VIOLATED HIS FIRST AND FIFTH AMENDMENT RIGHTS BECAUSE THE CRITERIA FOR DESIGNATION SET FORTH IN EXECUTIVE ORDER 13,224 IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD.**

72. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 71 above.

73. At the time Mr. Kadi was designated, E.O. 13,224 allowed for the designation of individuals or entities based on findings that they are "otherwise associated" with other designated persons or entities, without regard to the character or intent of the association or support. These terms are unconstitutionally vague and overbroad on their face and as applied to Mr. Kadi, and therefore violate his First and Fifth Amendment rights.

**COUNT VII**

**IEEPA, EXECUTIVE ORDER 13,224 AND THE IMPLEMENTING REGULATIONS VIOLATE MR. KADI'S FIRST AND FIFTH AMENDMENT RIGHTS BECAUSE THEY ARE UNCONSTITUTIONALLY VAGUE AND OVERBROAD.**

74. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 73 above.

75. The provisions of IEEPA, E.O. 13,224, and the implementing regulations impose vague and overbroad restrictions on its face and as applied to Mr. Kadi, in violation of the First and Fifth Amendments because they do not define such critical terms as "terrorist organization," "specially designated global terrorist," or any other term related to "terrorism."

76. The vague and overbroad provisions of the IIEPA, E.O. 13,224 and the implementing regulations have prevented Mr. Kadi from properly contesting evidence set forth against him and have failed to provide Mr. Kadi with an adequate independent tribunal in violation of his first and fifth amendment rights.

## COUNT VIII

## EXECUTIVE ORDER 13,224 VIOLATES MR. KADI'S FIRST AMENDMENT RIGHTS BECAUSE IT CONSTITUTES A BILL OF ATTAINDER.

77. Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 76 above.

78. E.O. 13,244 constitutes a bill of attainder in violation of the First Amendment on its face and as applied to Mr. Kadi, because E.O. 13,244 inflicts punishment without requiring an adequate and independent tribunal to determine a SDGT's guilt and takes away the life, liberty or property of a particular named or easily ascertainable person or group of persons.

## REQUESTED RELIEF

NOW WHEREFORE, Plaintiffs pray this court for the following relief:

1.    An injunction vacating the designation of Mr. Kadi as a Specially Designated Global Terrorist;

2.    An injunction vacating the freeze order imposed on Mr. Kadi's assets and restraining defendants from continuing to block or otherwise interfering with Mr. Kadi's access to and disposition of his assets;

3.    A declaratory judgment that the Executive Order provision authorizing the designation of individuals and entities based on being "otherwise associated" with a designated entity as it applies to Mr. Kadi is unconstitutional under the First and Fifth Amendments to the U.S. Constitution;

4.    A declaratory judgment that the regulatory scheme created by IEEPA, E.O. 13,224, and its implementing regulations are unconstitutional under the First and Fifth Amendments to the U.S. Constitution because they permit them to designate "Specially

Designated Global Terrorists" without any meaningful statutory limitation on this power, and thereby chill First Amendment protected activity, fail to give Plaintiffs adequate notice, and afford defendants unfettered discretion;

5. A declaratory judgment that defendants' designation of Mr. Kadi as a SDGT and their seizures of Mr. Kadi's assets violated Mr. Kadi's rights under the First, Fourth, and Fifth Amendments, the IEEPA and the APA.

6. A writ of mandamus to defendants requiring that they unfreeze and return Mr. Kadi's assets.

7. An award to plaintiff of his costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* and any other applicable provision of law;

8. Disclosure to Mr. Kadi of any and all information, documents, and materials related to his designation by OFAC; and

9. Such other and further relief as the Court may deem just and proper.

Dated January 16, 2008

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: ______________________
David F. Geneson (DC Bar #267245)

1300 I Street, N.W.
11th Floor East
Washington, DC 20005
Tel: 202.218.0000
Fax: 202.218.0020

Attorneys for Plaintiff