IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YASSIN ABDULLAH KADI, | ) <br> ) <br> ) |
| Plaintiff, | )    Civil Action 09-0108 (JDB) <br> ) |
| vs. | ) <br> ) |
| TIMOTHY GEITHNER, et al. | ) <br> ) |
| Defendants. | ) <br> ) |

**DECLARATION OF DANIEL L. BROWN, ESQ. IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S MOTION FOR DISCOVERY UNDER RULE 56(F)**

Pursuant to 28 U.S.C. § 1746, I, the undersigned, hereby declare:

1. I am a Partner at the law firm of Sheppard, Mullin, Richter & Hampton, LLP ("Sheppard Mullin"), counsel to Plaintiff Yassin Abdullah Kadi ("Plaintiff" or "Mr. Kadi"), in the above-entitled action. I respectfully submit this Declaration in opposition to Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment, and in Support of Plaintiff's Motion For Discovery Under Rule 56(f). I am fully familiar with the facts and circumstances set forth herein.

2. I possess personal knowledge and am competent to address the specific factual matters herein, except as to those which I have asserted upon information and belief.

3. As explained below and in Plaintiff's Memorandum, there are numerous instances where Plaintiff has already demonstrated that there are disputed issues of material fact as to whether Plaintiff was properly designated as a "specially designated global terrorist" ("SDGT") and that the Administrative Record contains materials that are not credible. However, without

-1-

any details of the conclusions set forth in the OFAC Memorandum,[1] it is currently impossible for Plaintiff fully to respond to Defendants' motion, and therefore, Mr. Kadi should be afforded the opportunity to take the discovery set forth in detail below.

### A. Procedural History And Defendants' Reliance Upon Secret Evidence.

4. On January 16, 2009, Plaintiff filed an eight-count Complaint alleging that Defendants wrongfully designated him as an SDGT, and that such designation violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and numerous provisions of the U.S. Constitution (Doc. No. 1) (the "Complaint").

5. On May 22, 2009, in response to the Complaint, Defendants filed a Motion To Dismiss Or, In The Alternative For Summary Judgment (Doc. No. 12), in which Defendants seek summary judgment with respect to Count One of the Complaint and request this Court to adopt as undisputed facts various conclusions reached in the OFAC Memorandum (the "Motion").[2]

6. On May 22, 2009, Defendants also filed the 2,817 page public Administrative Record, *see* Doc. No. 13.

7. Additionally, on May 22, 2009, Defendants filed *ex parte* and *in camera* (i) a classified Supplemental Memorandum in Support of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment; and (ii) a Classified Supplement to the Administrative

---

[1] In or about March 2004, the Office of Foreign Assets Control ("OFAC") issued a final memorandum (hereinafter the "OFAC Memorandum") which purported to specify the evidence and bases for designating Mr. Kadi as an SDGT and for freezing his assets.

[2] By their Motion, Defendants also move to dismiss Counts Two through Eight of Plaintiff's Complaint for failure to state claims, based *inter alia*, on the ground that Mr. Kadi should not be afforded constitutional rights because he is a foreign national. As set forth in the accompanying Memorandum, Mr. Kadi has alleged numerous contacts with the United States that entitle him to such constitutional protections. For example, as set forth by letter from Mr. Kadi's counsel to Mr. Joseph Ferguson, Assistant United States Attorney, Plaintiff's claim to the $820,000 loan to (footnote continued)

Record. *See* Doc. No. 14. These materials were lodged with the Court and not served upon Plaintiff.

8. Since Defendants' Motion is supported by evidence that they have refused to provide to Plaintiff or his attorneys, on June 25, 2009, Plaintiff filed a Motion to Preclude Defendants from Relying on any Evidence that Defendants Refuse to Provide to Plaintiff or His Counsel (Doc. No. 18) (the "Classified Evidence Motion"). The Classified Evidence Motion seeks to preclude Defendants from relying on Classified Evidence to which Plaintiff or his counsel have not been provided access or, in the alternative, to require Defendants to implement reasonable less-restrictive means to relying on the Classified Evidence.

9. On July 8, 2009, Defendants filed an Opposition to the Classified Evidence Motion (Doc. No. 19) (the "Opposition").

10. On July 30, 2009, Plaintiff filed a Reply in Further Support of the Classified Evidence Motion (Doc. No. 25). As explained in the briefing on the Classified Evidence Motion, Defendants fail to even address their ability to provide Plaintiff with some form of access to the information being used against him by implementing less-restrictive reasonable alternatives to relying on secret evidence.

### B. Defendants Have Prematurely Moved For Summary Judgment Without Affording Plaintiff Any Opportunity To Conduct Discovery.

11. Defendants have moved for summary judgment on Plaintiff's First Cause of Action in the Complaint, pursuant to the APA, despite that fact that, ***no discovery has been taken in this litigation as yet.*** Moreover, Plaintiff and his counsel have not even been afforded an opportunity to review the evidence that has been submitted *ex parte* to the Court.

---

QLI has been blocked as a result of the freeze. A true and correct copy of the Letter to Joseph Ferguson, AUSA, dated June 26, 2009, from Guy Martin, Esq. is attached hereto as Exhibit "A."

12.     As set forth in detail in the accompanying Memorandum, even under the current, undeveloped record, the Motion must be denied, because there exist numerous genuine, material issues of fact as to whether Plaintiff was properly designated as a "specially designated global terrorist," and as to the reliability of the purported evidence in the Administrative Record.

13.     However, if the Court is not persuaded by Plaintiff's submissions in opposition to the Motion that such genuine, material issues of fact now exist, as explained below, the Court should still grant Plaintiff leave to conduct discovery to develop additional evidence of such issues of fact.

14.     In the Memorandum, Plaintiff sets forth numerous disputed issues regarding the materials relied upon by the Defendants in rendering their decision to designate Plaintiff as an SDGT. In addition, set forth below are illustrative examples of discovery that Plaintiff needs, and which are likely to lead to admissible evidence that would further preclude summary judgment in Defendants' favor. These examples are not comprehensive, nor can they be at this stage, because among other things, Plaintiff has no idea which, if any, of the documents in the 2,817 page Administrative Record (or the evidence that Defendants refuse to disclose) were relied upon by Defendants. Accordingly, at this juncture, Plaintiff still cannot fully detail the specific depositions that he may wish to take, specific documents he may seek to have produced, or specific interrogatories he will propound.

15.     While, at this preliminary stage, Mr. Kadi cannot state with precision exactly what proper discovery will uncover, as explained further below, various materials contained in Plaintiff's Submissions[3] to OFAC indicate that there is a substantial probability that discovery

---

[3] The "Submissions" include: the Witness Statement of Yassin Abdullah Kadi, dated December 17, 2001, at AR 92-280; Supplemental Witness Statement of Yassin Abdullah Kadi, dated July (footnote continued)

-4-

will reveal additional evidence contradicting and undermining the conclusions set forth in the OFAC Memorandum and the evidence upon which OFAC appears to have relied. Any and all such evidence is relevant, and must be developed before summary judgment may be granted.

### C. Plaintiff's Vindications Around The World Are A Compelling Reason To Grant Discovery.

16. As explained in the Memorandum, Defendants' designation of Plaintiff as an SDGT started a worldwide chain reaction, causing Plaintiff's assets to be frozen around the world and authorities in various places to commence investigations into Plaintiff's alleged connection to terrorist activity, based on the same "evidence" relied upon by the Government.

17. However, to date, no authority that has permitted Plaintiff to defend himself has put forward any allegation that Mr. Kadi's legal team has not been able to refute comprehensively and conclusively. Nonetheless, the United States Government continues to refuse Plaintiff any reasonable opportunity to even understand the charges against him, let alone challenge those allegations. Plaintiff's vindication before various tribunals demonstrates why it is critical for Plaintiff to understand the charges against him and be afforded an opportunity to defend himself. For example:

18. On December 24, 2004, only months after Defendants issued the OFAC Memorandum against Mr. Kadi, authorities in Turkey issued a formal determination for Dismissal of Proceedings against Plaintiff. *See* Decision 2004/881 dated 30 December 2004, and

---

23, 2002, at AR 21-505; Yassin Abdullah Kadi Summary Presentation for OFAC, dated August 1, 2002, at AR 1068-1085; Statement of Yassin Abdullah Kadi, dated December 19, 2002, at AR 689-1067; Presentation for February 28th Meeting with OFAC, dated February 23, 2003, at AR 1184-1351; Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi, dated July 11, 2003, at AR 1357-1391; Submission of Yassin Abdullah Kadi to the Deputy Attorney General of Switzerland, Mr. Claude Nicati, Further to the Meeting at the Swiss Embassy in Riyadh on 1 July 2003, dated August 22, 2003, at AR 2020-2406 (collectively hereinafter Plaintiff's "Submissions").

Decision 2004/22072 dated 24 December 2004, true and correct copies of which are attached hereto as Exhibit "B." The Office of the Chief Public Prosecutor of the Republic of Turkey decided:

> ... there is no evidence or sign implying that [Mr Kadi] has relations with or assisted the illegal terrorist organisation Al-Qaida ... that the money transfers were made in conformity with the legal regulations, that there was nothing illegal about the commercial activities of the accused.

*Id.* at 3.

19. On December 26, 2004, after three years of thorough investigation, the prosecution authorities of the Republic of Albania formally decided to terminate the penal prosecution against Mr. Kadi, a true and correct copy of the decision, dated December 26, 2004, along with a copy of a certified translation is attached hereto as Exhibit "C." As stated by the prosecutor at the Attorney General's office:

> ... it cannot be achieved the conclusion that [Mr Kadi] has transferred funds for supporting terrorist activities through commercial companies owned by him in Albania. Being in these circumstances, when we have no sources of evidence against the citizen under investigation, [Mr Kadi], ... I value that the penal prosecution has to be terminated.

*Id.* at 4.

20. In August and September, 2006, a Swiss financial analyst, Pascal Jequier was instructed by the Swiss Examining Judge to examine all accounts in Switzerland of Mr. Kadi or entities associated with him (the "Swiss Reports") and concluded that in the case of each and every account *"the account ... does not include ... blatant indications of an activity of terrorist organisation financing,"* and confirmed that the accounts of Mr. Kadi's family members were not transit accounts. Swiss Reports at 54-62, a true and correct copy of which is attached as Exhibit "D."

21. On December 28, 2006, the Public Prosecutor's Office of the Republic of Turkey issued a formal decree, a true and correct copy of which is attached hereto at Exhibit "E," stating:

> It is not justified to initiate an investigation about the suspects [Mr Kadi... and others] as sufficient evidences were not collected to be able to institute a public action for the offences alleged.

*Id.* at 5.

22. Following 6 years of investigation by Swiss authorities, criminal proceedings against Plaintiff, which were initiated following his designation as an SDGT, were abandoned. *See* Letter from Swiss Deputy Attorney General Claude Nicati to Mr. Kadi's Swiss counsel, Marc Bonnant, dated December 17, 2007 and English translation, along with the exhibits annexed thereto, a true and correct copy of which is attached hereto as Exhibit "F."

23. Following his designation, as discussed in detail below, Swiss investigators conducted a thorough investigation into Mr. Kadi, working with law enforcement agencies throughout the world. *Id.* at 5. The Swiss abandoned their investigation even though OFAC provided extensive cooperation to the Swiss, including access to OFAC's files. *Id.* at 1.

24. On September 3, 2008, the Grand Chamber of the European Court of Justice ("ECJ") in Luxemburg delivered a landmark decision allowing Mr. Kadi's appeal to the European Court of Justice. *See Kadi v. Council of the European Union*, Joined Cases C-402/05 P and C-415/05 P (Sept. 3, 2008), a true and correct copy of the decision is attached hereto as Exhibit "G." The 14 judges of the ECJ ruled that the earlier judgment of the Court of First Instance must be set aside and that the contested freezing regulation must be annulled insofar as it relates to Mr. Kadi and further held that it had jurisdiction to review *whether the contested freezing regulation complied with fundamental human rights. Id.*

25. The ECJ concluded that Mr. Kadi's fundamental right to be heard and his right to effective judicial review were *"patently not respected."* *Id.* at ¶ 334. The ECJ also decided that the freezing regulation constituted an unjustified restriction of Mr. Kadi's right to property. *Id.* at ¶ 370.

26. On February 26, 2009, Mr. Kadi applied under Article 230 of the EC Treaty for the annulment of the latest EU freezing regulation, Commission Regulation 1190/2008, on the grounds that it lacks a sufficient legal base, infringes Mr. Kadi's right to a fair hearing and to effective judicial protection, violates the obligation to state reasons, is based on a manifest error of assessment, and is an unjustified interference with Mr. Kadi's right to property. *See, Kadi v. Commission of the European Communities*, ECR T- 85/09, (Feb. 26, 2009), a true and correct copy of which is attached hereto as Exhibit "H." As Mr. Kadi explains in his application, three months after the Court of Justice annulled Regulation 881/2002 on the ground that the Community institutions had patently failed to respect his fundamental rights, the Commission adopted the same draconian measure without a proper legal basis, in disregard of the judgment of the Court of Justice and without adequately safeguarding Mr. Kadi's rights of defense. *Id.* In applying for annulment of the latest freezing regulations, Mr. Kadi is seeking enforcement of the ECJ ruling of September 3, 2008, insofar as the freezing regulations relate to him.

D. **The Information Relied Upon By Defendants Has Been Discredited And Discovery Should Be Permitted To Further Demonstrate Such Unreliability.**

27. The contents of the unclassified portions of the Administrative Record reveal that OFAC has relied upon "news" reports and articles, and other "sources," which have already been discredited as unreliable and/or false. For example, *seven* of the ten citations referred to in the 2 page document faxed from the Department of Treasury to government officials in the United Kingdom, AR 39-40 (the "Fax") are to "articles," *two* of them are to websites, and the only non-

media report cited is the Affidavit of Robert Wright, FBI, dated June 8, 1998 ("Wright Affidavit"), which has been widely discredited as discussed below.

28. The Fax states that "Saudi businessmen have been transferring millions of dollars to Bin Laden through Blessed Relief," AR 39, and cites to a USA Today article, entitled "Saudi Money Aiding bin Laden," dated October 29, 1999, by Jack Kelley, AR 161-62. However, Jack Kelley was forced to resign following an investigation and USA Today withdrew the article from their website and published a correction, a true and correct copy of which is attached hereto as Exhibit "I" stating that:

> Kelley a reporter **was found recently to have fabricated several high-profile stories.**

*Id.*

29. Furthermore, the claims regarding Mr. Kadi's alleged connections to Hamas are derived from the Wright Affidavit, which contains fundamental misstatements of fact and as a result, unjustifiable conclusions and inferences regarding Plaintiff. Mr. Wright's poorly investigated assertions and illogical conclusions have been specifically refuted in detail in the Submissions, and further below. *E.g.*, AR 309-335. Indeed, subsequent events have shown those conclusions to be wholly unsustainable, notably, the acquittal of Muhammad Salah of charges that he financed Hamas. In fact, Mr. Wright has been severely discredited, following separate disciplinary charges brought by the FBI over allegations of insubordination and unprofessional conduct, resulting in the termination of his employment. *See. e.g.*, FBI TO FIRE DISSIDENT AGENT, by John Mintz, Washington Post, April 23, 2005; A10, a true and correct copy of which is attached hereto as Exhibit "J."

30. Similarly, Defendants' allegations concerning a purported $500,000 transfer appear to be derived from an allegation contained in a document written by the discredited

investigator and journalist Jean-Charles Brisard entitled "Report on Illegal Financial Activities And Terrorism Financing on The Territory of the Federation of Bosnia Herzegovina" (the "Brisard Bosnian Banking Report"), a true and correct copy of which is attached hereto as Exhibit "K." AR 2780-82. Contrary to Mr. Brisard's claims, the Brisard Bosnian Banking Report was never requested or commissioned by the United Nations. AR 2783. To be clear, the Muwafaq Foundation never transferred any funds to any terrorist organization whatsoever, in the Balkans or elsewhere.

31. Mr. Brisard was also responsible for authoring "Terrorism financing: roots and trends of Saudi terrorism financing" ( the "UN Report"), again purportedly commissioned by the President of the UN Security Council. AR 2623 n.30 ("In their report "terrorism financing", the United Nations indicates that [Mr. Kadi] is one of the main sponsors of Al Qaeda."). Contrary to Mr. Brisard's claims, the UN Report *was never requested or commissioned by the United Nations*. AR 2783. Indeed, the President of the UN Security Council, at the time, stated in regard to such claim and with respect to Mr. Brisard "[i]n summary, I regard that Mr. Brisard's conduct and attitude have been deceitful and marked by the intention to mislead." *Id.* Subsequently, in connection with a libel action against Mr. Brisard for statements made in, *inter alia*, the UN Report, the English High Court stated "[n]ot only did M Brisard mislead the court . . . . but, despite his professed intention, he has not . . . sought to justify those serious allegations . . . ." *Mahfouz v Brisard & Others* (2004) EWHC 1735 (QB) at ¶ 32, a true and correct copy of which is attached hereto as Exhibit "L."

32. Thereafter, Mr. Brisard issued an apology: "the Report contain[s] very serious and highly defamatory allegations . . . alleging support for terrorism . . . we accept and acknowledge that all of those allegations . . . are entirely and manifestly false." *See* "An apology to Sheikh

Khalid Bin Mahfouz and Sheikh Abdulrahman Bin Mafouz," October 2006, a true and correct copy of which is attached hereto as Exhibit "M." Additionally, Mr. Brisard signed a statement unconditionally retracting and withdrawing his allegations, including those concerning the Muwafaq Foundation. *See* the Witness Statement of Jean-Charles Brisard, dated October 4, 2006, at ¶¶ 26-27, a true and correct copy of which is attached hereto as Exhibit "N" ("I have no evidence . . . to indicate that Sheikh Khalid [Bin Mahfouz] donated this money for anything other than humanitarian and charitable purposes.").

33. Moreover, numerous lengthy exchanges between the Government and Swiss authorities concerning Plaintiff, stretching from October 2001 through March 2007 (the "Swiss Documents"), a true and correct copy of which are attached hereto as Exhibit "O," further reveal the unreliable nature of the evidence relied upon by OFAC.[4]

34. The Swiss Documents demonstrate that the cooperation between the Government and Switzerland was profound and lengthy. *See generally*, the Swiss Documents. To be clear, after Switzerland thoroughly investigated *the same evidence used to brand Plaintiff an SDGT, it abandoned its investigation.*

35. Indeed, it appears that the Swiss authorities may have been provided with access to the Classified Evidence. For example, by International Rogatory Letters, dated March 23, 2007, the Swiss Federal Examining Magistrate asks the United States for *"access to the documents which are filed with OFAC in Washington . . ."* Ex. O-31 at 3.

---

[4] Upon information and belief, in early 2004 Swiss Deputy Attorney General Claude Nicati engaged Jean-Charles Brisard as an expert in the criminal investigation in Switzerland. Given the foregoing, in August 2004, Mr. Nicati was forced to withdraw the mandate he had given to Mr. Brisard.

36. Some of the information in the Swiss Documents relates to a "Cooperating Witness." *See, e.g.,* Ex. O-18, (Cooperating Witness interview, dated June 2, 2004 hereinafter the "Cooperating Witness Statement"), Ex. O-20 (Complementary Request for Mutual Assistance in Criminal Matters, dated June 25, 2004).

37. While OFAC has never revealed to Plaintiff whether it has relied on the "Cooperating Witness Statement," they presumably have, given that it was provided to Swiss authorities in response to a request for information about Plaintiff. However, the Cooperating Witnesses Statement is riddled with falsehoods and errors, which were detailed by Mr. Kadi's Swiss counsel, Marc Bonnant, and submitted to Mrs. Bino. *See* Letters to the Office of the Federal Investigating Magistrates, Mrs. Maria-Antonella Bino, dated April 18, 2007 and May 24, 2007, from Marc Bonnant, Esq. with English translations, true and correct copies of which are attached hereto as Exhibit "P."

38. Notably, the Cooperating Witness Statement was not given under oath nor subject to the penalty of perjury. A deposition by contrast, would elicit sworn testimony.

39. Finally, six-months after Plaintiff's designation, OFAC officers conducted a review in Albania of "the Kadi documents." A true and correct copy of the review (hereinafter the "Albania Trip Report") is attached hereto as Exhibit "Q." One of the "team's goals . . . was to look for evidence that supports the designation of Sheik Yassin Kadi as a Specially Designated Terrorist under U.S. Executive Order and [to] assist the Albanian government in its criminal money laundering case against the companies and Kadi." Ex. Q at 3. Following the teams' extensive document review, the Albania Trip Report concluded that any alleged support for Mr. Kadi's designation was "[u]nfortunately . . . based on the *circumstantial/hearsay evidence* that we uncovered while in Albania . . . ." Ex. Q at 4 (emphasis added).

40. In sum, Defendants have designated Plaintiff as an SDGT based on a record that, at a minimum, is unreliable and is potentially false. Therefore, Plaintiff should be afforded discovery to demonstrate such fallibility and to determine the basis for his designation so that he has at least some opportunity to challenge the evidence being used against him. Among other things, some discovery is necessary to determine the evidence upon which OFAC has relied. For example, Plaintiff should be entitled to discover:

- whether the Cooperating Witness Statement[5] is part of the Classified Evidence and, if so, be provided an opportunity to rebut the allegations and challenge the credibility of the Cooperating Witness Statement, including proving that the "source" in fact, *has never even met Mr. Kadi.*

In addition, if the Government is in any way relying on the Wright Affidavit (or the subsequent proceeding spawned by the affidavit), Plaintiff should be afforded discovery:

- to further discredit the claims of the Wright Affidavit, including, Mr. Wright's disciplinary proceedings, suspension and his subsequent employment termination.

Similarly, Plaintiff must be permitted to demonstrate, if necessary, that in fact:

- Mr. Saleh, to whom OFAC claims Mr. Kadi is linked in support of his designation, appears to be a person that *Plaintiff does not even know.*[6]

---

[5] Obviously, neither Plaintiff nor his counsel were present for this interview. Deposition of this witness, whose testimony appears relevant to the present motion, will permit Plaintiff's counsel to show the witness key documents, and ask him about key inconsistencies, in order to develop a record that includes both a truthful and a complete rendition of his actual knowledge. The accuracy and reliability of witness testimony is essential when determining whether genuine disputes of material fact exists. Therefore, Plaintiff may need to depose other witnesses with relevant information who would refute Defendants' allegations.

[6] Dr. Abdul Latif Saleh appears to have been confused with another individual of Egyptian nationality who allegedly belongs to the banned Muslim Brotherhood, whom Mr. Kadi does not know and has never met. *See CIA Arrests Bin Laden Associate*, THE INDEPENDENT, November 15, 1999, a true and correct copy of which is attached hereto as Exhibit "R."

41. In order to oppose the Motion, Plaintiff must be afforded discovery which would at least provide him with some opportunity to refute the allegations in the OFAC Memorandum, including, but not limited to:

- discovery regarding the materials that OFAC relied upon in rendering its decision to designate Mr. Kadi as an SDGT, including discovery from individuals involved in the decision to designate him;

- discovery regarding the materials OFAC determined not to rely upon in rendering its decision to designate Mr. Kadi as an SDGT;

- discovery concerning any analysis by OFAC of the Submissions, including whether OFAC contests portions of Plaintiff's Submissions and in what regard; and

- discovery to determine the basis for his designation and opportunity to challenge such evidence.

42. Given the Government's bizarre conclusion in the OFAC Memorandum, that "[n]o one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that [Plaintiff] has been providing support to terrorists through his actions," AR 22, Plaintiff should be afforded the discovery he seeks herein, to determine, *inter alia*, the specific basis for his designation,[7] what specific evidence in the Administrative Record OFAC is relying upon to support his designation, which statements in the Submissions are not credible to the Government and the basis for such determination, and what additional evidence OFAC requires so that Plaintiff has some opportunity to lift the designation and clear Plaintiff's name.

---

[7] For example, Defendants may have relied upon the 1 page document faxed from the Department of Treasury to government officials in the United Kingdom, a true and correct copy of which is attached as Exhibit "S," in support of their designation of Mr. Ayadi as an SDGT, which in turn supports Mr. Kadi's designation. However, this document evidences the circular and self-referential, basis for Plaintiff's designation as both Chafiq Ayadi and Plaintiff were designated on grounds of association with the other.

43.    Indeed, the OFAC Memorandum contains numerous allegations which are merely conclusory statements without any supporting detail. Absent any detail about the conclusions set forth in the OFAC Memorandum, it is impossible for Plaintiff to respond.

44.    Therefore, Plaintiff should also be permitted to take discovery regarding the specific allegations in the OFAC Memorandum, including, but not limited to, discovery to determine:

- How the Muwafaq Foundation is alleged to have "operated under the umbrella of Makhtab Al-Khidamat"? Defs.' Br. at 10;

- The basis for and sources of OFAC's claim that "Dr. Abdul Latif Saleh, Kadi's business partner in Albania and the head of operations in Muwafaq's Albania office, was the founder and organizer of the Albanian Islamic Jihad ("AIJ")." Defs.' Br. at 11;

- The basis for and sources of OFAC's allegation that "Kadi acknowledged in 2001 that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkans." Defs.' Br. at 11;

- Details regarding the letter allegedly found in 2002 "apparently addressed to Usama bin Laden referenced [Kadi's] managing money for Bin Laden in Sudan. The letter also referred to [Kadi] as one of Bin Laden's former managers . . . [Kadi] often boasted of personally and occasionally meeting with Bin Laden in Afghanistan, Saudi Arabia and the Sudan," Defs.' Br. at 11, including the basis for and sources of such allegations;

- The details concerning each of the "several firms" in Albania allegedly owned by Mr. Kadi which "funneled money to extremists or employed extremists in positions where they controlled the firms' funds." Defs.' Br. at 11;

- The "working capital" allegedly provided by Bin Laden "for four or five of Kadi's companies in Albania" and the identity of such companies. Defs.' Br. at 11;

- The details of Mr. Kadi's alleged relationship with Asbat al-Ansar and the basis for such allegations. Defs.' Br. at 11;

- The details of the "logistical and financial support" alleged to have been provided by the Foundation for a mujahadin battalion in Bosnia. Defs.' Br. at 16;

- The details of the alleged "financial support" provided by the Foundation in the mid 1990s for the alleged terrorist activities of the mujaheddin. Defs.' Br. at 16;

- The details of all alleged "arms trafficking" alleged to have been carried out by the Foundation from Albania to Bosnia. Defs.' Br. at 16;

-15-

- The details of the allegation that "some involvement in the financing of these activities was provided by Usama Bin Laden." Defs.' Br. at 16; and

- The details of the allegation that Mr. Kadi "continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996, including . . . The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation," Defs.' Br. at 17, including the identity of such institutions and organizations, the source for such allegation, each transaction evidencing that funds were "funneled" to such organizations and the purposes for which such funds were deployed, and how Mr. Kadi is alleged to be connected to The Revival of Islamic Heritage Society or Al-Haramain Foundation.

## **CONCLUSION**

45. In sum, in the event that the Court is not already persuaded that disputed issues of material fact exist such that Defendants' summary judgment motion should be denied, discovery is absolutely necessary.

46. Plaintiff therefore respectfully requests that Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment be DENIED, or in the alternative, continued until the completion of discovery in the ordinary course of this litigation.

**WHEREFORE**, it is respectfully requested that Defendants' Motion To Dismiss Or, In The Alternative For Summary Judgment, be denied, together with such further relief as the Court deems just and proper.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 14, 2009.

_____
Daniel L. Brown

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of August 2009, I caused a copy of the foregoing Declaration of Daniel L. Brown in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, and in Support of Plaintiff's Motion for Discovery Under Rule 56(f) to be filed with the Court, via the Court's ECF system, which will send copies to the following counsel of record:

> Eric J. Beane, Esq.
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., N.W., Room 7124
> Washington, D.C. 20001

> By:   /s/ David F. Geneson
>         David F. Geneson