# EXHIBIT O-1



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

UNDER SECRETARY

October 9, 2001

Dear Colleague,

Please find enclosed an advance copy of an additional list of foreign individuals, groups and entities that the U.S. determined to have committed or to pose a significant risk of committing or providing material support for acts of terrorism. As of 8:00 a.m. Thursday, October 11, Washington time, this group of names will be distributed to U.S. financial institutions, updating the original list of 27 individuals, groups and entities whose assets were blocked pursuant to a September 23 Executive Order because of their ties to terrorism.

We greatly appreciate the fact that each of you has already taken significant steps to block terrorist assets. In this case, while the enclosed list is not yet public, we request that you take immediate action to ensure that newly-designated individuals, groups or entities cannot access any of their assets that might reside in your jurisdiction. However, in order to ensure that the terrorist groups or those acting for them do not move their assets before the effective date of U.S. implementation, we request that you maintain the enclosed list in strict confidence until we notify you that this list has been made public. We are still in the process of collecting individual identifier information, and we will provide you with this information in a separate communication as soon as it is available.

Again, I thank you for the superlative cooperation you have shown to date, and for your continuing assistance going forward.

Sincerely,

John B. Taylor

Enclosure

## Second Tranche of Names

1. Al Shifa Honey Press for Industry and Commerce
2. Al-Hamati Sweets Bakeries
3. Al-Nur Honey Press Shops (aka, Al-Nur Honey Center)
4. Ayadi Chafiq bin Muhammad
5. Dr. Amin Ah Haq (Dr. Amin ul-Haq)
6. Haji Abdul Manan Agha
7. Jam'yah Ta'awun al-Islamia (Society of Islamic Cooperation)
8. Mohammad Zia
9. Mufti Rashid Ahmad Ladehyanoy
10. Muhammad al-Hamati (aka, Mohammad Hamdi Sadiq al-Ahdal)
11. Omar Mahmoud Uthman (aka, Abu Qatada al-Filistini
12. Riad Hijazi (aka, Abu-Ahmad al-hawen, Rashid al-Maghribi, Abu-Ahmad al-Amriki, and Abu-Ahmad al-Shahid)
13. Tohir Yuldashev
14. Yasin al-Qadi (aka, Shaykh Yassin Abudullah Kadi) ←
15. AL-JADAWI, Saqar
16. Al-kadr, Ahmad Sa'id
17. AL-SHARIF, Sa'd
18. BIN MARWAN, Bilal
19. DARKAZANLI, Mamoun
20. Rabita Trust
21. Jaish-I-Mohammed (JIM)

# EXHIBIT O-2

✚ **Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice**
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

3003 Berne, October 9, 2001

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf.
Vostro rif.

Unser Zeichen
Notre réf. **B 128 909 Bog**/Fc

Nostro rif.

*In replying please
quote this file number*

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

**1 0. OKT. 2001**

**REGISTERED AIRMAIL**
U.S. Department of Justice
Criminal Division
Office of International Affairs
P.O. Box 27330
US-Washington, D.C. 20038-7330

Also by fax (pages 20)

---

## *Swiss MLAT request in the case WTC*

---

Dear Mrs Toledo,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above mentioned case.

The Deputy Attorney General of Switzerland, Mr. Claude Nicati is conducting an investigation against unknown persons for homicide, endangerment through air transportation, murder, coercion, hostage taking, etc. All the relevant details concerning the facts of the case, and the requested assistance may be taken out of the enclosed MLAT request dated October 8, 2001 and its respective translation.

Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

*sig. Bomio*

G. Bomio

Enclosures mentioned



SCHWEIZERISCHE BUNDESANWALTSCHAFT
MINISTERE PUBLIC DE LA CONFEDERATION
MINISTERO PUBBLICO DELLA CONFEDERAZIONE
PROCURA FEDERALA

3003 Berne
Taubenstrasse 16

☎ +41 (0)31 322 45 30
fax +41 (0)31 322 45 07
e-mail claude.nicati@ba.admin.ch
Votre Réf.
Notre Réf. Nic

Berne, le 8 octobre 2001

**Department of Justice**
**Office of International Affairs**
**USA**
Par l'intermédiaire de
L'Office fédéral de la justice
3003 Berne

# Requête d'entraide judiciaire internationale urgente

Madame, Monsieur, cher collègue,

## 1. Procédure ouverte en Suisse

Par décision du samedi 15 septembre 2001, le Ministère public de la Confédération a ouvert une procédure pénale contre inconnu(s) pour violation des art. 90ss de la loi fédérale sur l'aviation (LA; RS 748.0), en liaison avec les art. 5 et 6bis CPS, à associer aux art. 111, 112, 181, 183, 184, 185 et 340 CPS.

Ces infractions sont liées aux détournements d'avions commis aux USA le mardi 11 septembre 2001, lesquels ont conduit à l'écrasement de ceux-ci sur trois immeubles occasionnant ainsi la mort de plusieurs milliers de personnes, dont un nombre encore indéterminé mais important de ressortissants suisses.

L'enquête ouverte en Suisse a notamment pour but de déterminer si des infractions ont été commises en Suisse et si les auteurs présumés de ces attentats ont pu disposer, dans notre pays, d'un soutien de quelque nature que ce soit (financier, logistique, etc.).

## 2. Objet de la requête

La présente demande d'entraide judiciaire vise à obtenir de la part des autorités judiciaires américaines les informations qu'elles possèdent et qui ont un quelconque lien avec la Suisse. Elle vise aussi à obtenir les éléments actuellement en mains des autorités judiciaires américaines sur le rôle joué par Ossama Ben Laden dans la commission ou l'organisation de ces attentats.

### 3. Compétence

Le Ministère public de la Confédération est, en application de la législation suisse, compétent pour solliciter l'entraide judiciaire internationale.

### 4. Urgence

L'urgence est demandée en application de l'art. 31 ch. 5 du Traité d'entraide passé entre la Confédération suisse et les Etats-Unis d'Amérique[1], d'une part en raison de la gravité des infractions commises et des conséquences gravissimes de celles-ci et d'autre part car il existe un risque important que les auteurs ou les commanditaires de ces attentats disparaissent ou mettent le temps à profit pour faire disparaître des éléments de preuve.

### 5. Bilan sommaire des investigations en Suisse

A ce jour, les recherches conduites en Suisse ont permis de mettre en évidence que :

- Au moins deux des auteurs ont transité par la Suisse avant le 11 septembre dernier.
- Qu'ils ont procédé à l'achat de couteaux suisses dans l'aéroport de Zürich, que ceux-ci ont été retrouvés à Boston dans les bagages de Mohamad ATTA.
- Qu'ils ont effectué des prélèvements d'argent dans ce même aéroport à hauteur de CHF 1'700.-.
- Dans un premier temps, aucun délit d'initiés n'ait été commis au sein de la bourse suisse. En particulier, les organes compétents n'ont pas mis en évidence que des personnes physiques ou morales n'ait spéculé sachant que le 11 septembre 2001 des avions de ligne allaient s'écraser sur sol américain en provoquent les dommages et les morts que nous connaissons.

### 6. Information de la part des USA

Il ressort des informations lues dans la presse qu'Ossama Ben Laden est le principal suspect aux yeux des autorités américaines.

A ce jour, les autorités judiciaires ou policières suisses en charge du dossier n'ont reçu des autorités américaines aucun éléments susceptible de confirmer ces affirmations.

---

[1] Traité du 25 mai 1973 entre la Confédération suisse et les Etats-Unis d'Amérique sur l'entraide judiciaire en matière pénale; ci-après Traité; RS 0.351.933.6

### 7.    Objet de la requête

3

La présente requête vise à obtenir des autorités judiciaires américaines compétentes la transmission de tous les éléments en leur possession démontrant:

- les accusations qu'elles portent à l'encontre d'Ossama Ben Laden;
- les accusations qu'elles portent à l'encontre des membres de la famille d'Ossama Ben Laden, en particulier en ce qui concerne Yeslam Ben Laden, demi-frère d'Ossama, citoyen suisse établi à Genève;
- l'implication de sociétés, associations ou autres personnes morales sises en Suisse;
- l'implication d'autres personnes physiques ayant leur domicile en Suisse;
- l'implication de bureaux d'avocat, de fiduciaires ou de tous autres intermédiaires financiers sis en Suisse.

La présente requête vise également à ce qu'une délégation du Ministère public de la Confédération composée en tous les cas du soussigné et de deux enquêteurs de la police judiciaire fédérale puissent rencontrer le ou les procureurs en charge de ce dossier et les officiers de police (FBI) procédant aux investigations en liaison avec la Suisse.

Dans le cadre de cette demande d'entraide, vu l'urgence, il est demandé que le magistrat soussigné puisse directement disposer des éléments de preuve (documents, rapports, etc.).

### 8.    Réciprocité

Le Ministère public de la Confédération, par l'intermédiaire du soussigné, profite de l'occasion pour assurer aux autorités judiciaires américaines l'entière réciprocité et son éventuel soutien dans le cadre des investigations qu'ils conduisent en liaison avec ces tragiques événements.

Veuillez croire, Madame, Monsieur et cher collègue, à l'expression de notre haute considération.

### 9.    Langue

Cette demande d'entraide judiciaire est adressée en français avec une traduction en langue anglaise.

LE SUBSTITUT DU
PROCUREUR GÉNÉRAL

Claude Nicati

**Annexes:** Textes législatifs

### Article 90 (Swiss Federal Law on Aviation; LA; RS 748.0)

#### 3.   Endangerment through air transportation

[1] Whosoever wilfully disregards the legal provisions or accepted rules of transportation, whether as captain, crew member or passenger, and in so doing knowingly endangers the life or property of third parties shall be punished with a term of imprisonment of up to three years.

[2] Should the offender behave in a negligent manner the punishment shall be a term of imprisonment of up to six months or a fine of up to CHF 10,000.

### Article 98 (Swiss Federal Law on Aviation; LA; RS 748.0)

#### II. Jurisdiction

[1] Offences committed on board an aircraft, with the reservation of para. 2 are subject to federal criminal jurisdiction.

[2] Offences committed in the sense of article 91 shall be pursued and judged in accordance with the Federal Law on Administrative Criminal Law by the appropriate Federal Office.

[3] Should the punishable offences be committed on board foreign aircraft over Swiss soil, or on board Swiss aircraft outside Switzerland, the Swiss authority responsible for conducting the criminal proceedings may abstain from so doing.

### Article 111 (Swiss Criminal Code; SCC; RS 311.0)

#### 1.   Homicide, voluntary manslaughter

Whosoever intentionally kills a person, where none of the particular conditions contained in the following article apply, shall be punished with a term of penal servitude of not less than five years.

### Article 112 (Swiss Criminal Code; SCC; RS 311.0)

#### Murder

Should the offender behave in a manner which is particularly unscrupulous, where the motive, the purpose of the crime or the manner in which it was conducted are so reprehensible, the punishment shall be penal servitude for life or for a term of not less than ten years.

### Article 181 (Swiss Criminal Code; SCC; RS 311.0)

**Coercion**

Whosoever by use of force or threat of serious detriment or other restriction of another's freedom to act compels another to carry out an act, desist from carrying out an act or tolerate an act shall be punished with imprisonment or a fine.

### Article 183 (Swiss Criminal Code; SCC; RS 311.0)

**Deprivation of Liberty and Abduction**

[1] Whosoever unlawfully arrests or holds prisoner or otherwise unlawfully deprives another of his liberty

whosoever by the use of force, false pretence or threat takes another away from one location and holds him against his will at a different location

shall be punished with a term of penal servitude of up to five years or imprisonment.

[2] Equally, whosoever abducts a person not capable of reason or resistance or less than sixteen years of age shall incur the same punishment.

### Article 184 (Swiss Criminal Code; SCC; RS 311.0)

**Aggravating Circumstances**

Deprivation of liberty and abduction shall be punished with penal servitude when

the offender attempts to obtain a ransom

the offender treats the victim(s) in a cruel manner

the deprivation of liberty lasts more than ten days

the health of the victim(s) is significantly endangered.

### Article 185 (Swiss Criminal Code; SCC; RS 311.0)

**Hostage taking**

[1] Whosoever deprives another of his liberty, abducts or otherwise seizes another person in order to coerce another to carry out an act, desist from carrying out an act or tolerate an act

whosoever exploits a situation created in the foregoing manner by another in order so to coerce a third party

shall be punished with penal servitude.

[2] The punishment shall be a term of penal servitude of not less than three years when the offender threatens to kill, grievously harm or cruelly treat the victim(s).

[3] In particularly serious cases, namely when the offence involves a number of people, the offender may be punished with penal servitude for life.

[4] Should the offender retreat from coercion and release the victim(s), he may be more leniently punished (Art. 65).

[5] Equally punishable is he who commits the offence abroad, should he be arrested in Switzerland and not extradited. Article 6 figure 2 is applicable.


## Article 340 (Swiss Criminal Code; SCC; RS 311.0)

### Federal Jurisdiction

### Scope

[1] The following are subject to Federal Jurisdiction:

the punishable offences of the first and fourth chapters, as well as articles 140, 156, 189 and 190 in so far as they are directed against persons protected under international law;

the punishable offences of articles 137-141, 144, 160 and 172[ter] in so far as they concern premises, archives and documents of diplomatic missions and consular posts;

hostage taking in accordance with article 185 on coercion of authorities of the Confederation or foreign authorities;

felonies and misdemeanours contained in articles 224-226;

felonies and misdemeanours of the tenth chapter regarding coinage, paper money and banknotes, official postage stamps and other symbols of the Confederation, measures and weights;

the felonies and misdemeanours of the eleventh chapter in so far as documents of the Confederation are concerned;

the punishable offences of article 260[bis] as well as those of chapters thirteen to fifteen and of chapter seventeen in so far as they are directed against the Confederation, the authorities of the Confederation, against the will of the people in federal elections, votations, referenda or initiatives, against federal authority or justice; further, the felonies and misdemeanours of the sixteenth chapter and the felonies and misdemeanours committed by a member of the authorities or federal employee or punishable offences of the eighteenth and nineteenth chapters directed against the Confederation and the violations of articles 329-331;

the political felonies and misdemeanours, which are the cause or result of unrest, or through which an armed intervention of the Confederation is prompted.

[2] The punishable offences of the twelfth chapter [bis] are also subject to federal jurisdiction.

[3] The provisions contained in particular Federal Laws regarding the jurisdiction of the Federal Supreme Court are reserved.

**Request for judicial co-operation from Nicati to US Department of Justice 8 October 2001**

1. Proceedings commenced in Switzerland

By a decision of Saturday 15 September 2001 the Public Prosecutor opened criminal proceedings against unknown persons for violation of articles 90 ss of federal aviation law together with arts 5 and 6b CPS, and articles.....

These offences are linked to the hijacking of aeroplanes in the USA on Thursday 11 September 2001 which led to the these crashing into three buildings and causing the death of several thousands people, among whom a still undetermined number of Swiss nationals.

The goal of the investigation in Switzerland is to establish whether offences were committed in Switzerland and if the presumed culprits behind these acts were able to rely on support of some sort ( financial, logistic) in our country.

2. The object of the request

The present request for judicial co-operation aims to obtain from the American judicial authorities the information they possess which has any link with Switzerland. The request also aims to obtain information presently in the hands of the American judicial authorities on the role played by Bin Laden in the commission or organisation of these attacks.

3. Competence
The Public Prosecutor is, under Swiss legislation, competent to request international judicial co-operation.

4. Urgence
It is urgent.....

5. Summary of the investigations in Switzerland

To date the research conducted in Switzerland have allowed it to be shown that

- at least two of the perpetrators of the attacks travelled through Switzerland before Sep 11 last

- that they bought Swiss Army Knives at Zurich airport which were found in Boston in Mohamad Atta's luggage

- that they withdrew money in the same airport up to a sum of 1,700 Swiss francs

- first, no insider trading took place within the Swiss Stock Exchange. In particular the competent bodies did not show that individuals or legal persons had speculated knowing that on 11 September 2001 aeroplanes would crash on American soil causing the damage and death that they did.

6. Information held by USA

PCR1-217223.1

It seems from information read in the press that Ossama in Laden is the principal suspect in the eyes of the American authorities

To date, the Swiss judicial or police authorities in charge of the file have not received from the American authorities any information to confirm these assertions.

7. Purpose of the request

The present request aims to obtain from the competent American judicial authorities all information in their possession demonstrating:

- The accusations they make against OBL

- The accusations they make against OBL's family, in particular concerning Yeslam Ben Laden, half brother of Ossama, Swiss citizen established in Switzerland

- The involvement of Swiss companies, associations or other legal entities in Switzerland

- The involvement of other individuals living in Switzerland

- The involvement of law firms, fiduciaries or all other financial intermediaries in Switzerland

The present request aims equally to bring about a meeting between a delegation from the Swiss Prosecutor's office composed in any case of Nicati and two investigators from the federal judicial police or the prosecutors in charge of this file and the FBI officers liaising with Switzerland.

In the context of this request for assistance, given the urgency, it is requested that the under-signed magistrate provides this proof ( documents, reports etc).

8. Reciprocity
The Public Prosecutor, through the intermediary of Nicati, uses this occasion to assure the American Authorities of its support in the context of the investigations they are conducting in connection with these tragic events.

PCR1-217223.1

# EXHIBIT O-2A

11/10 '01 08:08 FAX +41 31 3230833        MONETARY/ECONOMY/FINANCE          ☑002/009
                                              US TREASURY DEPARTMENT                    ☑001
10/09/01  TUE 21:35 FAX 2026221829

18 02 0001

# DEPARTMENT OF THE TREASURY



1500 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20220

| | | |
|---|---|---|
| **Date:** | October 9, 2001 | **Page 1 of 3** |
| **To:** | Mr. Peter Siegenthaler | FAX: 9-011-41-31-322-6187 |
| | Director, Finance Administration Switzerland | TEL: 9-011-41-31-322-6005 |
| **From:** | John B. Taylor Under Secretary for International Affairs | FAX: (202) 622-0417 TEL: (202) 622-0656 |

11/10 '01 08:08 FAX +41 31 3230833     MONETARY/ECONOMY/FINANCE          ☑003/009
                                       US TREASURY DEPARTMENT            ☑002
10/09/01  TUE 21:36 FAX 2026221829



DEPARTMENT OF THE TREASURY 18 02 0002
WASHINGTON, D.C.

UNDER SECRETARY

October 9, 2001

Dear Colleague,

Please find enclosed an advance copy of an additional list of foreign individuals, groups and
entities that the U.S. determined to have committed or to pose a significant risk of committing or
providing material support for acts of terrorism. As of 8:00 a.m. Thursday, October 11,
Washington time, this group of names will be distributed to U.S. financial institutions, updating
the original list of 27 individuals, groups and entities whose assets were blocked pursuant to a
September 23 Executive Order because of their ties to terrorism.

We greatly appreciate the fact that each of you has already taken significant steps to block
terrorist assets. In this case, while the enclosed list is not yet public, we request that you take
immediate action to ensure that newly-designated individuals, groups or entities cannot access
any of their assets that might reside in your jurisdiction. However, in order to ensure that the
terrorist groups or those acting for them do not move their assets before the effective date of U.S.
implementation, we request that you maintain the enclosed list in strict confidence until we
notify you that this list has been made public. We are still in the process of collecting individual
identifier information, and we will provide you with this information in a separate
communication as soon as it is available.

Again, I thank you for the superlative cooperation you have shown to date, and for your
continuing assistance going forward.

Sincerely,

John B. Taylor

Enclosure

18 02 0003

## Second Tranche of Names

1. Al Shifa Honey Press for Industry and Commerce
2. Al-Hamati Sweets Bakeries
3. Al-Nur Honey Press Shops (aka, Al-Nur Honey Center)
4. Ayadi Chafiq bin Muhammad
5. Dr. Amin Ah Haq (Dr. Amin ul-Haq)
6. Haji Abdul Manan Agha
7. Jam'yah Ta'awun al-Islamia (Society of Islamic Cooperation)
8. Mohammad Zia
9. Mufti Rashid Ahmad Ladehyanoy
10. Muhammad al-Hamati (aka, Mohammad Hamdi Sadiq al-Ahdal)
11. Omar Mahmoud Uthman (aka, Abu Qatada al-Filistini
12. Riad Hijazi (aka, Abu-Ahmad al-hawen, Rashid al-Maghribi, Abu-Ahmad al-Amriki, and Abu-Ahmad al-Shahid)
13. Tohir Yuldashev
14. Yasin al-Qadi (aka, Shaykh Yassin Abudullah Kadi)
15. AL-JADAWI, Saqar
16. Al-kadr, Ahmad Sa'id
17. AL-SHARIF, Sa'd
18. BIN MARWAN, Bilal
19. DARKAZANLI, Mamoun
20. Rabita Trust
21. Jaish-I-Mohammed (JIM)



# EXHIBIT O-2B

11/10 '01 08:09 FAX +41 31 3230833          MONETARY/ECONOMY/FINANCE          ☑005/009
                                            US TREASURY DEPARTMENT            ☑001
10/10/01  WED 22:09 FAX 2026221829

18 02 0004    # 567



# DEPARTMENT OF THE TREASURY

1500 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20220

RW, FF

**Date:**      October 10, 2001                          Page 1 of 5

**To:**        Mr. Peter Siegenthaler              FAX: 9-011-41-31-322-6187

                                                   TEL: 9-011-41-31-322-6005
               Director, Finance Administration
               Switzerland

**From:**      John B. Taylor                      FAX: (202) 622-0417
               Under Secretary for International Affairs    TEL: (202) 622-0656

11/10 '01 08:09 FAX +41 31 3230833     MONETARY/ECONOMY/FINANCE          ☒008/009
10/10/01  WED 22:00 FAX 2926221829.        US TREASURY DEPARTMENT              ☒002

18 02 0005



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C.

UNDER SECRETARY

October 10, 2001

Dear Colleague,

Please find enclosed the identifier information for the additional 21 names I transmitted to you on October 9 of foreign individuals, groups and entities that the United States has determined to have committed or to pose a significant risk of committing or providing material support for acts of terrorism. Please note that the scheduled release of these names to U.S. financial institutions has been moved from Thursday, October 11, to 8 a.m. Friday, October 12, Washington time. Again, these names will update the original list of 27 names whose assets were blocked pursuant to the September 23 Executive order. I ask that you maintain the enclosed list in strict confidence until after its release on Friday, October 12.

Also attached is a list of the 22 most wanted terrorists identified by the Attorney General of the United States. This list has just been announced by the White House, and I want to provide it directly to you. These individuals are all under indictment in the United States.

Thank you for your continuing cooperation in our efforts to combat the financing of terrorism.

Sincerely,

John B. Taylor

Enclosure

18 02 0006

## ENTITIES (6):

AL-HAMATI SWEETS BAKERIES, Al-Mukallah, Hadhramawt Governorate, Yemen.

AL-NUR HONEY PRESS SHOPS (a.k.a. AL-NUR HONEY CENTER), Sanaa, Yemen.

AL-SHIFA' HONEY PRESS FOR INDUSTRY AND COMMERCE, P.O. Box 8089, Al-Hasabah, Sanaa, Yemen; By the Shrine Next to the Gas Station, Jamal Street, Ta'iz, Yemen; Al-'Arudh Square, Khur Maksar, Aden, Yemen; Al-Nasr Street, Doha, Qatar.

JAISH-I-MOHAMMED (a.k.a. ARMY OF MOHAMMED), Pakistan.

JAM'YAH TA'AWUN AL-ISLAMIA (a.k.a. SOCIETY OF ISLAMIC COOPERATION) (a.k.a. JAM'IYAT AL TA'AWUN AL ISLAMIYYA) (a.k.a. JIT), Qandahar City, Afghanistan.

RABITA TRUST, Room 9A, 2nd Floor, Wahdat Road, Education Town, Lahore, Pakistan; Wares Colony, Lahore, Pakistan.

## Individuals (15):

AGHA, Haji Abdul Manan (a.k.a. SAIYID, Abd Al-Man'am); Pakistan.

AL-HAMATI, Muhammad (a.k.a. AL-AHDAL, Mohammad Hamdi Sadiq) (a.k.a. AL-MAKKI, Abu Asim), Yemen.

AL-HAQ, Amin (a.k.a. AMIN, Muhammad; a.k.a. AH HAQ, Dr. Amin; UL-HAQ, Dr. Amin); DOB: 1960; POB: Nangahar Province, Afghanistan.

AL-JADAWI, Saqar; DOB: 1965.

AL-KADR, Ahmad Sa'id (a.k.a. AL-KANADI, Abu Abd Al-Rahman); DOB: 01 March 1948; POB: Cairo, Egypt.

AL-QADI, Yasin (a.k.a. KADI, Shaykh Yassin Abdullah) (a.k.a. KAHDI, Yasin), Jeddah, Saudi Arabia.

AL-SHARIF, Sa'd; DOB: 1969; POB: Saudi Arabia

BIN MARWAN, Bilal; DOB: 1947.

BIN MUHAMMAD, Ayadi Chafiq (a.k.a. AYADI SHAFIQ, Ben Muhammad) (a.k.a. AYADI CHAFIK, Ben Muhammad) (a.k.a. AIADI, Ben Muhammad) (a.k.a. AIADY, Ben Muhammad), Helena Meyer Ring 10-1415-80809, Munich, Germany; 129 Park Road, NW8, London, England; 28 Chausse Di Lille, Moscron, Belgium; Darvingasse 1/2/58-60, Vienna, Austria; Tunisia; DOB: 21 January 1963; POB: Safais (Sfax), Tunisia.

18 02 0007

DARKAZANLI, Mamoun, Uhlenhorster Weg 34, Hamburg, 22085 Germany; DOB: August 4, 1958; POB: Aleppo, Syria; Passport No: 1310636262 (Germany).

HIJAZI, Riad (a.k.a. HIJAZI, Raed M.) (a.k.a. AL-HAWEN, Abu-Ahmad) (a.k.a. AL-MAGHRIBI, Rashid (The Moroccan) (a.k.a. AL-AMRIKI, Abu-Ahmad (The American)) (a.k.a. AL-SHAHID, Abu-Ahmad), Jordan; DOB: 1968; POB: California, U.S.A.; SSN: 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.

LADEHYANOY, Mufti Rashid Ahmad (a.k.a. LUDHIANVI, Mufti Rashid Ahmad) (a.k.a. AHMAD, Mufti Rasheed) (a.k.a. WADEHYANOY, Mufti Rashid Ahmad); Karachi, Pakistan.

UTHMAN, Omar Mahmoud (a.k.a. AL-FILISTINI, Abu Qatada) (a.k.a. TAKFIRI, Abu 'Umr) (a.k.a. ABU UMAR, Abu Omar) (a.k.a. UTHMAN, Al-Samman) (a.k.a. UMAR, Abu Umar) (a.k.a. UTHMAN, Umar) (a.k.a. ABU ISMAIL), London, England; DOB: 30 December 1960 or 13 December 1960.

YULDASHEV, Tohir (a.k.a. YULDASHEV, Takhir), Uzbekistan.

ZIA, Mohammad (a.k.a. ZIA, Ahmad); c/o Ahmed Shah s/o Painda Mohammad al-Karim Set, Peshawar, Pakistan; c/o Alam General Store Shop 17, Awami Market, Peshawar, Pakistan; c/o Zahir Shah s/o Murad Khan Ander Sher, Peshawar, Pakistan.

18 02 0008

1.    Abdul Rahman Yasin

2.    Khalid Shaikh Mohammed

3.    Ahmed Al-Mughassil

4.    Ali Al-Houri

5.    Ibrahim Al-Yacoub

6.    Abdel Karim Al-Nasser

7.    Usama Bin Laden

8.    Muhammad Atef

9.    Ayman Al Zawahiri

10.   Fazul Abdullah Mohammed

11.   Mustafa Mohamed Fadhil

12.   Ahmed Khalfan Ghailani

13.   Fahid Mohammed Ally Msalam

14.   Sheikh Ahmed Salim Swedan

15.   Abdullah Ahmed Abdullah

16.   Anas Al-Libi

17.   Saif Al Adel

18.   Ahmed Mohammed Hamed Ali

19.   Mushin Musa Matwalli Atwah

20.   Imad Mugniyah

21.   Hassan Izz-Al-Din

22.   Ali Atwa



# EXHIBIT O-3



*Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice*
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

3003 Berne, October 12, 2001

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf.
Vostro réf.

Unser Zeichen
Notre réf.  B 128 909-Bag

Nostro rif.

*In replying please
quote this file number*

**REGISTERED AIRMAIL**
U.S. Department of Justice
Criminal Division
Office of International Affairs
P.O. Box 27330
US-Washington, D.C. 20038-7330

Also by fax (pages 21 )

### *Supplemental Swiss MLAT request in the case WTC*

Dear Mrs Toledo,

According to the provisions of the Treaty between the United States of America
and the Swiss Confederation on Mutual Assistance in Criminal Matters, the
Federal Office of Justice, Swiss Central Authority, requests the assistance of
the appropriate US authorities in the above mentioned case.

The Deputy Attorney General of Switzerland, Mr. Claude Nicati is conducting
an investigation against unknown persons for homicide, endangerment through
air transportation, murder, coercion, hostage taking, etc. All the relevant details
concerning the facts of the case, and the requested assistance may be taken
out of the enclosed supplemental MLAT request dated October 12, 2001 and
its respective translation.

Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

sig. Bomio

G. Bomio

Enclosures mentioned

cc. without enclosures:

- M. C. Nicati, Substitut du procureur général, Taubenstr. 16, 3003 Berne
- Schweizerische Botschaft, Washington
    zHd. - Herrn M. Wey, Legal Affairs
        - Herrn H. Rüdlinger, Liaison Officer FOPM

*(a copy of the letter rogatory will be provided upon request)*


DFAE, M. N. Michel

9.0.

**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**PROCURA FEDERALA**

3003 Berne
Taubenstrasse 16

☎ +41 (0)31 322 45 79
fax +41 (0)31 322 45 07
e-mail   claude.nicati@ba.admin.ch
Votre Réf.
Notre Réf.  Nic

Berne, le 12 octobre 2001

**Department of Justice**
**Office of International Affairs**
**USA**
Par l'intermédiaire de
L'Office fédéral de la justice
3003 Berne

**Requête d'entraide judiciaire internationale complémentaire et urgente**

Madame, Monsieur, cher collègue,

**1.    Procédure ouverte en Suisse et précédente demande du 8 octobre 2001**

Par courrier du 8 octobre dernier, je vous ai informé que par décision du samedi 15 septembre 2001, le Ministère public de la Confédération avait ouvert une procédure pénale contre inconnu(s) pour violation des art. 90ss de la loi fédérale sur l'aviation (LA; RS 748.0), en liaison avec les art. 5 et 6bis CPS, à associer aux art. 111, 112, 181, 183, 184, 185 et 340 CPS, en liaison avec les attentats commis sur sol américain le 11 septembre dernier.

J'ai également porté à votre connaissance que l'enquête ouverte en Suisse a notamment pour but de déterminer si des infractions ont été commises dans notre pays et si les auteurs présumés de ces attentats ont pu disposer d'un soutien de quelque nature que ce soit (financier, logistique, etc.).

Par décision du 23 septembre 2001, M. Georges W. Bush, Président des USA, a publié une liste[1] de 27 personnes et entités fortement soupçonnées d'avoir participé, à un titre ou un autre aux attentats qui ont endeuillé votre pays.

Le 12 octobre 2001, le Président Georges W. Bush a également porté à la connaissance des autorités et des médias que la première liste était complété par une deuxième[2] portant 21 noms.

---

[1] annexe n° 1
[2] annexe n° 2

Les autorités suisses ont décidé de transmettre immédiatement ces informations à tous les intermédiaires financiers afin que ceux-ci procèdent à des vérifications au sein de leur établissement et:

- bloquent les relations financières des personnes et entités suspectes,
- annoncent celles-ci au bureau de communication en matière de blanchiment.

Selon la loi en vigueur dans notre pays, dans un délai de cinq jours à compter du blocage du compte, il appartient au Ministère public de la Confédération de décider du gel définitif du compte ou de la transaction annoncée, sur la base de soupçons de blanchiment d'argent[3] ou d'appartenance du titulaire du compte à une organisation criminelle[4].

Les expériences faites depuis la commission des attentats ont permis de mettre en évidence que:

- les banques et les autres intermédiaires travaillant en Suisse ont fait déjà un important travaille de recherche sur la base d'une liste de quelque 550 entités (personnes physiques et morales) établie par le "Basel Committee on Banking Supervision";
- ces recherches n'ont pas permis de procéder au blocage de fonds importants;
- il est très difficile pour les intermédiaires financiers, sur la base d'un nom et/ou d'un seul prénom de faire des recherches efficaces dans leur fichiers clients;
- de nombreuses personnes ont des noms et des prénoms très proches de ceux évoqués dans les listes publiées par le Président Bush les 23 septembre et 12 octobre.

## 2.  Compétence

Le Ministère public de la Confédération est, en application de la législation suisse, compétent pour solliciter l'entraide judiciaire internationale.

## 3.  Urgence

L'urgence est également demandée en application de l'art. 31 ch. 5 du Traité d'entraide passé entre la Confédération suisse et les Etats-Unis d'Amérique[5], car les annonces des intermédiaires financiers sont susceptibles d'avoir lieu ces prochains jours.

## 4.  Bilan sommaire des investigations en Suisse

A ce sujet il est renvoyé au contenu de la demande d'entraide daté du 8 octobre dernier.

---

[3] Art. 305bis CPS
[4] Art. 260ter CPS
[5] Traité du 25 mai 1973 entre la Confédération suisse et les Etats-Unis d'Amérique sur l'entraide judiciaire en matière pénale; ci-après Traité; RS 0.351.933.6

## 5.    Objet de la requête

La présente demande d'entraide judiciaire complémentaire vise à obtenir de la part des autorités judiciaires américaines toutes les informations (nom, prénom, alias, adresse, date de naissance, citoyenneté, actes reprochés, etc.) qu'elles possèdent en relation avec

- les 27 personnes et entités mentionnées sur la première liste édictée par la Maison Blanche le 23 septembre 2001
- les 21 personnes et entités citées sur la deuxième liste publiée le 12 octobre.

Il est en particulier important pour les autorités judiciaires que je représente de connaître les raisons pour lesquelles les 48 personnes et entités sont mentionnées sur ces deux listes. La connaissance de ces motifs permettra de mieux cibler les recherches policières et judiciaires en Suisse et ainsi d'être plus efficace au profit de la lutte contre le terrorisme que nous menons actuellement.

## 6.    Réciprocité

Le Ministère public de la Confédération, par l'intermédiaire du soussigné, profite de l'occasion pour assurer aux autorités judiciaires américaines l'entière réciprocité et son soutien dans le cadre des investigations qu'ils conduisent en liaison avec ces tragiques événements.

Veuillez croire, Madame, Monsieur et cher collègue, à l'expression de notre haute considération.

## 7.    Langue

Cette demande d'entraide judiciaire est adressée en français avec une traduction en langue anglaise.

LE SUBSTITUT DU
PROCUREUR GÉNÉRAL

Claude Nicati

Annexes :

- liste n° 1 du 23 septembre 2001 (annexe n° 1)
- liste n° 2 du 12 octobre 2001 (annexe n° 2)
- art. 260ter CPS (annexe n° 3)
- art. 305bis CPS (annexe n° 4)

**Complementary and urgent request for judicial co-operation dated 12 October 2001**

1. Procedure opened in Switzerland and previous request of 8 October 2001

By my letter of 8 October, I informed you that by the decision of 15 September 2001, the Public Prosecutor had opened criminal proceedings against persons unknown for violation of x,y,z articles.

I also brought to your attention that the aim of the investigation opened in Switzerland is to establish whether offences were committed in our country and if the alleged perpetrators of these attacks were able to rely on support of some kind.

By a decision of 23 September 2001, George Bush published a list of 27 people and entities strongly suspected of having participated in some way or another in the attacks which plunged your country into mourning.

On 12 October 2001, President Bush equally brought to the attention of the authorities and the media that the first list was added to by a second, bearing 21 names.

The Swiss authorities decided to immediately transmit this information to all the financial intermediaries so that they can carry out checks and:

- Freeze the financial affairs of suspected entities and individuals .

- Report these to the money laundering office

According to the law in force in our country, in a period of five days from the freezing of an account, it is up to the Public Prosecutor to decide on the definitive/final freezing of the account or transaction reported, on the basis of suspicions of money laundering or the fact that the holder of an account belongs to a criminal organisation.

Experiments carried out since the attacks have shown that:

- Banks and other intermediaries working in Switzerland have already carried out important research on the basis of the list of some  550 individuals and legal entities established by the "Basel Committee on Banking Supervision"

- This research has not led to the freezing of important sums

- It is very difficult for the financial intermediaries, on the basis of a name and/or a single first name, to carry out efficient research on their client files

- Numerous people  have names and surnames which are very similar to those on the list published by Bush on 23 September and 12 October

2. Competence
The Public Prosecutor is competent to do this…

3. Urgency
it is urgent..

PCR1-217259.1

4. Summary of Swiss investigation - see request of 8 October

5. The purpose of the request

The present request for judicial cooperation aims to obtain from the American judicial authorities all information ( name, surname, alias, address, dob, nationality, charges made) that they possess in relation to:

- The 27 people and entities mentioned on the first list put out by the White House on 23 September 2001

- The 21 people and entities cited on the 2nd list published on 12 October

It is particularly important for the judicial authorities that I represent to know the reasons why the 48 people and entities mentioned above are on these two lists. The knowledge of these reasons will allow them to more efficiently target the police and judicial research in Switzerland and also to be more efficient in the fight against terrorism that we are presently involved in.

6. Reciprocity
I will reciprocate

# EXHIBIT O-4

 *Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice*
*Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police*

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

2 9. OKT. 2001

BA1032 /041 RTG

3003 Berne, October 26, 2001

**URGENT**

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf.
Vostro rif.

Unser Zeichen
Notre réf. **B 128 909 Bog**

Nostro rif.

**REGISTERED AIRMAIL**
U.S. Department of Justice
Criminal Division
Office of International Affairs
P.O. Box 27330
US-Washington, D.C. 20038-7330

Also by fax (pages 10 )

### *Transmittal of Spontaneous Information within the framework of a Second Supplemental Swiss MLAT request in the case WTC*

Dear Mrs Toledo,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters (art. 38), as well as to article 67a of the IMAC, we are pleased to provide you with the enclosed spontaneous information.

Mr. Claude Nicati, Federal prosecutor, has opened a criminal investigation against unknown persons for homicide, endangerment through air transportation, murder, coercion, hostage taking, etc. In the framework of his investigation, the Swiss magistrate has become aware of information which may also interest the criminal US authorities. In the same context, the Swiss prosecutor has issued a freeze order. All the relevant details concerning the facts of the case may be taken out of the enclosed documentation.

In order to enable the Swiss Federal prosecutor to maintain the freeze order and to share with your authorities the information that may be gathered in Switzerland we invite the competent US authorities to provide us with an urgent MLAT request containing the information requested by the Swiss Federal prosecutor. As soon as we receive your MLAT request we will issue a freeze order and the decision for granting assistance.

<u>Due to the urgency in this case we draw your attention upon the fact that the Swiss precautionary freeze will be in place till **November 16th, 2001.**</u>

**We draw your attention upon the fact that the content of this spontaneous information shall only be used in order to provide us with a formal MLAT request.**

Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

sig. Bomio

G. Bomio

Enclosures mentioned



SCHWEIZERISCHE BUNDESANWALTSCHAFT
MINISTERE PUBLIC DE LA CONFEDERATION
MINISTERO PUBBLICO DELLA CONFEDERAZIONE
OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND

3003 Bern
Taubenstrasse 16

☎ +41 (0)31 322 45 79
fax +41 (0)31 322 45 07
e-mail claude.nicati@ba.admin.ch
Our Ref. BA/032/01/BTE/Nic/PS

Bern, 25th October 2001

**Department of Justice
Office of International Affairs
USA**
Transmitted via:
Swiss Federal Office of Justice
3003 Bern

---

| **Second urgent and supplementary request for mutual assistance in criminal matters** |
| --- |

Dear Sir, Madam, dear colleague,

1.  **Procedure underway in Switzerland and previous requests of 8th and 12th October 2001**

In our correspondences of 8th and 12th October, I informed you that in the decision of Saturday, 15th September, the Office of the Attorney General of Switzerland opened legal proceedings against person(s) unknown for the violation of articles 90ss of the Swiss Federal Law on Aviation (LA; RS 748.0), in connection with articles 5 and 6bis of the Swiss Criminal Code (SCC), associated with articles 111, 112, 181, 183, 184, 185 and 340 SCC, in relation with the attacks committed on American soil on 11th September.

I also brought to your attention that the inquiry open in Switzerland notably seeks to determine whether offences have been committed in Switzerland and whether the presumed perpetrators of these attacks could possibly have had some form of support of whatever nature (financial, logistics etc.) from within our country.

Following a decision taken on 23rd September 2001, Mr. George W. Bush, President of the United States, published a list of 27 people and entities strongly suspected of having participated in one form or another in the attacks which have cast a shadow over your country (Bush-List No. 1).

On 12th October 2001, President George W. Bush also brought to the attention of the authorities and the media the fact that the first list had been supplemented by a second bearing the names of 21 people (Bush-List No. 2).

One of the persons mentioned on Bush-List No. 2 is **Yasin AL-QADI (a.k.a. KADI Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin)**, Yeddah, Saudi Arabia.

In compliance with this list and art. 9 of the federal law against money laundering the **Faisal Finance (Switzerland) S.A.** in **Geneva** brought to the attention of the Swiss Money Laundering Reporting Office (MROS) the existence of 24 accounts which are related to Mr. Yassin Abdallah KADI (see the list of the FPO in the <u>annex No. 1</u>).

The Office of the Attorney General has decided today to <u>freeze</u> all 24 accounts, to <u>seize</u> all documents related to these accounts and to obligate the Faisal Finance (Switzerland) S.A. to <u>produce</u> all these documents to our office.

We do so in compliance to Bush-List No. 2 only. Swiss authorities know neither Mr. KADI nor his companies so far and we do not have any further information about him from abroad.

Therefore we urgently ask you to provide us <u>immediately</u> with further information concerning the facts:

- why Mr. KADI has been put on Bush-List No. 2
- what kind of activities/crimes do you reproach to Mr. KADI

The Office of the Attorney General of Switzerland will keep the above-mentioned accounts frozen until **November 16th, 2001**. In order to maintain these freezings for a longer period of times we compulsorily need above-mentioned information by this date. In case you are not able to provide us with <u>detailed and approved information</u>, we will deblock these accounts without further notice.

## 2.   Competence

Under Swiss law, the Office of the Attorney General of Switzerland is responsible for seeking international mutual assistance in criminal matters.

## 3.   Urgency

Urgency is requested in the application of art. 31 para. 5 of the treaty on international mutual assistance passed between the Swiss Confederation and the United States of America as the announcements by the financial intermediaries are likely to be made in the coming days.

## 4.   Summary of investigations in Switzerland to date

We refer you to the request for mutual assistance dated 8th and 12th October 2001.

## 5.   Subject of the Request

The current request for mutual legal assistance seeks to obtain from the American judicial authorities all information, which they possess in relation to Mr. KADI and his activities as above mentioned.

3

## 6.    Reciprocity

The Office of the Attorney General of Switzerland, through the undersigned, takes this opportunity to assure the American judicial authorities of the full reciprocity and of any eventual support related to the investigations they are conducting concerning these tragic events.

## 7.    Language

This request for international mutual assistance is addressed to you directly in English.

Please accept,  Sir, Madam and dear colleague, our highest considerations.



**Office of the Attorney General of Switzerland
Deputy Attorney General**

Claude Nicati

Annex:

1. List of 24 accounts related to Mr. Yassin Abdallah KADI and Chafik AYADI (produced by the Swiss Federal Office of Police) on October 25th, 2001.

# Annex 1

| MELDUNG | KONTOINHABER | VERMÖGEN PER 16.10.2001 |
|---------|--------------|------------------------|
| 1056/73 | Leemount Limited | - SFr. |
| 1057/71 | Caravan Development Group Limited | 11'296'305.00 SFr. |
| 1058/69 | Sara Company Limited | 8'694'091.00 SFr. |
| 1059/67 | Loks-Holl Shpk | 5.00 SFr. |
| 1060/83 | Cavallo Limited | 8.00 SFr. |
| 1061/81 | Solano Limited | 4'443.00 SFr. |
| 1062/79 | NMCC Limited | 44'626.00 SFr. |
| 1063/77 | Alla Animation Procuction Est. | 1'626.00 SFr. |
| 1064/75 | Kadi Abdullah Yassin A. (Sohn) | 926'397.00 SFr. |
| 1065/73 | Kadi Nahlah Abdallah | - SFr. |
| 1066/71 | Nahed Abdallah Kadi | 24'727.00 SFr. |
| 1067/69 | Laila Abdallah Kadi | 141'942.00 SFr. |
| 1068/67 | Najiah Abdallah Kadi | 132.00 SFr. |
| 1069/65 | Nafisah Abdallah Kadi | 18'409.00 SFr. |
| 1070/81 | Kawthar Abdallah Kadi | 2'910.00 SFr. |
| 1071/79 | Maaz Yassin Abdullah Qadi | - SFr. |
| 1072/77 | Banan Yassin A. Kadi | 465'529.00 SFr. |
| 1073/75 | Hafsah Yassin A. Kadi | 465'508.00 SFr. |
| 1074/73 | Sahl Yassin A. Kadi | 1'199'576.00 SFr. |
| 1075/71 | Hajer Y.A. Kadi | 463'286.00 SFr. |
| 1076/69 | Sarah Yassin A. Qadhi | 465'523.00 SFr. |
| 1077/67 | Euro Invest Ltd. Sarajevo | 1'114.00 SFr. |
| 1078/65 | Depozitna Bank DD | 1'313.00 SFr. |
| 1079/63 | Kadi Yassin | 22'040.00 SFr. |

**TOTAL**                                  24'239'510.00 SFr.

## MROS-Meldung Faisal Finance S.A. vom 19.10.2001

| Konto (MROS) | Kontoart | 1) Kontoinh. 2) WB 3)Geldherkunft | Zeichnungsberechtigter | USD (CHF) |
|---|---|---|---|---|
| IFA 10361 (1077/67) | EK 01.09.96 | 1) Euro Invest Ltd Sarajevo<br>2) Yassin A. A. Kadi<br>3) Caravan Ltd + Yassin A.A.Kadi | -Chafik Ayadi Sarajevo | 672.37 (114.00) |
| IFA 10321 (1078/65) | EK 04.06.96 | 1) Depozitna Bank DD Sarajevo<br>2) Chafik Ayadi<br>3) Yassin A.A.Kadi + Leemount Ltd + Caravan Ltd | -Chafik Ayadi Sarajevo | 792.61 (1'313.00) |
| IFA 10451 (1060/83) | EK 24.11.98 | 1) CAVALLO Ltd Isle of Man<br>2) Yassin A.A. Kadi<br>2) Walled Hafiz Mohammed Abu...<br>3) Sara Ltd + Caravan Ltd | -Walled Hafiz Mohammed Abu Sheika | 4.57 (8.00) |
| IFA 10741 (1061/81) | EK 03.06.99 | 1) SOLANO Ltd Bahamas<br>2) Yassin A.A. Kadi<br>2) Ahmed Mohamed Omer Ba Sudan<br>3) Sarah Ltd+ Caravan Ltd + Internat. Banken | -Yassin A.A. Kadi<br>- Mahmed A.O.Bin Mahfooz | 2'679.60 (4'443.00) |
| IFA 10738 (1062/79) | EK 07.02.00 | 1) NMCC Ltd Isle of Man<br>2) Yassin A.A. Kadi<br>3) Yassin Kadi Group + Internationale Banken | -Yassin A.A.Kadi | 26915.16 (44'626.00) |

2

| Konto (MROS) | Kontoart | 1) Kontoinh. 2) WB 3)Geldherkunft | Zeichnungsberechtigter | Betrag (USD) |
|---|---|---|---|---|
| IFA 10736 (1063/77) | EK 01.06.99 | 1) ALLA Animation Prod. Est. Jeddah 2) Yassin A.A.Kadi 3) internationale Banken | -Yassin A.A.Kadi | 980.50 (1'626.00) |
| IFA 10372 (1058/69) | EK 08.06.98 | 1) SAFA Company Ltd. Malaysa, vorg. Offshore Press (L) BHD 2) Yassin A.A.Kadi 3) Familienvermögen | -Yassin A.A. Kadi - BalgisA.A.Radwan (Frau) | 5'241'509.05 (8'694'091.00) |
| IFA 10329 (1059/67) | EK 26.01.96 | 1) LOKS-HOL Shpk Albanien 2) Yassin A.A.Kadi 3) Leemount Ltd+Caravan Ltd | -Yassin A.A.Kadi | 3.01 (5.00) |
| IFA 1004 (1979/63) | PK 12.11.90 | 1) Yassin A.A. Kadi 2) do 3) Familienvermögen | -Tallal Mohamed Badkook SA | 13'292.79 (22'040.00) |
| IFA 10172 (1056/73) | PK 02.08.92 | 1) LEEMOUNT Ltd Isle of Man 2) Yassin A.A. Kadi 3) Familienvermögen und Gewinne in Saudiarabien | -Yassin A.A. Kadi - Omar Saleh Saeed Al Amoudi SA | 0.0 (0.0) |
| IFA 10257 (1057/71) | PK 01.07.94 | 1) CARAVAN Development Group Ltd Isle of Man 2) Yassin A.A. Kadi 3) Familienvermögen und Gewinne in Saudiarabien | - Yassin A.A. Kadi - Omar Saleh Saeed Al Amoudi SA | 6'810'336.70 (11'296'305.00) |

3

| Konto (MROS) | Kontoart | 1) Kontoinh. 2) WB 3)Geldherkunft | Zeichnungsberechtigter | Betrag (USD) |
|---|---|---|---|---|
| IFA 10441 (1071/79) | PK 28.09.98 | 1) Maaz Y. Abdullah Qadi 80 (Sohn) 2) dito 3) Yassin A.A.Kadi | -Yassin A.A. Kadi (Vater) | 0.0 (0,0) |
| IFA 10442 (1072-77) | PK 28.09.98 | 1) Banan Yassin A. Kadi 82 (Sohn) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Vater) - Balgis A.A. Radwan (Mutter) | 280'777.50 (465'529.00) |
| IFA 10443 (1073/75) | PK 28.09.98 | 1) Hafsa Yassin A.Kadi 84 (Sohn) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Vater) - Balgis A.A. Radwan (Mutter) | 280'765.66 (465'508.00) |
| IFA 10444 (1074/73) | PK 28.09.98 | 1)Sahl Yassin A. Kadi 87 (Sohn) 2) dito 3) Yassin A.A.Kadi + Maaz Y.Abdullah Qadi | -Yassin A.A. Kadi (Vater) | 723'508.20 (1199'576.00) |
| IFA 10445 (1075/71) | PK 01.10.98 | 1) Hajer Y.A. Kadi 97 (Sohn) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Vater) - Balgis A.A. Radwan (Mutter) | 279'425.20 (463'286.00) |
| IFA 10446 (1076/69) | PK 28.09.98 | 1) Sarah Yassin A. Qadhi 90 (Tochter) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Vater) - Balgis A.A. Radwan (Mutter) | 280'774.91 (465'523.00) |
| IFA 10470 (1064/75) | PK 03.06.99 | 1) Abdullah Y.A. Kadi 89 (Sohn) 2) dito 3) Yassin A.A. Kadi | - Yassin A.A. Kadi (Vater) - Balgis A.A. Radwan (Mutter) | 558'744.86 (926'397.00) |

4

| Konto (MROS) | Kontoart | 1) Kontoinh. 2) WB 3)Geldherkunft | Zeichnungsberechtigter | Betrag (USD) |
|---|---|---|---|---|
| IFA 10019 (1065/773) | PK 11.11.90 | 1) Nahlah Abdullah Kadi (Schwester) 2) dito 3) Yassin A.A. Kadi | - Yassin A.A. Kadi (Bruder) - Tallal Mohamed Badkook SA | 0.0 (0.0) |
| IFA 10020 (1066/71) | PK 11.11.90 | 1) Nahed Abdallah Kadi 64 (Schwester) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Bruder) | 14'914.13 (24727.00) |
| IFA 10021 (1067/69) | PK 11.11.90 | 1) Laila Abdallah Kadi 48 (Schwester) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Bruder) - Tallal Mohamed Badkook | 85'610.62 (141'942.00) |
| IFA 10022 (1068/67) | PK 11.11.90 | 1) Najia Abdalla Kadi 57 (Schwester) 2) dito 3) Leemount Ltd + Caravan Ltd | - Yassin A.A. Kadi (Bruder) - Tallal Mohamed Badkook | 80.90 (132.00) |
| IFA 10023 (1069/65) | PK 11.11.90 | 1) Nafisah Abdallah Kadi 56 (Schwester) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Bruder) | 11'103.30 (18'409.00) |
| IFA 10024 (1070/81) | PK 11.11.90 | 1) Kawthar Abdallah Kadi 49(Schwester) 2) dito 3) Yassin A.A.Kadi | - Yassin A.A. Kadi (Bruder) | 1'755.19 (2'910.00) |

25.10.2001 Bundeskriminalpolizei Charles De Pierre

# EXHIBIT O-5



**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**PROCURA FEDERALA**

**Kopie**

3003 Berne
Taubenstrasse 16

BA/032/01/BTE/Nic                           Berne, le 26 octobre 2001

<u>ORDONNANCE URGENTE DE SEQUESTRE</u>

Dans le cadre de la procédure ouverte contre inconnu (s) pour violations des art. 90ss de la loi fédérale sur l'aviation (LA; RS 748.0), en liaison avec les art. 5 et 6$^{bis}$ CPS, à associer aux art. 111, 112, 181, 183, 184, 185 et 340 CPS,

**concernant**

les détournements d'avions commis aux USA le mardi 11 septembre 2001 lesquels ont conduit à l'écrasement de ceux-ci sur trois immeubles occasionnant ainsi la mort de plusieurs milliers de personnes, dont un nombre indéterminé mais important de ressortissants suisses

**vu**

les annonces faites par l'intermédiaire financier FAISAL FINANCE (Switzerland) S.A. à Genève, au bureau de communication en matière de blanchiment,

l'extension de cette procédure à M. YASSIN AA. Kadi (Al-Quadi), né le 23.02.1955 au Caire (Egypte), ressortissant de l'Arabie Saoudite, P.O. Box 214 Jeddah 21411 (Arabie Saoudite) pour infraction à l'art. 260$^{ter}$ CPS, par le fait d'avoir éventuellement participé au financement de l'organisation criminelle Al-Qaida,

les liens de cette organisation avec Oussama Ben Laden,

les art. 65 et suivants et spécialement 71 PPF[1],

à titre subsidiaire l'ordonnance instituant des mesures à l'encontre des Taliban[2], laquelle a été complétée le 25 octobre 2001[3],

**considérant :**

que le prévenu figure sur la liste de personnes suspecte, dite liste Bush 2,

que l'intermédiaire financier FAISAL FINANCE (Switzerland) S.A. à Genève à annoncé l'existence des 24 comptes suspects au bureau de communication en matière de blanchiment (MROS),

qu'il figure également sur la liste publiée par le Comité des sanctions des nations Unies[4],

---

[1] RS 312.0; Procédure pénale fédérale du 15 juin 1934; PPF
[2] RS 946.203; du 2 octobre 2000, état au 25 octobre 2001
[3] Inscription additionnelles (décision du Comité des sanctions des Nations Unies concerant l'Afghanistan du 19 octobre 2001; en vigueur en Suisse depuis le 25 octobre 2001
[4] cf. : note 3 ci-dessus

Kopie

-2-

● qu'il se trouve ainsi également dans les inscriptions additionnelles de l'ordonnance sur les Taliban[5]

que le fait même de figurer sur ces listes est un signe à l'intention de l'autorité judiciaire que des éléments doivent être vérifiés et que, dans cet intervalle, les comptes bancaires du prévenu où les comptes sur lesquels il a un pouvoir de disposition quelconque doivent être gelés,

que les autorités judiciaires américaines ont été sollicitées ce jour afin qu'elles livrent rapidement toutes les informations en leur possession en relation avec le prévenu et ses liens avec une quelconque organisation terroriste,

qu'à défaut d'une décision judiciaire, lesdits comptes seraient de toute façon gelés par l'ordonnance sur les Taliban[6],

qu'ainsi il apparaît raisonnable d'ordonner le blocage judiciaire des comptes au minimum jusqu'à l'obtention des informations demandées aux autorités de poursuite pénale américaines,

que dans un délai échéant au 15 novembre 2001, l'entreprise FAISAL FINANCE (Switzerland) SA, destinatrice de la présente ordonnance devra également fournir certaines informations en relation avec lesdits comptes,

qu'à défaut d'obtenir les informations utiles de la part des autorités judiciaires américaines il appartiendra éventuellement au Ministère public de la Confédération de libérer les comptes du blocage judiciaire,

● que cette mesure apparaît proportionnée aux circonstances,

**ordonne :**

1. à l'intermédiaire financier FAISAL FINANCE (Switzerland) SA, le blocage des comptes

  1.1.   IFA 10361 (référence du bureau de communication n° GEWA 1077-67)

  1.2.   IFA 10321 (référence du bureau de communication n° GEWA 1078-65)

  1.3.   IFA 10451 (référence du bureau de communication n° 1060/83)

  1.4.   IFA 10741 (référence du bureau de communication n° 1061/81)

  1.5.   IFA 10738 (référence du bureau de communication n° 1062/79)

  1.6.   IFA 10736 (référence du bureau de communication n° 1063/77)

  1.7.   IFA 10372 (référence du bureau de communication n° 1058/69)

  1.8.   IFA 10329 (référence du bureau de communication n° 1059/67)

  1.9.   IFA 10004 (référence du bureau de communication n° 1079/63)

  1.10.  IFA 10172 (référence du bureau de communication n° 1056/73)

  1.11.  IFA 10257 (référence du bureau de communication n° 1057/71)

  1.12.  IFA 10441 (référence du bureau de communication n° GEWA 1071-79)

  1.13.  IFA 10442 (référence du bureau de communication n° GEWA 1072-77)

  1.14.  IFA 10443 (référence du bureau de communication n° GEWA 1073-75)

---

[5] cf.: note 3 ci-dessus
[6] art. 3 de l'ordonnance sur les Taliban; RS 946.203

Kopie

-3-

1.15.   IFA 10444 (référence du bureau de communication n° GEWA 1074-73)

1.16.   IFA 10445 (référence du bureau de communication n° GEWA 1075-71)

1.17.   IFA 10446 (référence du bureau de communication n° GEWA 1076-69)

1.18.   IFA 10470 (référence du bureau de communication n° GEWA 1064-75)

1.19.   IFA 10019 (référence du bureau de communication n° GEWA 1065-73)

1.20.   IFA 10020 (référence du bureau de communication n° GEWA 1066-71)

1.21.   IFA 10021 (référence du bureau de communication n° GEWA 1067-69)

1.22.   IFA 10022 (référence du bureau de communication n° GEWA 1068-67)

1.23.   IFA 10023 (référence du bureau de communication n° GEWA 1069-65)

1.24.   IFA 10024 (référence du bureau de communication n° GEWA 1070-81)

2.   la production par FAISAL FINANCE (Switzerland) SA, d'ici au 15 novembre 2001, des éléments suivants en relation avec les comptes :

2.1. IFA 10004

   2.1.1. transaction du 05.12.1990 (paiement d'une somme de USD 2 millions via Albaraka Bank London sur un compte de Yassin A.A. Kadi à Al Shamal Islamic Bank) : swift, motifs du paiement, et tout documents en relation avec cet ordre;

   2.1.2. transaction du 16.03.1992 (paiement d'une somme de USD 4 millions via Alabarak Bank London à Al Shamal Islamic Bank) : swift, motifs du paiement, et tout documents en relation avec cet ordre;

2.2. IFA 10172

   2.2.1. transaction du 22.01.1993 (paiement d'une somme de USD 2 millions via le Crédit Lyonnais (Suisse) SA à A Al Shamal Islamic Bank) : swift, motifs du paiement, et tout documents en relation avec cet ordre;

2.3. tout autre document en la possession de FAISAL FINANCE démontrant que des virements bancaires ont eu lieu de la part M. YASSIN A.A. Kadi (Al-Quadi) en faveur de A Al Shamal Islamic Bank.

3.   dit que le Ministère public de la Confédération se réserve la possibilité de demander à FAISAL FINANCE (Switzerland) S.A. et au bureau d'avocats Secretan Troyanov tout autre document en relation avec lesdits comptes ou le prévenu et son entourage.

4.   la présente ordonnance est transmise à :

4.1. FAISAL FINANCE (Switzerland) S.A., Case postale 1494, 1211 Genève 1 (par fax et lettre signature);

4.2. Bureau d'avocats Secretan Troyanov, Me Eric W. Fiechter, avocat, Case postale 189, 1211 Genève 12 (par fax et lettre signature);

4.3. Bureau de communication en matière de blanchiment (référence Mor/Alr 731056-631079; par courrier interne);

4.4. Secrétariat d'Etat à l'économie (seco; M. Roland Vock)

4.5. Police judiciaire fédérale (finances, inspecteur Charles De Pierre) (par courrier interne)

-4-                                          **Kopie**

<u>Moyens de droit</u>

Un recours peut être interjeté contre ladite ordonnance dans un délai de dix jours auprès de la Chambre d'accusation du Tribunal fédéral (art. 105$^{bis}$ al. 2 PPF). Contre les autres décisions de la police judiciaire fédérale, un recours peut être interjeté auprès du procureur fédéral de la Confédération dans un délai de dix jours (art. 105$^{bis}$ al. 1 PPF).

**LE SUBSTITUT DU PROCUREUR GENERAL**
**DE LA CONFEDERATION**

Claude Nicati

06/11 '01 15:41 FAX +41 31 3224507        BUNDESANWALTSCHAFT                    ☑001

*a.a.*

```
*************************
***   SENDEBERICHT   ***
*************************
```

SENDUNG OK

```
SE/EM NR              1173
RUFNR. GEGENSTELLE               00012026221956
NEBENADRESSE
NAME GEGENSTELLE
ANF.ZEIT             06/11 15:39
ÜB.ZEIT              02'08
SEITEN GESENDET         5
ERGEBNIS             OK
```

# OFFICE OF THE ATTORNEY GENERAL

## FAX COVER SHEET

| | |
|---|---|
| **TO** | Mr. Bill Hofmann<br>Department of Finance, Washington |
| **FAX NUMBER** | 001 202 622 19 56 |
| **NUMBER OF PAGES**<br>(including this cover sheet) | 5 |
| **FROM** | Claude Nicati<br>Deputy Attorney General of Switzerland |
| **DATE AND TIME** | 6th November 2001 |
| **MESSAGE** | |

Dear Mr. Hofmann,

Hereby I send you the requested fax. Excuse me for the delay.

*informal translation, to be inserted at tab 5*

from Swiss Public Prosecutor's Office to Faisal Finance, Mr Kadi's bank in Switzerland

Berne, 26 October 2001
**Urgent sequestration order**

In the context of the procedure started against unknown persons for violation of art 90ss of federal aviation law..

Concerning

The hijacking of planes in the USA on Tuesday 11 September...

Seeing that

Denunciations made by Faisal Finance (Switzerland) in Geneva to the money laundering office,

The extension of this procedure to Mr YASSIN AA Kadi .....for possibly having participated in the financing of the criminal organisation Al-Qaida,

This organisation's links with Oussama Ben Laden

Articles 65 and especially 71 PPF

The Taliban order of 25 October 2001

Considering

That the person concerned figures on  the list of suspected persons on Bush List 2

That the financial intermediary Faisal Finance (Switzerland) in Geneva has reported the existence of the 24 suspect accounts to the money laundering office,

That he is also on the UN list

That he is also to be found on the additional registers of the Taliban order

That the very fact of appearing on these lists is a sign of the judicial authorities that certain elements must be verified and that, in the meantime, the bank accounts of the person concerned or the accounts on which he has the right to sign, must be frozen

That in the absence of a legal decision, the said accounts must in any case be frozen in accordance with the Taliban order

That it therefore appears reasonable to, as a minimum, order the legal freezing of the accounts until the information requested from the American criminal authorities has been obtained

PCR1-219510.1

That by 15 November 2001 Faisal Finance, the recipient of this order, must also provide certain information in relation to the said accounts,

That if useful information is not received from the American legal authorities it will be up to the Public Prosecutor to unfreeze the accounts

That this measure appears proportionate in the circumstances

Orders
The financial intermediary Faisal Finance to block accounts....
1. ( see French original)


2. The production by Faisal Finance by 15 November of the following in relation to the accounts
2.1 IFA 10004
2.1.1 transaction of 5.12.1990 (payment of a sum of USD 2 million via Albaraka Bank London on an account of Yassin AA Kadi to Al Shamal Islamic Bank): swift, payment methods and all documents relating to this order;

2.1.2 transaction of 16.3. 1992 ( payment of a sum of USD 4 million via Albaraka Bank London to A Al Shamal Islamic Bank): swift, payment methods and all documents relating to this order;

2.2 IFA 10172
2.2.1 transaction of 22.1.1993 (payment of a sum of USD 2 million via Credit Lyonnais to A Al Shamal Islamic Bank: swift, payment methods and all documents relating to this order;

2.3 any other documents in the possession of Faisal Finance which show that bank transfers took place from Mr Kadi to A Al Shamal Islamic Bank.

3. that it remains possible for the Public Prosecutor to ask Faisal Finance and the law firm Secretan Troyanov any other document relating to the above accounts or the person concerned and his entourage.

4. the present order is sent to:
4.1 Faisal Finance
4.2 The law firm Secretan Troyanov
4.3 The money laundering office
4.4 The Secretary of State for the Economy
4.5 The federal police

Legal measures
An appeal against this order can be lodged within 10 days at the Federal Tribunal...

# EXHIBIT O-6





**U.S. Department of Justice**

*Criminal Division*

MEW:RT:JHF:JT:jt
182-15038

_____

Washington, D.C. 20530

November 2, 2001

BY FEDERAL EXPRESS

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

```
┌─────────────────────┐
│   BA Justiz         │
│ E - 7. NOV. 2001   │
└─────────────────────┘
```

Dear Mr. Bomio:

　　Re:  Request from Switzerland for Assistance
　　　　in the Case WTC (Your ref: B 128 '909 Bog)

　　Pursuant to your communication with Randy Toledo regarding
the above-captioned matter, please find enclosed a copy of the
requested indictment.

　　If you have any questions concerning this matter, please
contact me at (202) 514-0951, or Julie Thirolf, the paralegal
assigned, at (202) 616-0549. Thank you for your assistance in
this matter.

　　　　　　　　　　　Sincerely,

　　　　　　　　　　　Mary Ellen Warlow
　　　　　　　　　　　Director
　　　　　　　　　　　Office of International Affairs
　　　　　　　　　　　Criminal Division

　　　　　　　　　　　By:  Judith Friedman

　　　　　　　　　　　Judith Friedman
　　　　　　　　　　　Senior Trial Attorney

Enclosure

# EXHIBIT O-7

NOV-09-2001  19:17        GEN COUNSEL                    202 622 1944   P.01/02

# OFFICE OF THE ASSISTANT GENERAL COUNSEL
## (ENFORCEMENT)
## DEPARTMENT OF THE TREASURY
## 15TH AND PENNSYLVANIA AVENUE, N.W., ROOM 2000
## WASHINGTON, D.C.  20220

FAX:  (202) 622-1944
TEL:  (202) 622-0670

DATE: *11-9-01*

TO: *Claude Nicati*

ADDRESSEE'S FAX NUMBER: *011 4103 322 4507*

FROM: *James Gillis*

NUMBER: *202-622-1931*

SUBJECT:

NUMBER OF PAGES TO FOLLOW: *1*

Comments / Special Instructions:



SCHWEIZERISCHE
BUNDESANWALTSCHAFT

E  12. NOV. 2001

NiC



**GENERAL COUNSEL**

## DEPARTMENT OF THE TREASURY
### WASHINGTON

November 9, 2001

Claude Nicati
Deputy Attorney General
Office of the Attorney General of Switzerland
Taubenstrasse 16
3003 Bern

As you discussed today with Messrs. Hoffman and Gillis of this office, we request an extension
of time until November 30, 2001 for the Department of the Treasury to provide the information
you have requested.

Thank you very much for your assistance.

Sincerely,

Stephen J. McHale
Assistant General Counsel
(Enforcement)



**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**PROCURA FEDERALA**



3003
Taubenstrasse 16

☏ +41 (0)31 322 45 79
fax +41 (0)31 322 45 07
e-mail claude.nicati@ba.admin.ch
Votre Réf.
Notre Réf. Nic

Bern, 12th November 2001

Office of the Assistant General Counsel
Department of the Treasury
Mr. Stephen J. McHale
15th and Pennsylvania Avenue
Washington D.C. 20220
USA
**Via fax : 001 202 622 1944**

**Letter of request; extension of answer time**

Dear Sir,

Thank you for your fax dated November 11th, 2001.

After examining your request, I accept to extend the answer's time until <u>November 30th</u>, 2001.

Best regards

**OFFICE OF THE ATTORNEY GENERAL**
**THE DEPUTY ATTORNEY GENERAL**

Claude Nicati

# EXHIBIT O-8



**Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice**
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

3003 Berne, November 16, 2001

SCHWEIZERISCHE BUNDESANWALTSCHAFT

1 6. NOV. 2001

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf.
Vostro rif.

Unser Zeichen
Notre réf. B 128 909 BOG/BEA
Nostro rif.

In replying please
quote this file number

**REGISTERED AIRMAIL**
U.S. Department of Justice
Criminal Division
Office of International Affairs
P.O. Box 27330
US-Washington, D.C. 20038-7330

**Also by fax** (pages 5 )

---

***Supplemental Swiss MLAT request dated November 13, 2001 in the case WTC***

---

Dear Mrs Toledo,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above mentioned case.

The Deputy Attorney General of Switzerland, Mr. Claude Nicati, is conducting an investigation against unknown persons for homicide, endangerment through air transportation, murder, coercion, hostage taking, etc. All the relevant details concerning the facts of the case, and the requested assistance may be taken out of the enclosed supplemental MLAT request dated November 13, 2001.

Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

G. Bomio

sig. Bomio

Ausgang
1 6. NOV. 2001

Enclosures mentioned

**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND**

3003 Bern
Taubenstrasse 16

☎ +41 (0)31 322 45 79
fax +41 (0)31 322 45 07
e-mail claude.nicati@ba.admin.ch
Our Ref. BA/032/01/BTE/Nic/PS
       BA/040/01/BTE/Nic/PS

Bern, 13th November 2001

**Department of Justice**
**Office of International Affairs**
**USA**
Transmitted via:
Swiss Federal Office of Justice
3003 Bern

---

**Fourth urgent request for mutual assistance in criminal matters**

---

Dear Sir, Madam, dear colleague,

1. **First procedure underway in Switzerland and previous requests of 8th, 12th and 25th October 2001 (BA/032/01/BTE/Nic/PS)**

   a) Our request No. 1 and No. 2

   In our correspondences of October, 8th and 12th, 2001, I informed you that with decision of Saturday, September 15th, 2001, the Office of the Attorney General of Switzerland opened legal proceedings against person(s) unknown for the violation of articles 90ss of the Swiss Federal Law on Aviation (LA; RS 748.0), in connection with articles 5 and 6bis of the Swiss Criminal Code (SCC), associated with articles 111, 112, 181, 183, 184, 185 and 340 SCC, in relation with the attacks committed on American soil on 11th September.

   I also brought to your attention that the inquiry open in Switzerland notably seeks to determine whether offences have been committed in Switzerland and whether the presumed perpetrators of these attacks could possibly have had some form of support of whatever nature (financial, logistics etc.) from within our country.

   The aim of our first request of October 8th, 2001, was to obtain information currently in the hands of the American judicial authorities concerning the role played by Usama Bin Laden in the organization and execution of the attacks of September 11th, 2001.

   In our second request dated October 12th, 2001, we asked you to provide us with all information your authorities have obtained concerning the persons mentioned in the Bush Lists No. 1 and No. 2.

b) Your answer dated November 2, 2001

On November 7th, 2001, we received your above mentioned answer which consists in a copy of the INDICTMENT S (9) 98 Cr. 1023 (LBS) concerning the bombings on August 7th, 1998, in Nairobi (Kenya) and Dar Es Salaam (Tanzania).

Apart from some general information about Usama Bin Laden, his organization Al Qaeda and members of this group inflicted in the attacks of 1998, this paper unfortunately does not answer any of our questions posed in the first and second request concerning the attacks of September 11th, 2001.

2.    Request No. 3 of October 25th 2001

a) Our request No. 3

On October 12th, 2001, President George W. Bush published a supplemented list bearing the names of 21 other people (Bush-List No. 2).

One of the persons mentioned on Bush-List No. 2 is **Yasin AL-QADI (a.k.a. KADI Shaykh Yassin Abdullah; a.k.a. KAHDI, Yasin)**, Jeddah, Saudi Arabia.

As mentioned in our third request of October 25th, 2001, the Office of the Attorney General has decided to freeze all 24 accounts, to seize all documents related to these accounts and to obligate the Faisal Finance (Switzerland) S.A. to produce all these documents to our office.

In this last request the Office of the Attorney General of Switzerland asked your office to provide us with detailed and approved information, until **November 16th, 2001**, in order to maintain these freezings for a longer period of times.

b) Your request of November 11th, 2001

The Department of Treasury, Assistant General Counsel Stephan J. McHale; asked us by fax to extend the period of times. Following this request, we have prolonged this deadline until **November 30th, 2001**. Mr. McHale has already received our yesterdays' decision by fax.

3.  Second procedure underway in Switzerland (BA/040/01/BTE/Nic/PS)

a) Our new request of today

On October 24th, 2001, the Office of the Attorney General extended it's investigations and opened a separate case against NADA Management Organizations SA, Lugano (Switzerland), former AL TAQWA Management organization SA, Lugano

(Switzerland), as well as against Mr. Mustafa Youssef NADA, born 05/17/1931, and Ali Ghaleb HIMMAT, born 06/16/1938.

As you know, last Wednesday, November 7th, 2001, we searched the offices of NADA Management Organization SA in Lugano, the private houses of Mr. Nada and Mr. Himmat in Campione (Italy) as well as offices in Vaduz and the home of Mr. Ahmet Huber in Bern, one of the Swiss board members of NADA Management Org. SA in Lugano.

The same day, we blocked all accounts in Switzerland belonging to NADA Management Organization SA in Lugano as well as to Mr. Nada and Mr. Himmat.

In order to proceed with our investigation and the measures already taken, we are obliged to have more detailed and approved information concerning the firm NADA Management Organization SA in Lugano and the board members (Mr. NADA, Mr. HIMMAT, Mr. HUBER, and Mr. and Mrs. MANSOUR).

b) Visit of the Swiss Attorney General in the United States

As discussed between Ms. Randy Toledo and myself previously, the Attorney General, Mr. Valentin Roschacher, the Director of the Federal Office of Police, Mr. Jean-Luc Vez, as well as members of the Federal police office and of our office intend to come to the U.S. to talk to your authorities in charge (Dept. of Treasury, Federal Prosecutors of the US, FBI etc.), to discuss the cases and to obtain the information we asked for in our four requests. As discussed on the phone, we would like to suggest **week 48, i.e. November 26 – 29th, 2001** for our visit. Please let us know as soon as possible if this date is convenient for those persons involved on your side.

## 4. Competence

Under Swiss law, the Office of the Attorney General of Switzerland is responsible for seeking international mutual assistance in criminal matters.

## 5. Urgency

Urgency is requested in the application of art. 31 para. 5 of the treaty on international mutual assistance passed between the Swiss Confederation and the United States of America as the announcements by the financial intermediaries are likely to be made in the coming days.

## 6. Summary of investigations in Switzerland to date

We refer you to the request for mutual assistance dated 8th and 12th October 2001.

4

## 7.  Subject of the Request

The current request for mutual legal assistance seeks to obtain from the American judicial authorities all information, which they possess in relation to Mr. KADI and his activities as above mentioned.

## 8.  Reciprocity

The Office of the Attorney General of Switzerland, through the undersigned, takes this opportunity to assure the American judicial authorities of the full reciprocity and of any eventual support related to the investigations they are conducting concerning these tragic events.

## 9.  Language

This request for international mutual assistance is addressed to you directly in English.

Please accept,  Sir, Madam and dear colleague, our highest considerations.

**Office of the Attorney General of Switzerland**
**Deputy Attorney General**

Claude Nicati

# EXHIBIT O-9

NOV-21-2001  13:22                                                        P.02



**U.S. Department of Justice**

*Criminal Division*

---

Washington, D.C. 20530

## BY FAX; ORIGINAL BY COURIER

Randy Toledo
Associate Director, OIA
Criminal Division
1301 New York Av., NW
Suite 800.
Washington, DC 20005

Re:   <u>Swiss Request for Assistance in the Investigation of the WTC Attacks</u>

Dear Ms. Toledo:

In response to the above-captioned Swiss request of October 8, 2001, please forward to the requesting Swiss authorities the following information. First, with regard to the request for information relating to indictments of Usama bin Laden, regrettably, the only information available is the indictment in the Southern District of New York relative to Mr. bin Laden's involvement in the attacks on the U.S. Embassies in Africa in 1998. At the present time, there is no indictment of Mr. bin Laden in connection with the events of September 11, 2001. We will be happy to share with the Swiss authorities copies of any public indictments that are returned in connection with this matter when those become available.

Secondly, the Swiss MLAT request asks for any information/indictments relative to bin Laden family members. To this we respond that no family members have been indicted.

Third, the request seeks information relative to persons in Switzerland implicated in the events of September 11. Please be advised that the federal prosecutors investigating this matter are not aware of any public information responsive to this request. We have no information that persons in Switzerland are implicated in this case.

Fourth, the Swiss request of October 8, 2001, seeks a meeting between Swiss and U.S. investigators. I understand that this meeting is being planned for the week of November 26. We will welcome Swiss Deputy Attorney General Claude Nicati and other Swiss authorities at that time.

Finally, we understand that Swiss authorities have submitted supplemental MLAT requests and that your office has forwarded these requests to the Treasury Department for response.

If I may be of further assistance, please do not hesitate to contact me.

Sincerely,

Barbara B. Berman
Trial Attorney
Criminal Division

2

# EXHIBIT O-9A



GENERAL COUNSEL

DEPARTMENT OF THE TREASURY
WASHINGTON

18 02 0020

November 29, 2001

**BY TELECOPIER**

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Bern
SWITZERLAND

     Re:   Yassin A. Kadi

Dear Mr. Nicati:

     I am enclosing a copy of a letter I wrote to you today summarizing evidence which provides a reasonable basis to believe that Mr. Kadi has been and continues to be a financier of terrorists and terrorist-related organizations. The original of this letter is being formally transmitted today, pursuant to the mutual legal assistance treaty between the United States and Switzerland, from our Central Authority to the Cental Authority of Switzerland.

     I am writing separately to draw your attention to two transactions involving accounts at Faisal Finance (Switzerland) S.A. which we are continuing to investigate. The first of these is a $200,000 wire transfer on December 23, 1992 from Faisal Finance to an account jointly held by Ismail Selim Elbarasse and Abu Marzook, two HAMAS operatives. The significance of this transfer is recounted in the affidavit of Special Agent Wright, previously provided to you, at page 26. Another wire transfer of $665,000 from Faisal Finance on January 4, 1993 into the same account is discussed at page 28 of the affidavit. We expect that the United States presently will make an MLAT request concerning these two transfers, among other matters. In the meantime, you may find from information currently available to you that these transactions are of interest in your investigation.

     Thank you for you continuing assistance. If you have any questions, please do not hesitate to contact me at (202) 622-0283.

          Sincerely,

          David D. Aufhauser
          General Counsel



**GENERAL COUNSEL**

DEPARTMENT OF THE TREASURY
WASHINGTON

18 02 0021

November 29, 2001

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Berne
SWITZERLAND

    Re:   <u>Yassin A. Kadi</u>

Dear Mr. Nicati:

    This letter is provided to you pursuant to your request under the mutual legal assistance treaty between the United States and Switzerland in connection with the action taken by the Government of Switzerland to block assets of Yassin A. Kadi (aka Qadi or Qadhi). Although some of the information concerning Mr. Kadi comes from sensitive sources that we cannot disclose, we have agreed to provide you with an unclassified summary of certain information concerning Mr. Kadi. We believe that this information is generally reliable and, taken as a whole, supports the decision to block Mr. Kadi's assets. This summary may be disclosed publicly in legal proceedings.

    Based upon information available to the United States Government, we have a reasonable basis to believe that Mr. Kadi has a long history of financing and facilitating the activities of terrorists and terrorist-related organizations, often acting through seemingly legitimate charitable enterprises and businesses.

    In 1991, Mr. Kadi wired $820,000 to a business in the United States. This money was laundered through a complex land transaction in Illinois, apparently to hide any connection to Mr. Kadi and the eventual transfer of the funds to the Quranic Literacy Institute (QLI). Some of the proceeds of this transaction were used by QLI to finance the activities of Mohammed Salah (alias Abu Ahmed),[1] an admitted head of the military wing of the terrorist organization HAMAS.[2] Subsequently, Mr. Kadi wired $27,000 *directly* to Mr. Salah's account in March

---

[1] Mr. Salah is a "Specially Designated Terrorist" (STD) under United States Executive Order No. 12947, 60 Fed. Reg. 5079 (1995) (E.O. 12947). <u>See</u> Notice of Blocking, 60 Fed. Reg. 41152 (1995).

[2] HAMAS has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) and an SDT under E.O. 12947, <u>see</u> 31 C.F.R. Ch V, App. A, and a "Specially Designated Global Terrorist" (SDGT) under United States Executive Order No. 13224, 66 Fed. Reg. 49079 (2001) (E.O. 13224).

18 02 0022

M. Claude Nicati
November 29, 2001
Page 2

1992. This wire, from Faisal Finance account number IFA 10004, came directly from an account that is the subject of the Swiss sequestration order covering Mr. Kadi's accounts. There were additional wires from Faisal Finance to Mr. Salah's account, but our information on those transfers is still incomplete. Similarly, we are still investigating other Faisal Finance transfers, one for $200,000 and another for $665,000, all or a substantial portion of which were sent to Mr. Salah through an account controlled by another HAMAS operative, Abu Marzook.[3]

At the direction of Abu Marzook, Mr. Salah distributed tens of thousands of dollars, and perhaps more, to HAMAS cells in and around Israel. Mr. Salah was arrested in Israel in 1993 carrying nearly $100,000 in cash and extensive notes of his meetings with HAMAS operatives during the days preceding his arrest. Analysis of the monetary transfers involved in the Illinois land transaction, and of wires into Mr. Salah's accounts prior to leaving for Israel, show a close connection between the funds involved in the transactions and those distributed by Mr. Salah to terrorist cells.[4]

In recent press interviews, Mr. Kadi has denied any wrongdoing in connection with these money transfers. He says that the loan on the Illinois property was intended to help the QLI "open a peaceful dialogue between nations," but he has neither explained the convoluted nature of the transaction nor made any claim for repayment of the "loan." He claims not to recall ever having met Mr. Salah, although Mr. Salah's lawyer states that Mr. Salah did meet with Mr. Kadi, that Mr. Kadi befriended him, and that he gave the $27,000 to Mr. Salah to open a bank account in Chicago.

Mr. Kadi has acknowledged in a number of press accounts that he is the founder of the Muwafaq, or "Blessed Relief," Foundation. He is identified in legal records as "Chairman" of the foundation. The leader of the terrorist organization Al-Gama'at Al-Islamiya,[5] Talad Fuad Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia. The foundation also operated in Sudan, Somalia and Pakistan, among other places.

A number of individuals employed by or otherwise associated with the Muwafaq Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation. Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a member of Al-Qa'ida and the Al-Faran terrorist group[6] responsible for the kidnapping of

---

[3] Mr. Marzook has been designated a SDT under E.O. 12947. See 31 C.F.R. Ch. V, App. A.

[4] A detailed account of Mr. Salah's activities, which included the recruitment and funding of HAMAS terrorists, can be found in the affidavit of FBI Special Agent Robert Wright (previously provided to you) and in *In re Extradition of Marzook*, 924 F. Supp. 565, 587-92 (S.D.N.Y. 1996).

[5] Al-Gama'at Al-Islamiya has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996. See 31 C.F.R. Ch. V, App. A.

[6] Al-Faran is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

NOV-29-2001  12:41        GEN COUNSEL                          202 622 1944    P.05/06

M. Claude Nicati                                    18 02 0023
November 29, 2001
Page 3

Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United
States for his role in the first World Trade Center attack. Following the arrest of Ramzi Yusif in
1995, the Pakistani police reportedly raided Muwafaq's offices and held its local director in
custody for several months. The Muwafaq Foundation also provided support to HAMAS and the
Abu Sayyaf Organization[7] in the Philippines.

The Muwafaq Foundation also employed or served as cover for Islamic extremists
connected with the military activities of Makhtab Al-Khidamat (MK),[8] which has been partially
financed by the Muwafaq Foundation. The Muwafaq Foundation supplied identity cards and
employment as cover for some Arabs to allow them to obtain visas to remain in Pakistan. The
founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor. Following the
dissolution of MK in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs
formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.

Mr. Kadi has asserted in various press interviews that the Muwafaq Foundation ceased
operations at a range of different times in 1995, 1996 or 1997. However, the United Nations ,
reported that Muwafaq was active in Sudan as late as 1997. Moreover, far from ceasing
operations, the U.N. report stated that the "Muwafaq Foundation plans to *continue to expand* its
humanitarian activities in the coming year . . . ." U.N. Department of Humanitarian Affairs,
*Consolidated Inter-Agency Appeal for Sudan January-December 1997* (Feb. 18, 1997)(emphasis
added).

From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi
Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.[9] Ayadi Chafiq
fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front
(TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader. Mr. Chafiq was expelled
from Tunisia because of his membership in the TIF. As of February 1999, Mr. Chafiq was
running Mr. Kadi's European network and serving as the president of Deposîtna Banka in
Sarajevo, Bosnia, which was owned by Mr. Kadi. Mr. Chafiq may have participated in planning
an attack on a U.S. facility in Saudi Arabia. Mr. Chafiq left his residence in London in a hurry
after the September 11 attacks, and had reportedly been in the United States in the months
preceding the attack.

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is
typical of the financial support network of Al Qa'ida and other terrorist organizations. Working
in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative
"relief" organizations provide cover for individuals engaged in recruiting, organizing, and

---

[7] The Abu Sayyaf Organization is a "Specially Designated Global Terrorist Entity" under E.O. 13224.
[8] MK is a "Specially Designated Global Terrorist Entity" under E.O. 13224.
[9] Ayadi Chafiq is a "Specially Designated Global Terrorist Individual" under E.O. 13224. <u>See</u> Amendment of Final
Rule, 66 Fed. Reg. 54404 (2001). He also is listed as one of the signatories on Swiss accounts at Faisal Financial
with Kadi.

NOV-29-2001  12:42      GEN COUNSEL                          202 622 1944    P.06/06

M. Claude Nicati                                        18  02  0024
November 29, 2001
Page 4

training terrorist cells.  Their provision of humanitarian aid and educational services is done in
concert with the terrorists to win the hearts and minds of the local people to whatever causes the
terrorists espouse.  When a region becomes more settled, such as Bosnia or Albania today,
seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist
organizational activity.  Mr. Kadi's actions and those of his Muwafaq Foundation and businesses
fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist
activities.

As noted previously, this is a summary of information concerning Mr. Kadi that we can
release at this time.  If we are able to release additional information in the future we will let you
know.

Sincerely,

David D. Aufhauser
General Counsel

TOTAL P.06



# EXHIBIT O-10



*Bundesamt für Justiz · Office fédéral de la justice · Ufficio federale di giustizia · Uffizi federal da giustia*
Eidg. Justiz- und Polizeidepartement · Département fédéral de justice et police · Dipartimento federale di giustizia e polizia · Departament federal da giustia e polizia

3003 Berne, le 7 décembre 2001

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf.  BA/032/01/BTE/Nic/PS
Vostro rif.

Unser Zeichen
Notre réf.  B 128 909/01 BOG/BEA

Ministère public de la Confédération
A l'att. du Procureur M. C. Nicati
Taubenstrasse 16
3003 Berne

*BUNDESANWALTSCHAFT*

– 7. DEZ. 2001

*Commission rogatoire adressée aux USA dans l'affaire WTC*

Monsieur,

Nous nous référons à votre courrier du 12 octobre 2001, par lequel l'entraide judiciaire dans la procédure mentionnée en exergue a été demandée aux autorités américaines.

Vous trouverez, ci-joint, les actes recueillis en exécution de cette requête.

Veuillez agréer, Madame, Monsieur, l'assurance de notre considération distinguée.

**DIVISION DE L'ENTRAIDE JUDICIAIRE INTERNATIONALE**
Section de l'entraide judiciaire

Giorgio Bomio

Annexes mentionnées

*informal translation, to be inserted at tab 10*

Letter from Federal Justice Office to Swiss Public Prosecutor
Berne, 7 December 2001

Sir

We refer to your letter of 12 October 2001 in which you asked the American authorities
for judicial assistance.

Please find enclosed the documents gathered in relation to this request.

PCRI-219522.1

22.11. BOG
WSR



**U.S. Department of Justice**

*Criminal Division*

MEW:RT:JHF:JT:jt
182-15033 (please repeat when responding)

Washington, DC 20530

November 29, 2001

BY FEDERAL EXPRESS

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

BA Justiz
E  -3. DEZ. 2001

Dear Mr. Bomio:

Re:   Request from Switzerland for Assistance in the case WTC - Swiss Reference
      Number B 128 909 Bog/1

        Enclosed are materials provided by authorities of the United States Treasury Department
in response to the above-captioned treaty request.  The materials include a letter from the General
Counsel for the Department of the Treasury, Mr. David D. Aufhauser, and a copy of an affidavit
by FBI Special Agent Robert Wright, both relative to Mr. Yassin A. Kadi (aka Qadi or Qadhi).
Also included is a copy of an executive summary entitled "Responsibility for the Terrorist
Atrocities in the United States, 11 September 2001," released by British authorities, reporting on
links between Osama bin Laden and the events of September 11, 2001.  The materials and
information contained herein may be used only in conformity with the provisions of article 5 of the
treaty.

Our records indicate that the request is partially executed. The portion of the request that remains outstanding relates to information on Nada Management. We will forward any information we receive on this entity as soon as possible.

Sincerely,

Mary Ellen Warlow
Director
Office of International Affairs
Criminal Division

By: *Judith Friedman*

Judith Friedman
Senior Trial Attorney

Enclosures

2

NOV-29-2001  12:39       GEN COUNSEL                          202 622 1944   P.01/06

# OFFICE OF THE ASSISTANT GENERAL COUNSEL (ENFORCEMENT)
## DEPARTMENT OF THE TREASURY
### 15TH AND PENNSYLVANIA AVENUE, N.W., ROOM 2000
## WASHINGTON, D.C. 20220

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

E  3 0. NOV. 2001

FAX:  (202) 622-1944
TEL:  (202) 622-0670

DATE:  29 Nov. 2001

TO:  M. Claude Nicoti

ADDRESSEE'S FAX NUMBER:  011 - 41 - 31 - 322 - 4507

FROM:  James P. Gillis

NUMBER:  (202) 622 - 1927

SUBJECT:

NUMBER OF PAGES TO FOLLOW:  5

Comments / Special Instructions:



**GENERAL COUNSEL**

## DEPARTMENT OF THE TREASURY
### WASHINGTON

November 29, 2001

**BY TELECOPIER**

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Bern
SWITZERLAND

  Re:  Yassin A. Kadi

Dear Mr. Nicati:

  I am enclosing a copy of a letter I wrote to you today summarizing evidence which provides a reasonable basis to believe that Mr. Kadi has been and continues to be a financier of terrorists and terrorist-related organizations. The original of this letter is being formally transmitted today, pursuant to the mutual legal assistance treaty between the United States and Switzerland, from our Central Authority to the Cental Authority of Switzerland.

  I am writing separately to draw your attention to two transactions involving accounts at Faisal Finance (Switzerland) S.A. which we are continuing to investigate. The first of these is a $200,000 wire transfer on December 23, 1992 from Faisal Finance to an account jointly held by Ismail Selim Elbarasse and Abu Marzook, two HAMAS operatives. The significance of this transfer is recounted in the affidavit of Special Agent Wright, previously provided to you, at page 26. Another wire transfer of $665,000 from Faisal Finance on January 4, 1993 into the same account is discussed at page 28 of the affidavit. We expect that the United States presently will make an MLAT request concerning these two transfers, among other matters. In the meantime, you may find from information currently available to you that these transactions are of interest in your investigation.

  Thank you for you continuing assistance. If you have any questions, please do not hesitate to contact me at (202) 622-0283.

       Sincerely,

       David D. Aufhauser
       General Counsel



**GENERAL COUNSEL**

### DEPARTMENT OF THE TREASURY
#### WASHINGTON

November 29, 2001

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Berne
SWITZERLAND

Re:    Yassin A. Kadi

Dear Mr. Nicati:

This letter is provided to you pursuant to your request under the mutual legal assistance treaty between the United States and Switzerland in connection with the action taken by the Government of Switzerland to block assets of Yassin A. Kadi (aka Qadi or Qadhi). Although some of the information concerning Mr. Kadi comes from sensitive sources that we cannot disclose, we have agreed to provide you with an unclassified summary of certain information concerning Mr. Kadi. We believe that this information is generally reliable and, taken as a whole, supports the decision to block Mr. Kadi's assets. This summary may be disclosed publicly in legal proceedings.

Based upon information available to the United States Government, we have a reasonable basis to believe that Mr. Kadi has a long history of financing and facilitating the activities of terrorists and terrorist-related organizations, often acting through seemingly legitimate charitable enterprises and businesses.

In 1991, Mr. Kadi wired $820,000 to a business in the United States. This money was laundered through a complex land transaction in Illinois, apparently to hide any connection to Mr. Kadi and the eventual transfer of the funds to the Quranic Literacy Institute (QLI). Some of the proceeds of this transaction were used by QLI to finance the activities of Mohammed Salah (alias Abu Ahmed), [1] an admitted head of the military wing of the terrorist organization HAMAS. [2] Subsequently, Mr. Kadi wired $27,000 *directly* to Mr. Salah's account in March

---

[1] Mr. Salah is a "Specially Designated Terrorist" (STD) under United States Executive Order No. 12947, 60 Fed. Reg. 5079 (1995) (E.O. 12947). See Notice of Blocking, 60 Fed. Reg. 41152 (1995).

[2] HAMAS has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) and an SDT under E.O. 12947, see 31 C.F.R. Ch V, App. A, and a "Specially Designated Global Terrorist" (SDGT) under United States Executive Order No. 13224, 66 Fed. Reg. 49079 (2001) (E.O. 13224).

M. Claude Nicati
November 29, 2001
Page 2

1992. This wire, from Faisal Finance account number IFA 10004, came directly from an account
that is the subject of the Swiss sequestration order covering Mr. Kadi's accounts. There were
additional wires from Faisal Finance to Mr. Salah's account, but our information on those
transfers is still incomplete. Similarly, we are still investigating other Faisal Finance transfers,
one for $200,000 and another for $665,000, all or a substantial portion of which were sent to Mr.
Salah through an account controlled by another HAMAS operative, Abu Marzook.[3]

At the direction of Abu Marzook, Mr. Salah distributed tens of thousands of dollars, and
perhaps more, to HAMAS cells in and around Israel. Mr. Salah was arrested in Israel in 1993
carrying nearly $100,000 in cash and extensive notes of his meetings with HAMAS operatives
during the days preceding his arrest. Analysis of the monetary transfers involved in the Illinois
land transaction, and of wires into Mr. Salah's accounts prior to leaving for Israel, show a close
connection between the funds involved in the transactions and those distributed by Mr. Salah to
terrorist cells.[4]

In recent press interviews, Mr. Kadi has denied any wrongdoing in connection with these
money transfers. He says that the loan on the Illinois property was intended to help the QLI
"open a peaceful dialogue between nations," but he has neither explained the convoluted nature
of the transaction nor made any claim for repayment of the "loan." He claims not to recall ever
having met Mr. Salah, although Mr. Salah's lawyer states that Mr. Salah did meet with Mr. Kadi,
that Mr. Kadi befriended him, and that he gave the $27,000 to Mr. Salah to open a bank account
in Chicago.

Mr. Kadi has acknowledged in a number of press accounts that he is the founder of the
Muwafaq, or "Blessed Relief," Foundation. He is identified in legal records as "Chairman" of
the foundation. The leader of the terrorist organization Al-Gama'at Al-Islamiya,[5] Talad Fuad
Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a
mujahadin battalion in Bosnia. The foundation also operated in Sudan, Somalia and Pakistan,
among other places.

A number of individuals employed by or otherwise associated with the Muwafaq
Foundation have connections to various terrorist organizations. Muhammad Ali Harrath, main
activist of the Tunisian Islamic Front (TIF) in the United Kingdom, was associated with
Muwafaq personnel in Bosnia and other TIF members worked at the Muwafaq Foundation.
Syrian citizen Mahmoud Mehdi, once a director of the Muwafaq Foundation in Pakistan, was a
member of Al-Qa'ida and the Al-Faran terrorist group[6] responsible for the kidnapping of

---

[3] Mr. Marzook has been designated a SDT under E.O. 12947. See 31 C.F.R. Ch. V, App. A.

[4] A detailed account of Mr. Salah's activities, which included the recruitment and funding of HAMAS terrorists,
can be found in the affidavit of FBI Special Agent Robert Wright (previously provided to you) and in *In re
Extradition of Marzook*, 924 F. Supp. 565, 587-92 (S.D.N.Y. 1996).

[5] Al-Gama'at Al-Islamiya has been designated a "Foreign Terrorist Organization" pursuant to the Anti-Terrorism
and Effective Death Penalty Act of 1996. See 31 C.F.R. Ch. V, App. A.

[6] Al-Faran is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

M. Claude Nicati
November 29, 2001
Page 3

Westerners in Kashmir. He was also close to Ramzi Yusif who has been convicted in the United States for his role in the first World Trade Center attack.   Following the arrest of Ramzi Yusif in 1995, the Pakistani police reportedly raided Muwafaq's offices and held its local director in custody for several months.  The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization[7] in the Philippines.

The Muwafaq Foundation also employed or served as cover for Islamic extremists connected with the military activities of Makhtab Al-Khidamat (MK),[8] which has been partially financed by the Muwafaq Foundation.  The Muwafaq Foundation supplied identity cards and employment as cover for some Arabs to allow them to obtain visas to remain in Pakistan.  The founder of MK was Abdallah Azzam, who was Usama bin Laden's mentor.  Following the dissolution of MK in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida.

Mr. Kadi has asserted in various press interviews that the Muwafaq Foundation ceased operations at a range of different times in 1995, 1996 or 1997.  However, the United Nations reported that Muwafaq was active in Sudan as late as 1997.  Moreover, far from ceasing operations, the U.N. report stated that the "Muwafaq Foundation plans to *continue to expand* its humanitarian activities in the coming year . . . ."  U.N. Department of Humanitarian Affairs, *Consolidated Inter-Agency Appeal for Sudan January-December 1997* (Feb. 18, 1997)(emphasis added).

From 1993, the head of the European offices of the Muwafaq Foundation was Ayadi Chafiq Bin Muhammad, who has been identified as Mr. Kadi's closest associate.[9]  Ayadi Chafiq fought in Afghanistan in the 1980s and is known to be associated with the Tunisian Islamic Front (TIF) in Algeria and Nabil Ben Mohammad Salah Maklouf, its leader.  Mr. Chafiq was expelled from Tunisia because of his membership in the TIF.  As of February 1999, Mr. Chafiq was running Mr. Kadi's European network and serving as the president of Depositna Banka in Sarajevo, Bosnia, which was owned by Mr. Kadi.  Mr. Chafiq may have participated in planning an attack on a U.S. facility in Saudi Arabia.  Mr. Chafiq left his residence in London in a hurry after the September 11 attacks, and had reportedly been in the United States in the months preceding the attack.

The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Al Qa'ida and other terrorist organizations.  Working in troubled areas such as Bosnia, Somalia, Sudan, and various refugee camps, the putative "relief" organizations provide cover for individuals engaged in recruiting, organizing, and

---

[7] The Abu Sayyaf Organization is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

[8] MK is a "Specially Designated Global Terrorist Entity" under E.O. 13224.

[9] Ayadi Chafiq is a "Specially Designated Global Terrorist Individual" under E.O. 13224.  See Amendment of Final Rule, 66 Fed. Reg. 54404 (2001).  He also is listed as one of the signatories on Swiss accounts at Faisal Financial with Kadi.

M. Claude Nicati
November 29, 2001
Page 4

training terrorist cells.  Their provision of humanitarian aid and educational services is done in
concert with the terrorists to win the hearts and minds of the local people to whatever causes the
terrorists espouse.  When a region becomes more settled, such as Bosnia or Albania today,
seemingly legitimate businesses replace charitable foundations as cover for continuing terrorist
organizational activity.  Mr. Kadi's actions and those of his Muwafaq Foundation and businesses
fit this pattern and give rise to a reasonable basis to believe that they have facilitated terrorist
activities.

As noted previously, this is a summary of information concerning Mr. Kadi that we can
release at this time.  If we are able to release additional information in the future we will let you
know.

Sincerely,

David D. Aufhauser
General Counsel

# RESPONSIBILITY FOR THE TERRORIST ATROCITIES IN THE UNITED STATES, 11 SEPTEMBER 2001

## EXECUTIVE SUMMARY

The attached document summarises both the public and newly declassified material linking Usama Bin Laden and the Al Qaida network to the terrorist atrocities of 11 September 2001. It updates the document published by the Prime Minister on 4 October.

The update has been produced to remind people why we are engaged in this action, and to publish new information:

- There is now information linking the majority of the hijackers with Al Qaida, rather than just the three originally stated.

- A senior Bin Laden associate has admitted since 4 October to have trained some of the hijackers in Afghanistan.

- Bin Laden's own statements and those of his lieutenants since 4 October have also been increasingly self-incriminatory. He has made no attempt to deny responsibility for the attacks:

  - On 7 October he said: "Here is America struck by God Almighty ...so that its greatest buildings are destroyed...I swear to God that America will not live in peace before peace reigns in Palestine, and before the army of the infidels depart the land

of Mohammed".

- On 9 October one of his spokesmen praised the 11 September atrocities as "a good deed" which "transferred the battle into the US heartland". He warned "the storm of plane attacks will not abate".

- On 13 October, one of his associates broadcast direct threats referring back to 11 September: "we...advise the Muslims in the United States and Britain...not to travel by plane. We also advise them not to live in high-rise buildings and towers".

- Bin Laden has come closest to admitting responsibility in an inflammatory video made on 20 October which has been circulating among supporters of the Al Qaida network:

- Referring to the attacks on US buildings: "It is what we instigated for a while, in self-defence...So if avenging the killing of our people is terrorism, let history be a witness that we are terrorists".

- He also issued explicit threats: "Bush and Blair...don't understand any language but the language of force. Every time they kill us, we kill them, so the balance of terror is achieved".

- He pledged to continue the campaign of terror: "The battle has been moved inside America, and we shall continue until we win this battle, or die in the cause and meet our maker".

- He again admitted to terrorism:  "The bad terror is what America and Israel are practising against our people...what we are practising is the good terror that will stop them doing what they are doing".

- In an interview to the Pakistani paper Dawn in November 2001, he again made a number of self-incriminatory threats and statements.

*This document does not purport to provide a prosecutable case against Usama Bin Laden in a court of law. Intelligence often cannot be used evidentially, due both to the strict rules of admissibility and to the need to protect the safety of sources. But on the basis of all the information available HMG is confident of its conclusions as expressed in this document.*

## RESPONSIBILITY FOR THE TERRORIST ATROCITIES IN THE UNITED STATES, 11 SEPTEMBER 2001 AN UPDATED ACCOUNT

## INTRODUCTION

1.   The clear conclusions reached by the government are:

- Usama Bin Laden and Al Qaida, the terrorist network which he heads, planned and carried out the atrocities on 11 September 2001;

- Usama Bin Laden and Al Qaida retain the will and resources to carry out further atrocities;

- the United Kingdom, and United Kingdom nationals are potential targets; and

- Usama Bin Laden and Al Qaida were able to commit these atrocities because of their close alliance with the Taleban régime, which allowed them to operate with impunity in pursuing their terrorist activity.

2.   The material in respect of 1998 and the USS *Cole* comes from indictments and intelligence sources.  The material in

respect of 11 September comes from intelligence and the criminal investigation to date. The details of some aspects cannot be given, but the facts are clear from the intelligence.

3.   The document does not contain the totality of the material known to HMG, given the continuing and absolute need to protect intelligence sources.

## SUMMARY

4.   The relevant facts show:

### Background

- Al Qaida is a terrorist organisation with ties to a global network, which has been in existence for over 10 years. It was founded, and has been led at all times, by Usama Bin Laden.

- Usama Bin Laden and Al Qaida have been engaged in a jihad against the United States, and its allies. One of their stated aims is the murder of US citizens, and attacks on America's allies.

- Usama Bin Laden and Al Qaida have been based in Afghanistan since 1996, but have a network of operations throughout the world. The network includes training camps, warehouses, communication facilities and commercial operations able to raise significant sums of money to support its activity. That activity includes substantial exploitation of the illegal drugs trade from

Afghanistan.

- Usama Bin Laden's Al Qaida and the Taleban régime have a close and mutually dependent alliance. Usama Bin Laden and Al Qaida provide the Taleban régime with material, financial and military support. They jointly exploit the drugs trade. The Taleban régime allows Bin Laden to operate his terrorist training camps and activities from Afghanistan, protects him from attacks from outside, and protects the drugs stockpiles. Usama Bin Laden could not operate his terrorist activities without the alliance and support of the Taleban régime. The Taleban's strength would be seriously weakened without Usama Bin Laden's military and financial support.

- Usama Bin Laden and Al Qaida have the capability to execute major terrorist attacks.

- Usama Bin Laden has claimed credit for the attack on US soldiers in Somalia in October 1993, which killed 18; for the attack on the US Embassies in Kenya and Tanzania in August 1998 which killed 224 and injured nearly 5000; and was linked to the attack on the USS *Cole* on 12 October 2000, in which 17 crew members were killed and 40 others injured.

- They have sought to acquire nuclear and chemical materials for use as terrorist weapons.

**In relation to the terrorist attacks on 11 September**

5. After 11 September we learned that, not long before, Bin

Laden had indicated he was about to launch a major attack on America. The detailed planning for the terrorist attacks of 11 September was carried out by one of UBL's close associates. Of the 19 hijackers involved in 11 September 2001, it has been established that the majority had links with Al Qaida. A senior Bin Laden associate claimed to have trained some of the hijackers in Afghanistan. The attacks on 11 September 2001 were similar in both their ambition and intended impact to previous attacks undertaken by Usama Bin laden and Al Qaida, and also had features in common. In particular:

- Suicide attackers

- Co-ordinated attacks on the same day

- The aim to cause maximum American casualties

- Total disregard for other casualties, including Muslim

- Meticulous long-term planning

- Absence of warning.

6.  Al Qaida retains the capability and the will to make further attacks on the US and its allies, including the United Kingdom.

7.  Al Qaida gives no warning of terrorist attack.

**THE FACTS**

**Usama Bin Laden and Al Qaida**

8.    In 1989 Usama Bin Laden, and others, founded an international terrorist group known as "Al Qaida" (the Base). At all times he has been the leader of Al Qaida.

9.    From 1989 until 1991 Usama Bin Laden was based in Afghanistan and Peshawar, Pakistan. In 1991 he moved to Sudan, where he stayed until 1996. In that year he returned to Afghanistan, where he remains.

**The Taleban Régime**

10.    The Taleban emerged from the Afghan refugee camps in Pakistan in the early 1990s. By 1996 they had captured Kabul. They are still engaged in a bloody civil war to control the whole of Afghanistan. They are led by Mullah Omar.

11.    In 1996 Usama Bin Laden moved back to Afghanistan. He established a close relationship with Mullah Omar, and threw his support behind the Taleban. Usama Bin Laden and the Taleban régime have a close alliance on which both depend for their continued existence. They also share the same religious values/ and vision.

12.    Usama Bin Laden has provided the Taleban régime with troops, arms and money to fight the Northern Alliance. He is closely involved with Taleban military training, planning and operations. He has representatives in the Taleban military command structure. He has also given infrastruture assistance and humanitarian aid. Forces under the control of Usama Bin Laden have fought alongside the Taleban in the civil war in Afghanistan.

13.   Omar has provided Bin Laden with a safe haven in which to operate, and has allowed him to establish terrorist training camps in Afghanistan. They jointly exploit the Afghan drugs trade. In return for active Al Qaida support, the Taleban allow Al Qaida to operate freely, including planning, training and preparing for terrorist activity. In addition the Taleban provide security for the stockpiles of drugs.

14.   Since 1996, when the Taleban captured Kabul, the United States government has consistently raised with them a whole range of issues, including humanitarian aid and terrorism. Well before 11 September 2001 they had provided evidence to the Taleban of the responsibility of Al Qaida for the terrorist attacks in East Africa. This evidence had been provided to senior leaders of the Taleban at their request.

15.   The United States government had made it clear to the Taleban régime that Al Qaida had murdered US citizens, and planned to murder more. The US offered to work with the Taleban to expel the terrorists from Afghanistan. These talks, which have been continuing since 1996, have failed to produce any results.

16.   In June 2001, in the face of mounting evidence of the Al Qaida threat, the United States warned the Taleban that it had the right to defend itself and that it would hold the régime responsible for attacks against US citizens by terrorists sheltered in Afghanistan.

17.   In this, the United States had the support of the United Nations. The Security Council, in Resolution 1267, condemned Usama Bin Laden for sponsoring international terrorism and

operating a network of terrorist camps, and demanded that the Taleban surrender Usama Bin Laden without further delay so that he could be brought to justice.

18.   Despite the evidence provided by the US of the responsibility of Usama Bin Laden and Al Qaida for the 1998 East Africa bombings, despite the accurately perceived threats of further atrocities, and despite the demands of the United Nations, the Taleban régime responded by saying no evidence existed against Usama Bin Laden, and that neither he nor his network would be expelled.

19.   A former Government official in Afghanistan has described the Taleban and Usama Bin Laden as "two sides of the same coin: Usama cannot exist in Afghanistan without the Taleban and the Taleban cannot exist without Usama".

## Al Qaida

20.   Al Qaida is dedicated to opposing 'un-Islamic' governments in Muslim countries with force and violence.

21.   Al Qaida virulently opposes the United States. Usama Bin Laden has urged and incited his followers to kill American citizens, in the most unequivocal terms.

22.   On 12 October 1996 he issued a declaration of jihad as follows:

> *"The people of Islam have suffered from aggression, iniquity and injustice imposed by the Zionist-Crusader alliance and their collaborators . . .*

*It is the duty now on every tribe in the Arabian peninsula to fight jihad and cleanse the land from these Crusader occupiers. Their wealth is booty to those who kill them.*

*My Muslim brothers: your brothers in Palestine and in the land of the two Holy Places* [Saudi Arabia] *are calling upon your help and asking you to take part in fighting against the enemy – the Americans and the Israelis. They are asking you to do whatever you can to expel the enemies out of the sanctities of Islam."*

Later in the same year he said that

*"terrorising the American occupiers [of Islamic Holy Places] is a religious and logical obligation".*

In February 1998 he issued and signed a 'fatwa' which included a decree to all Muslims:

*". . . the killing of Americans and their civilian and military allies is a religious duty for each and every Muslim to be carried out in whichever country they are until Al Aqsa mosque has been liberated from their grasp and until their armies have left Muslim lands."*

In the same 'fatwa' he called on Muslim scholars and their leaders and their youths to

*"launch an attack on the American soldiers of Satan"*

and concluded:

*"We - with God's help - call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill Americans and plunder their money whenever and wherever they find it. We also call on Muslims . . . to launch the raid on Satan's US troops and the devil's supporters allying with them, and to displace those who are behind them."*

When asked, in 1998, about obtaining chemical or nuclear weapons he said *"acquiring such weapons for the defence of Muslims [is] a religious duty"*, and made the following claim in an interview printed in the Pakistan newspaper *Dawn* in November 2001:

*"I wish to declare that if America used chemical or nuclear weapons against us, then we may retort with chemical and nuclear weapons. We have the weapons as deterrent."*

In an interview aired on Al Jazira (Doha, Qatar) television he stated:

*"Our enemy is every American male, whether he is directly fighting us or paying taxes."*

In two interviews broadcast on US television in 1997 and 1998 he referred to the terrorists who carried out the earlier attack on the World Trade Center in 1993 as *"role models"*. He went on to exhort his followers *"to take the fighting to America"*.

23.   From the early 1990s Usama Bin Laden has sought to obtain nuclear and chemical materials for use as weapons of terror.

24.   Although US targets are Al Qaida's priority, it also explicitly threatens the United States' allies. References to *"Zionist-Crusader alliance and their collaborators"*, and to *"Satan's US troops and the devil's supporters allying with them"* are references which unquestionably include the United Kingdom. This is confirmed by more specific references in a broadcast of 13 October, during which Bin Laden's spokesman said:

> *"Al Qaida declares that Bush Sr, Bush Jr, Clinton, Blair and Sharon are the arch-criminals from among the Zionists and Crusaders . . . Al Qaida stresses that the blood of those killed will not go to waste, God willing, until we punish these criminals . . . We also say and advise the Muslims in the United States and Britain . . . not to travel by plane. We also advise them not to live in high-rise buildings and towers."*

25.   There is a continuing threat. Based on our experience of the way the network has operated in the past, other cells, like those that carried out the terrorist attacks on 11 September, must be assumed to exist.

26.   Al Qaida functions both on its own and through a network of other terrorist organisations. These include Egyptian Islamic Jihad and other north African Islamic extremist terrorist groups, and a number of other jihadi groups in other countries including the Sudan, Yemen, Somalia, Pakistan and India. Al Qaida also maintains cells and personnel in a number of other countries to facilitate its activities.

27.   Usama Bin Laden heads the Al Qaida network. Below him is a body known as the Shura, which includes representatives of other terrorist groups, such as Egyptian Islamic Jihad leader

Ayman Zawahiri and prominent lieutenants of Bin Laden such as Mohamed Atef (also known as Abu Hafs Al-Masri). Egyptian Islamic Jihad has, in effect, merged with Al Qaida.

28.   In addition to the Shura, Al Qaida has several groups dealing with military, media, financial and Islamic issues.

29.   Mohamed Atef is a member of the group that deals with military and terrorist operations.  His duties include principal responsibility for training Al Qaida members.

30. Members of Al Qaida must make a pledge of allegiance to follow the orders of Usama Bin Laden.

31.   A great deal of evidence about Usama Bin Laden and Al Qaida has been made available in the US indictment for earlier crimes.

32.   Since 1989, Usama Bin Laden has conducted substantial financial and business transactions on behalf of Al Qaida and in pursuit of its goals.  These include purchasing land for training camps, purchasing warehouses for the storage of items, including explosives, purchasing communications and electronics equipment, and transporting currency and weapons to members of Al Qaida and associated terrorist groups in countries throughout the world.

33.   Since 1989 Usama Bin Laden has provided training camps and guest houses in Afghanistan, Pakistan, the Sudan, Somalia and Kenya for the use of Al Qaida and associated terrorist groups. We know from intelligence that there are currently at least a dozen camps across Afghanistan, of which at least four are used

for training terrorists.

34.   Since 1989, Usama Bin Laden has established a series of businesses to provide income for Al Qaida, and to provide cover for the procurement of explosives, weapons and chemicals, and for the travel of Al Qaida operatives.  The businesses have included a holding company known as 'Wadi Al Aqiq', a construction business known as 'Al Hijra', an agricultural business known as 'Al Themar Al Mubaraka', and investment companies known as 'Ladin International' and 'Taba Investments'.

**Usama Bin Laden and previous attacks**

35.   In 1992 and 1993 Mohamed Atef travelled to Somalia on several occasions for the purpose of organising violence against United States and United Nations troops then stationed in Somalia.  On each occasion he reported back to Usama Bin Laden, at his base in the Riyadh district of Khartoum.

36.   In the spring of 1993 Atef, Saif al Adel, another senior member of Al Qaida, and other members began to provide military training to Somali tribes for the purpose of fighting the United Nations forces.

37.   On 3 and 4 October 1993 operatives of Al Qaida participated in the attack on US military personnel serving in Somalia as part of the operation 'Restore Hope.'  Eighteen US military personnel were killed in the attack.

38.   From 1993 members of Al Qaida began to live in Nairobi and set up businesses there, including Asma Ltd, and Tanzanite King.  They were regularly visited there by senior members of Al

Qaida, in particular by Atef and Abu Ubadiah al Banshiri.

39.   Beginning in the latter part of 1993, members of Al Qaida in Kenya began to discuss the possibility of attacking the US Embassy in Nairobi in retaliation for US participation in Operation Restore Hope in Somalia.  Ali Mohamed, a US citizen and admitted member of Al Qaida, surveyed the US Embassy as a possible target for a terrorist attack.  He took photographs and made sketches, which he presented to Usama Bin Laden while Bin Laden was in Sudan.  He also admitted that he had trained terrorists for Al Qaida in Afghanistan in the early 1990s, and that those whom he trained included many involved in the East African bombings in August 1998.

40.   In June or July 1998, two Al Qaida operatives, Fahid Mohammed Ali Msalam and Sheik Ahmed Salim Swedan, purchased a Toyota truck and made various alterations to the back of the truck.

41.   In early August 1998, operatives of Al Qaida gathered in 43, New Runda Estates, Nairobi to execute the bombing of the US Embassy in Nairobi.

42.   On 7 August 1998, Assam, a Saudi national and Al Qaida operative, drove the Toyota truck to the US Embassy.  There was a large bomb in the back of the truck.

43.   Also in the truck was Mohamed Rashed Daoud Al 'Owali, another Saudi.  He, by his own confession, was an Al Qaida operative, who from about 1996 had been trained in Al Qaida camps in Afghanistan in explosives, hijacking, kidnapping, assassination and intelligence techniques.  With Usama Bin Laden's express permission, he fought alongside the Taleban in

Afghanistan. He had met Usama Bin Laden personally in 1996 and asked for another 'mission.' Usama Bin Laden sent him to East Africa after extensive specialised training at camps in Afghanistan.

44.    As the truck approached the Embassy, Al 'Owali got out and threw a stun grenade at a security guard. Assam drove the truck up to the rear of the Embassy. He got out and then detonated the bomb, which demolished a multi-storey secretarial college and severely damaged the US Embassy, and the Co-operative bank building. The bomb killed 213 people and injured 4500. Assam was killed in the explosion.

45.    Al 'Owali expected the mission to end in his death. He had been willing to die for Al Qaida. But at the last minute he ran away from the bomb truck and survived. He had no money, passport or plan to escape after the mission, because he had expected to die.

46.    After a few days, he called a telephone number in Yemen to have money transferred to him in Kenya. The number he rang in Yemen was contacted by Usama Bin Laden's phone on the same day as Al 'Owali was arranging to get the money.

47.    Another person arrested in connection with the Nairobi bombing was Mohamed Sadeek Odeh. He admitted to his involvement. He identified the principal participants in the bombing. He named three other persons, all of whom were Al Qaida or Egyptian Islamic Jihad members.

48.    In Dar es Salaam the same day, at about the same time, operatives of Al Qaida detonated a bomb at the US Embassy, killing 11 people. The Al Qaida operatives involved included

Mustafa Mohamed Fadhil and Khaflan Khamis Mohamed.  The
bomb was carried in a Nissan Atlas truck, which Ahmed
Khfaklan Ghailani and Sheikh Ahmed Salim Swedan, two Al
Qaida operatives, had purchased in July 1998, in Dar es Salaam.

49.   Khaflan Khamis Mohamed was arrested for the bombing.
He admitted membership of Al Qaida, and implicated other
members of Al Qaida in the bombing.

50.   On 7 and 8 August 1998, two other members of Al Qaida
disseminated claims of responsibility for the two bombings by
sending faxes to media organisations in Paris, Doha in Qatar, and
Dubai in the United Arab Emirates.

51.   Additional evidence of the involvement of Al Qaida in the
East African bombings came from a search conducted in London
of several residences and businesses belonging to Al Qaida and
Egyptian Islamic Jihad members.  In those searches a number of
documents were found including claims of responsibility for the
East African bombings in the name of a fictitious group, 'the
Islamic Army for the liberation of the Holy Places'.

52.   Al 'Owali, the would-be suicide bomber, admitted he was
told to make a videotape of himself using the name of the same
fictitious group.

53.   The faxed claims of responsibility were traced to a telephone
number, which had been in contact with Usama Bin Laden's cell
phone.  The claims disseminated to the press were clearly written
by someone familiar with the conspiracy.  They stated that the
bombings had been carried out by two Saudis in Kenya, and one
Egyptian in Dar es Salaam.  They were probably sent before the
bombings had even taken place.  They referred to two Saudis

dying in the Nairobi attack.  In fact, because Al 'Owali fled at the last minute, only one Saudi died.

54.    On 22 December 1998 Usama Bin Laden was asked by *Time* magazine whether he was responsible for the August 1998 attacks. He replied:

> "*The International Islamic Jihad Front for the jihad against the US and Israel has, by the grace of God, issued a crystal clear fatwa calling on the Islamic nation to carry on Jihad aimed at liberating the holy sites.  The nation of Mohammed has responded to this appeal.  If instigation for jihad against the Jews and the Americans . . . is considered to be a crime, then let history be a witness that I am a criminal. Our job is to instigate and, by the grace of God, we did that, and certain people responded to this instigation.*"

He was asked if he knew the attackers:

> "*. . . those who risked their lives to earn the pleasure of God are real men.  They managed to rid the Islamic nation of disgrace.  We hold them in the highest esteem.*"

And what the US could expect of him:

> "*. . . any thief or criminal who enters another country to steal should expect to be exposed to murder at any time . . . The US knows that I have attacked it, by the grace of God, for more than ten years now . . . God knows that we have been pleased by the killing of American soldiers [in Somalia in 1993].  This was achieved by the grace of God and the efforts of the mujahideen . . . Hostility towards America is a religious duty and we hope to be rewarded for it by God. I*

*am confident that Muslims will be able to end the legend of the so-called superpower that is America. "*

55.   In December 1999 a terrorist cell linked to Al Qaida was discovered trying to carry out attacks inside the United States. An Algerian, Ahmed Ressam, was stopped at the US-Canadian border, and over 100 lbs of bomb-making material was found in his car.  Ressam admitted he was planning to set off a large bomb at Los Angeles International airport on New Year's Day.  He said that he had received terrorist training at Al Qaida camps in Afghanistan and then been instructed to go abroad and kill US civilians and military personnel.

56.   On 3 January 2000, a group of Al Qaida members, and other terrorists who had trained in Al Qaida camps in Afghanistan, attempted to attack a US destroyer with a small boat loaded with explosives.  Their boat sank, aborting the attack.

57.   On 12 October 2000, however, the USS *Cole* was struck by an explosive-laden boat while refuelling in Aden harbour. Seventeen crew were killed, and 40 injured.

58.   Several of the perpetrators of the *Cole* attack (mostly Yemenis and Saudis) were trained at Usama Bin Laden's camps in Afghanistan.  Al 'Owali has identified the two commanders of the attack on the USS *Cole* as having participated in the planning and preparation for the East African Embassy bombings.

59.   In the months before the September 11 attacks, propaganda videos were distributed throughout the Middle East and Muslim world by Al Qaida, in which Usama Bin Laden and others were shown encouraging Muslims to attack American and Jewish targets.

60.   Similar videos, extolling violence against the United States and other targets, were distributed before the East African Embassy attacks in August 1998.

## Usama Bin Laden and the 11 September attacks

61.   Nineteen men have been identified as the hijackers from the passenger lists of the four planes hijacked on 11 September 2001. Many of them had previous links with Al Qaida or have so far been positively identified as associates of Al Qaida.  An associate of some of the hijackers has been identified as playing key roles in both the East African Embassy attacks and the USS *Cole* attack. Investigations continue into the backgrounds of all the hijackers.

62.   From intelligence sources, the following facts have been established subsequent to 11 September; for intelligence reasons, the names of associates, though known, are not given.

- In the run-up to 11 September, Bin Laden was mounting a concerted propaganda campaign amongst like-minded groups of people - including videos and documentation - justifying attacks on Jewish and American targets; and claiming that those who died in the course of them were carrying out God's work.

- We have learned, subsequent to 11 September, that Bin Laden himself asserted shortly before 11 September that he was preparing a major attack on America.

- In August and early September close associates of Bin Laden were warned to return to Afghanistan from other

parts of the world by 10 September.

- Immediately prior to 11 September some known associates of Bin Laden were naming the date for action as on or around 11 September.

- A senior associate claimed to have trained some of the hijackers in Afghanistan.

- Since 11 September we have learned that one of Bin Laden's closest and most senior associates was responsible for the detailed planning of the attacks.

- There is evidence of a very specific nature relating to the guilt of Bin Laden and his associates that is too sensitive to release.

63.   In addition, Usama Bin Laden has issued a number of public statements since the US strikes on Afghanistan began. The language used in these, while not an open admission of guilt, is self-incriminating.

64.   For example, on 7 October he said:

> "Here is America struck by God Almighty in one of its vital organs, so that its greatest buildings are destroyed. Grace and gratitude to God . . . I swear to God that America will not live in peace before peace reigns in Palestine, and before all the army of infidels depart the land of Mohammed, peace by upon him."

65.   On 9 October his spokesman praised the *"good deed"* of the

hijackers, who *"transferred the battle into the US heartland"*. He warned that the *"storm of plane attacks will not abate"*.

66.   On 20 October Bin Laden gave an inflammatory interview which has been circulating, in the form of a video, among supporters in the Al Qaida network. In the transcript, when referring to the US buildings that were attacked, he says:

> *"It is what we instigated for a while, in self-defence. And it was in revenge for our people killed in Palestine and Iraq. So if avenging the killing of our people is terrorism, let history be a witness that we are terrorists."*

Later in the interview he said:

> *"Bush and Blair . . . don't understand any language but the language of force. Every time they kill us, we will kill them, so the balance of terror can be achieved."*

He went on:

> *"The battle has been moved inside America, and we shall continue until we win this battle, or die in the cause and meet our maker."*

He also said:

> *"The bad terror is what America and Israel are practising against our people, and what we are practising is the good terror that will stop them doing what they are doing."*

67.   Usama Bin Laden remains in charge, and the mastermind, of Al Qaida. In Al Qaida, an operation on the scale of the 11

September attacks would have been approved by Usama Bin
Laden himself.

68.   The modus operandi of 11 September was entirely consistent
with previous attacks.  Al Qaida's record of atrocities is
characterised by meticulous long-term planning, a desire to inflict
mass casualties, suicide bombers, and multiple simultaneous
attacks.

69.   The attacks of 11 September 2001 are entirely consistent
with the scale and sophistication of the planning which went into
the attacks on the East African Embassies and the USS *Cole*.  No
warnings were given for these three attacks, just as there was
none on 11 September.

70.   Al Qaida operatives, in evidence given in the East African
Embassy bomb trials, have described how the group spends years
preparing for an attack.  They conduct repeated surveillance,
patiently gather materials, and identify and vet operatives, who
have the skills to participate in the attack and the willingness to
die for their cause.

71.   The operatives involved in the 11 September atrocities
attended flight schools, used flight simulators to study the controls
of larger aircraft and placed potential airports and routes under
surveillance.

72.   Al Qaida's attacks are characterised by total disregard for
innocent lives, including Muslims.  In an interview after the East
African bombings, Usama Bin Laden insisted that the need to
attack the United States excused the killing of other innocent
civilians, Muslim and non-Muslim alike.

73.   No other organisation has both the motivation and the capability to carry out attacks like those of the 11 September - only the Al Qaida network under Usama Bin Laden.

## Conclusion

74.   The attacks of the 11 September 2001 were planned and carried out by Al Qaida, an organisation whose head is Usama Bin Laden.  That organisation has the will, and the resources, to execute further attacks of similar scale.  Both the United States and its close allies are targets for such attacks.  The attack could not have occurred without the alliance between the Taleban and Usama Bin Laden, which allowed Bin Laden to operate freely in Afghanistan, promoting, planning and executing terrorist activity.

# EXHIBIT O-11

7 8

BCG
N74



**U.S. Department of Justice**

*Criminal Division*

Washington, D.C. 20530

BA Justiz
E 16. JAN 2002

**TELEFAX** transmittal sheet

DATE:          January 15, 2002

TO:            Giorgio Bomio, Esquire
               Central Authority for U.S. Requests
               Division of International Legal Assistance
               Federal Office of Justice

               **Fax Number:** 011-41-31-322-5380

FROM:          Mary Ellen Warlow
               Director
               OFFICE OF INTERNATIONAL AFFAIRS
               CRIMINAL DIVISION
               UNITED STATES DEPARTMENT OF JUSTICE

               By

               Juliana Thirolf
               Paralegal Specialist

               For: Randy Toledo, Associate Director

SUBJECT:       Request from Switzerland for Assistance
               in the Matter of WTC

REFERENCE:     Swiss Reference Number: B 128 909 Bog
               Our reference number: 182-15033

MESSAGE:       Attached please find a letter regarding the above-
               captioned request.  Thank you for your assistance
               in this matter.  Regards!

Number of pages:        6                    Sent by:  jt
Telephone number:    (202) 616-0549(direct)
Telefax number:      (202) 514-0080

1/15/2002 12:23 FAX 202 305 1099     DOJ CRIMINAL DIVISION     → FOJ          ☑002



MEW:RT:JT:jt
182-15033 (please repeat when responding)

**U.S. Department of Justice**

*Criminal Division*

Washington, DC 20530

January 15, 2002

COPY BY FACSIMILE; ORIGINAL BY AIRMAIL

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

        Re:  Request from Switzerland in the Matter of WTC –
             Swiss Reference No. B 128 909 Boq

Dear Mr. Bomio:

     Enclosed please find a letter from the United States
Department of the Treasury regarding the above-captioned matter.
The original of this response was sent directly to Deputy
Attorney General Nicati in response to his MLAT request.

     Our records indicate that the request has been executed to
the extent possible.  As stated in the enclosed letter, we will
notify you if we can release additional information concerning
Nada and his companies.  Regards!

                         Sincerely,

                         Mary Ellen Warlow
                         Director
                         Office of International Affairs

                 By:     *Randy Toledo*

                         Randy Toledo
                         Associate Director

Enclosure

cc (by facsimile):

    Herbert Cohrs
    FBI Legal Attaché
    U.S. Embassy
    Bern, Switzerland

    Facsimile: 011-41-31-357-7368

1/15/2002 12:24 FAX 202 305 1090   DOJ CRIMINAL DIVISION   → FOJ   @004
GRL COUNSEL CH                                       202 622 1911   P.02/04



**DEPARTMENT OF THE TREASURY**
WASHINGTON

GENERAL COUNSEL

January 4, 2002

M. Claude Nicati
Substitut du Procureur General
Taubenstrasse 16
3003 Berne
SWITZERLAND

**BY TELECOPIER**
011-41-31-322-4507

Re:   Al Taqwa/Nada Management Organization

Dear Mr. Nicati:

This letter is provided to you pursuant to your request under the mutual legal assistance treaty between the United States and Switzerland in connection with the action taken by the Government of Switzerland to block assets of Youssef (also spelled "Yusuf") M. Nada and Nada Management Organization. Although some of the information concerning Nada comes from sensitive sources that we cannot disclose, we have agreed to provide you with an unclassified summary of certain information concerning Nada. We believe that this information is generally reliable and, taken as a whole, supports the decision to block the assets of Nada and Nada Management Organization. This summary may be disclosed publicly in legal proceedings.

Based upon information available to the United States Government, we have a reasonable basis to believe that Nada and his affiliated companies have a history of financing and facilitating the activities of terrorists and terrorist-related organizations.

Bank Al Taqwa (occasionally misspelled as "Taqua" in some press reports) was established in 1988 with significant backing from the Egyptian Muslim Brotherhood,[1] and it has long been thought to be involved in financing radical groups like the Palestinian HAMAS, Algeria's Islamic Salvation Front and Armed Islamic Group, and Tunisia's An-Nahda. Bank Al Taqwa was founded in the Bahamas and is a close affiliate

---

[1] Although the Muslim Brotherhood has not been designated by the United States Government, the organization is outlawed in Egypt and authorities there have long argued, according to press reports, that it is a front for terrorists. The Islamic Jihad is a splinter of the Muslim Brotherhood and, with the Gema'a al-Islamiya, were responsible for the assassination of Anwar Sadat, according to press accounts.

01/15/2002 12:24 FAX 202 305 1089          DOJ CRIMINAL DIVISION        → FOJ___ __ ____      ☑005

January 4, 2002
Page 2 of 3

of Al Taqwa Management Organization. The organization changed its name to Nada Management Organization in the spring of 2000.

In 1997, it was reported that the $60 million collected annually for HAMAS from all parts of the world were moved to accounts with Al Taqwa. As shown below, this close association with the financing of terrorists has continued unchecked.

The Malta and Lugano, Switzerland branch offices of the Al Taqwa Management Organization receive money that "pours in" from Kuwait and the United Arab Emirates for Usama bin Laden. Jordan has accused Bank Al Taqwa in the Bahamas of having financed a network linked to bin Laden and of plotting terror attacks against Western and tourist targets during the millennium celebrations.

As of late September 2001, bin Laden and his Al Qa'ida organization received financial assistance from Youssef M. Nada and Ali bin Mussalim. Nada has a controlling interest in, and is chairman of, Bank Al Taqwa, and Mussalim is involved in Bank Al Taqwa operations. Since the 1980s, following the pullout of the Soviet army from Afghanistan, Mussalim, assisted by Nada, has been providing indirect investment services for Al Qa'ida, investing funds for bin Laden, and making cash deliveries on request to the Al Qa'ida organization.

As of October 2000, Bank Al Taqwa appeared to be providing a clandestine line of credit for a close associate of Usama bin Laden. This bin Laden lieutenant had a line of credit with a Middle East financial institution that drew on an identical account number at Bank Al Taqwa. Unlike other accounts – even accounts of private banking customers – this account was blocked by the computer system and special privileges were required to access it. No identifiable names were associated with the account. These circumstances are highly unusual, and may have been done to conceal the association of the bin Laden organization with Bank Al Taqwa.

Youssef Nada confirmed in an interview with the Al-Jazeera television station that he is a member of the Muslim Brotherhood. He denied that he had over met or had contact with Usama bin Laden, although Nada acknowledged that members of the bin Laden family, other than Usama bin Laden, had invested in the bank. Press accounts, however, have linked Nada with Usama bin Laden. Nada also acknowledged having personal ties with Saddam Hussein. According to Syrian political analyst Sami Moubayed, Nada was implicated in a failed assassination attempt on the late Egyptian president Gamal Abdul Nasser in 1954. Nada fled Egypt and has been a fugitive from that country for many decades.

One of the Al Taqwa board members, Ahmed Huber, confirmed that he had met with members of bin Laden's organization in Beirut. Huber has defended the bombing of the World Trade Center buildings and the Pentagon. He is well known for his extreme anti-Israel views. In 1989, he supported the "fatwa" calling for the death of author Salman Rushdie.

Mr. Claude Nicati
January 4, 2002
Page 3 of 3

Bank Al Taqwa and a founder and director, Ahmed Idris Nasreddin, have been supporters of an Islamic center in Milan, Italy which may be Al Qa'ida's most important base in Europe. The ICI and its members have been linked to several terrorist plots, including the 1993 World Trade Center bombing and a failed scheme to bomb the U.S. embassy in Rome.

An investigation of the ICI following the arrest in Italy of Egyptian and Jordanian extremists, revealed that these individuals carried out their work at the ICI. In addition, the investigation uncovered links between the ICI and organizations controlled by Nasreddin in the Bahamas. Some ICI members were directly in contact with Bank Al Taqwa.

As noted previously, this is a summary of information concerning Nada and his companies that we can release at this time. If we are able to release additional information in the future we will notify you.

Sincerely,

George B. Wolfe
Deputy General Counsel

TOTAL P.04

# EXHIBIT O-12



**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**PROCURA FEDERALA**                                    3003 Berne

☎ +41 (0)31 322 45 30
fax +41 (0)31 322 45 07
e-mail claude.nicati@ba.admin.ch
Votre Réf.
Notre Réf. EAII/1/01/0007

Berne, April 30, 2002

Department of the Treasury
Mister George B. Wolfe
Deputy General Counsel
***By fax : 001 202 622 19 11***
*and via Swiss Federal Office of Justice,*
*Central Authority for Legal Assistance with*
*the US, to the DOJ, OIA*

- **Fifth request for mutual assistance in criminal matters according to the Swiss-American Treaty of May 25, 1973 (MLAT): Al Taqwa / Nada Management Organization Ltd; your letter of January 4th and our request of January 23rd, 2002**
- **Request for a bilateral meeting on the operational level**

Mister Deputy General Counsel,

Dear Mister Wolfe,

1.   **Summary of the previous requests for legal  assistance in the above captioned case and of the investigations in Switzerland up to this date:**

Insofar the summary  of our investigations in Switzerland is needed, we refer  to our MLAT-request  of October 8th, 2001.

Up to his day we transmitted four MLAT-requests  to the competent US-authorities..

- ◆  8th October, 2001
- ◆  12th October, 2001
- ◆  25th October, 2001
- ◆  13th November, 2001

The first three requests are now fully executed, however, the  complete execution of our request of November 2001 is still awaited.

Your answer of January 4th, 2002 did indeed clear up some points but it still remains insufficient to satisfy the needs of our procedure. As you know, we need more de-

tailed information under Swiss law in order to maintain the coercive measures we have taken.

For this reason we forwarded to you the renewed request of January 23rd, 2002. Among other topics, this request was discussed between Mr. David Aufhauser, General Counsellor, the Attorney General of Switzerland, Dr. Valentin Roschacher and Mr. Michel-André Fels, acting Federal Prosecutor, International Affairs, on February 28, 2002. The result of this discussion was that Treasury could very well complete its answer of January 4th, 2001 and this without giving details about the sources of the information, in other words to provide us with the information and the detailed facts we absolutely and urgently need in order to complete our investigation in Switzerland, and resulting of this provide you with confirmed information as well. As you know, mutual legal assistance is a patchwork that can and has to be completed under the rules of the Treaty we know.

We enclose the following documents to this fifth MLAT-request and invite you to provide us with your more detailed answer as stated above at your earliest convenience:

- your answer of January 4th, 2002[1]
- our letter of January 23rd, 2002[2],
- your answer of 22nd, 2002[3].

## 2.   New requests

### 2.1.   US Customs-operation in Virginia

We have the information[4] that US Customs has proceeded to houses searches in Virginia and that interesting documentation in relationship with Nada Management Organisation Ltd and Bank Al Taqwa in Nassau might have been found.

We would appreciate to receive copies of all documents seized in Virginia in the frame of these house searches relating to :

- Nada management Organisation Ltd (CH) and all related entities,
- Bank Al Taqwa (Bahamas/CH) and all related entities,
- Bank Taqwa for Commerce and Real Estate Comp. Ltd,
- Al Taqwa Trade,
- Akida Investment Co Ltd (Bahamas)
- Youssef NADA,
- Ali Ghaleb HIMMAT,
- Ahmed HUBER,
- MANSOUR,
- Ahmed Idriss NASREDDIN and all related/subordinated entities,
- Ahmed Idriss NASREDDIN's family,
- Nasreddin Group Int Holding Ltd,

---

[1] enclosure # 1
[2] enclosure # 2
[3] enclosure # 3
[4] information of Mr. William Hoffman, US Treasury, enclosure # 3

- ◆ Whada Charitable Found,
- ◆ Nasreddin Charitable Foundation,
- ◆ International Islamic University Trust,
- ◆ Switzerland in generally.

If you deem it necessary, we are absolutely in a position to send to the United States a federal police team that could scan quickly the seized documentation in order to facilitate the decision what is of interest to us..

## 2.2. Nada management Organisation Ltd; bank accounts

According to our investigations,

- ◆ Nada management Organisation Ltd,
- ◆ Bank Al Taqwa,
- ◆ Youssef NADA
- ◆ Ali Ghaleb HIMMAT,
- ◆ Ahmed HUBER
- ◆ MANSOUR,

hold and/or figure in several bank accounts[5]. For the Swiss investigation it is necessary to know whether those account numbers or names figure in your files, your ongoing investigations of US Treasury, Operation Green Quest or the FBI terrorism financial review group or in the evidence you already might have seized.

The agents and analysts from the Treasury Department and FBI, who were in Switzerland from April 2nd, 2002 to April 12th, 2002, confirmed this way to proceed to get this information needed[6]

It goes without saying that we are especially interested to know whether or not the persons/accounts named above helped an/or have been used to finance terrorist actions or groups.

## 2.3. NASREDDIN

According to the President Bush list # 12

*NASREDDIN, Ahmed Idris (a.k.a. NASREDDIN, Ahmad I.; a.k.a. NASREDDIN, Hadj Ahmed; a.k.a. NASREDDINE, Ahmed Idriss), Corso Sempione 69, 20149 Milan, Italy; 1 via delle Scuole, 6900 Lugano, Switzerland; Piazzale Biancamano, Milan, Italy; Rue de Cap Spartel, Tangiers, Morocco; DOB 22 Nov 1929; POB Adi Ugri, Ethiopia; Italian Fiscal Code: NSRDRS29S22Z315Y (individual) [SDGT]*

is suspected to be linked with terrorism.

---

[5] enclosure # 4 ( 2 pages)
[6] enclosure # 5, report of the on site review of records seized in Switzerland (April 2nd to April 12th , 2002)

4

It is crucial for our investigations to get all the information in your possession about this person. This information will help us to examine the documentation we have seized in his societies.

In particular, we need to know:

♦ the reasons why this person is on the Bush list # 12;
♦ copies of all documents that have brought the US authorities to the decision to put this name on the list;
♦ copies of all documents indicating that this person is supporting and/or taking part in terrorist action or is financing terrorist groups.

### 3.   Competence

Under Swiss law an in accordance with the MLAT between Switzerland an the United States of America, the Office of the Attorney General of Switzerland is responsible for seeking international mutual assistance in criminal matters.

### 4. Urgency

Urgency is requested in the application of art. 31 para. 5 of the Treaty[7], this in general due to the nature of the case and as the announcements by the financial intermediaries and banks are likely to be made in the coming days and fixing short legal delays to maintain freezes or to unfreeze funds .

### 5.   Request for a bilateral meeting

We seize the opportunity to reiterate our proposition made during the February 2002 visit of the Attorney General of Switzerland, Dr. Valentin Roschacher and Mr. Michel-André Fels, Federal Prosecutor, International Affairs, on February 28, 2002 tending to discuss how the operational aspects of the legal assistance proceedings between our two countries might be optimised. This meeting with US Treasury, the DOJ, OIA and the FBI could take place this spring or in early summer. The undersigned as well as Mr. Michel-André Fels would be happy to travel to the United States and to find solutions to speed up and to optimise our common work, all this under the working-title "stretch the system but do not break it"!. We invite you therefore to co-ordinate with the DOJ in order to set up this meeting we consider to be of the highest importance.

---

[7] Treaty of 25th May 1973 between the Swiss Confederation and the United States of America on International Mutual Assistance in Criminal Matters; hereafter Treaty; RS 0.351.933.6

# EXHIBIT O-13

| | |
|---|---|
| **Von:** | Nicati Claude BA |
| **Gesendet:** | Freitag, 6. Dezember 2002 17:11 |
| **An:** | 'william.HOFFMAN@do.treas.gov' |
| **Cc:** | _FEDPOL-BKP Büro WTC |
| **Betreff:** | RE: Massachussets Raid: al-Kadi link mentioned |

Dear Mister Hoffman,

Thank You very much for your information. Of course that was also for me a pleasure to work with You.

Best wishes for You to and I hope You will enjoy a good beginning in the new function.

Regards

Claude Nicati

-----Message d'origine-----
**De:** william.HOFFMAN@do.treas.gov [SMTP:william.HOFFMAN@do.treas.gov]
**Date:** vendredi 6 décembre 2002 15:55
**À:** claude.nicati@ba.admin.ch
**Cc:** giulio.haas@was.rep.admin.ch
**Objet:** FW: Massachussets Raid: al-Kadi link mentioned

Dear Mr. Nicati -- Here is another action affecting al-Kadi. The information concerning this matter is with the FBI and Operation Greenquest.

I also want to take this opportunity to tell you that I will be leaving the Treasury Department at the end of December, and will begin work in the State Department's Legal Adviser's Office, probably in early February 2003. It has been a pleasure working with you! I do not yet know whether I will be working on law enforcement matters at the State Department, but that is one of several possibilities.

Best wishes for the holidays!
Bill Hoffman

-----Original Message-----
**From:** Choppin, Adam
**Sent:** Friday, December 06, 2002 9:23 AM
**To:** Fox, William; Zarate, Juan; Ashin, Paul; Beal, Jason; Hoffman, William; Jaakson, Juhan; Lurie, Paul; Murden, Bill; Quinn, Lois; Ross, Jeff; Vardaman, John III

**Subject:** Massachussets Raid: al-Kadi link mentioned

## Hotlink to Terror?
### Feds Raid Boston Area Computer Firm Suspected of Links to Al Qaeda
ABC News
Dec. 6
- Federal agents have raided a Boston-area computer software firm looking for evidence that the company, which does business with key government agencies including the FBI, might have links to Osama bin Laden's terror network.

The Quincy, Mass., firm, Ptech, makes software and is allegedly secretly owned by **Qassin al-Kadi**, one of 12 Saudi businessmen accused of funneling millions of dollars to al Qaeda. U.S. government investigators told ABCNEWS' chief investigative correspondent Brian Ross that there are fears al Qaeda may have had access to some of the government's most closely held secrets through the company, which provided computer software for the FBI, the Navy, the Air Force and the agency that handles nuclear weapons security.

Just before midnight Thursday, in a driving snowstorm that blanketed the East Coast, a team of U.S. Customs agents raided the firm's Quincy offices.

The raid was the culmination of a top-secret investigation coordinated with the White House amid concerns that the company was secretly owned and controlled by al Qaeda activists or sympathizers.

The agents brought their own computers with them to download files from the firm's computers.

Agents could be seen inside the Ptech headquarters, searching the offices and going through the company's computers.

The company's Web site reveals a list of customers that is a who's-who of sensitive government agencies, including the Naval Air Systems Command, NATO, the House of Representatives and the Department of Energy, which handles security for nuclear weapons and material.

Looking for a 'Back Door'

Officials believe Ptech is linked to one of bin Laden's alleged money men, a Saudi multi-millionaire named Qassin al-Kadi.

Al-Kadi has repeatedly denied any connection to bin Laden, but he is on the U.S. government's so-called "dirty dozen" list of leading terror financiers who are being investigated by the CIA, and his accounts have been frozen by the United States.

In an interview last year with ABCNEWS' John Miller, al-Kadi denied sending any money to bin Laden. "To hear such an accusation had been put on myself, this is a complete mistake, a big one," he said.

American officials say al-Kadi and the other businessmen on the CIA list all have business and personal connections to the Saudi royal family.

The Customs investigation has been given the highest priority inside the government and for the last few weeks, government agencies have quietly been searching their computer software to see if there are any hidden bugs or "back doors" that would make it easy for terrorist hackers to break in.

ABCNEWS correspondent Brian Ross contributed to this report.


**DJ US Agents Raid Mass Co Ptech; Terror Link Feared - ABC**
DOW JONES NEWSWIRES
December 6, 2002
NEW YORK (Dow Jones)--U.S. agents have raided the Quincy, Mass., offices of
Ptech Inc. because of concerns that the company is controlled by al-Qaida
sympathizers or activists, ABC News reported Friday.

"Good Morning America" showed scenes of agents at the company and said the
top-secret raid had been coordinated by the White House and given the highest
priority. It said agents had brought their own computers to download files from
the company.

ABC reported that U.S. officials believe that Ptech is linked to one of
several Saudi businessmen thought to be financiers of Osama bin Laden. The
report said that the businessman, who has denied links to bin Laden, has had his
accounts frozen by the U.S. and is on the U.S. government list of terrorist
financiers.

The network noted that Ptech's Web site lists sensitive U.S. government
customers, including the Federal Bureau of Investigation, U.S. Air Force and
Department of Energy as well as the North Atlantic Treaty Organization.

According to the report, U.S. officials have been examining government
software to see if there might be bugs enabling terrorists to get access to
sensitive data.

# EXHIBIT  O-13A

6th Swiss Request → US

Dour 13 2003 - requests interrogation of Salim

we don't have - is referred to in 15 Dec 2003 request.

# EXHIBIT O-14

## Pestoni Janine BA

| | |
|---|---|
| **Von:** | Nicati Claude BA |
| **sendet:** | Mittwoch, 14. Mai 2003 13:45 |
| | Pestoni Janine BA |
| **Betreff:** | TR: Visit in Switzerland - follow up questions |

Ad acta

Nic

-----Message d'origine-----
| | |
|---|---|
| **De:** | Rouiller Jean-Paul   LFB |
| **Date:** | lundi 12 mai 2003 15:03 |
| **À:** | 'chip.poncy@do.treas.gov'; Nicati Claude BA |
| **Objet:** | Visit in Switzerland - follow up questions |

Dear Mr Poncy,

as you might remember, during your quick passage at the LFB offices, I mentioned the al Qadi case and the connection we were able to establish between him and Mr Wael Hamza Juleidan. According to our information, the Turkish account Juleidan used in Turkey to receive al Qadi's money might be connected to the Maram Company, a structure connected (according to your intel services) to al Qa'eda.

Based on the above information, and on behalf of Mr Nicati, I am wondering if you could provide us with any sensitive (opens sources are not necessary, we also have our share on the guy) piece of info relating to Wael Hamza Juleidan.

We would be glad if you could be of any help in this matter. It would tremendously help us support our case against al Qadi.

Thanks for your help

Regards

Jean-Paul Rouiller

1

# EXHIBIT O-15



**DEPARTMENT OF DEFENSE**
CRIMINAL INVESTIGATION TASK FORCE
6010 6TH STREET
FORT BELVOIR, VIRGINIA 22060

13 June 2003

Florence R. Schurch
Police Attache'
Embassy of Switzerland
2900 Cathedral Avenue, NW
Washington, DC 20008

SUBJECT:  Request for Assistance on Jelaidan and Al -Qadi

1.    The following are the results of the Department of Defense
Criminal Investigation Task Force (DoD CITF) search for releasable
information pertaining to Wael Hamza Jelaidan (Variant: Jalaidan,
Julaidan), and Yasin Al-Qadi (Variant: Yassin Kadi):

-Jelaidan is a Saudi National who allegedly joined forces with Usama
bin Laden's (UBL) mentor, the late Palestinian scholar Abdullah Azzam.
The U.S. Government has described Jelaidan as a 'co-founder' of al-
Qaida and its logistics chief.  In September 2002, the U.S. Department
of the Treasury froze Jelaidan's assets after designating him as a
'supporter of al-Qaida terror.' A United Nations Report identified
Jelaidan as a leading financial supporter of al-Qaida and UBL
acknowledged close relations with him.

-Al-Qadi is a prominent Saudi businessman, who first drew U.S.
attention in 1998 when he was accused in an FBI affidavit of sending
$820,000 in a money-laundering scheme to finance the militant Islamic
group Hamas; he was not charged in the case.  In October 2002, the
U.S. and British Governments froze Al-Qadi's assets for allegedly
supporting Al-Qaida.   U.S. Government sources stated that Al-Qadi
channeled millions of dollars to UBL through the Muwafaq (Blessed
Relief) Foundation.

2.    Intelligence and open source information link strong ties between
Jelaidan and Al-Qadi.    Same sources reflect high probability that
both individuals are connected with known international terrorist
groups.

3.    If you have any questions concerning this letter please do not
hesitate to contact Brandon Bergstedt, at (703) 805-3345.

MARK FALLON
Deputy Commander

Printed on Recycled Paper

# EXHIBIT O-16

17/12 '03 10:04 FAX +41 31 3225380      DOSSIERVERWALTUNG BJ                    ☒001/002

 **Bundesamt für Justiz · Office fédéral de la justice · Ufficio federale di giustizia · Federal Office of Justice**
Eidg. Justiz- und Polizeidepartement · Département fédéral de justice et police · Dipartimento federale di giustizia e polizia · Federal Department of Justice and Police

| | |
|---|---|
| 3003 Berne, December 17, 2003 | **By facsimile** and **lettre signature** |

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

E 17. DEZ. 2003

Telephone ++ 41 31 322 58 95
Telefax ++ 41 31 322 53 80

Ihr Zeichen
Votre réf.
Vostro rif.

Unsor Zeichen
Notre réf. **B 128 909/03 BOG/BAK**
Nostro rif.

In replying please
quote this file number

Office of International Affairs
U. S. Department of Justice
10th and Constitution Ave., NW
Criminal Division
Keeney Building
Washington, DC 20530
USA

---

**Request for Assistance made by the Office of the Attorney General of Switzerland on December 15, 2003 in the case of Yassin Abdullah KADI**

---

Dear Ms. Warlow,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above-mentioned case.

The Swiss Federal Prosecutor is conducting an investigation against the above-mentioned person for criminal organisation. All the relevant details concerning the facts of the case, involved persons and the requested assistance may be taken out from the enclosed rogatory letter.

Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

Giorgio Bomio

Enclosures mentioned

Copy for information:

- Office of the Attorney General of Switzerland, Taubenhalde 16, 3003 Berne
  (BA/EAII/1/01/0007/0006)

 **SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**

3003 Berne

Berne, December 15, 2003

*via Swiss Federal Office of Justice, Central Authority for*
*Legal Assistance with the United States*

Case: BA/EA II/1/01/0007/0006

<u>**CONFIDENTIAL**</u>

# COMPLEMENTARY REQUEST FOR MUTUAL ASSISTANCE IN CRIMINAL MATTERS

**FROM THE OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND**
**TO**
**THE CRIMINAL INVESTIGATION AUTHORITIES OF THE UNITED STATES**
**VIA**
**THE DEPARTMENT OF JUSTICE OF THE UNITED STATES OF AMERICA,**
**OFFICE OF INTERNATIONAL AFFAIRS**
**10th AND CONSTITUTION AVE., NW**
**CRIMINAL DIVISION / KEENEY BUILDING**
<u>**WASHINGTON, D.C. 20530**</u>
<u>**USA**</u>

Dear Sir,
Dear Madam,

The Office of the Attorney General of Switzerland is conducting a criminal investigation pursuant to Art. 101 *et seg.* of the Swiss Federal Law on Penal Procedure (LPP) against the person of

<u>**Yassin Abdullah KADI born on February 23, 1955 in Egypt, citizen of Saudi**</u>
<u>**Arabia**</u>

2

for suspected violation of Art 260ter of the Swiss Penal Code (participation in a criminal organization). A copy of this legal statute is included as annex to this complementary request for mutual legal assistance.

The alleged criminal act is indirectly related to the PENTHBOMB case. The foremost objective of the proceeding opened in Switzerland against Yassin KADI is to determine whether the powerbrokers of the terror attacks found any kind of financial support in Switzerland. In particular, KADI is alleged having made payments to terrorist organizations from 1990 until 1993.

In the course of the present proceeding, six MLAT requests have already been transmitted to the competent US authorities. The last one is from January 13, 2003 asking for the interrogation of Mahmoud Mamdouh SALIM. This interrogation has not yet been realized.

## 1. SUMMARY OF THE FACTS

1.  On October 25, 2001, the Office of the Attorney General of Switzerland opened a criminal investigation against Yassin KADI who allegedly supported a terrorist organization.

2.  Summarizing, between 1990 and 1993 Mr. KADI transferred large amounts of money from Saudi Arabia on his accounts at a bank in Switzerland. These deposits were made for a total sum representing USD 23 millions. Subsequently, amounts almost equivalent to those deposited on the account by Mr. KADI, were first transferred to the accounts of Mr. JULEIDAN, a suspected logistics chief for Usama Bin Laden, then transferred to different accounts in Turkey. The principal beneficiary of these transactions was Wael JULEIDAN, at that time owner of the firm MARAM Ltd. in Istanbul. JULEIDAN and his partner Mohammed Luay BAYAZED bought MARAM from Mamdou Mahmod SALIM, a well known member of Al Qaida. Besides, the aforementioned Mohammed Luay BAYAZED was the President of the Chicago-based Benevolence International Foundation in 1994, whose director, Enaan ARANAOUT, is in prison for financial support of Al Qaida.

3.  Mr. KADI was interrogated by the Office of the Attorney General of Switzerland and by the Federal Criminal Investigation Police in Saudi Arabia on July 1, 2003. Upon questioning, he stated that the money transferred to accounts in Turkey was set aside in order to finance school buildings in Yemen. His statements and explanations appeared to be untrustworthy.

3

## 2. REQUEST

1.    On February 14, 2001 a proceeding has been opened against SADEEK ODEH, MOHAMED RASHED AL-'OWHALI, KHALFAN KHAMIS, WADIH EL HAGE et al. for charges in relation to attacks against the US embassies in Africa.
According to our information, WADIH EL HAGE and Jamal AHMED AL-FADL were personal assistants to Usama BIN LADEN and both are detained in New York. ESSAM AL RIDI AND HOUSSAINE KHERCHTOUM are said to be former members of Al Qaida. According to our information, they are also in custody in the district of New York.

2.    It seems that these persons may have some information related to the ongoing investigation against Yassin KADI in Switzerland. In particular, they may provide the Swiss authorities with facts relating to:

- MARAM Ltd.
- Yassin KADI
- Wael JULEIDAN
- Mohammed BAYAZED

The Office of the Attorney General of Switzerland, invoking the Treaty between the Swiss Confederation and the United States of America on Mutual Assistance in Criminal Matters, signed on 25 May 1973, and the Federal Act of 3 October 1975 implementing said Treaty, **kindly requests the cooperation of the American Criminal Investigation Authorities to :**

2.1.   Allow the undersigned magistrate, together with representatives of the Federal Criminal Police, to interrogate personally

- Mr. Mahmoud Mamdouh SALIM (according to our request dated January 13, 2003)

- Wadih EL HAGE

- Jamal AHMED AL-FADL

- Essam AL RIDI

- L'Houssaine KHERCHTOUM

as **witnesses** at the location of their detainment in New York or at any other location designated by the competent judicial authority.

4

In the course of our investigations, it seems that these persons may have some information which would allow us to further the investigations opened against the above-mentioned Yassin KADI.

2.2.   To grant the access to the files of the proceedings opened in the USA against the abovementioned persons.

2.3.   Provide the undersigned magistrate with any further information regarding the aforementioned persons. The information requested should concern condemnations by courts of law, legal proceedings underway, investigations which have been suspended, as well as any simple or well-founded suspicions.

## 3. COMPETENCE

Under Swiss law and in accordance with the MLAT between Switzerland an the United States of America, the Office of the Attorney General of Switzerland is responsible for seeking international mutual assistance in criminal matters.

The Office of the Attorney General of Switzerland hereby guarantees that the information obtained within the framework of this request for mutual assistance in criminal matters shall be solely reserved for use as evidence in criminal proceedings relating to violations of common law.

In the course of this investigation, the undersigned is planning a stay in the USA from **19 to 24 January 2004** so that the consultation of the files and the interrogation of the abovementioned persons could take place during this period.

For any complement of information required, we would kindly request the American Authorities to contact the Undersigned Claude NICATI (Tel. ++41 31 322 45 30 or Fax ++41 31 322 45 07) or Mrs. Juliette NOTO, assistant to the Federal Prosecutor (Tel. ++41 31 322 06 27).

Thanking the American Authorities in advance for their greatly appreciated cooperation, we remain

5

Sincerely yours,


**DEPUTY ATTORNEY
GENERAL OF THE SWISS
CONFEDERATION**

Claude Nicati


Copy to:

- Dominique Ritter, Swiss Criminal Police FEDPOL (Task Force Terror), 3003 Berne
- Ms Florence SCHÜRCH, Police Attachée FEDPOL, Washington DC.


Enclosure:

• Legal provisions mentioned (Art. 260ter of the Swiss Penal Code)

## Article 260ter Criminal organization

1. Everyone who participates in an organization that keeps its structure and membership secret and whose purpose is to commit criminal acts of violence or obtain revenues by criminal means, everyone who supports the criminal activities of such an organization, shall be liable to imprisonment for a maximum of 5 years.

2. The judge is free to reduce the sentence (Sec. 66) in respect of a person who has endeavoured to prevent the organization's pursuit of criminal activity.

3. A person who commits an offence abroad is also liable to punishment if the organization exercises or has to exercise its criminal activity in whole or in part within Switzerland. Sec. 3 (1) 2nd paragraph shall apply.

5

Thank you for your assistance in this matter.

Yours sincerely

**The Deputy Attorney General**

Claude Nicati

Copy to : Swiss Criminal Police (Task Force CH/USA)

# EXHIBIT O-17

 **Bundesamt für Justiz** · Office fédéral de la justice · Ufficio federale di giustizia · Uffizi federal da giustia
Eidg. Justiz- und Polizeidepartement · Département fédéral de justice et police · Dipartimento federale di giustizia e polizia · Departement federal da giustia e polizia

3003 Berne, 23 avril 2004

Téléphone  031 322 58 95
Téléfax  031 322 53 80

Ihr Zeichen
Votre réf.  BA/EAII/1/01/006
Vostro rif.

Unser Zeichen
Notre réf.  B 128 909/03 BOG/BEA
Nostro rif.

Ministère public de la Confédération
All'att. de M. Nicati
Procureur général suppléant
3003 Berne

Enregistré

| SCHWEIZERISCHE |
| BUNDESANWALTSCHAFT |
| E   2 3. APR. 2004 |
| EAII /1/01 /0006 |
| Nic | Vui | |

### Commission rogatoire du 15 décembre 2003, dans l'affaire Yassin Abdullah KADI adressée aux autorités compétentes américaines

Monsieur le Procureur général suppléant,

Nous nous référons à l'affaire précitée et vous transmettons, ci-joint, copie du fax du Département de la justice américain, daté di 21 avril 2004, pour information.

En restant à votre disposition pour d'éventuels renseignements, veuillez agréer, Procureur général suppléant, nos salutations distinguées.

**DIVISION DE L'ENTRAIDE JUDICIAIRE INTERNATIONALE**
Section de l'entraide judiciaire

Giorgio Bomio

Annexe mentionnée

*informal translation, to be inserted at tab 17*

From Swiss Federal Justice Office to Claude Nicati
Berne, 23 April 2004

**Request for judicial assistance of 15 December 2003 in the Kadi matter made to the American authorities**

Dear Mr Public Prosecutor

We refer to the above matter and are sending you a copy of a fax received from the American Department of Justice, dated 21 April 2004, for your information.

We remain at your disposal.

Yours faithfully,

International mutual legal assistance section

PCR1-219524.1

4/21/2004 17:25 FAX                                    ☒001



# Office of International Affairs

BA Justiz
E  22. APR. 04
B 128909/3
Act

DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
1301 NEW YORK AVENUE, NW - SUITE 800
WASHINGTON, DC 20005

## TELEFAX TRANSMITTAL SHEET

DATE: 04·21·04

TO: Mr. Raphael Mauro

FROM: J. Thirolf (for J. Friedman)

SUBJECT: Salim - Kadi Request from S2

MESSAGE:

Please find attached our cover letter and a letter from USAO - Southern District of New York.

TOTAL NUMBER OF PAGES (INCLUDING THIS ONE): 4

TRANSMITTED BY:

FOR VOICE COMMUNICATION WITH THIS OFFICE, PLEASE TELEPHONE: (202)514-0000

·4/21/2004 17:26 FAX                                                    ☑002



                                        **U.S. Department of Justice**

                                        *Criminal Division*

MEW:RT:JHF:JT:jt
182-15033 (please repeat when responding)

                                        Washington, DC 20530

                                        April 21, 2004

<u>By Facsimile and Airmail</u>

Raphael Mauro, Esquire
Central Authority for U.S. Requests
Division of International Legal Assistance
Federal Office of Justice
Bundesrain 20
3003 Bern
Switzerland

Dear Mr. Mauro:

    Re:    Request from Switzerland for Assistance in the Matter of WTC/ Mahmoud
           Mamdouh SALIM/ Yassin Abdullah KADI - Swiss Reference
           <u>Number B 128 909/03 BOG/BAK</u>

       Enclosed is a letter from the U.S. Attorney's Office for the Southern District of New
York in response to the above-captioned treaty request.  Please forward this letter to Mr. Nicati.

    Thank you for your assistance in this matter.

                                    Sincerely,

                                    Mary Ellen Warlow
                                    Director
                                    Office of International Affairs
                                    Criminal Division

                        By:     *Judith Friedman*

                                    Judith Friedman
                                    Senior Trial Attorney

Enclosures

4/21/2004 17:26 FAX                                                                    ☑003

JF
6 B

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 19, 2004

**BY FEDERAL EXPRESS**

Judith H. Friedman
Office of International Affairs
1301 New York Avenue, N.W.
Washington, D.C. 20530

**Re: Swiss Request for Witness Statements**

Dear Ms. Friedman:

I write in response to your inquiry regarding Switzerland's request to interview a number of convicted al Qaeda associates, including Wadih el Hage, Mamdouh Mahmud Salim, Jamal al-Fadl and L'Houssaine Kherchtoum.

As you are aware, in May 2001, el Hage was convicted after a five-month trial of terrorism offenses, among other crimes, and subsequently was sentenced to life imprisonment. El Hage's appeal of his conviction currently is pending in the Second Circuit Court of Appeals. As such, el Hage continues to enjoy the Fifth Amendment privilege against self-incrimination. I recently spoke with one of el Hage's lawyers who advised that he (el Hage) would indeed assert his Fifth Amendment right should he be asked to speak with Swiss law enforcement authorities.

In April 2003, Salim pled guilty to conspiring to murder a federal official; his conviction is not yet final as he has not yet been sentenced. As a result, like el Hage, Salim retains the right to assert the Fifth Amendment privilege, which is exactly what his lawyer has advised he (Salim) would do if asked to be interviewed. It is expected that these appeals will not be resolved for a long time. As such, it will be a long time before the privilege against self-incrimination becomes unavailable to el Hage and Salim.

Al-Fadl and Kherchtoum are cooperating witnesses who testified at el Hage's trial. Neither al-Fadl nor Kherchtoum has been sentenced; future testimony is expected by these witnesses. As we advised Mr. Nicati during his January 2004 visit to New York, we are available to ask questions of al-Fadl and/or Kherchtoum on Mr. Nicati's behalf.

- 121176

14/21/2004  17:26 FAX                                                    ☒004

Judith H. Friedman
April 19, 2004
page 2

   Please do not hesitate to call should you have any questions.  We, as always, are happy to provide whatever assistance you require.

                        Very truly yours,

                        DAVID N. KELLEY
                        United States Attorney
                        Southern District of New York

By:                    _____

                        LESLIE C. BROWN
                        KENNETH M. KARAS
                        ROBIN A. LINSENMAYER
                        Assistant United States Attorneys
                        (212) 637-2638/1034/2307

# EXHIBIT O-18

 **SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**
**PROCURA FEDERALA**

| | |
|---|---|
| Procureur général suppléant: | Claude Nicati |
| Assistante du procureur: | Juliette Noto Lherminé |
| Greffière: | Annick Vuilleumier |

3003 Bern

Tél.: +41 31 322 06 74
Fax: +41 31 322 05 03

E-mail: annick.vuilleumier@ba.admin.ch

Procédure n° MPC/EAII/1/01/0006                    Berne, le 21 juin 2004

## Note au dossier

Le document daté du 2 juin 2004 du U.S. Department of Justice, rédigé par l'agent du FBI Mike Anticev, à été remis par lui-même en date du 8 juin 2004 à Monsieur Claude Nicati.


                                        Annick Vuilleumier
                                        Greffière

*informal translation, to be inserted at tab 18*

Berne 21 June 2004

Note to the file on Swiss Public Prosecutor's headed paper

The document dated 2 June 2004 from the US Department of Justice, written by FBI agent Mike Anticev, was delivered by him to Mr Claude Nicati on 8 June 2004.

PCR1-219526.1



Enregistré

**U.S. Department of Justice**

Federal Bureau of Investigation

In Reply, Please Refer to
File No.
315N-NY-259391

New York Office
June 2, 2004

Co-operating Witness Interview

On 1/13/2004, a co-operating witness, hereafter referred to as "source", was interviewed about an individual named Yasin Al-Kadi. The source advised the following:

The source advised that Yasin Al-Kadi is from the Dosari (phonetic) tribe in Saudi Arabia and that he may use the alias Abu Khalid. Although the source never directly worked with Al-Kadi, he (source) saw Al-Kadi twice, circa 1993-94, at one of Osama Bin Laden's guesthouses located in the Riyadh City section of Khartoum, Sudan. The source believes that Al-Kadi in not a member of Al-Qaida, but was definitely a noteworthy individual who supported jihad.

The source advised that Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located inside the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time. The source was told by Abu Fadl Al-Makki that Al-Kadi would bring donated money from the Gulf area, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan.

The source advised that Al-Kadi also brought money to Khartoum for Al-Qaida. According to the source, some of this money was used to help finance the building of the Damazin to Kurmuk road which was started at the end of 1989. Furthermore, the source advised that Abu Unaith and Abu Hammam were involved in establishing the Wadi Al-Aqiq company.

The source advised that Al-Kadi also supported Al-Haramain in Zagreb, Croatia during the conflict in Bosnia. Like

document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Afghanistan and Sudan, Al-Kadi brought donations from Saudi
Arabia and other Gulf countries to Croatia to support the jihad.
The source was not sure if any of the money was from Al-Kadi
personally.  Aside from money, Al-Kadi was also responsible for
shipping tapes and books about jihad and Islam to Al-Haramain.
The source advised that these shipments were sent to Croatia and
forwarded to Bosnia for distribution.  According to the source,
some of the material remained in Croatia and was distributed to
Arab and Bosnian Muslims residing there.

          Furthermore, the source advised that while he was in
Zagreb, Croatia, Abu Ayman Al-Sudani (not the Abu Ayman Al-Sudani
who is related to Mohamed Suliman Al-Nalfi) told him that Al-Kadi
was one of the individuals who financially supported Al-Haramain.
The source advised that Abu Ayman is originally from Kassalla,
Sudan and was one of the individuals who managed the Al-Haramain
office in Zagreb.  The source believes that Abu Ayman was not an
Al-Qaida member but did support the group.  To clarify the
management structure of Al-Haramain in Zagreb, the source advised
that the Emir of the office was a Saudi named Al-Sheikh Aqil
(phonetic) and under him was an individual named Al-Sheikh Adnan
Ar-Roor (phonetic).  According to the source, Abu Ayman worked
under Aqil, who he (source) described as having a wandering eye,
and Ar-Roor.  However, Abu Ayman told the source that the person
who actually ran Al-Haramain was Saudi Prince Fiasal Al-Turki.

          The source advised that Ar-Roor was originally from
Syria and was also involved in financing jihad in Afghanistan and
Bosnia.  According to the source, Ar-Roor was not an Al-Qaida
member.  However, Ar-Roor is an Islamic scholar who gave a lot of
lectures about jihad and was good friends with Al-Kadi.

          Finally, the source advised that the money that was
being sent to Pakistan by Al-Kadi was done through the Hawala
system and not traditional banks.  The source was not sure about
the method by which money was being sent to Croatia.

2

# EXHIBIT O-19

# SUMMARY OF CLAUDE NICATI'S PRESS RELEASE
## DATED 24 JUNE 2004

Does not name Kadi, by says :

"A scond important element of the investigations conducted post September 11 was the extension of procedure to a Saudi National who maintains business relations, from Saudi Arabia, with Switzerland and USA.  He is suspected of having transferred several millions in his capacity as former president of a charitable foundation called "Muwafaq" to people linked with the Al Qaeda network, by using Swiss bank accounts. The Public Prosecutor froze his Geneva bank account containing millions of US dollars.

He has been interviewed, several times, by Nicati, denies having terrorist links. Public Prosecutor also closing this investigation."

PCR1-219467.1



SCHWEIZERISCHE BUNDESANWALTSCHAFT
MINISTÈRE PUBLIC DE LA CONFÉDÉRATION
MINISTERO PUBBLICO DELLA CONFEDERAZIONE
OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND

---

Medienmitteilung – Communiqué aux médias – Comunicato per la stampa – Media release

---

*Embargo: jeudi 24 juin 2004, à 14.15 heures*

## Le MPC clôt les enquêtes antiterroristes menées avec la PJF et il dresse un bilan provisoire.

**Trois procédures de transmises à l'Office des juges d'instruction fédéraux**

**Berne, le 24 juin 2004.** Le Procureur général de la Confédération, Valentin Roschacher, et son suppléant, Claude Nicati, ont informé les médias, ce jeudi, au Palais fédéral, de la clôture imminente des enquêtes suisses entreprises par le Ministère public de la Confédération (MPC) et par la Police judiciaire fédérale (PJF) après les attentats du 11 septembre 2001; puis, ils ont établi un bilan provisoire. D'après les autorités de poursuite pénale de la Confédération, la Suisse n'a pas occupé, jusqu'à présent, une place primordiale, dans les activités déployées par le réseau terroriste international Al-Quaida, en tant qu'organisation criminelle, mais elle est touchée, de manière périphérique, par d'allégués délits relevant de son soutien logistique et de son financement. Trois enquêtes complexes seront transmises, dans les semaines à venir, à l'Office des juges d'instruction fédéraux (OJI) aux fins de l'instruction préparatoire fédérale.

Le 15 septembre 2001, le Ministère public de la Confédération a ouvert une enquête à l'encontre d'inconnus en corrélation avec les attentats perpétrés aux Etats-Unis. Il s'agissait d'élucider les relations qui pouvaient exister entre ces actes terroristes et des événements en Suisse. On a fondé la „Task Force Terror USA", au sein de l'Office fédéral de la police, afin que la Police judiciaire fédérale mène à bien ces enquêtes. Alors que les premières recherches avaient cherché à déterminer, en premier lieu, si la Suisse aurait été concernée par la préparation logistique des attentats, on a recueilli peu après des indices portant sur un éventuel transit, par la place financière suisse, de capitaux servant au financement du terrorisme.

**Soupçon de financement du terrorisme par le biais d'une société financière**

Le 24 octobre 2001, le Ministère public de la Confédération a étendu l'enquête à deux responsables de la société financière „Nada Management Organization SA" (précédemment „Al Taqwa") sise au Tessin, à Lugano ; il a mis sous séquestre, le 7 novembre 2001, nombre de documents au cours d'une opération coordonnée avec l'Italie et le Liechtenstein. Leur dépouillement a pris du temps vu leur volume. L'analyse a confirmé les

suspicions qui pesaient sur les deux prévenus ; ils avaient apporté leur soutien à une organisation criminelle. Ils sont soupçonnés d'avoir mis sur pied les canaux par lesquels les montants servant au financement d'activités terroristes ont coulé à destination de la Suisse et en provenance de cette dernière. L'enquête va être close et la procédure sera transmise, dans les prochaines semaines, à l'Office des juges d'instruction fédéraux pour suite à donner dans le cadre de l'instruction préparatoire fédérale. Cette dernière constitue la deuxième des trois phases que connaît la procédure pénale de la Confédération.

**Soupçon de financement du terrorisme par le biais d'une fondation caritative**

Un deuxième élément primordial des investigations conduites après les attentats perpétrés aux Etats-Unis a été l'extension de la procédure, le 25 septembre 2001, à un ressortissant saoudien qui entretient des relations d'affaires, depuis l'Arabie saoudite, avec la Suisse et avec les Etats-Unis. Il est soupçonné d'avoir transmis plusieurs millions, en sa qualité d'ancien président d'une fondation caritative dénommée „Muwafaq", à des proches du réseau Al-Qaida, en utilisant des comptes suisses. Le Ministère public de la Confédération a bloqué des avoirs pour un montant de plusieurs millions de dollars US dans une banque de Genève ; il s'agit d'un nombre à deux chiffres. Le prévenu a été entendu, à plusieurs reprises, par Claude Nicati, Procureur général suppléant de la Confédération ; il conteste avoir des liens avec les milieux terroristes. Des demandes d'entraide judiciaire ont été présentées à l'Arabie saoudite, aux Etats-Unis, à la Turquie et à l'Albanie dans le cadre des investigations le concernant. Le Ministère public de la Confédération clôt également cette procédure ; il demandera à l'Office des juges d'instruction fédéraux de s'en saisir aux fins de l'instruction préparatoire.

**Soupçon de soutien logistique à Al-Qaida**

Un troisième élément primordial des enquêtes antiterroristes menées par le Ministère public de la Confédération et par la Police judiciaire fédérale concerne l'attentat de Ryiad du 12 mai 2003, au cours duquel un ressortissant suisse a trouvé la mort. On a recueilli des indices de contacts téléphoniques avec la Suisse, à Ryiad, auprès de plusieurs personnes qui entretenaient des liens étroits avec les auteurs de l'attentat ; ces indices portent sur 36 numéros de téléphone suisses. Le Ministère public de la Confédération a ouvert ici, le 20 mai 2003, une enquête contre inconnus pour soutien apporté ou participation à une organisation criminelle, entre autres ; il a étendu cette procédure, entre septembre et décembre, à un groupe de neuf personnes de nationalité étrangère résidant en Suisse. Au fil des investigations menées sur les rapports au sein de ce groupe et sur les activités concrètes de ses membres en Suisse et à l'étranger, il est apparu qu'une d'entre elles consistait manifestement à faire entrer illicitement en Suisse des gens provenant du monde arabe, notamment du Yémen, et de leur fournir ici de faux papiers. Les investigations ont montré que ces personnes, dont certaines pourraient avoir entretenu des contacts étroits avec Al-Quaida, sont passées à la clandestinité ou qu'elles ont été conduites dans d'autres pays d'Europe. Les investigations ont conduit, le 22 décembre 2003, à une première arrestation. On a procédé, le 8 janvier 2004, à huit autres arrestations et à des perquisitions étendues dans les

3

cantons de Vaud, de Genève, de Berne, d'Argovie et de Zurich. Dans le cadre de cette procédure, le MPC a présenté des demandes d'entraide judiciaire à l'Arabie saoudite, au Qatar, au Yémen, à la Belgique, à l'Italie, à l'Allemagne et à la France. Quatre des prévenus, détenus en préventive, ont été libérés depuis lors car il n'y a plus de danger de collusion. La procédure menée à l'encontre de ces personnes suit son cours. Début mai 2003, une autre personne, impliquée elle aussi dans la procédure, a été placée en détention préventive, ce qui fait qu'à l'heure actuelle six des dix personnes arrêtées se trouvent encore sous les verrous. Dans cette affaire, quatre recours ont été rejetés, depuis janvier, par le Tribunal fédéral ou par le Tribunal pénal fédéral à Bellinzone. Deux demandes de libération provisoire ont également été refusées. Enfin, le Ministère public de la Confédération va clore la procédure, dans les jours à venir, et il la transmettra, dans les prochaines semaines, au juge d'instruction fédéral pour instruction préparatoire, les soupçons ayant été confirmés au cours de l'enquête. Tant qu'un tribunal n'aura pas prononcé de jugement, la présomption d'innocence vaudra pour tous les personnes concernées par la procédure.

« Task Force USA », autres procédures et entraide judiciaire

Les tâches de la „Task Force Terror USA" ont été transférées, à la fin de l'an passé, à un commissariat de la Police judiciaire fédérale, le commissariat „Terrorisme". Outre les travaux consacrés aux procédures complexes mentionnées plus haut, bien plus d'un millier d'indices portant sur d'éventuelles relations avec Al-Qaida, en Suisse, ont fait l'objet de vérifications depuis le 15 septembre 2001. Certains d'entre eux étaient parvenus à des services de police ; d'autres étaient passés par les canaux d'information de ces derniers et d'autres encore avaient été transmis au Bureau de communication en matière de blanchiment d'argent de l'Office fédéral de la police. Ils ont nécessité des recherches parfois très étendues et longues. Dans la très grande majorité des cas, on a pu exclure tout rapport avec le terrorisme international. Ce n'est que dans de rares cas que sont apparus des éléments susceptibles de fonder une procédure, du point de vue pénal, ou que des soupçons plus concluants se sont faits jour sur des relations du réseau Al-Qaida en Suisse ou transitant par la Suisse; tel a été ainsi le cas après les attentats de Djerba en avril 2002 et de Bali en octobre 2002 (la procédure du Ministère public de la Confédération a été classée entre-temps) et après les attentats d'Istanbul en novembre 2003 (la procédure est encore ouverte), ou bien encore en connexité avec la tentative faite par deux ressortissants britanniques d'entrer en Suisse, en septembre 2002, à un poste-frontière de Bâle (la procédure est encore ouverte, une demande d'entraide judiciaire étant pendante auprès des autorités britanniques) ou lors de la prise en otages de quatre ressortissants suisses dans le Sahara algérien en février 2003 (la procédure du Ministère public de la Confédération a été transmise au début de 2003 à l'Office des juges d'instruction fédéraux). De même, plusieurs demandes d'entraide judiciaire émanant d'autorités étrangères, lesquelles concernaient des relations terroristes internationales examinées par les autorités judiciaires et policières suisses, ont été exécutées par le Ministère public de la Confédération en collaboration avec la Police judiciaire fédérale et avec l'Office fédéral de la justice au cours des investigations antiterroristes menées depuis septembre 2001 ; il s'agissait de plusieurs requêtes provenant des Etats-Unis, notamment dans l'affaire Moussaoui, et

4

de deux demandes émanant de la France et de l'Espagne en relation avec
l'attentat de Djerba.

**La Suisse n'occupe pas une place primordiale, mais elle est
concernée elle aussi.**

De l'avis du Procureur général, on peut dire que la Suisse n'a pas occupé
une place primordiale dans les activités criminelles du réseau international
de Al-Qaida, mais qu'elle est touchée, en périphérie, par des délits
présumés relevant du soutien logistique et du financement. Il convient
aujourd'hui de ne pas sous-estimer la place de la Suisse dans le contexte
international, ni de la surestimer. Cependant, il s'est avéré, au vu des
comptes bancaires de deux cadres de Al-Qaida clos déjà depuis une
dizaine d'années, que la Suisse n'était pas épargnée, avant le 11
septembre 2001 ; la coopération étroite et collégiale avec les autorités de
poursuite pénale chargées des enquêtes antiterroristes internationales
avait donc sa raison d'être ; il se peut fort bien qu'elle la garde à l'avenir.

**Renforcement de la coopération internationale au niveau de la
poursuite pénale**

C'est dans ce contexte qu'il faut apprécier les efforts consentis par le
Ministère public de la Confédération en vue d'aller à l'essentiel, en
collaboration internationale, dans le cadre des procédures qu'il mène ; il
s'efforce également d'accélérer les choses, dans le strict respect des
dispositions légales en vigueur en Suisse et des principes de l'Etat de droit.
Il a ainsi organisé dans notre pays, en automne 2002, une conférence de
deux jours, la „Quiet Conference", au sein de laquelle les autorités de
poursuite pénale chargées des enquêtes antiterroristes en Europe étaient
toutes représentées ; elles y ont procédé à un échange d'informations au
niveau des procureurs. Un „Operative Working Arrangement", un
arrangement de travail au niveau opératif donc, a été conclu avec les
autorités américaines compétentes, en septembre 2002, à l'initiative du
Ministère public de la Confédération et avec l'aval du Conseil fédéral; cet
arrangement a réglementé la coopération, au niveau opératif, des autorités
de poursuite pénale des deux Etats concernés. Ce texte deviendra caduc
du fait de la clôture, dans les jours et les semaines à venir, des enquêtes
en Suisse; sa validité était limitée à la durée des investigations portant sur
les attentats du 11 septembre 2001. Comme le Procureur général de la
Confédération, Valentin Roschacher, l'a déclaré devant les médias, les
autorités judiciaires et policières de la Confédération n'ont rien perdu de
leur détermination ; elles souhaitent apporter leur contribution aux efforts
consentis, au niveau international, pour lutter contre le terrorisme dans le
cadre du droit pénal et de participer ainsi aux travaux entrepris, dans le
monde, pour juguler, dans le respect des principes constitutionnels suisses,
la menace que constitue cette forme de grande criminalité transfrontière.



Le responsable de l'information:

Hansjürg Mark Wiedmer, chef d'information MPC, tél. 031 / 324 324 0

Does not name Kadi but says

"a 2nd important element of the investigation
chanered post Sept 11, was the extension
of pressure to a Saudi National who has
business relations from Saudi Arabia maintains
with Switzerland + USA. He is suspected of
having transferred several million in his
capacity as former president of a
chantable foundation called 'Muwafaq'
to people linked with the Al Qaida network
by using Swiss bank accounts. The

Public Prosecutor froze his Citi bank
containing millions of US dollars. He is
freed
He has been interviewed, several times, by
Nicati, denies having terrorist links
Public prosecutor also closing this
investigation .""

# EXHIBIT O-20



**SCHWEIZERISCHE BUNDESANWALTSCHAFT
MINISTERE PUBLIC DE LA CONFEDERATION
MINISTERO PUBBLICO DELLA CONFEDERAZIONE**

3003 Berne

18 01 0435

Berne, June 25, 2004

*via Swiss Federal Office of Justice, Central Authority for
Legal Assistance with the United States*

Case: BA/EA II/1/01/**0006**

<u>CONFIDENTIAL</u>

# COMPLEMENTARY REQUEST FOR MUTUAL ASSISTANCE IN CRIMINAL MATTERS

**FROM THE OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND
TO
THE CRIMINAL INVESTIGATION AUTHORITIES OF THE UNITED STATES
VIA
THE DEPARTMENT OF JUSTICE OF THE UNITED STATES OF AMERICA,
OFFICE OF INTERNATIONAL AFFAIRS
10th AND CONSTITUTION AVE., NW
CRIMINAL DIVISION / KEENEY BUILDING
<u>WASHINGTON, D.C. 20530</u>
<u>USA</u>**

Dear Sir,
Dear Madam,

The Office of the Attorney General of Switzerland is conducting a criminal investigation pursuant to Art. 101 *et seg.* of the Swiss Federal Law on Penal Procedure (LPP) against the person of

<u>Yassin Abdullah KADI born on February 23, 1955 in Egypt, citizen of Saudi
Arabia</u>

2                    18  01  0436

for suspected violation of Art 260ter of the Swiss Penal Code (participation in a criminal organization). A copy of this legal statute is included as annex to this complementary request for mutual legal assistance.

The alleged criminal act is indirectly related to the PENTHBOMB case. The foremost objective of the proceeding opened in Switzerland against Yassin KADI is to determine whether the powerbrokers of the terror attacks found any kind of financial support in Switzerland. In particular, KADI is alleged having made payments to terrorist organizations from 1990 until 1998.

In the course of the present proceeding, seven MLAT requests have already been transmitted to the competent US authorities. The last one is from December 15, 2003 asking for the interrogation of Mahmoud Mamdouh SALIM, Wadih EL HAGE, Jamal AL FADL, Essam AL RIDI and L'Houssaine KHERCHTOUM.

These interrogations have not been realized.

## 1. SUMMARY OF THE FACTS

1.  On October 25, 2001, the Office of the Attorney General of Switzerland opened a criminal investigation against Yassin KADI who allegedly supported a terrorist organization.

2.  Summarizing, between 1990 and 1998 Mr. KADI transferred large amounts of money from Saudi Arabia on his accounts at a bank in Switzerland. These deposits were made for a total sum representing USD 23 millions. Subsequently, amounts almost equivalent to those deposited on the account by Mr. KADI, were first transferred to the accounts of Mr. JULEIDAN, a suspected logistics chief for Usama Bin Laden, then transferred to different accounts in Turkey. The principal beneficiary of these transactions was Wael JULEIDAN, at that time owner of the firm MARAM Ltd. in Istanbul. JULEIDAN and his partner Mohammed Luay BAYAZED bought MARAM from Mamdou Mahmod SALIM, a well known member of Al Qaida. Besides, the aforementioned Mohammed Luay BAYAZED was the President of the Chicago-based Benevolence International Foundation in 1994, whose director, Enaan ARANAOUT, is in prison for financial support of Al Qaida.

3.  Mr. KADI was interrogated by the Office of the Attorney General of Switzerland and by the Federal Criminal Investigation Police in Saudi Arabia on July 1, 2003 and during spring 2004. Upon questioning, he stated that the money transferred to accounts in Turkey was set aside in order to finance school

3                    18 01 0437

buildings in Yemen. His statements and explanations appeared to be untrustworthy.


## 2. REQUEST


1.    On February 14, 2001 a proceeding has been opened against SADEEK ODEH, MOHAMED RASHED AL-'OWHALI, KHALFAN KHAMIS, WADIH EL HAGE et al. for charges in relation to attacks against the US embassies in Africa. According to our information, WADIH EL HAGE and Jamal AHMED AL-FADL were personal assistants to Usama BIN LADEN.


2.    According to our information, Jamal AHMED AL-FADL is a co-operating witness and therefore he may have some information related to the ongoing investigation against KADI in Switzerland. In particular, he may provide the Swiss authorities with facts relating to:


- MARAM Ltd.
- Yassin KADI
- Wael JULEIDAN
- Mohammed BAYAZED


The Office of the Attorney General of Switzerland, invoking the Treaty between the Swiss Confederation and the United States of America on Mutual Assistance in Criminal Matters, signed on 25 May 1973, and the Federal Act of 3 October 1975 implementing said Treaty, **kindly requests the cooperation of the American Criminal Investigation Authorities to :**


2.1.    Allow the undersigned magistrate to send detailed questionnaires to the American Criminal Investigation Authorities in order to get the testimony of


- Jamal AHMED AL-FADL


as a **witness.**


In the course of our investigations, it seems that this person may have some information which would allow us to further the investigations opened against the above-mentioned Yassin KADI.

4                18 01 0438

2.2.    Provide the undersigned magistrate with any further information
        regarding the ties the aforementioned person could have had with
        Yassin KADI. The information requested should also concern the ties of
        Yassin KADI with any alleged member of Al Qaida.

## 3. COMPETENCE

Under Swiss law and in accordance with the MLAT between Switzerland an the
United States of America, the Office of the Attorney General of Switzerland is
responsible for seeking international mutual assistance in criminal matters.

The Office of the Attorney General of Switzerland hereby guarantees that the
information obtained within the framework of this request for mutual assistance in
criminal matters shall be solely reserved for use as evidence in criminal proceedings
relating to violations of common law.

For any complement of information required, we would kindly request the American
Authorities to contact the Undersigned Claude NICATI (Tel. ++41 31 322 45 30 or
Fax ++41 31 322 45 07) or Mrs. Juliette NOTO, assistant to the Federal Prosecutor
(Tel. ++41 31 322 06 27).

Thanking the American Authorities in advance for their greatly appreciated
cooperation, we remain

Sincerely yours,

**DEPUTY ATTORNEY**
**GENERAL OF THE SWISS**
**CONFEDERATION**

Claude Nicati

5                    18 01 0439

Copy to:

    -   Dominique Ritter, Swiss Criminal Police FEDPOL (Task Force Terror), 3003 Berne

    -   Ms Florence SCHÜRCH, Police Attachée FEDPOL, Washington DC.


<u>Enclosure:</u>

- Legal provisions mentioned (Art. 260ter of the Swiss Penal Code)

**Article 260ter Criminal organization**

1. Everyone who participates in an organization that keeps its structure and membership secret and whose purpose is to commit criminal acts of violence or obtain revenues by criminal means, everyone who supports the criminal activities of such an organization, shall be liable to imprisonment for a maximum of 5 years.

2. The judge is free to reduce the sentence (Sec. 66) in respect of a person who has endeavoured to prevent the organization's pursuit of criminal activity.

3. A person who commits an offence abroad is also liable to punishment if the organization exercises or has to exercise its criminal activity in whole or in part within Switzerland. Sec. 3 (1) 2nd paragraph shall apply.

# EXHIBIT O-21

18 01 0442

Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

3003 Berne, June 29, 2004

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf. ~
Vostro rif.

Unser Zeichen
Notre réf. B 129629/01 BOG/BEA
Nostro rif.

*In replying please
quote this file number*

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

E 2 9. JUNI 2004

EA II /1 / 01 / 0006

Vu        | 99

**Lettre signature**
Office of International Affairs
Department of Justice
Suite 800
1301 New York Ave., N.W.
Washington, DC 20005
United States of America

---

*Supplemental Request for Assistance dated June 25, 2004 in the case of Yassin Kadi*

---

Dear Ms. Warlow,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above mentioned case.

The Swiss Federal Prosecutor is conducting an investigation against the above-mentioned person for Criminal Organization. All the relevant details concerning the facts of the case, concerned persons and the requested assistance may be taken out of the enclosed letter rogatory of June 25, 2004 and its respective translation.

We request that compulsory measures be ordered if necessary. Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

c/o. Bomio

G. Bomio

Enclosures mentioned

18  01  0443

<u>cc. without enclosures:</u>

- Schweizerische Bundesanwaltschaft
  3003 Bern (BA/EA II/1/01/0006)

- Mr. David Albert Maniquis, Attache (FBI), Embassy of the United States of
  America, Jubiläumsstr. 93, 3005 Berne

- Schweizerische Botschaft, Washington
      zHd. - Frau Marion Weichelt Krupski, Botschaftsrätin (Rechtsfragen).
             - Frau Florence Schürch, Botschaftsattaché, Verbindungsagentin

*(a copy of the letter rogatory will be provided upon request)*

# EXHIBIT O-22

18 01 0444

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

E - 8. JULI 2004
Enregistré

| Par | Vui | |

*Embassy of the United States of America*

Office of the Legal Attache
United States Embassy
Bern, Switzerland

Our File No:  80-BR-5359
              163I-BR-7130

July 4, 2004

Mr. Claude Nicati
Bundesanwaltschaft
Taubenstr 16
CH-3003 Bern

Re: Future Cooperation in
Terrorism Matters

Dear Mr. Nicati:

Per our telephone conversation of 06/29/04 and in reference to Mr. Roschacher's press conference of 06/24/04, I would like to take this opportunity to express the hopes of the FBI and U.S. Department of Justice that your office's decision to declare the "Operative Working Agreement" "to have expired" will not hamper our efforts to jointly address terrorism matters.

As you are aware, just in the two months that I have been in Bern, the FBI has attempted to furnish support to your investigations through the deployment of the DocEx Team with respect to OP SAUD, by furnishing information from FBI Sacramento's "RISK AVERSE" and FBI Tampa's investigation of MOHAMMED CHARANI and initiating direct contact between BKP and FBI case agents assigned to the aforementioned investigations, as well as by furnishing non-classified information pertaining to the Al-Farooq training camp. As you are further aware, the FBI is currently attempting to have cooperators from FBI Buffalo's "Lakawanna Six" investigation identify photographs of ABDELLA YAS and FBI New York is working with the US Attorney's Office for the Southern District of New York to furnish your office with an admissible statement from a significant future U.S. trial witness.

We hope that your office will be able to execute the pending U.S. MLAT request with respect to MOHAMMED CHARANI by September 15, 2004, to allow for the timely analysis of the information prior to the expiration of the statute of limitations with respect to certain potential violations in December 2004.

18  01  0445

We would also  appreciate your office advising us of what charges are being sought against what subjects with respect to your office's OP SAUD, AL TAQWA, and AL-KADI investigations.

I appreciate your attention in these matters.

Sincerely yours,

Richard F. Tamplin
Legal Attaché

# EXHIBIT O-23



**SCHWEIZERISCHE BUNDESANWALTSCHAFT**
**MINISTERE PUBLIC DE LA CONFEDERATION**
**MINISTERO PUBBLICO DELLA CONFEDERAZIONE**

3003 Berne

**18  01  0447**

Berne, July 09, 2004

*via Swiss Federal Office of Justice, Central Authority for Legal Assistance with the United States*

Case: BA/EA II/1/01/0006

<u>CONFIDENTIAL</u>

# COMPLEMENTARY REQUEST FOR MUTUAL ASSISTANCE IN CRIMINAL MATTERS

**FROM THE OFFICE OF THE ATTORNEY GENERAL OF SWITZERLAND**
**TO**
**THE CRIMINAL INVESTIGATION AUTHORITIES OF THE UNITED STATES**
**VIA**
**THE DEPARTMENT OF JUSTICE OF THE UNITED STATES OF AMERICA,**
**OFFICE OF INTERNATIONAL AFFAIRS**
**10th AND CONSTITUTION AVE., NW**
**CRIMINAL DIVISION / KEENEY BUILDING**
<u>**WASHINGTON, D.C. 20530**</u>
<u>**USA**</u>

Dear Sir,
Dear Madam,

The Office of the Attorney General of Switzerland is conducting a criminal investigation pursuant to Art. 101 *et seg.* of the Swiss Federal Law on Penal Procedure (LPP) against the person of

<u>**Yassin Abdullah KADI born on February 23, 1955 in Egypt, citizen of Saudi Arabia**</u>

2

18 01 0448

for suspected violation of Art 260ter of the Swiss Penal Code (participation in a criminal organization). A copy of this legal statute is included as annex to this complementary request for mutual legal assistance.

The alleged criminal act is indirectly related to the PENTHBOMB case. The foremost objective of the proceeding opened in Switzerland against Yassin KADI is to determine whether the powerbrokers of the terror attacks found any kind of financial support in Switzerland. In particular, KADI is alleged having made payments to terrorist organizations from 1990 until 1998.

In the course of the present proceeding, eight MLAT requests have already been transmitted to the competent US authorities. The last one is from June 25, 2004 asking for the interrogation of Jamal AL FADL.

## 1. SUMMARY OF THE FACTS

1.  On October 25, 2001, the Office of the Attorney General of Switzerland opened a criminal investigation against Yassin KADI who allegedly supported a terrorist organization.

2.  Summarizing, Mr. KADI transferred large amounts of money to Albania from his business and personal accounts with the Faisal Bank in Switzerland. The Faisal Bank accounts of *Caravan*, *Loks Hall* and *Euroinvest* were used. The amounts of money being moved to Albania seem disproportional to the profits of his Albanian companies. In fact money was pumped into the business initially and then largely ignored. Besides, it seems to be no distinction between companies and charitable organizations Kadi funded in Albania. The amalgam of all the companies and non profit organizations working together raises the possibility that theses businesses were used as a cover for terrorism financing or money laundering operations.

3.  Mr. KADI was interrogated by the Office of the Attorney General of Switzerland and by the Federal Criminal Investigation Police in Saudi Arabia on July 1, 2003 and during spring 2004. His statements and explanations on his Albanian business network appeared to be untrustworthy.

3

18  01  0449

## 2. REQUEST

1. In 1993 Kadi began his investments in Albania although the country was in desperate economic conditions at that period. Ignoring these less than promisiong economic conditions, Kadi established different companies in Albania. Most of his Albanian network was funded trough his personal and business accounts with Faisal Bank in Switzerland and much of the money went to executives trusted by Kadi to run his operations that have undeniable links to Al Qaida.

2. According to our information, in 2002 OFAC conducted interviews with Kadi's local employees in Albania and material was seized by the US authorities. These documents may have some information related to the ongoing investigation against KADI in Switzerland. In particular, he may provide the Swiss authorities with facts relating to the network that Kadi had set up between Albania and Switzerland. These documents may provide the Swiss authorities with facts relating to:

- LOX HALL
- CARAVAN
- MUWAFAQ
- ARAB ALBANIAN ISLAMIC BANK
- ALINTID
- Dr Abdul Latif SALEH
- DR. NASSAR
- MEDICARE

The Office of the Attorney General of Switzerland, invoking the Treaty between the Swiss Confederation and the United States of America on Mutual Assistance in Criminal Matters, signed on 25 May 1973, and the Federal Act of 3 October 1975 implementing said Treaty, **kindly requests the cooperation of the American Criminal Investigation Authorities to :**

2.1.    **Allow the undersigned magistrate to obtain a copy of the material seized by US authorities, especially OFAC, in Albania regarding the above mentioned entities and persons.**

**These documents are of major interest for the Swiss authorities.**

4

18 01 0450

### 3. COMPETENCE

Under Swiss law and in accordance with the MLAT between Switzerland an the United States of America, the Office of the Attorney General of Switzerland is responsible for seeking international mutual assistance in criminal matters.

The Office of the Attorney General of Switzerland hereby guarantees that the information obtained within the framework of this request for mutual assistance in criminal matters shall be solely reserved for use as evidence in criminal proceedings relating to violations of common law.

For any complement of information required, we would kindly request the American Authorities to contact the Undersigned Claude NICATI (Tel. ++41 31 322 45 30 or Fax ++41 31 322 45 07) or Mrs. Juliette NOTO, assistant to the Federal Prosecutor (Tel. ++41 31 322 06 27).

Thanking the American Authorities in advance for their greatly appreciated cooperation, we remain

Sincerely yours,

**DEPUTY ATTORNEY
GENERAL OF THE SWISS
CONFEDERATION**

Claude Nicati

Copy to:

-   Dominique Ritter, Swiss Criminal Police FEDPOL

5                    18 01 0451

- (Ms Florence SCHÜRCH, Police Attachée FEDPOL,
  Washington DC.

Enclosure:

• Legal provisions mentioned (Art. 260ter of the Swiss Penal Code)

**Article 260ter Criminal organization**

1. Everyone who participates in an organization that keeps its structure and membership secret and whose purpose is to commit criminal acts of violence or obtain revenues by criminal means, everyone who supports the criminal activities of such an organization, shall be liable to imprisonment for a maximum of 5 years.

2. The judge is free to reduce the sentence (Sec. 66) in respect of a person who has endeavoured to prevent the organization's pursuit of criminal activity.

3. A person who commits an offence abroad is also liable to punishment if the organization exercises or has to exercise its criminal activity in whole or in part within Switzerland. Sec. 3 (1) 2nd paragraph shall apply.

# Exhibit O-24



Office fédéral de la justice · Bundesamt für Justiz · Federal Office of Justice
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

18 01 0454

SCHWEIZERISCHE
BUNDESANWALTSCHAFT

7 7 JULI 2004

ERL/1/01/0006

Nic. 6 22

3003 Berne, July 26, 2004

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
Votre réf. 182-15033
Vostro rif.

Unser Zeichen
Notre réf. B 128909/03 BOG/BEA
Nostro rif.

Lettre signature
Office of International Affairs
Department of Justice
Suite 800
1301 New York Ave., N.W.
Washington, DC 20005
United States of America

**Advanced by Fax**

*In replying please
quote this file number*

***Supplementary Request for Assistance dated July 09, 2004, in the case of
Yassin Abdullah KADI born on February 23, 1955 in Egypt, citizen of Saudi
Arabial***

· Dear Ms. Warlow,

According to the provisions of the Treaty between the United States of America
and the Swiss Confederation on Mutual Assistance in Criminal Matters, the
Federal Office of Justice, Swiss Central Authority, requests the assistance of
the appropriate US authorities in the above mentioned case.

The Swiss Federal Prosecutor in Berne is conducting an investigation against
the above-mentioned person for participation in a criminal organization. All the
relevant details concerning the facts of the case, concerned person, and the
requested assistance may be taken out of the enclosed letter rogatory of July
09, 2004.

We request that compulsory measures be ordered if necessary. Please keep us
informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

G. Bomio

· sig. Bomio
Enclosures mentioned

18  01  0455

<u>cc. without enclosures</u>:

- Schweizerische Bundesanwaltschaft
  3003 Bern (ad. BA/EA II/1/01/0006)

- Mr. David Albert Maniquis, Attache (FBI), Embassy of the United States of
  America, Jubiläumsstr. 93, 3005 Berne

- Schweizerische Botschaft, Washington
       zHd. - Frau Marion Weichelt Krupski, Botschaftsrätin (Rechtsfragen)
             - Frau Florence Schürch, Botschaftsattaché, Verbindungsagentin

*(a copy of the letter rogatory will be provided upon request)*

# Exhibit O-25

**Vuilleumier Annick BA**                                        18 01 0456

| | |
|---|---|
| e: | Nicati Claude BA |
| Envoyé: | Donnerstag, 29. Juli 2004 17:31 |
| À: | Noto Juliette BA |
| Cc: | Vuilleumier Annick BA |
| Objet: | TR : Kadi requests (B 128909/03 and B 129629/01) |

Pour info

Claude

-----Message d'origine-----
De : Nicati Claude BA
Envoyé : jeudi, 29. juillet 2004 17:30
À : 'Judith.Friedman2@usdoj.gov'; Nicati Claude BA; Bomio Giorgio BJ Cc :
Gregory.Bassi@usdoj.gov Objet : RE : Kadi requests (B 128909/03 and B 129629/01)


Hello Judith,

To answer your question :

1.    We did not have any contact with OFAC
2.    We have already transmitted our question to Mike A. In NY through the attorney.

Once again thank You for your help.

All the best

Claude

----Message d'origine-----
De : Judith.Friedman2@usdoj.gov [mailto:Judith.Friedman2@usdoj.gov]
Envoyé : mercredi, 28. juillet 2004 22:42
À : 'claude.nicati@ba.admin.ch'; 'Giorgio.Bomio@bj.admin.ch'
Cc : Gregory.Bassi@usdoj.gov
Objet : Kadi requests (B 128909/03 and B 129629/01)


Claude,
We are in receipt of the above-referenced requests, in which you ask us to do the
following:
1.    provide materials seized by OFAC in Albania, relating to various designated
entities; and
2.    interview Jamal Ahmed Al-Fadl, using the questions provided.

Can you please let me know the following:

1.    Is OFAC aware through other means, that you are seeking these records?  If so,
can you please provide the name of your point of contact?  If not, we will forward the
request to OFAC in the normal manner.
2.    Are the AUSAs in New York in receipt of the questions and have they agreed to
conduct the interview?  If not, and in any event, please forward the questions to OIA,
so that we may formally provide them to the attorneys in the Southern District of New
York.

I would add that it would be helpful to fax or e-mail communication in the future, if
possible, since the request for the interview came via mail this week, though it was
sent several weeks ago.

Thank you for your cooperation.  Best regards.  Judith

# EXHIBIT O-25A



SCHWEIZERISCHE BOTSCHAFT

AMBASSADE DE SUISSE

AMBASCIATA DI SVIZZERA

EMBASSY OF SWITZERLAND



fedpol.ch

**Swiss Federal Criminal Police**

2900 Cathedral Avenue
Washington, D.C. 20008

September 13, 2004

**U.S. Department of Justice**
Office of International Affairs
**Ms. Judith Friedman**
1301 New York Avenue NW
Washington, DC 20530

Tel: 202 745 7986
Fax: 202 387 8325

**Subject:      Jamal AL FADL**

Dear Judith:

As agreed, please find enclosed the questionnaire and the photos to be used for the interview of **Jamal AL FADL** regarding **Yasssin AL KADI** and the **Muslim Brotherhood**.

At the same time, we kindly ask you to return the CD ROM that was handed to you at the occasion of Mr. Nicati's visit since you are unable to open the files.

Sincerely yours,

SWISS LIAISON OFFICE

Florence Schurch
Police Attaché

Encl.

## Questions to Jamal AL FADL concerning Yassin Al Kadi

<u>Confirmation</u>

Can you confirm your statements made in the court proceedings before the United
States District Court, Southern District of New York,
Unites States of America v. Osama Bin Laden, et al. Defendants,
Spring 2001, presided by the District Judge, Hon. Leonard B. Sand?

<u>General questions concerning Yassin Al Kadi</u>

1. Upon presentation of photographs / Who is the man on the photographs
   number 13 and number 20?

2. Where does Yassin Al Kadi come from?

3. Have you (Jamal Al Fadl) personally seen Yassin Al Kadi?

4. Is Yassin Al Kadi a member of Al Qaeda?

5. Which alias did Yassin Al Kadi use?

6. Is the alias of this man „Abu Khalid"?

7. Who gave him this alias?

8. Where do you (Jamal Al Fadl) know Yassin Al Kadi from?

9. On which occasions did you (Jamal Al Fadl) see Yassin Al Kadi? (Indicate
   exact date and time)

10. Have you (Jamal Al Fadl) ever seen Yassin Al Kadi in a mosque accompanied
    by members of the organization Al Qaeda?

11. Have you (Jamal Al Fadl) ever seen Yassin Al Kadi in a training camp of Al
    Qaeda?

12. Have you ever seen Yassin Al Kadi in a Maktab al Khidmat lil Mujahidin al-
    Arab (Afghan Service Bureau)?

13. Have you (Jamal Al Fadl) ever seen Yassin Al Kadi in the house or in the
    office of Osama Bin Laden?

    countries have you seen Yassin Al Kadi?

17. Did Yassin Al Kadi have contacts with Ayman al Zawahiri?

18. Did Yassin Al Kadi have contacts with Abu Ubadiah al-Banshiri or Muhammed Atif?

19. With whom of the persons linked to Al Qaeda did Yassin Al Kadi have contacts?

20. Was Yassin Al Kadi a member of the Muslim Brotherhood?

## Questions concerning Abdelmagid al Zindani

21. Upon presentation of photographs / Who is the man on the photographs number 21 and number 22?

22. Where does Abdelmagid al Zindani come from?

23. Have you personally seen Abdelmagid al Zindani?

24. Did Abdelmagid al Zindani have contacts with persons associated with Al Qaeda?

25. Is Abdelmagid al Zindani a member of Al Qaeda?

26. Did Abdelmagid al Zindani have contacts with person ..... on a regional and national or international level and who a ..... e organization Al Qaeda?

27. Did Abdelmagid al Zindani have an alias?

28. Where do you (Jamal Al Fadl) know Abdelmagid al Z .....

29. On which occasions did you (Jamal Al Fadl) see Abdelmagid al Zindani? (Indicate exact date and time)

30. In which countries did you (Jamal Al Fadl) see Abdelmagid al Zindani?

31. Did he have personal contacts with Osama bin Laden?

32. Was he a member of Al Qaeda?

33. What were the duties of Abdelmagid al Zindani?

34. Abdelmagid al Zindani recruit, in Yemen, Mudjahiddin for the jihad wars?

36. Have you (Jamal Al Fadl) ever seen Abdelmagid al Zindani together with Yassin Al Kadi?

37. Did Abdelmagid al Zindani and Yassin al Kadi have common interests?

38. Did Abdelmagid al Zindani and Yassin al Kadi have joint accounts at financial institutions?

39. Did Abdelmagid al Zindani finance accommodation for jihad fighters?

40. Did Abdelmagid al Zindani finance other buildings for the organization Al Qaeda?

41. What can you (Jamal Al Fadl) tell us about the Al Eman University in Yemen?

42. Did students or former students of the Al Eman University in Yemen join the organization Al Qaeda?

43. Did persons associated with Al Qaeda visit the El Eman University?

44. Did Al Qaeda have training camps in Yemen?

45. What else can you tell us about the relationships between Abdelmagid al Zindani and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning Mamdou Mahmoud Salim

46. Upon presentation of a photograph / Who is the man on the photograph number 16?

47. Where does Mamdouh Mahmoud Salim come from?

48. Have you ever seen Mamdouh Mahmoud Salim personally?



49. Did Mamdouh Mahmoud Salim have contacts with persons associated with A Qaeda?

50. Is Mamdou Mahmoud Salim a member of Al Qaeda?

51. Among the persons associated with Al Qaeda, with whom did Mamdou Mahmoud Salim have the best or closest contacts?

52. Which alias did Mamdou Mahmoud Salim use?

who are important on a regional,

55. On which occasions did you see Mamdouh Mahmoud Salim? (Indicate exact date and time)

56. In which countries have you seen Mamdouh Mahmoud Salim?

57. Did Mamdouh Mahmoud Salim have personal contacts with Osama bin Laden?

58. Did Mamdou Mahmoud Salim receive a salary from the organization Al Qaeda?

59. What were the duties of Mamdouh Mahmoud Salim?

60. Have you seen Mamdouh Mahmoud Salim together with Yassin Al Kadi?

61. Did Mamdouh Mahmoud Salim and Yassin al Kadi have common interests?

62. What were the financial resources of Mamdouh Mahmoud Salim?

63. Would Mamdouh Mahmoud Salim have been able to found a company with his own financial resources?

64. Did Mamdouh Mahmoud Salim ever mention that he was founding a company in Turkey?

65. Has Mamdouh Mahmoud Salim ever talked about a company called Maram?

66. Did Mamdou Mahmoud Salim have contacts with the Al Taqwa bank?

67. What else can you tell us about the relationships between Mamdou Mahmoud Salim and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

Questions concerning the wife of Mamdou Mahmoud Salim, Thikra Grawhar Mubarak

68. Was Mamdou Mahmoud Salim married?

69. How many wives did he have?

70. Who was Thikra Grawhar Mubarak?

71. Where did Thikra Grawhar Mubarak come from?

72. Have you (Jamal Al Fadl) ever seen Thikra Grawhar Mubarak personally?

75. Did Thikra Grawahr Mubarak have business duties in Al Qaeda companies or in companies owned by her husband Mamdouh Mahmoud Salim?

76. Did Thikra Grawahr Mubarak have religious duties towards the wives of Al Qaeda members?

77. Were there influential female members of Al Qaeda?

78. Was Thikra Grawahr Mubarak a member of Al Qaeda?

79. Did Thikra Grawahr Mubarak receive money from the organization Al Qaeda?

80. Did Thikra Grawahr Mubarak have an alias?

81. Did Thikra Grawahr Mubarak have personal contacts with male members of Al Qaeda?

82. Did Thikra Grawahr Mubarak have personal contacts with wives of the influential Al Qaeda members?

83. Did Thikra Grawahr Mubarak have contacts with the family of Yassin Al Kadi?

84. Did Thikra Grawahr Mubarak have contacts with the Al Taqwa bank?

85. Where is Thikra Grawahr Mubarak today?

86. What else can you tell us about the relationships between Thikra Grawahr Mubarak and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

Questions concerning Osama Bin Laden

87. Did Osama Bin Laden personally know the Saudi financier Yassin Al Kadi?

88. Have you ever seen Osama Bin Laden and Yassin Al Kadi together? (indicate exact date and time and place)

89. Has Osama Bin Laden ever mentioned Yassin Al Kadi?

90. Has Osama Bin Laden ever mentioned the Muwafaq Foundation?

91. What were the common interests of Osama Bin Laden and Yassin Al Kadi?

92. Did Osama Bin Laden and Yassin Al Kadi own jointly companies or charity organizations?

95. What else can you tell us about the relationships between Osama Bin Laden and Yassin Al Kadi?

Questions concerning Wael Hamza Julaidan

96. Do you know the man on the photographs number 12 and number 17?

97. Was Wael Hamza Julaidan a member of Al Qaeda?

98. What was his alias in the Al Qaeda circles?

99. What were the tasks or the role of Wael Hamza Julaidan in the organization Al Qaeda?

100.     Until when did Wael Hamza Julaidan play an active role within the organization Al Qaeda?

101.     Was Wael Hamza Julaidan personally present in Sudan?

102.     Was Wael Hamza Julaidan personally present in the Balkan wars (Croatia/Bosnia)?

103.     Was Wael Hamza Julaidan personally present in other conflict areas (Chechnya, Somalia etc.) on behalf of Al Qaeda?

104.     Did Wael Hamza Julaidan personally know the leader of Al Qaeda, Osama Bin Laden?

105.     Did Wael Hamza Julaidan have contacts with other leaders of the organization Al Qaeda?

106.     How were the contacts between Wael Hamza Julaidan and the Egyptian community within the leading circles of the organization Al Qaeda (Ayman Al Zawahiri, Abu Ubadiah al-Banshiri etc.)

107.     Until when was Wael Hamza Julaidan active in or on behalf of the organization Al Qaeda?

108.     Have you ever seen Wael Hamza Julaidan and Abdelmagid al Zindani together?

109.     What were the common interests of Wael Hamza Julaidan and Abdelmagid al Zindani?

110.     Did Wael Hamza Julaidan and Abdelmagid al Zindani own jointly

112.    Were there financial connections between Yassin Al Kadi and Wael Hamza Julaidan?

113.    Did Wael Hamza Julaidan support the organization Al Qaeda financially?

114.    How were the supporting funds transferred from Wael Hamza Julaidan to Al Qaeda?

115.    Did Wael Hamza Julaidan also use companies, charity organizations, handing over of cash or Hawala systems in order to transfer the funds to the organization Al Qaeda?

116.    Were the funds which Wael Hamza Julaidan transferred to the organization Al Qaeda earmarked for specific purposes?

117.    Did Wael Hamza Julaidan contribute financially to the set-up of training camps for Al Qaeda?

118.    Did Wael Hamza Julaidan mandate the construction of houses or buy houses for Al Qaeda?

119.    Where did the money at the disposal of Wael Hamza Julaidan come from?

120.    Did Wael Hamza Julaidan have connections in Switzerland?

121.    What else can you tell us about the relationships between Wael Hamza Julaidan and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning Mohammed Luay Bayazed

122.    Upon presentation of a photograph / Who is the person on the photograph number 14?

123.    Where does Mohammed Luay Bayazed come from?

124.    Have you ever seen Mohammed Luay Bayazed personally?

125.    Did Mohammed Luay Bayazed have contacts with persons associated to Al Qaeda?

126.    Is Mohammed Luay Bayazed a member of Al Qaeda?

129.     On what occasions did you see Mohammed Luay Bayazed? (Indicate exact date and time)

130.     In which countries did you see Mohammed Luay Bayazed?

131.     Did Mohammed Luay Bayazed have personal contacts with Osama bin Laden?

132.     Was Mohammed Luay Bayazed a member of the organization Al Qaeda?

133.     Did he receive a salary from the organization Al Qaeda?

134.     What were the duties of Mohammed Luay Bayazed?

135.     Was Mohammed Luay Bayazed managing companies on behalf of Al Qaeda?

136.     Did he manage money accounts for the organization Al Qaeda?

137.     Have you ever seen Mohammed Luay Bayazed together with Yassin Al Kadi?

138.     Did Mohammed Luay Bayazed and Yassin al Kadi have common interests?

139.     What kind of relationships, personal or business, did Mohammed Luay Bayazed have with Mamdou Mahmoud Salim?

140.     Was there a direct or indirect relationship between Thikra Grawhar Mubarak (Salim's wife) and Mohammed Luay Bayazed?

141.     What kind of relationships did Mohammed Luay Bayazed have with Wael Hamza Julaidan?

142.     Did Mohammed Luay Bayazed and Wael Hamza Julaidan found and manage jointly companies or did they open and manage jointly accounts on behalf of Al Qaeda?

143.     What were the financial resources of Mohammed Luay Bayazed?

144.     Would Mohammed Luay Bayazed have been able to found a company with his own financial resources?

145.     Where is Mohammed Luay Bayazed today?

<u>Questions concerning Mohammed Omar Zubayr</u>

147.     Upon presentation of a photograph / Do you (Jamal al Fadl) know the person on the photograph number 18?

148.     Under which name do you (Jamal Al Fadl) know this person?

149.     Is Mohammed Omar Zubayr a member of the „Muslim Brotherhood"?

150.     Have you ever seen Mohammed Omar Zubayr together with members of the organization Al Qaeda?

151.     What are the duties of Mohammed Omar Zubayr in the circles associated with the organization Al Qaeda?

152.     Did Mohammed Omar Zubayr act as an economic consultant for the organization Al Qaeda?

153.     How many persons associated with the organization Al Qaeda have studied at the King Abdelaziz University in Jeddah / Saudi Arabia?

154.     Did the organization Al Qaeda have a closer relationship with the King Abdelaziz University?

155.     Have you ever seen Mohammed Omar Zubayr together with Osama Bin Laden?

156.     Have you ever seen Mohammed Omar Zubayr together with Mamdou Mahmoud Salim?

157.     Have you ever seen Mohammed Omar Zubayr together with Mohammed Luay Bayazed?

158.     Have you ever seen Mohammed Omar Zubayr together with Wael Hamza Julaidan?

159.     Have you ever seen Mohammed Omar Zubayr together with Yassin Al Kadi?

160.     Did Yassin Al Kadi and Mohammed Omar Zubayr have common interests?

161.     What else can you tell us about the relationships between Mohammed Omar Zubayr and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

163.   Did Abu Fadl Al-Makki receive a salary from the organization Al Qaeda?

164.   Where did Abu Fadl Al-Makki come from and which names did he use?

165.   What was your (Jamal Al Fadl) relationship with Abu Fadl Al-Makki?

166.   Did Yassin Al Kadi and Abu Fadl Al-Makki know each other personally?

167.   What common interests did Abu Fadl Al-Makki and Yassin al Kadi have?

168.   Has Abu Fadl Al-Makki ever mentioned the money flows from Yassin Al Kadi to the organization Al Qaeda?

169.   Were such funds also used to purchase weapons?

170.   In you opinion, how reliable are statements (such as Money from Kadi for Al Qaeda to buy weapons) made by Abu Fadl Al-Makki ein?

171.   How exactly was the money transferred from the Gulf States via Yassin Al Kadi to the organization Al Qaeda?

172.   What else can you tell us about the relationships between Abu Fadl Al-Makki and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning Abu Unaith Al-Saudi

173.   Who is Abu Unaith Al Saudi?

174.   What is the real name of Abu Unaith Al-Saudi?

175.   From which country does Abu Unaith Al Saudi come from originally?

176.   Is Abu Unaith Al Saudi a member of Al Qaeda?

177.   For how long had Abu Unaith Al-Saudi been a member of Al Qaeda?

178.   In which countries was Abu Unaith Al-Saudi active on behalf of Al Qaeda?

179.   Did Abu Unaith Al Saudi have personal contacts with Osama bin Laden?

180.   Was Abu Unaith Al Saudi a member of an important Al Qaeda council?

182.    Did Abu Unaith Al Saudi also buy weapons for the organization Al Qaeda?

183.    Where did the money for the purchase of weapons come from?

184.    Did Abu Unaith Al Saudi manage an office, a company or a charity organization on behalf of Al Qaeda?

185.    Did Abu Unaith Al Saudi hold accounts for the organization Al Qaeda?

186.    Where and in which buildings did Abu Unaith al Saudi have his offices?

187.    Were also charity organizations present in the buildings where Abu Unaith al Saudi had his offices?

188.    Who was responsible for these charity organizations?

189.    Did Abu Unaith Al Saudi receive directly money from these charity organizations?

190.    Was Abu Unaith Al Saudi a friend of Yassin Al Kadi?

191.    Did Abu Unaith Al-Saudi have business relations with Yassin Al Kadi?

192.    Did Yassin Al Kadi bring money to Abu Unaith Al-Saudi?

193.    Did Yassin Al Kadi and Abu Unaith Al-Saudi have joint accounts?

194.    Where is Abu Unaith Al-Saudi today?

195.    What else can you tell us about the relationships between Abu Unaith Al-Saudi and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning Abu Hamman al-Saudi

196.    Who is Abu Hammam al-Saudi?

197.    Is Abu Hammam al-Saudi a member of Al Qaeda?

198.    Did Abu Hammam al-Saudi have personal contacts with Osama bin Laden?

199.    Was Abu Hammam al Saudi a member of an important Al Qaeda

202.    In which countries was Abu Hammam al Saudi active for Al Qaeda?

203.    Did he receive a salary from the organization Al Qaeda?

204.    What is the real name of Abu Hammam al Saudi?

205.    Is the real name of Abu Hammam al Saudi „Saleh Hussein Ali al-Zenu"?

206.    Did Abu Hammam al Saudi buy weapons for Al Qaeda?

207.    Where did the money come from?

208.    Did Yassin Al Kadi have contacts with Abu Hammam al Saudi?

209.    Was Yassin Al Kadi a friend of Abu Hammam al Saudi's?

210.    Did Abu Hammam Al Saudi have business relations with Yassin Al Kadi?

211.    Did Yassin Al Kadi bring money to Abu Hammam al Saudi?

212.    Did Abu Hammam al Saudi own bank accounts?

213.    Did Al Kadi and Abu Hammam al Saudi have joint accounts?

214.    Did Abu Hammam al Saudi manage an office, a business or a charity organization on behalf of Al Qaeda?

215.    Where were these offices, businesses or charity organizations, for which Abu Hammam al Saudi was working?

216.    Were there other important facilities in the buildings where these offices, businesses or charity organizations of Abu Hammam al Saudi were located?

217.    What else can you tell us about the relationships between Abu Hammam al Saudi and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning Abu Ayman Al Sudani

218.    Who is Abu Ayman Al Sudani from Zagreb/Croatia?

219.    Do you (Jamal Al Fadl) know the real name of Abu Ayman Al Sudani?

222.    Did Abu Ayman Al Sudani work for the Al Haramain Islamic Foundation?

223.    In which places did Abu Ayman Al Sudani work for the Al Haramain Islamic Foundation?

224.    What were Abu Ayman Al Sudani's duties?

225.    Did Abu Ayman also work for the organization Al Haramain was Al Masjed Al Aqsa?

226.    Did Abu Ayman Al Sudani know the financier Yassin Al Kadi?

227.    Did Abu Aymann Al Sudani mention the financier Yassin Al Kadi?

228.    What were the common interests of Abu Aymann Al Sudani and Yassin Al Kadi?

229.    What else can you tell us about the relationships between Abu Aymann al Sudani and Yassin Al Kadi on the one hand and the organization Al Qaeda on the other hand?

## Questions concerning other persons

230.    Have you ever seen Yassin Al Kadi and Ramzi Yousef together?

231.    Did Yassin Al Kadi and the leader of the NIF in Sudan, Hasan Tourabi, have personal contacts?

232.    Yassin Al Kadi personally supported the „Albanian Sports Club". This club was managed by Sulejman Cerkezi (Sulaiman Charchizi) and Admir Banaj. Do you know these persons and the club?

233.    Have you ever seen Mohammed Qutb, who is living in Saudi Arabia and who is of Egyptian descent, in the company of persons associated with the organization Al Qaeda?

234.    Did Yahya Bin Laden, Bakr Bin Laden and Omar Bin Laden visit their half-brother Osama Bin Laden?

235.    Do you (Jamal Al Fadl) know Haythem Al Sa'ida, who was active in Albania?

236.    Did Mr Kadi have contacts with Mr Haythem Al Sa'ida in Albania?

238.     Do you (Jamal Al Fadl) know Dr. Zaheer Ahmed, who was responsible for the Shifa Hospital in Pakistan?

239.     Have you ever seen Yusuf Al Qaradawi together with Al Qaeda members?

240.     Did the Al Taqwa bank have business relations with the organization Al Qaeda?

241.     Have you (Jamal Al Fadl) ever seen the manager of the Al Taqwa bank, Ali Ghaleb Himmat, together with members of the organization Al Qaeda?

242.     Have you (Jamal Al Fadl) ever seen the manager of the Al Taqwa bank, Yousef Nada, together with members of the organization Al Qaeda?

243.     Did Ahmed Idris Nasreddin have contacts with members of the organization Al Qaeda?

244.     Do you know Soliman Biheiri, from the US company BMI, who used to live in Switzerland for a long time?

245.     Did the organization Al Qaeda or members of Al Qaeda have contacts with persons in Switzerland?

## Questions concerning the Muwafaq Foundation

246.     Have you (Jamal Al Fadl) ever heard of the Muwafaq Foundation?

247.     Yassin Al Kadi had shares in or founded various companies in conflict areas where the Muwafaq Foundation was active. Kadi's companies supported financially the Muwafaq Foundation in the respective country. Do you (Jamal Al Fadl) have any knowledge about this course of action?

248.     What was the purpose of the Muwafaq Foundation?

249.     Did the Muwafaq Foundation also support the organization Al Qaeda?

250.     What kind of services did the Muwafaq Foundation provide for the organization Al Qaeda?

251.     Did the Muwafaq Foundation carry out transports for the organization Al Qaeda?

252.     How were funds and goods of the Muwafaq Foundation transferred to the organization Al Qaeda?

271.    Did Chafik Ayadi have contacts with persons from the organization Al Qaeda?

272.    What else can you (Jamal Al Fadl) tell us about the individual Chafik Ayadi?

273.    Do you know Mohamed Ali Harrath, who is the brother-in-law of Chafik Ayadi and who is living in England?

274.    What can you (Jamal Al Fadl) tell us about the managers of the Muwafaq Foundation in Albania, Derwaish Abu Sukaar, Dr. Yusuf Ismail from Jordan and Adham Sarhan?

275.    What can you (Jamal Al Fadl) tell us about Husam Tayeh, who used to work for the Muwafaq Foundation in Kukes (Albania) and Bajaram Curri (Albania)?

276.    Do you know one Husam Tayeh, who fought as a mujahidin in Afghanistan?

277.    What can you (Jamal Al Fadl) tell us about the managers of the Muwafaq Foundation in Zenica / Bosnia-Herzegovina, Enes Ibrahimagic, Bashir Mekni and Alzain Ahmad (Abu Wail)?

278.    What can you (Jamal Al Fadl) tell us about the project manager of a chicken farming project of the Muwafaq Foundation in Sarajevo / Croatia, Tarik Swadi?

279.    What can you (Jamal Al Fadl) tell us about the manager of the Muwafaq Foundation in Zagreb / Croatia, El Obaid El Obaid?

280.    Did the organization Al Qaeda have contacts with the organization Islamska Zajednica in Zagreb?

281.    What can you (Jamal Al Fadl) tell us about Ahmed Ibrahim Al-Naggar and Omar Al-Faruq, who may have been active in the Balkans on behalf of the Muwafaq Foundation?

282.    Did Mahmoud Mehdi, brother of Amir Mehdi (head of the Muwafaq Foundation Pakistan / Afghanistan), have relations with the organization Al Qaeda?

283.    Did you see Mahmoud Mehdi in Afghanistan?

286.     Were these funds also used to buy weapons or for other military purposes?

287.     Is there a difference between the two charity organizations Al-Haramain Islamic Foundation and Al-Haramain wa Al Masjed Al Aqsa Charity?

288.     Did Yassin al Kadi support the charity organization Al-Haramain Islamic Foundation?

289.     Who is Mansour Al Kadi, who used to work for the charity organization Al-Haramain Islamic Foundation and who, most likely, is not related to Yassin Al Kadi?

290.     Do you (Jamal Al Fadl) know Ahmed Ibrahim Al-Naggar of the Al Haramain Islamic Foundation?

291.     Do you know Mr Omal Al-Faruq?

292.     The charity organization Al Haramain wa Al Masjed Al Aqsa Charity supported the Risala schools in Sarajevo. Are you familiar with these schools?

293.     Two of the responsible representatives of the Al Haramain wa Al Masjed Al Aqsa Charity were Mahmood Taiba and Mohamed Ibrahim Saeed. Do you know these two individuals?

294.     Did the Rahma Charitable Foundation have ties with the organization Al Qaeda?


Questions concerning business dealings in Sudan

295.     In 1991, the Sudanese finance minister, Abdul Rahim Hamdi, organized a business conference in Khartoum, to which Yassin Al Kadi and other important persons from Saudi Arabia were also invited. Was the organization Al Qaeda also present at this conference?

296.     Was the Al Hijra Company in Sudan a business of Al Qaeda?

297.     Who managed the Al Hijra Company in Sudan?

298.     Was the Wadi Al-Aqiq a business of the organization Al Qaeda?

299.     Who founded the Wadi Al-Aqiq company?

254.   Have you ever seen both Khalid Bin Mahfouz and Yassin Al Kadi together with representatives of the organization Al Qaeda?

255.   Did the Muwafaq Foundation support the Maktab al Khidmat lil Mujahidin al-Arab (Afghan Service Bureau)?

256.   Have you ever seen the owner of the Bin Ja'ad Establishment, Khamir Amer Ballayth, together with representatives of Al Qaeda or with Yassin Al Kadi?

257.   Upon presentation of a photograph / Do you know the man on the photograph number 11?

258.   What can you (Jamal Al Fadl) tell us about Amir Mehdi, manager of the Muwafaq Foundation in Pakistan and Afghanistan?

259.   What can you (Jamal Al Fadl) tell us about the successor of Amir Mehdi at the Muwafaq Foundation, Nabih Hussein?

260.   What can you (Jamal Al Fadl) tell us about the local manager of the Muwafaq Foundation in Jalalabad, Sher Akbar?

261.   In whose names, legal or natural persons, were the vehicles of the organization Al Qaeda registered.

262.   Did the organization Al Qaeda use also vehicles of the Muwafaq Foundation?

263.   What can you (Jamal Al Fadl) tell us about Muhammad Jamal Khalifa?

264.   Did Al Qaeda use vehicles that were registered in the name of Muhammad Jamal Khalifa?

265.   Have you ever seen Muhammad Jamal Khalifa in the company of Yassin Al Kadi, Khalid Bin Mahfouz or a member of Al Qaeda?

266.   What can you (Jamal Al Fadl) tell us about the manager of the Muwafaq Foundation in Sudan, Siraj el ein Abdul Bari?

267.   Did the Sub-Saharan International Development Organisation (SIDO) in Sudan have connections with members of the organization Al Qaeda?

268.   What can you (Jamal al Fadl) tell us about the head of the well development project „Al Raian" of the Muwafaq Foundation in Sudan, Ali Hassan Mohammed Al Tayyab?

302.     Where did Yassin Al Kadi invest his money in Sudan?

303.     Did Yassin Al Kadi have shares in businesses linked to the organization Al Qaeda?

304.     What kind of businesses associated with Al Qaeda was Mamdouh Mahmoud Salim managing in Sudan?

305.     What kind of businesses associated with Al Qaeda was Mohamed Luay Bayazed managing in Sudan?

306.     What kind of businesses associated with Al Qaeda was Abu Hamman al-Saudi managing in Sudan?

307.     What kind of business associated with Al Qaeda was Abu Unaith Al-Saudi managing in Sudan?

308.     Did the organization Al Qaeda in Sudan have business dealings with Mr Yassin Ahmed?

Questions concerning businesses in the Balkans

309.     In 1993, the Muslim Albanian International Investment Conference was held in Tirana: Was the organization Al Qaeda also present there?

310.     The Caravan Development Group (Karavan) of Yassin Al Kadi supported various charity organizations in the Balkans. Do you know this company?

311.     One of the important business partners of Yassin Al Kadi in the Balkans was Dr. Abdul Latif Salah (Saleh). Do you know this person?

312.     Tarek Nasser, Said O.Y. Hourani, Waleed Abu Sheika, Hamza Abu Rayyan used to work for various companies (Alinted, Cavallo, Lojall, Albanian Snacks, Euroinvest) owned by Yassin Al Kadi in the Balkans. Do you know these persons and companies?

313.     Yassin Al Kadi's company Lojall in Tirana / Albania was sold. Do you know the new owner, Medhat El-Mazalwy and his company Markata?

314.     Yassin Al Kadi had a project, the Boulevard Towers (Twin Towers), in Albania / Tirana. Are you familiar with this project?

315.     The International Islamic Relief Organisation (IIRO) allegedly had offices in these Twin Towers. Mr. Walid S.A.Hamed is alleged to have worked

316.    The first business partner of Yassin Al Kadi in Saudi Arabia was Kamal Jamjoon. Do you know Kamal Jamjoon or his family and are there connections with the organization Al Qaeda?

317.    Qays Julaidan was a business partner of Yassin Al Kadi in the company Abrar. Do you know Mr Qays Julaidan and are there any connections with the organization Al Qaeda?

318.    Do you know Mr. Abdullah Alireza and the Yenel Group?

Questions concerning Istanbul / Turkey

319.    Did the city of Istanbul play a special strategic role for the organization Al Qaeda?

320.    Did the organization Al Qaeda have representatives in the city of Istanbul?

321.    Did the organization Al Qaeda hold bank accounts in Istanbul?

322.    Did the organization Al Qaeda order goods in Istanbul?

323.    Do you (Jamal Al Fadl) know the company Saglam Construction Limited in Istanbul?

324.    Do you (Jamal Al Fadl) know Mr Yavuz Subasi from Istanbul?

325.    Do you (Jamal Al Fadl) know Mr Mehmet Fatih from Istanbul?

Questions concerning businesses in other countries

326.    Did Yassin Al Kadi have relationships, private or business, in Malaysia?

327.    Have you ever heard of the Abrar Group of Yassin Al Kadi?

328.    Did Yassin Al Kadi have businesses in Pakistan or Afghanistan?

Finance questions

329.    Was Yassin Al Kadi directly involved in the financing of Al Qaeda?

330.    Did Yassin Al Kadi support the purchase of weapons, jihad wars or attacks of the organization Al Qaeda?

332.    Did the organization Al Qaeda have business dealings with companies of Yassin Al Kadi?

333.    Who managed the funds of Yassin Al Kadi in Afghanistan, Pakistan, Sudan, Bosnia, Croatia, Albania and other countries?

334.    Where did the funds at the disposal of Yassin Al Kadi come from?

335.    What kind of relations did the organization Al Qaeda have with the Shamal Islamic Bank in Khartoum?

336.    In the early 90s, Yassin Al Kadi transferred several million US$ to the Shamal Islamic Bank in Khartoum. Do you know what happened to this money?

337.    Did the organization Al Qaeda have accounts at or shares in the Al-Barakah Bank in London or elsewhere?

338.    Did the organization Al Qaeda have accounts at or shares in the Faisal Finance Bank?

339.    Did Al Qaeda have an account at the Faisal Finance Bank in Peshawar?

340.    Do you know the bank employee named Sayed Hassan, who is or was working for the Faisal Finance in Geneva / Switzerland?

341.    Which methods were used for the transfer of funds to the organization Al Qaeda (Hawala, courier, money transfers via charity organizations, money transfers via companies, bank transfers etc.)?

342.    Did Yassin Al Kadi also use such methods in order to have money transferred to the organization Al Qaeda?

343.    Did Kadi have bank accounts in Pakistan, Afghanistan, Sudan, Bosnia or other countries?

344.    Did Yassin Al Kadi bring money to Sudan?

345.    How, where and when, and to whom in Sudan did Yassin Al Kadi bring the money?

346.    Did Yassin Al Kadi bring money to Pakistan?

347.    How, where and when, and to whom in Pakistan did Yassin Al Kadi bring the money?

350.     Did Yassin Al Kadi bring money to the Balkans?

351.     How, where and when, and to whom in the Balkans did Yassin Al Kadi bring the money?

352.     In approximately 1998, Yassin Al Kadi sent large sums by bank transfer to Wael Hamza Julaidan. Had Yassin Kadi financially supported Wael Hamza Julaidan even before then?

353.     Who kept the books of the organization Al Qaeda?

354.     Who decided to what end the money was to be used within the organization Al Qaeda?

355.     Did the organization Al Qaeda have outside consultants for financial matters?

356.     Did the organization Al Qaeda have outside consultants for other matters?

357.     Were the profits of the individual companies associated with Al Qaeda earmarked for specific purposes or were the profits also used for the purchasing of weapons, the financing of wars or attacks?

358.     Did the organization Al Qaeda or any of its members have connections or contacts to the Swiss financial center?

Presentation of photographs

359.     Which persons are on the photographs number 1 to 19?

Federal Criminal Police (FCP)                                    Bern, 16 August 2004
Terrorism Investigations / Coordination
Dominique Ritter

# Exhibit O-26



**U.S. Department of Justice**

Criminal Division

18  01  0503

MEW:SCR:RT:JHF:GMB:gmb
182-15033

*Washington, D.C.  20530*

October 4, 2004

BY FEDERAL EXPRESS

Florence R. Schurch
Police Attaché
Embassy of Switzerland
2900 Cathedral Avenue, NW
Washington, D.C. 20008

    Re:  Request from Switzerland in the Matter of Yassin
        Abdullah KADI

Dear Florence,

    As discussed, please find enclosed the original CD-Roms
provided by Mr. Nicati in connection with the above-mentioned
request.  Please let me know if you have any questions.

                Sincerely,

                Mary Ellen Warlow
                Director
                Office of International Affairs
                Criminal Division

        By:            Gregory M. Bassi
                Paralegal Specialist

Enclosure



# Exhibit O-27

18 01 0508



E 29. NOV. 2004

Au 246

**U.S. Department of Justice**

*Criminal Division*

MEW:SCR:RT:JHF:GMB:gmb
182-15033

Washington, D.C. 20530

November 26, 2004

<u>BY FEDERAL EXPRESS</u>

Giorgio Bomio, Esquire
Central Authority for U.S. Requests
Federal Office of Justice
International Legal Assistance Section
Bundesrain 20
3003 Bern
Switzerland

Re:  Request from Switzerland for Assistance in the Matter
of Yassin Abdullah KADI;
<u>Your Ref.: B 128 909/03 BOG/BEA</u>

Dear Mr. Bomio:

Enclosed are materials provided by the United States
Department of the Treasury, Office of Foreign Assets Control
(OFAC), in response to the above-captioned treaty request from
Deputy Attorney General Claude Nicati. Included are documents
pertaining to OFAC's Interviews of Yassin Abdullah Kadi's local
employees in Albania in 2002. Please forward this information to
the appropriate Swiss authorities for analysis. The materials
and information contained therein may be used only in conformity
with the provisions of article 5 of the treaty.

Our records indicate that the supplemental request dated
July 26, 2004, is now fully executed; nevertheless, we are
prepared to provide additional assistance if the Swiss
authorities so require. If you have any questions, please do
not hesitate to contact us.

Sincerely,

Mary Ellen Warlow
Director
Office of International Affairs

By:

Judith H. Friedman
Senior Trial Attorney

Enclosures



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

18 01 0509

NOV 2 3 2004

FAC No. SDG- 233482

Mary Ellen Warlow
Office of International Affairs
Criminal Division
United States Department of Justice
1301 New York Ave., NW
Washington, D.C. 20530

Dear Director Warlow,

Per your request, dated August 19, 2004, to the Office of Foreign Assets Control (OFAC), attached is a redacted version of the report of OFAC's interviews of Yassin Abdullah Kadi's local employees in Albania in 2002.

This document is being provided to you to be forwarded to Swiss Deputy Attorney General, Claude Nicati, per his July 9, 2004 bilateral request (Case: BA/EA II/1/01/0006) for assistance with an ongoing investigation of Kadi in connection with his alleged support of terrorist organizations.

OFAC is pleased to provide assistance on this matter. Please contact Jennifer Yang of my staff at (202) 622-7219 if you have any further questions.

Sincerely,

*Robert W. Werner*

Robert W. Werner
Director
Office of Foreign Assets Control

Attachment

18  01  0510

THIS DOCUMENT IS CLASSIFIED 'LAW ENFORCEMENT SENSITIVE'

# OFAC TDY TO ALBANIA

## April 30, 2002 – May 21, 2002

## - A Review of the Kadi Companies -

THIS DOCUMENT IS CLASSIFIED 'LAW ENFORCEMENT SENSITIVE'

18  01  0511

# INDEX

1.   Preliminary Findings of OFAC's Albanian TDY

2.   Violeta Spaho Interview, May 8, 2002

3.   Status Report Memo to ▮▮▮▮▮, May 10, 2002

4.   Liljana Cavo Interview, May 11, 2002

5.   Amr El Zainy Interview, May 14, 2002

  – Organizational Chart for the Kadi Companies

  – Organizational Chart for Karavan Company

6.   Petrit Musa Interview, May 13, 2002

7.   Follow-up Petrit Musa Interview, May 16, 2002

8.   Kadi Folder Documents (EXCEL Spreadsheet)

# Exhibit O-28



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 31, 2005

**BY FEDERAL EXPRESS**

Judith Friedman
Senior Trial Attorney
Office of International Affairs
1301 New York Avenue, N.W.
Washington, D.C. 20530

Dear Ms. Friedman:

I enclose a binder of materials for transmittal to our Swiss colleagues in respo
to their September 13, 2004 request for assistance.  Should you have any questions, please do
hesitate to call.

Very truly yours,

DAVID N. KELLEY
United States Attorney
Southern District of New York

By: _____

LESLIE C. BROWN
Assistant United States Attorney
(212) 637-2638

enclosures

# TABLE OF CONTENTS

1.   Request from the Swiss Federal Criminal Police.

2.   LHM dated April 26, 2005 which answers 359
     questions posed by the Swiss.

3.   Supplementary LHM dated May 3, 2005 which
     gives additional background information to provide
     the reader with a better understanding of the subject
     matter.

4.   First set photographs shown to the source.

5.   Second set of photographs shown to the source.

6.   CD containing numerous photographs (refer to LHM
     dated April 26, 2005)

# Exhibit O-29

10/06 *05 08:12 FAX +41 31 3225380      DOSSIERVERWALTUNG BJ                                    ☑001/003



# FAX

**Bundesamt für Justiz · Office fédéral de la justice · Ufficio federale di giustizia · Federal Office of Justice**
Eidg. Justiz- und Polizeidepartement · Département fédéral de justice et police · Dipartimento federale di giustizia e polizia · Federal Department of Justice and Police

*International legal assistance - Internationale Rechtshilfe - Entraide judiciaire internationale*
CH -3003 Berne

| | | | |
|---|---|---|---|
| Telephone  +41 (0)31 323 57 04 | **June 10, 2005** | Seiten (inkl. Titelseite): | |
| Telefax      +41 (0)31 322 53 80 | | Total pages (including cover sheet): | **3** |
| | | Total pages (couverture incluse): | |

| An:<br>To:<br>A: | Office of International Affairs<br>Department of Justice<br>Suite 800<br>1301 New York Ave., N.W.<br>Washington, DC 20005<br>United States of America<br>Att Mrs Judith Friedman | Fax:<br>Fax No.:<br>Fax: | **memo** |



EAII II E 5 0 13 ⁹
Vic Vai:
memo

Ministère public de la Confédération
A l'att. de M. Claude Nicati, Substitu
du Procureur général

| Ihre Referenz:<br>your reference:<br>votre réf.: | - | Unsere Ref.:<br>our reference:<br>notre réf.: | **B 129629/1 BOT** |

Betrifft:      **Letter of request issued on June, 29th by the Federal Prosecutor's Office in**
Subject:      **the case of Yassin KADI**
conceme:

Dear Mrs Friedman

Kindly find enclosed, as requested, a copy of our cover letter of June, 29th 2004.

Best regards

**DIVISION FOR INTERNATIONAL LEGAL ASSISTANCE**
Swiss central authority

Nicolas BOTTINELLI

10/08 '05 08:12 FAX +41 31 3225380      DOSSIERVERWALTUNG BJ                    ☑002/003



 **Office fédéral de la Justice · Bundesamt für Justiz · Federal Office of Justice**
Département fédéral de justice et police · Eidg. Justiz- und Polizeidepartement · Federal Department of Justice and Police

3003 Berne, June 29, 2004

Telefon 031 / 322 58 95
Telefax 031 / 322 53 80

Ihr Zeichen
  Votre réf.
  Vostro rif.

Unser Zeichen
  Notre réf. B 129629/01 BOG/BEA
  Nostro rif.

*In replying please
quote this file number*

**Lettre signature**
Office of International Affairs
Department of Justice
Suite 800
1301 New York Ave., N.W.
Washington, DC 20005
United States of America

---

### *Supplemental Request for Assistance dated June 25, 2004 in the case of Yassin Kadi*

---

Dear Ms. Warlow,

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above mentioned case.

The Swiss Federal Prosecutor is conducting an investigation against the above-mentioned person for Criminal Organization. All the relevant details concerning the facts of the case, concerned persons and the requested assistance may be taken out of the enclosed letter rogatory of June 25, 2004 and its respective translation.

We request that compulsory measures be ordered if necessary. Please keep us informed about the further developments in this case.

Thank you for your assistance.

**FEDERAL OFFICE OF JUSTICE**
Swiss Central Authority

sig. Bomio

G. Bomio


29. JUNI 2004

Enclosures mentioned

0/06 '05 08:13 FAX +41 31 3225380     DOSSIERVERWALTUNG BJ                    ☑003/003

cc. without enclosures:

- Schweizerische Bundesanwaltschaft
  3003 Bern (BA/EA II/1/01/0006)

- Mr. David Albert Maniquis, Attache (FBI), Embassy of the United States of
  America, Jubiläumsstr. 93, 3005 Berne

- Schweizerische Botschaft, Washington
  zHd. - Frau Marion Weichelt Krupski, Botschaftsrätin (Rechtsfragen)
         - Frau Florence Schürch, Botschaftsattaché, Verbindungsagentin

  *(a copy of the letter rogatory will be provided upon request)*

# Exhibit O-30



**U.S. Department of Justice**

*Criminal Division*

MEW:SCR:PJR:JHF:AEL:ael
182-15033

Washington, D.C. 20530



June 30, 2005

BY REGULAR MAIL

Ms. Florence Schurch
Police Attaché
Embassy of Switzerland
2900 Cathedral Avenue, N.W.
Washington, DC 20008

Re: Request from Switzerland for Assistance in the Matter
of Yassin KADI; Your Ref: B 129629/1 BOT

Dear Ms. Schurch:

Enclosed are materials provided by the United States
Attorney's Office for the Southern District of New York in
response to the above-captioned treaty request. Please forward
this information to the appropriate Swiss authorities for
analysis. The materials and information contained therein may be
used only in conformity with the provisions of article 5 of the
treaty.

Our records indicate that the request is now fully executed.
We will keep our file open for 90 days before closing if Swiss
thorities do not intend to send a supplemental request at that
time.

Sincerely,

Mary Ellen Warlow
Director
Office of International Affairs
Criminal Division

By:   Judith H. Friedman
      Senior Trial Attorney

Enclosures

# Exhibit O-31

18 01 0915



Office des juges d'instruction fédéraux
Eidg. Untersuchungsrichteramt
Ufficio dei giudici istruttori federali
Office of Federal Examining Magistrates

To the legal Authorities of
The United States having
Jurisdiction

Rue du Mont-Blanc 4 · P.O. Box 1795 · CH–1211 Geneva1
Phone ·           022 906 90 20
Fax ·             022 906 90 21
E-Mail ·          ariane.roussy@ura.admin.ch

Federal Examining Magistrate ·   Maria-Antonella Bino
Clerk *ad hoc* ·                 Ariane Roussy

Geneva, March 23rd 2007 / ROA

## International Rogatory Letters

### Federal criminal procedure VU.2005.7; MPC v/ Yassin Abdullah KADI

Ladies and Gentlemen Magistrates,

Since July 29th 2005, I am in charge, in my capacity as Federal Examining Magistrate, of the criminal procedure Nr VU.2005.7 conducted against Yassin Abdullah KADI, namely for supporting a criminal organization according to Sect. 260ter of the Swiss code of criminal law. You will find appended a copy of said rule as well as of those about prescription (**see enclosure**).

In the frame of this examination, Yassin Abdullah KADI is suspected for having financed, namely in his capacity as Chairman of the Muwafaq Foundation, the terrorist organization «Al-Qaïda» managed by Oussama BEN LADEN, by forwarding funds in 1998 of about USD 1'250'000.- to Wael Hamzah JELAIDAN. The latter is presumed to be one of the financiers of the above-mentioned «Al-Qaïda» group. The funds in question would have passed in transit through accounts of which Yassin Abdullah KADI is the owner, even the beneficial owner, opened among others with the banking establishment Faisal Private Bank (Switzerland) SA (formerly : Faisal Finance (Switzerland) SA), in Geneva, Switzerland. Yassin Abdullah KADI's accounts are currently sequestrated since October 2001.

Yassin Abdullah KADI is still mentioned on the "Bush II" list as one of the persons linked to Oussama BEN LADEN, to the «Al-Qaïda» group and the Taliban:

1/3

The examination which I'm conducting is currently focused on the real final destination of the payments by which Yassin Abdullah KADI would have financially supported the terrorist organization «Al-Qaïda» and on the effective part played by the above-mentioned in the frame of it.

According to information forwarded to me, the judgments in the cases United States of America v. Soliman S. BIHEIRI and United States of America v. Enaam ARNAOUT would contain elements which could allow to synthesize the activities and the organization of the «Al-Qaïda» terrorist group from 1988 to 2001 and an eventual involvement of Yassin Abdullah KADI.

Still according to information which I'm holding, the trial in the case United States of America v. Muhammad SALAH and Abdulhaleem AL ASHQAR would be currently taking place in the United States.

I would like to remind, still according to the information which reached me, that along the 90s, Yassin Abdullah KADI would have transferred USD 820'000.- in favour of the Queranic Literacy Institute in Chicago, in the United States. Nevertheless, a short time later on, it has been discovered that the real remittee of the funds was Muhammad SALAH, who was precisely working in the above-mentioned institute in Chicago. Part of said funds would have been used in order to purchase weapons and reorganize the management of Hamas within the occupied territories as well as in the Gaza strip. Muhammad SALAH would be an operational member of Hamas and would have been pointed out as a terrorist. Still in the 90s, Yassin Abdullah KADI would have met several times Muhammad SALAH and transferred important amounts of money directly to the personal accounts of the latter.

Consequently, you would oblige me by authorizing me to accede to the BIHEIRI, ARNAOUT SALAH and AL ASHQAR investigation files, in order to enable me to examine any documents which could be useful for the preliminary investigation which I'm currently conducting and, if the need arises, to be in position to add a copy to the Swiss file.

You would also oblige me by allowing me to interrogate, if necessary by means of your services, Jamal AL FADEL, witness under protection in the frame of the judicial cases opened in your country against Oussama BEN LADEN and « Al-Qaïda ». I would like to remind that Jamal Ahmad AL FADEL has been himself a member of the terrorist organization « Al-Qaïda ». Jamal Ahmed AL FADEL has already made a number of statements which do implicate Yassin Abdullah KADI in his capacity as financial support to the «Al-Qaïda» organization. These statements have already been added to the Swiss procedure and I would like to take the opportunity to thank you for your precious cooperation. At the current stage of the examination, you would oblige me by authorizing me to make still a few additional questions to Jamal AL FADEL. The purpose of such questions would be to clarify at the very best the part of Yassin Abdullah KADI particularly in connection with the AL HARAMAIN foundation, Mahmud SALIM and other known or presumed members of the «Al-Qaïda» organization. I would also like to know how far the procedures directed against Jamal Ahmad AL FADEL did progress and eventually to have access to the file of said procedures, in order to select eventual exhibits which could be useful to bring the examination which I am conducting to the fore.

18 01 0917

Finally, you would oblige me by giving me access to the documents which are filed with the OFAC in Washington and allowed particularly to point Yassin Abdullah KADI out as being one of the persons linked to Oussama BEN LADEN, to the «Al-Qaïda» group and the Taliban.

I would like to remain at your disposal for any kind of additional information.

For your knowledge, I would like to stress out that this request is addressed to you in accordance with the Treaty between the Swiss Confederation and the United States of America on mutual assistance in criminal matters of May 25th 1973 and particularly with Sect. 16 and following (TEJUS; SR 0.351.933.6) and is forwarded to you over the channel of our central authority, i.e. the Federal Office of Justice, in application of Sect. 28 TEJUS.

I would like already to inform you that the performance of these Letters will be delegated to the Inspectors of the Federal Criminal Police Damien MARTINEZ and Dominique RITTER who would like to travel to the United States some time about May 2007.

I should thank you now and henceforth for your precious cooperation and assure you our reciprocity.

Best regards.

The Federal Examining Magistrate

[L.S. & illegible signature]

Dr Maria-Antonella Bino

<u>Enclosures</u>: as mentioned.

<u>Copy</u>: Messrs Damien Martinez and Dominique Ritter, Federal Criminal Police, Berne

---

**CERTIFIED TRUE AND CORRECT TRANSLATION**





IACP

18 01 0918

**Excerpts from the Swiss code of criminal law**                    RS 311.0
Of December 21st 1937 (Situation on December 19th 2006)

Book 2      Special rules
Title 12     Crimes or offences against peace

**Section 260ter**

*Criminal organization*

1. Whoever shall have taken part in an organization which maintains its structure and its numbers secret and which pursues the aim of committing criminal acts of violence or procuring income by criminal means,

Whoever shall have supported such an organization in its criminal activity,

Shall be sentenced to penal servitude for five years, at the most, or to fine.

2. The Judge may freely reduce the sentence (Sect. 48a) with regard to one who shall have done his best to impede the pursuit of the criminal activity of the organization.

3. Is also punishable whoever shall have committed the offence abroad if the organization exercises or has to exercise its criminal activity wholly or in part in Switzerland. Section 3, paragraph 2, is applicable.

Book 1      General rules
Part 1      Crimes and offences
Titre 6      Prescription

*Art. 97*

*1. Prescription of criminal action.*
*Prescription period*

[1] The criminal action does prescribe:

a.      by 30 years if the infraction is liable to a penalty involving personal restraint for lifetime;
b.      by fifteen years if it is liable to a penalty involving personal restraint for more then three years;
c.      by seven years if it is liable to any other penalty.

[2] In case of acts of sexual intercourse with children (Sec. 187) and dependant minors (Sect. 188), and in case of offences within the meaning assigned by Sect. 111, 113, 122, 182, 189 to 191 and 195 directed against a child under 16 years of age, the prescription of the criminal action runs in any case until the day on which the victim is 25.

[3] The prescription does not run any longer if, before the due date, a judgement of first instance has been passed.

./.

**18 01 0919**

*Sect. 97 (continuation):*

[4] The prescription of the criminal action in case of acts of sexual intercourse with children (Sect. 187) and dependant minors (Sect. 188), and in case of offences within the meaning of Sect. 111 to 113, 122, 182, 189 to 191 and 195 directed against a child under 16 years of age, committed prior to the amendment of October 5th 2001 coming into force, is fixed according to paragraph 1 to 3 if it is not yet expired by then.

---

**Book 1 General rules**
**Part  1 Crimes and offences**
**Title  6 Prescription**

*Art. 98*

*Starting point*

The prescription runs:

a.    from the day that the perpetrator committed the punishable action;

b.    from the day of the last act if this activity is perpetrated several times;

c.    from the day on which the reprehensible dealings stopped if they were lasting for a period of time.

18 01 0920



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Swiss Confederation

Federal Department of Justice and Police FDJP
Federal Office of Justice FOJ
Section for Mutual Legal Assistance

ALF, FOJ, Bundesrain 20, 3003 Berne, Switzerland

**Registered**

Office of International Affairs OIA
Department of Justice
Suite 800
1301 New York Ave., N.W.
Washington DC 20005
UNITED STATES

Office des juges d'instruction fédéraux
Genève

R: 0 5 AVR. 2007

Also by fax, memo, 7 pages

Your reference :
Our reference : B 126'909 ALF

Berne, April 2nd 2007

**Request for assistance made on March 23rd 2007, by the Swiss Federal Examining Magistrate in criminal proceedings against Yassin Abdullah KADI**

Dear Sir or Madam

According to the provisions of the Treaty between the United States of America and the Swiss Confederation on Mutual Assistance in Criminal Matters, the Federal Office of Justice, Swiss Central Authority, requests the assistance of the appropriate US authorities in the above mentioned case.

The Swiss Federal Examining Magistrate is conducting an investigation against the above-mentioned person for supporting a criminal organization (Sect. 260ter Swiss code of criminal law). All the relevant details concerning the facts of the case, concerned persons and the requested assistance may be taken out of the enclosed letter rogatory dated March 23rd 2007 and its respective translation.

We request that compulsory measures be ordered if necessary. Please keep us informed about the further developments in this case.

Thank you for your assistance.

Yours faithfully

sig. Albertini

Florence Albertini

Enclosure mentioned

Florence Albertini
Bundesrain 20, 3003 Berne, Switzerland
Telephone : +41 31 324 94 69, Telefax : +41 31 322 53 80
irh@bj.admin.ch
http://www.bj.admin.ch

**18 01 0921**



Copy to:

Office des juges d'instruction fédéraux
Mme Maria-Antonella Bino, Juge d'instruction fédéral
Rue du Mont-Blanc 4
Case postale 1795
1211 Genève 1
(ad: VU.2005.7)


Mr Daniel Boyd, Attache (FBI)
Embassy of the United States of America
Jubiläumsstr. 93
3005 Berne

Schweizerische Botschaft
Washington
zHd.
• Frau Andrea Bosshard, Botschaftsrat (Rechtsfragen)
• Frau Florence Schürch, Botschaftsattaché, Verbindungsagentin

18 01 0910



**Office des juges d'instruction fédéraux**
**Eidg. Untersuchungsrichteramt**
**Ufficio dei giudici istruttori federali**
**Office of Federal Examining Magistrates**

Aux autorités judiciaires
américaines compétentes

Rue du Mont-Blanc 4 · C.P. 1795 · CH – 1211 Genève 1
Téléphone ·        022 906 90 20
Téléfax ·          022 906 90 21
E-Mail ·           ariane.roussy@ura.admin.ch

Juge d'instruction fédéral ·    Maria-Antonella Bino
Greffière *ad hoc* ·            Ariane Roussy

Genève, le 23 mars 2007 / ROA

## Commission rogatoire internationale

### Procédure pénale fédérale VU.2005.7; MPC c/ Yassin Abdullah KADI

Mesdames et Messieurs les Magistrats,

Depuis le 29 juillet 2005, je suis en charge, en ma qualité de Juge d'instruction fédéral, de la procédure pénale n° VU.2005.7 dirigée à l'encontre de Yassin Abdullah KADI, en particulier pour soutien à une organisation criminelle au sens de l'art. 260ter du Code pénal suisse. Vous trouverez ci-joint copie de ladite disposition ainsi que de celles relatives à la prescription (cf. **annexe**).

Dans le cadre de cette instruction, Yassin Abdullah KADI est soupçonné d'avoir financé, notamment en sa qualité de Président de la Fondation Muwafaq, l'organisation terroriste « Al-Qaïda » dirigée par Oussama BEN LADEN, en faisant notamment parvenir des fonds en 1998 pour environ USD 1'250'000.- à Wael Hamzah JELAIDAN. Ce dernier est présumé être l'un des financiers du groupe « Al-Qaïda » précité. Les fonds en question auraient transité par des comptes, dont Yassin Abdullah KADI est titulaire, voire ayant droit économique, ouverts entre autres auprès de l'établissement bancaire Faisal Private Bank (Switzerland) SA (anciennement : Faisal Finance (Switzerland) SA), à Genève, Suisse. Les comptes de Yassin Abdullah KADI sont actuellement saisis à titre conservatoire depuis le mois d'octobre 2001.

Yassin Abdullah KADI figure encore sur la liste "Bush II" comme étant l'une des personnes liées à Oussama BEN LADEN, au groupe « Al-Qaïda » et aux Taliban.

L'instruction que je diligente porte actuellement sur la véritable destination finale des versements avec lesquels Yassin Abdullah KADI aurait soutenu financièrement l'organisation terroriste « Al-Qaïda » et sur le rôle effectivement revêtu par le précité au sein de celle-ci.

Selon les informations qui m'ont été transmises, les jugements dans les affaires Etats-Unis d'Amérique c. Soliman S. BIHEIRI et Etats-Unis d'Amérique c. Enaam ARNAOUT contiendraient des éléments permettant de synthétiser les activités et l'organisation du groupe terroriste « Al-Qaïda » pendant les années 1988 à 2001 et une éventuelle implication de Yassin Abdullah KADI.

Toujours selon les informations en ma possession, le procès dans l'affaire Etats-Unis d'Amérique c. Muhammad SALAH et Abdulhaleem AL ASHQAR se déroulerait actuellement aux Etats-Unis.

Je rappelle encore que, toujours selon mes sources, dans le courant des années 1990, Yassin Abdullah KADI aurait transféré USD 820'000.- en faveur du Queranic Literacy Institute à Chicago, aux Etats-Unis. Il a cependant été découvert peu après que le vrai destinataire de ces fonds était Muhammad SALAH qui travaillait justement pour l'institut précité à Chicago. Une partie de ces fonds aurait été utilisée pour acheter des armes et réorganiser la direction du Hamas dans les territoires occupés ainsi que dans la bande de Gaza. Muhammad SALAH serait un membre opérationnel du Hamas et aurait été désigné comme terroriste. Toujours dans les années 1990, Yassin Abdullah KADI aurait rencontré Muhammad SALAH à plusieurs reprises et transféré des sommes importantes d'argent directement sur les comptes personnels de ce dernier.

Partant, vous m'obligeriez en m'autorisant l'accès aux dossiers des enquêtes BIHEIRI, ARNAOUT SALAH et AL ASHQAR afin de pouvoir examiner toute pièce qui pourrait être utile à l'instruction préparatoire que je diligente actuellement et, le cas échéant, de pouvoir en verser une copie au dossier suisse.

Vous m'obligeriez également en permettant d'interroger, si nécessaire par l'intermédiaire de vos services, Jamal AL FADEL, témoin protégé dans le cadre d'affaires judiciaires ouvertes sur votre territoire à l'encontre d'Oussama BEN LADEN et de « Al-Qaïda ». Je rappelle que Jamal Ahmad AL FADEL a été lui-même membre de l'organisation terroriste « Al-Qaïda ». Jamal Ahmed AL FADEL a déjà fait un certain nombre de déclarations qui mettent en cause Yassin Abdullah KADI en sa qualité de soutien financier présumé de l'organisation « Al-Qaïda ». Ces déclarations sont déjà versées à la procédure suisse et je saisis l'occasion pour vous remercier de votre précieuse collaboration. Au stade actuel de l'instruction, vous m'obligeriez en me laissant poser encore quelques questions complémentaires à Jamal AL FADEL. Ces questions auraient pour but d'éclaircir au mieux le rôle de Yassin Abdullah KADI en particulier en relation avec la fondation AL HARAMAIN, Mahmud SALIM et d'autres membres avérés ou présumés de l'organisation « Al-Qaïda ». Je souhaiterais aussi connaître l'état d'avancement des procédures dirigées à l'encontre de Jamal Ahmad AL FADEL et éventuellement avoir accès au dossier desdites procédures pour y sélectionner d'éventuelles pièces qui pourraient être utiles à l'avancement de l'instruction que je diligente.

18 01 0912

Enfin, vous m'obligeriez en donnant accès aux documents qui sont archivés au sein de l'OFAC à Washington et qui ont permis en particulier de désigner Yassin Abdullah KADI comme étant l'une des personnes liées à Oussama BEN LADEN, au groupe « Al-Qaïda » et aux Taliban.

Je reste à votre disposition pour tout renseignement complémentaire.

A toutes fins utiles, je relève que la présente requête vous est adressée conformément au Traité entre la Confédération suisse et les Etats-Unis d'Amérique sur l'entraide judicaire en matière pénale du 25 mai 1973 en particulier aux art. 16 et ss (TEJUS ; RS 0.351.933.6) et vous est transmise par l'intermédiaire de notre autorité centrale, à savoir l'Office fédéral de la justice, en application de l'art. 28 TEJUS.

Je vous informe d'ores et déjà que l'exécution de la présente sera déléguée aux Inspecteurs de Police judiciaire fédérale Damien MARTINEZ et Dominique RITTER qui souhaiteraient pouvoir se rendre aux Etats-Unis aux alentours du mois de mai 2007.

Je vous remercie par avance de votre précieuse collaboration et vous assure de notre réciprocité.

Veuillez croire, Mesdames et Messieurs les Magistrats, à l'assurance de ma considération distinguée.

Le Juge d'instruction fédéral

Dr Maria-Antonella Bino

Annexe : ment.

Copie:

MM. Damien Martinez et Dominique Ritter, Police judiciaire fédérale, Berne

18 01 0913

**Extraits du Code pénal suisse**
du 21 décembre 1937 (Etat le 19 décembre 2006)                    RS 311.0

Livre 2      Dispositions spéciales
Titre 12     Crimes ou délits contre la paix publique

*Art. 260ter*

*Organisation criminelle*

1. Celui qui aura participé à une organisation qui tient sa structure et son effectif secrets et qui poursuit le but de commettre des actes de violence criminels ou de se procurer des revenus par des moyens criminels,

celui qui aura soutenu une telle organisation dans son activité criminelle,

sera puni d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

2. Le juge pourra atténuer librement la peine (art. 48a) à l'égard de celui qui se sera efforcé d'empêcher la poursuite de l'activité criminelle de l'organisation.

3. Est également punissable celui qui aura commis l'infraction à l'étranger si l'organisation exerce ou doit exercer son activité criminelle en tout ou en partie en Suisse. L'art. 3, al. 2, est applicable.

Livre 1      Dispositions générales
Partie 1     Crimes et délits
Titre 6      Prescription

*Art. 97*

*1. Prescription de l'action pénale.*
*Délais*

[1] L'action pénale se prescrit:

a.     par 30 ans si l'infraction est passible d'une peine privative de liberté à vie;
b.     par quinze ans si elle est passible d'une peine privative de liberté de plus de trois ans;
c.     par sept ans si elle est passible d'une autre peine.

[2] En cas d'actes d'ordre sexuel avec des enfants (art. 187) et des mineurs dépendants (art. 188), et en cas d'infractions au sens des art. 111, 113, 122, 182, 189 à 191 et 195 dirigées contre un enfant de moins de 16 ans, la prescription de l'action pénale court en tout cas jusqu'au jour où la victime a 25 ans.

[3] La prescription ne court plus si, avant son échéance, un jugement de première instance a été rendu.

./.

Extraits du Code pénal suisse

**18 01 0914**

RS 311.0

*Art. 97 (suite) :*

[4] La prescription de l'action pénale en cas d'actes d'ordre sexuel avec des enfants (art. 187) et des mineurs dépendants (art. 188), et en cas d'infractions au sens des art. 111 à 113, 122, 182, 189 à 191 et 195 dirigées contre un enfant de moins de 16 ans commis avant l'entrée en vigueur de la modification du 5 octobre 2001 est fixée selon les al. 1 à 3 si elle n'est pas encore échue à cette date.

---

**Livre 1 Dispositions générales**
**Partie 1 Crimes et délits**
**Titre 6 Prescription**

*Art. 98*

*Point de départ*

La prescription court:

a.  dès le jour où l'auteur a exercé son activité coupable;
b.  dès le jour du dernier acte si cette activité s'est exercée à plusieurs reprises;
c.  dès le jour où les agissements coupables ont cessé s'ils ont eu une certaine durée.