## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **YASSIN ABDULLAH KADI,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  09-0108 (JDB)** |
| **TIMOTHY GEITHNER, et al.,**[1] | |
| **Defendants.** | |

## MEMORANDUM OPINION

This case, brought by Yassin Abdullah Kadi,[2] a citizen and permanent resident of Saudi

Arabia,  involves a challenge to the decision of the Office of Foreign Assets Control ("OFAC")

to designate him as a "specially designated global terrorist ("SDGT").  Presently pending are (1)

defendants'[3] motion to dismiss or, in the alternative, for summary judgment; (2) Kadi's motion

for discovery under Fed. R. Civ. P. 56(f); and (3) Kadi's motion to amend his complaint. For the

reasons that follow, the Court will grant defendants' motion for summary judgment, deny Kadi's

motion for discovery under Rule 56(f), and deny Kadi's motion to amend the complaint.

---

[1]  Pursuant to Fed. R. Civ. P. 25, Timothy Geithner, the current Secretary of the U.S. Department of the Treasury, has been substituted for Henry Paulson, who was the Secretary when this action was filed.

[2] In the administrative record, plaintiff Kadi is addressed as "Al-Qadi."  Depending on the context,  this Memorandum Opinion uses both spellings interchangeably.  Moreover, the administrative record is replete with alternate spellings of various individuals and organizations. For simplicity, and where not otherwise indicated, the Court has attempted to be consistent in the spelling of certain entities and individuals, even with references contained in direct quotations or citations.

[3]  Kadi lodges his complaint against defendants Geithner, Adam J. Szubin, in his official capacity as Director of OFAC, the U.S. Department of the Treasury, and OFAC.  The Court will refer to the defendants collectively as "the Government."

**BACKGROUND**

## I.      Statutory and Regulatory Background

The listing of SDGTs is governed by the International Emergency Economic Powers Act,

50 U.S.C. § 1701 et seq. ("IEEPA"), and Executive Order 13,224 (66 Fed. Reg. 49,079 (Sept. 23,

2001)) ("EO 13,224").   IEEPA "authorizes the President to declare a national emergency when an

extraordinary threat to the United States arises that originates in substantial part in a foreign

state."  Holy Land Found. v. Ashcroft, 333 F.3d 156, 159 (D.C. Cir. 2003).  Such a declaration

provides the President with extensive authority set forth in 50 U.S.C. § 1702, which permits the

President to block property subject to the jurisdiction of the United States.  Specifically, the

President is authorized to:

> investigate, block during the pendency of an investigation,
> regulate, direct and compel, nullify, void, prevent or prohibit, any
> acquisition, holding, withholding, use, transfer, withdrawal,
> transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or
> transactions involving, any property in which any foreign country
> or a national thereof has any interest by any person, or with respect
> to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1)(B).  IEEPA further provides that, in the event of "judicial review of a

determination made under this section, if the determination was based on classified information

. . . such information may be submitted to the reviewing court ex parte and in camera."  Id. §

1702(c).

After September 11, 2001, the President issued EO 13,224 invoking his authority under

IEEPA and the United Nations Participation Act, 22 U.S.C. § 287c.  The Executive Order

declared a "national emergency" with respect to "grave acts of terrorism and threats of terrorism

committed by foreign terrorists, including the terrorist attacks . . . committed on September 11, 2001, . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Id.  EO 13,224 ordered the blocking of property of twenty-seven specific terrorists and terrorist organizations identified in an Annex.  Id. § 3.  The Secretary of the Treasury is authorized to designate additional persons whose property or interests in property should be blocked, where the Secretary finds that such persons "act for or on behalf of" or are "owned or controlled by" designated terrorists, or they "assist in, sponsor, or provide . . . support for" (including "financial . . . support" or "financial . . . services") or are "otherwise associated with" them.  Id. §§ 1(c)-(d).  The Secretary has delegated his authorities under the Executive Order to the Director of OFAC.  31 C.F.R. § 594.802.  Persons designated pursuant to the Executive Order are referred to as "specially designated global terrorists" (SDGT).  See 31 C.F.R. § 594.310.

## II.     Procedural History and Designation[4]

Kadi is a citizen and permanent resident of Saudi Arabia and a self-described "prominent Saudi Arabian businessman and philanthropist."  Compl. ¶ 1; AR 94.  On October 12, 2001, OFAC designated Kadi a SDGT pursuant to the IIEPA and EO 13,224, Compl. ¶ 20, which, by operation of law, resulted in the blocking of all of his property and interests in property subject to the jurisdiction of the United States.  It is undisputed that OFAC did not give notice to Kadi before blocking his assets.  The designation was made known to Kadi and to the public through a press release instructing financial institutions to freeze Kadi's assets.  Compl. ¶ 20; AR 123-26.

---

[4]  The facts are drawn from Kadi's complaint, the unclassified pleadings, and the unclassified administrative record.  Citations to the administrative record are to the unclassified administrative record, which is cited as "AR".

A press release was also issued by authorities in the United Kingdom.  Compl. ¶ 20.  By letter

dated October 15, 2001, OFAC also mailed Kadi a "Notice of Blocking" providing direct notice

of the designation and blocking and advising him of the administrative procedures available to

challenge OFAC's action.  AR 2784-85.  Notice of the designation was also published on

October 26, 2001 in the Federal Register.  See 66 Fed. Reg. 54404 (Oct. 26, 2001).

Kadi thereafter sought judicial review in the High Court in London.  Compl. ¶¶ 22-23.

In response to a request for information by the United Kingdom, the United States Treasury

Department faxed a two-page document to United Kingdom officials in October 2001 ("two-page

fax"), which Kadi learned about during his court proceedings in London.  Compl. ¶ 24.  Kadi

places much emphasis on this two-page fax, which summarized unclassified information relating

to Kadi's financial support of terrorist activities through a charitable organization known as the

Muwafaq Foundation and his other ties to terrorists and terrorism financing.  AR 39-40.  Kadi

claims that around May 23, 2002, he met with OFAC staff at the U.S. Embassy in Saudi Arabia,

where OFAC denied knowledge of the two-page fax.  Compl. ¶ 25.  However, there is no

dispute that Kadi received a copy of the two-page fax, reviewed it, and proceeded to refute

various contentions as part of his petition for reconsideration.  See Compl. ¶ 29.

Kadi petitioned OFAC for reconsideration on December 21, 2001. AR 23.  In the months

and years thereafter, he has submitted several witness statements and other materials in support

of his petition and has engaged in a series of exchanges with OFAC.  On March 12, 2004, OFAC

issued a twenty-page unclassified memorandum denying Kadi's request for reconsideration

("OFAC Memorandum").  Compl. ¶ 30.  AR 3-40.  Kadi maintains that this is the only formal

written statement he has received from the United States government.  Compl. ¶ 31. Based on

these events, Kadi filed this action on January 16, 2009, challenging the evidentiary basis for his

designation and the freezing of his assets, and raising an array of constitutional claims.

Specifically, he claims violations under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.,

the IEEPA, and the First, Fourth, and Fifth Amendments.  On May 22, 2009, defendants filed a

motion to dismiss or, in the alternative, for summary judgment.  Kadi opposes the motion and

seeks discovery under Rule 56(f).  Kadi also seeks leave to file an amended complaint.  The

Court heard argument with respect to the pending motions on April 9, 2010, and thereafter

requested supplemental briefing, which has now been completed.[5]

## STANDARD OF REVIEW

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)); accord Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed

factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide

the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and

conclusions" or "a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S.

at 555-56; see also Papasan v. Allain, 478 U.S. 265, 286 (1986).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

---

[5] On June 25, 2009, Kadi moved to preclude the Government from relying on any
evidence that was not provided to Kadi, including classified information that was part of the
administrative record.  That motion was denied by this Court on March 30, 2010. See Order,
ECF No. 39.

relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting

Twombly, 550 U.S. at 570); accord Atherton v. District of Columbia Office of the Mayor, 567

F.3d 672, 681 (D.C. Cir. 2009).  A complaint is plausible on its face "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.  This amounts to a "two-pronged

approach" under which a court first identifies the factual allegations entitled to an assumption of

truth and then determines "whether they plausibly give rise to an entitlement to relief." Id. at

1950-51.

     The notice pleading rules are not meant to impose a great burden on a plaintiff.  Dura

Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534

U.S. 506, 512-13 (2002).  When the sufficiency of a complaint is challenged by a motion to

dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  Leatherman v. Tarrant Cnty. Narcotics & Coordination

Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir.

1979); see also Erickson, 551 U.S. at 94 (citing Twombly, 550 U.S. at 555-56).  The plaintiff

must be given every favorable inference that may be drawn from the allegations of fact.  Scheuer

v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113

(D.C. Cir. 2000).  However, "the court need not accept inferences drawn by plaintiffs if such

inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Commc'ns

Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Nor does the court accept "a legal conclusion

couched as a factual allegation," or "naked assertions [of unlawful misconduct] devoid of further

factual enhancement." Iqbal, 129 S. Ct. at 1949-50 (internal quotation marks omitted); see also

Aktieselskabet AF 21. November 21 v. Fame Jeans Inc., 525 F.3d 8, 17 n.4 (D.C. Cir. 2008)

(explaining that the court has "never accepted legal conclusions cast in the form of factual

allegations").

       Under Fed. R. Civ. P. 56(a), summary judgment is appropriate when the pleadings and

the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Id.  In a case involving review of a final agency

action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in

Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative

record.  See Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, *7

(D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on

other grounds, 967 F. Supp. 2d 6 (D.D.C. 1997).  Under the APA, it is the role of the agency to

resolve factual issues to arrive at a decision that is supported by the administrative record,

whereas "the function of the district court is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did."  See

Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also Northwest

Motorcycle Ass'n v. United States Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994)

("[T]his case involves review of a final agency determination under the [APA]; therefore,

resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's

review is limited to the administrative record.").  Summary judgment thus serves as the

mechanism for deciding, as a matter of law, whether the agency action is supported by the

administrative record and otherwise consistent with the APA standard of review.  See Richard v.

INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25,

31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Plaintiffs challenge Kadi's designation as a SDGT as violating the requirements of the APA, IIEPA, and EO 13,224.  The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. at 416. The Court's review is confined to the administrative record, subject to limited exceptions not applicable here.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## DISCUSSION

I.    **APA Claim**

A.  **Standard for Motion for Summary Judgment and Discovery**

Before addressing the merits of Kadi's APA claim, the Court first considers Kadi's preliminary argument that summary judgment is inappropriate because there are disputed issues

of material fact.  Alternatively, he claims that the motion for summary judgment is premature

because he has not been provided an opportunity to obtain discovery on his claims.  <u>See</u> Opp'n at

64-69.

In general, summary judgment "is proper only after the plaintiff has been given adequate

time for discovery."  <u>First Chicago Int'l v. United Exch. Co.,</u> 836 F.2d 1375, 1380 (D.C. Cir.

1988).  However, a party opposing summary judgment and seeking to obtain discovery under

Rule 56(f) has the burden of stating "concretely why additional discovery is needed to oppose a

motion for summary judgment." <u>Messina v. Krakower</u>, 439 F. 3d 755, 762 (D.C. Cir. 2006); <u>see</u>

<u>also</u> <u>Byrd v. EPA</u>, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999) (party seeking discovery has the

burden of identifying which facts to be discovered would create triable issue, as well as the

reasons why discovery is necessary to challenge the summary judgment motion).

Kadi argues that because the classified record was not made available to him, he is unable

to respond to the motion for summary judgment.  Moreover, he claims that because subsequent

decisions by other countries "vindicated him," the administrative record is therefore incomplete,

and he contends that he should be given an opportunity to supplement it.  The Court rejects these

arguments.  Subsequent to the 2004 decision, Kadi has had several years and opportunities to

petition OFAC to supplement the administrative record, but he has not done so.  Moreover,

absent "evidence that the agency has given a false reason . . . discovery is inappropriate in cases

under the APA."  <u>See</u> <u>Nat'l Treasury Employees Union v. Seidman</u>, 786 F. Supp. 1041, 1046

(D.D.C. 1992).  Although Kadi attempts to argue that OFAC has acted in bad faith, nothing in

the record supports Kadi's contention.  Even if the Court permitted discovery, it is doubtful that it

would garner additional facts that would help to decide whether the agency action was arbitrary

and capricious, given the deferential review of such actions. See Camp, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); Seidman, 786 F. Supp. at 1046 n. 11 ("The Court may not substitute its judgment for that of the decision-making agency.") (citing Motor Vehicle Mfrs., 463 U.S. at 43). Accordingly, the Court will deny Kadi's motion for discovery under Rule 56(f) with respect to the APA claim and will proceed to resolve it.

**B.   Merits of the APA Claim**

Kadi's APA claim primarily challenges OFAC's decision to continue his SDGT designation as arbitrary and capricious, as based on a lack of sufficient procedural safeguards, for insufficiency of the evidence in the administrative record, and for OFAC's misplaced reliance on the facts that were in the record. See Compl. ¶¶ 51-54. In considering the merits of the claim, the Court has reviewed the parties' submissions, the arguments made by the parties at the hearing before the Court, and the entire administrative record, which consists of both the classified and unclassified record.

In reviewing a challenge to the agency's decision as arbitrary and capricious, the Court bears several considerations in mind. The D.C. Circuit has stated that "a highly deferential review applies" to examination of a SDGT designation. Islamic Am. Relief Agency v. Gonzales, 477 F. 3d 728, 732 (D.D.C. 2007); Holy Land Found., 333 F.3d at 162. As previously stated, the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs., 463 U.S. at 43. The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be

10

searching and careful, the ultimate standard of review is a narrow one." Id. at 416.  The Court,

then, "must consider whether the decision was based on a consideration of the relevant factors

and whether there has been a clear error of judgment." Id.  Courts are particularly mindful that

their review is highly deferential when matters of foreign policy and national security are

concerned.  See Islamic Am. Relief Agency, 477 F.3d at 734 ("[O]ur review -- in an area at the

intersection of national security, foreign policy, and  administrative law -- is extremely

deferential."); Zarmach Oil Servs v. U.S. Dep't of the Treasury, 750 F. Supp. 2d 150, 155

(D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in

matters of foreign policy,' including cases involving blocking orders.") (citing Regan v. Wald,

468 U.S. 222, 242 (1984)); Holy Land Found., 219 F. Supp. 2d at 84 ("Blocking orders are an

important component of U.S. foreign policy, and the President's choice of this tool to combat

terrorism is entitled to particular deference.")

     1.    Overview of the OFAC Decision and Kadi's Arguments[6]

After petitioning OFAC for reconsideration in December 2001, Kadi and the agency

engaged in several meetings and Kadi provided numerous statements and submissions.  On

March 12, 2004, OFAC notified Kadi that his petition for reconsideration was denied and that his

name would remain on the list of SDGTs.  AR 1.  OFAC emphasized that its determination

rested on the "totality of the record" (both classified and unclassified), which showed that Kadi

had financial relationships -- primarily through the Muwafaq Foundation, but also through other

---

[6] Kadi's APA claim focuses on OFAC's denial of his reconsideration petition on March 12, 2004, as the "final agency action" challenged.  Hence, for purposes of the APA claim, the Court considers the adequacy of evidence supporting the March 2004 OFAC decision to continue the designation, rather than the adequacy of the evidence supporting the initial designation decision in 2001.

Kadi companies -- with many persons and organizations that were designated SDGTs by OFAC:

> No one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that AL-QADI has been providing support to terrorists through his actions.  Rather, when considering the number of sources, the numbers of activities and length of time, the totality of the evidence, both classified and unclassified, this provides a reason to believe Yasin AL-QADI has funded terrorist and extremist individuals and operations.

AR 22.

In deciding that Kadi's continued designation was warranted, OFAC considered an administrative record of over 2800 pages, which included the extensive submissions Kadi made to OFAC during the reconsideration process,[7] as well as other documents.  OFAC also considered a classified record.  Based on its assessment of all this evidence, OFAC determined that "a reasonable basis remains to continue the designation of [Kadi] under E.O. 13224."  AR 1.  OFAC invoked each of the three grounds authorized in EO 13,224, finding that there was "reason to believe" that Kadi was:

- acting for or on behalf of al Qaida, Osama Bin Laden, and Makhtab al-Khidamat, persons listed in the Annex to E.O. 13,224;

- assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, among others, al Qaida, Osama Bin Laden, Makhtab al-Khidamat, Hamas, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el

_____

[7] Kadi provided several witness statements and submissions to OFAC, some of which had been submitted in other proceedings.  They include: Kadi's Witness Statement, Dec. 17, 2001 (AR 92-280); Kadi's Supplemental Witness Statement, July 23, 2002 (AR 281-505); Kadi's Summary Presentation for OFAC, Aug. 1, 2002 (AR 1068-1085); Kadi's Third Witness Statement, Dec. 19, 2002 (AR 689-1067); Kadi's Presentation for February 28th Meeting with OFAC, Feb. 28, 2003 (AR 1184-1351); Kadi's Answers to Questions Concerning the Petition to Delist, July 11, 2003 (AR 1357-1391); Kadi's Submission to the Deputy Attorney General of Switzerland, Mr. Claude Nicati, Further to the Meeting at the Swiss Embassy in Riyadh, August 22, 2003 (AR 2020-2406).

Julaidan, persons subject to E.O. 13,224; and

- associated with, among others, al Qaida, Osama Bin Laden, Makhtab al-Khidamat, Hamas, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan . . . .

AR 22.  Although OFAC invoked all three grounds, and emphasized its decision to continue the designation based on the totality of the record, OFAC's decision appears to rely primarily on Kadi's financial support of terrorism.  Neither Kadi nor the Government take the position that all three criteria must be satisfied in order to uphold the designation.[8]

Kadi acknowledges the highly deferential review accorded to OFAC's decision.  But he claims that the administrative record, even when viewed in its totality, shows that "there is no 'substantial evidence' . . . of any sort" to support the designation, see Opp'n at 48, and he argues that the evidence underlying OFAC's decision is unreliable.  Specifically, Kadi claims that the administrative record fails to support OFAC's findings that he (1) provided support to terrorism through his leadership in the Muwafaq Foundation; (2) provided financial or other support to SDGTs; or (3) had any other ties to justify the sanctions imposed against him.  Opp'n at 49.  As part of his attack on the sufficiency of the evidence, Kadi takes issue with OFAC's reliance on his own statements as evidenced in the frequent reference to them in the OFAC Memorandum.  He

---

[8]  The OFAC Memorandum contains repeated emphasis on "money" and "funding," both in the "Conclusion" and throughout the final decision.  The Government states that it is not moving for summary judgment on the "otherwise associated with" criterion, nor does it seek summary judgment on the "material support" or "services" element of the basis for designation.  See Defs.' Mot. at 12 n.6 ("Defendants are not moving for summary judgment on [this] basis  . . . this alternative basis for designation is largely duplicative of the other grounds . . . ."); Reply at 37 ("Kadi was designated for providing financial support, so the Court need not and should not consider whether the terms 'material support' or 'services' might be unconstitutionally applied to another party.")  These terms, however, are the focus of Kadi's vagueness and overbreadth claims.

also protests OFAC's use of classified information to support the continued designation.[9]  Finally, Kadi continues to dispute the accuracy and reliability of certain pieces of evidence in the record, notably the two-page fax, news articles, and the affidavit submitted by FBI Agent Richard Wright.  He also points to subsequent decisions by other countries, with varying procedural postures, as purported indicators of OFAC's error in continuing his designation.

Kadi argues that the two-page fax sent by the United States to the United Kingdom contained "substantially erroneous" information.  He further claims that the fax's reliance on "non-evidential sources" such as news articles and information from websites constituted hearsay.  Compl. ¶ 24.  But Kadi's argument that the Government is categorically foreclosed from considering "hearsay" sources is wrong.  Courts, including the D.C. Circuit, have held that hearsay evidence can be considered as part of the administrative record.  See Holy Land Found., 333 F.3d at 162 (rejecting the contention that OFAC may not rely on hearsay evidence, and stating that designations can be based on a broad range of evidence, including intelligence data and hearsay declarations); Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 196 (D.C. Cir. 2001); Al Haramain Islamic Found. v. U.S. Dep't of Treasury, 585 F. Supp. 2d 1233, 1258 (D. Ore. 2008) ("Al Haramain I") ("The APA permits the agency's use of 'any oral or documentary evidence' so long as the evidence is not irrelevant, immaterial, or unduly repetititious evidence.") (quoting 5 U.S.C. § 556(d)).  Accordingly, OFAC's reliance on newspaper articles, whether in the two-page fax or in the administrative record generally, was entirely proper.

---

[9] This issue was addressed by the Court's March 30, 2010 order denying his motion to preclude the Government's reliance on such evidence.

Kadi also alludes to the findings by other investigative bodies around the world that, according to him, have considered the same or similar terrorism allegations against him, and "vindicated" him in every forum. See Opp'n at 4-5. However, the decisions cited by Kadi all post-date the March 2004 OFAC decision under review and are not part of the administrative record. Notwithstanding the impropriety of considering such decisions, the Court would, in any event, be reluctant to rely on the decisions of other countries based on information that likely differed from the administrative record compiled by and available to OFAC. Moreover, these decisions may have been reached under different standards of proof or review, which further undermines any persuasiveness they would have.

      2.    <u>Kadi's Involvement in the Muwafaq Foundation</u>

The Court now turns to the evidentiary basis for OFAC's conclusion that Kadi provided support -- particularly financial support -- to terrorist causes and to other SDGTs. OFAC emphasizes Kadi's leadership in the Muwafaq Foundation in its March 2004 decision. Accordingly, the Court looks first to Kadi's relationship with that entity.

The Muwafaq Foundation -- Arabic for "Blessed Success" or "Holy Success" -- was founded in the Channel Islands on May 31, 1992 as a charitable foundation. Sudan was the first country in which Muwafaq was active; it subsequently operated in Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzogovina, Albania, Austria, and Germany. AR 707. Kadi refers to Muwafaq as a "highly decentralised operation" that "carried out separate activities in various countries or regions"; therefore, it had "no central administration," and "no central accounting systems nor any central bank accounts." AR 1357-58. Muwafaq reportedly terminated operations in 1996 or 1997, but the OFAC Memorandum states that Muwafaq "continued to operate until

mid-2001 under the umbrella of Makhtab al-Khidamat . . . considered to be the precursor to al-Qaida," before Makhtab al-Khidamat dissolved and was absorbed into Osama Bin Laden's organization, and that "Muwafaq . . . joined [al-Qaida]." AR 14-15. Kadi's submissions also note that Muwafaq is still registered in Holland and Belgium. AR 708-09.

The administrative record reflects that Kadi played a significant leadership role in Muwafaq. Kadi is one of six trustees, and the others "delegated . . . the running and operation of the Foundation" to Kadi, who "was the driving force behind the administration of the foundation." AR 1357. He effectively conceded that he directly supervised the individual country offices. Kadi "selected the managers responsible for the various countries"; worked with them to determine "which charitable activities to engage in"; helped "raise money for those activities" ; and, "[w]henever possible," he visited the country locations where Muwafaq operated "to meet with the country managers regarding the activities of the Foundation," "about 3-4 times a year" for each country. AR 1359. Significantly, in addition to choosing and managing Muwafaq's personnel, Kadi also transferred funds to the organization. He concedes that he made those transfers, but argues that they were "solely and exclusively for the charitable purposes of the foundation." Opp'n at 52.

OFAC relied on Kadi's involvement in Muwafaq and, in particular, activities claimed to have occurred in Bosnia, Albania, Sudan, and Pakistan, to conclude that Kadi financially supported terrorist activities, primarily through Muwafaq, but also through other Kadi-owned entities. It considered Kadi's relationships with, and financial transfers to, designated terrorists Abdul Latif Saleh, Wa'el Julaidan, and Chariq Ayadi -- who were all involved in Muwafaq.

16

a.      *Activities in Albania and Bosnia and Kadi's Relationship to Saleh*

OFAC pointed to Kadi's activities in Albania, through Muwafaq and other Kadi-owned

entities, as evidence of Kadi's financial support of terrorist activities and other SDGTs.  OFAC

also concluded that "[s]ome involvement in the financing of these activities had also been

provided by Osama Bin Laden."  AR 9.  According to OFAC's findings, Muwafaq gave logistical

and financial support to Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia that was

designated as a SDGT on October 31, 2001.  The organization also transferred $500,000 to

terrorist organizations in the Balkans in the mid-1990s.  AR 9.  OFAC also found that Muwafaq

was involved in arms trafficking from Albania to Bosnia.  And OFAC concluded that as of late

2001, Kadi had continued to finance institutions and organizations in the Balkans after Muwafaq

ceased operations there, including two entities that were designated as SDGTs in early 2002 --

The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-

Herzegovina branch of the Al-Haramain Foundation.  AR 9-10.

Kadi also owned several Albanian companies, which, according to OFAC, "funneled

money to extremists or employed extremists in positions where they controlled the firms' funds."

AR 11.  In addition, "Bin Laden allegedly provided the working capital for four or five of AL-

QADI's companies in Albania."  Id.  In 1992, Kadi met Abdul Latif Saleh at a medical

conference, and soon thereafter entered into several business ventures with him, including

Karavan, an Albanian construction and property development company, and what OFAC

characterizes as Kadi's main Albanian firm.  AR 766-767.  According to OFAC, Saleh was

general manager of all of Kadi's businesses in Albania and held 10% of Kadi Group investments

in Albania.  AR 10-11.  He was also an "official signer" for Karavan and its bank accounts, and

had authorization to withdraw money directly from Kadi's bank accounts and transfer funds.  AR 1367.  Saleh was also the head of Muwafaq's Albanian operations.  AR 10, 737-41.

Kadi himself admits that money was taken from his local businesses "to make payments to support [Muwafaq's] activities."  AR 1367.  Money was often taken from Karavan's accounts to fund Muwafaq, and Karavan's accounts were also used to make contributions to other non-governmental organizations; Kadi would then reimburse Karavan.  Id. This arrangement was confirmed by OFAC's interviews with two Karavan employees -- Violet Spaho, a financial manager, and Amr Al Zainy (aka Amr al-Zaini), who was Karavan's director and Kadi's financial representative in Albania.  According to OFAC, when Karavan was ready to send a large sum of money back to Saudi Arabia as profits, the main office in Saudi Arabia instructed Karavan to give the funds to charitable causes, which included Muwafaq.  AR 12.  OFAC pointed to large wire transfers in and out of Kadi's personal bank accounts, as well as large cash withdrawals made from Karavan accounts and large payments to Saleh.  AR 12.

In 1999, Saleh was deported from Albania.  Kadi claimed that Saleh was deported as a matter of mistaken identity -- he shared the same name with an Egyptian citizen who was "a member of the Jihad Group."  AR 10 & 739-40.  However, OFAC had a different account.  It found that Saleh was expelled because of his ties with known terrorists, including Osama Bin Laden, and stated that Saleh's number had been found in the phone books of Bin Laden associates who had targeted the U.S. Embassy in Tirana in 1998.  OFAC, based on an interview with Al Zainy, noted that when Wa'el Julaidan, a SDGT characterized by OFAC as a "Bin Laden associate," visited Albania, Saleh treated Julaidan as his boss.  AR 12.  OFAC also believed that Saleh had founded and organized the Albanian Islamic Jihad (AIJ).  AR 10-11.  OFAC claimed

that Kadi was an active supporter and fundraiser for AIJ, and noted that Muwafaq operated a

school in Kukes in 1997, where several students had been selected for membership in AIJ.  AR

9-11.  Kadi confirmed that Muwafaq financially supported the school, and that Saleh was

involved in running it, but stated that it shut down due to financial problems. AR 743.

>b.     *Involvement in Other Countries and Other Muwafaq Ties*

OFAC also considered Muwafaq's involvement in other countries such as Pakistan and

Sudan, and other connections that indicated that Muwafaq was tied to terrorist activites and

SDGTs.  Muwafaq's Pakistan operation was established in Islamabad in 1992, and Kadi hired

Amir Mehdi to be its local director.  AR 720 & 723-24.  As director, Mehdi's responsibilities

included handling and distributing Muwafaq funds.  Mehdi turned out not to be a good choice.

Kadi himself conceded that the Pakistan Government raided Muwafaq's office in Islamabad on

March 21, 1995, and that subsequently "the officials of the FIA (the Pakistan security services)

arrested Amir Mehdi on March 29, 1995." AR 724.  Kadi's only explanation was that FIA had

also conducted raids and targeted other Muslim charities working in Pakistan.  Id.  According to

OFAC, however, the reason for the raid was Mehdi's involvement in terrorist activities.

Specifically, one of Mehdi's telephone numbers had been used by associates of terrorists in

Pakistan and abroad, and open source reporting had indicated that the raid was triggered by

Ramzi Yousef's arrest for the first World Trade Center bombing.  AR 11.  Kadi claimed that he

terminated Mehdi's employment following his release from arrest in 1995.  AR 725.  The

Pakistan offices were permanently closed in 1997.  Id.

OFAC also pointed to ties between Muwafaq's office in Sudan and Osama Bin Laden, as

well as Kadi's claimed acknowledgment that Muwafaq's Sudan office had "provided assistance to

jihad activities in the Middle-East and the Balkans." AR 12.   The administrative record reflects

that Sudan was the first country in which Muwafaq was active, and that it had an office in

Khartoum.  AR 709, 714.  OFAC stated that when Muwafaq opened in Sudan, around 1991 to

1993, Osama Bin Laden was based in the country.  Kadi closed the office in 1996, apparently

having become embroiled in accusations of terrorism.  AR 718.  The Africa Confidential had

implicated Muwafaq in terrorism, but Kadi and the publication eventually settled a libel action.

OFAC considered that resolution, but rejected Kadi's claim that it supported a finding that

Muwafaq was not involved in supporting terrorist activities or SDGTs.   AR 12.

OFAC also considered Muwafaq's relationship to Makhtab al-Khidamat, an umbrella

organization established in the early 1980s that was believed to be the precursor to al-Qaida.

OFAC found that "Muwafaq was part of Makhtab al-Khidamat and continued to operate under

the Makhtab al-Khidamat umbrella until mid-2001, when the latter dissolved and was absorbed

into Osama Bin Laden's organization.  Subsequently, a number of Arab [NGOs] and

organizations formerly affiliated with Makhtab al-Khidamat . . .  joined Al-Qaida.  These

included Muwafaq."  AR 14-15.  Kadi denies this claim, noting that Muwafaq had ceased

operating by 1998 at the latest.  Opp'n at 51 (citing Defs.' Mot. at 10).

     *c.*     *Kadi's Arguments*

Kadi disputes OFAC's findings and maintains that Muwafaq was an organization engaged

in charitable activities, not in supporting terrorism.  He claims that he provided a legitimate

explanation for any expenditures through Muwafaq, which OFAC simply ignored, and accuses

OFAC of drawing a conclusory connection between Muwafaq (and by extension, Kadi) and

terrorism, by failing to consider "all of the good works done by the Foundation."  Opp'n at 50-51.

Although Kadi admits that he transferred large amounts of cash to certain Muwafaq personnel who were implicated in terrorist activities, Kadi claims no knowledge of their involvement and states that, in any case, his involvement with them predated their designations as SDGTs.

Kadi surmises that the "principal source" for accusations against Muwafaq was likely the October 19, 1999 USA Today article authored by Jack Kelley.  Opp'n at 51.  The article, titled "Saudi Money Aiding Bin Laden Businessmen Are Financing Front Groups," described how prominent businessmen in Saudi Arabia were transferring tens of millions of dollars to Bin Laden-linked bank accounts, and identified "Blessed Relief" as a "front" for Bin Laden.  See AR 161-62.  Kadi contends that this article was unreliable because USA Today later conceded that it had "several errors" and because Kelley was subsequently found "to have fabricated several high-profile stories."  See  Opp'n at 10, 51; Brown Decl., Ex. I.

To the extent Kadi contends that newspaper articles cannot be relied upon by the Government *at all*, that proposition is not well-grounded.  As already stated, reliance on hearsay is plainly allowed.  Furthermore,  reliance on newspaper articles has been permitted to "fill in evidentiary gaps when there is corroboration," as well as to provide background information. See Awad v. Obama, 646 F. Supp. 2d 20, 25 (D.D.C. 2009) (applying this principle in reviewing a habeas petition of a Guantanamo detainee).  This is consistent with the generally recognized principle that reliability of evidence and reasonableness are the touchstones of measuring the agency's decision, in contrast to Kadi's assumption that newspapers are *per se* unreliable.

More to the point, Kadi does not claim that Kelley fabricated any assertions in the article that would be relevant *here*.  And, although USA Today ultimately corrected some errors that appeared in the article, the published correction post-dated OFAC's decision and hence is not part

of the administrative record.  The same reasoning applies to Kadi's reliance on Kelley's

subsequent resignation.  Moreover, OFAC does not appear to rely significantly on Kelley's

article.  And Kadi, as part of his submissions, provided OFAC with his version of the claims

made in the Kelley article, see, e.g., AR 711-14.  OFAC therefore had the benefit of Kadi's

account which it then reasonably discredited based on the evidence in the record as a whole.

Contrary to Kadi's argument that OFAC "failed to consider" the good works of Muwafaq,

both the March 2004 OFAC Memorandum and the administrative record indicate otherwise.

OFAC acknowledged that Kadi had provided evidence of Muwafaq's involvement "in substantial

charitable activities."  Nevertheless, OFAC concluded that this evidence "by no means

undermines the determination that the charity was, in addition, used to fund terrorism."  AR

2788. It was not unreasonable for OFAC to conclude that charitable organizations that perform

good works could also concurrently act as conduits for terrorist activities.  In its Memorandum,

OFAC cited to the April 12, 2002 testimony by the Deputy Assistant Secretary for Terrorism and

Violent Crime before the House Financial Subcommittee on Oversight and Investigations:

> Investigation and analysis by enforcement agencies have yielded
> information indicating that terrorist organizations sometimes
> utilize charities to facilitate funding and to funnel money.
> Charitable donations to non-governmental organizations (NGOs)
> are commingled and then often diverted or siphoned to groups or
> organizations that support terrorism . . . . Though these charities
> may be offering humanitarian services here or abroad, funds raised
> by these various charities are sometimes diverted to terrorist
> causes.  This scheme is particularly troubling because of the
> perverse use of funds donated in good will to fuel terrorist acts.

AR 21.  Simply because Muwafaq was a charitable organization or performed charitable deeds

does not make it immune to designation by OFAC.  Indeed, other courts have upheld OFAC's

designations of charitable organizations, notwithstanding their status or involvement in good

deeds.  See Islamic Am. Relief Agency, 477 F.3d at 736-37 (focus is on charitable organization's

support of terrorism); Holy Land Found., 333 F.3d at 164-65 (same); Humanitarian Law Project

v. U.S. Treasury Dep't, 578 F.3d 1133, 1139 (9th Cir. 2009) ("Humanitarian Law Project III")[10]

("[M]oney is fungible; giving support intended to aid an organization's peaceful activities frees

up resources that can be used for terrorist acts.") (citing Humanitarian Law Project I, 205 F. 3d at

1133; see also Humanitarian Law Project IV, 130 S. Ct. at 2725 (citing and relying on evidence

provided by government affidavit that concluded the following: "Muddying the waters between

its political activism, good works, and terrorist attacks, Hamas is able to use its overt political

and charitable organizations as a financial and logistical support network for its terrorist

operations.").

      As for Kadi's argument that he did not intend to provide financial support to SDGTs or

for terrorist acts through Muwafaq or his other companies, that claim is unavailing.  Kadi's intent

in donating to terrorist causes or to SDGTs is not relevant here.  See, e.g., Islamic Am. Relief

Agency, 477 F.3d at 735-36 (intent to aid unlawful acts was inapplicable in the context of

donations to terrorist groups, "because the money could be used for unlawful activities regardless

of donor intent").  Moreover, the Court rejects Kadi's contention that OFAC should have

disregarded any pre-designation information about individuals or organizations. See, e.g., Holy

---

      [10]  A number of cases cited herein involve the Humanitarian Law Project. They are as
follows:  Humanitarian Law Project  v. Reno, 205 F. 3d 1130 (9th Cir. 2000)) ("Humanitarian
Law Project I") (claims relating to prohibited activities under material support statute, 18 U.S.C.
§ 2339B);  Humanitarian Law Project v. U.S. Treasury Dep't, 484 F. Supp. 2d 1099 (C.D. Cal.
2007) ("Humanitarian Law Project II") (challenge and claims relating to SDGT designation);
Humanitarian Law Project v. U.S. Treasury Dep't, 578 F.3d 1133 (9th Cir. 2009) ("Humanitarian
Law Project III") (affirming Humanitarian Law Project II) ;  Holder v. Humanitarian Law Project,
130 S. Ct. 2705 (2010) ("Humanitarian Law Project IV") (reviewing challenges and claims
relating to material support statute 18 U.S.C. § 2339B).

Land Found., 333 F.3d at 162 ("[I]t was clearly rational for Treasury to consider [Holy Land Foundation's] genesis and history, which closely connect it with Hamas.").

The Court has reviewed the evidence both in the classified and unclassified records.  The record, taken as a whole, and with references to various sources over different periods of time, confirms Kadi's close involvement in Muwafaq and, in turn, Muwafaq's involvement in the financing of terrorist activities and support of SDGTs, despite whatever charitable works the foundation may also have undertaken.  Evidence in the unclassified record indicates that Kadi was integrally involved in running Muwafaq, including the hiring and placement of SDGTs in key roles in the foundation, who then had the authority and ability to receive money from Kadi, to access Kadi's funds, and to designate and divert those funds to other sources and causes.  Kadi himself admitted to transferring funds to such Muwafaq personnel, or allowing them access to his personal funds. Although he claimed in every instance that either the funds were accessed for charitable purposes or that he had no knowledge to what ends the funds may have actually been used, OFAC reasonably concluded that Kadi's claims were incredible considering all the other evidence in the record.  And although the Court cannot cite to any specific information in the classified record, the Court's careful review confirms that there is substantial evidence in the record before OFAC that Kadi was involved, through Muwafaq, in providing financial support for terrorists.

3.    Financial Support to other SDGTs

Substantial evidence in the record also supports OFAC's conclusion that Kadi provided financial support to other SDGTs, including Muhammad Salah, Chafiq Ayadi, and Wa'el

Julaidan.[11]  In each instance, Kadi claims that his association with these individuals pre-dated

their designations and that the transfers of money he provided to them were all for legitimate

purposes.  He claims that these relationships were benign, that he "worked with individuals who

he knew, trusted, and respected, based on their track records in the relevant charitable or

humanitarian field," Opp'n at 51, and that OFAC had no basis to conclude that any of these

individuals "were connected with terrorism in any way" because they were designated years after

Kadi had known them.  Id.   Some of these contentions have already been addressed by the Court,

but they are unavailing in all respects and unsupported by the evidence in the record.  OFAC's

findings are briefly summarized below.

     *a.*    *Wa'el  Julaidan*

Julaidan was designated a SDGT on September 6, 2002.  Kadi stated that he has known

Julaidan as a family friend, and that their relationship predated Julaidan's SDGT designation by

twenty years.  AR 2026.  According to Kadi, Julaidan came from a reputable family and had a

reputation for trustworthiness.  AR 2026-29.  Julaidan was the head of the Saudi Joint Relief

Committee in Kosovo and had assisted Kadi in creating a women's teachers' college for Croatian

and Bosnian refugees. AR 747.  While Kadi admits to a longstanding personal and business

relationship with Julaidan, he contends that there is no basis for the allegations that Julaidan was

an associate of Osama Bin Laden or that Kadi himself was aware of this fact. Opp'n at 58-60; AR

747.

Kadi admitted that he provided significant financial benefits to Julaidan.  For example, he

stated that he gave shares of a business he owned, "KA Stan," to Julaidan as a "reward for the

---

[11] Although OFAC names other SDGTs, the OFAC Memorandum focuses on these three
individuals.

assistance he provided to [Kadi's] charitable activities in Bosnia." AR 772. The only

shareholders in KA Stan were Kadi, Julaidan, and Chariq Ayadi, another SDGT. See id. Kadi

also acknowledged that he transferred $1.25 million through Karavan directly to Julaidan's

personal account between February 24, 1998 and August 3, 1998. AR 2022. Kadi stated that the

money was intended to fund the creation of housing units for Al Emam University in Sanaa,

Yemen, a project that was being overseen by Julaidan's company Maram. AR 2022-23. Kadi

also admitted that he transferred the funds at issue to Jualaidan's personal account, AR 2032, but

claimed it was "solely and exclusively for the purpose of supporting the University Housing

Project, and not for any other purpose," AR 2033. He explained that he did not transfer the

funds to Maram, because he "had entrusted the University Housing Project to . . . [Julaidan]

alone." Id. This explanation is puzzling, particularly because Maram was Julaidan's own

company, and Kadi had relied on a table of information purporting to show that Julaidan made

payments of substantially the same amounts to his company soon thereafter.

     Kadi's table was submitted to OFAC to demonstrate that the funds had a legitimate

purpose, corroborated by timing. The table shows that after each of the five payments to

Julaidan, Julaidan then made a payment to Maram of substantially the same amount, to

correspond with construction invoices for the same figures. AR 2034-35. However, there are

several problems with Kadi's version of events, and with the information he provided to OFAC.

For instance, $100,000 appears to be unaccounted for in the table. Id. Although Julaidan

received a total of $1.25 million from Kadi, the table reflects that only $1.15 million was

transferred to Maram. AR 2035. Footnote 2 to Kadi's table also states that "[a]ccording to bank

statements of Maram's account . . . [one] sum [$300,000] was never received in Maram's account

. . . . ." Kadi presumably believes this is not a problem because his table still shows "invoices"

and "demands" to Maram totaling $1.249 million.  But the mere existence of invoices (and

"demands") does not necessarily show that Kadi's transfers to Julaidan were used to pay those

specific invoices, particularly because "money is fungible."  See Humanitarian Law Project IV,

130 S. Ct. at 2725-26 (agreeing with propositions that "money is fungible" and that "funds raised

ostensibly for charitable purposes have in the past been redirected by some terrorist groups to

fund the purchase of arms and explosives") (internal quotations omitted); Regan v. Wald, 468

U.S. 222, 243 (1984) (affirming President's decision to ban travel to Cuba on the basis of

"curtail[ing] the flow of hard currency to Cuba -- currency that could then be used in support of

Cuban adventurism").

OFAC also reasonably discredited Kadi's claim that he did not know of Julaidan's

relationship to Osama Bin Laden.  Kadi himself conceded that it was "common knowledge" that

both Julaidan and Bin Laden had known each other through their involvement in repelling the

Russian invasion of Afghanistan in the 1980s.  See AR 1378.  Kadi explained, though, that he

had no knowledge whether this association continued.  However, Kadi also stated that he asked

Julaidan on "several occasions" whether he had an ongoing relationship with Bin Laden, which

Julaidan had denied.  AR 1379.   It is somewhat disingenuous, then, for Kadi to claim that he had

no knowledge or suspicion at all that Julaidan may have continued working with Bin Laden.

Kadi also acknowledged that the Saudi Arabian government had frozen Julaidan's assets

in 2002 based on its finding that Julaidan had supported Osama Bin Laden's terrorism network.

The administrative record contained a press release from the Saudi Embassy in DC issued on

September 10, 2002 that referred to Julaidan as a "Bin Laden operative" and  stated: "Julaidan, a

Saudi fugitive is believed to have funneled money to al-Qaeda. . . . Osama Bin Laden and a top

al-Qaeda lieutenant, Abu Zubaida, have acknowledged Julaidan as a known associate for their

operations.  Julaidan, who fought with Bin Laden in Afghanistan during the 1980s, allegedly

provided financial and logistical support to the al-Qaeda network." AR 2690-91.  Kadi's only

response to this evidence was that the incident occurred years after the transaction at issue.  That

argument is not compelling.  See, e.g., Holy Land Found., 333 F.3d at 162 (stating that it was

"clearly rational" for OFAC to consider information that pre-dated a SDGT designation and

information regarding a SDGT's "history and genesis"); Islamic Am. Relief Agency, 477 F.3d at

734 ("An entity's genesis and history may properly be considered by OFAC in making the

designation or blocking," at least where there is no indication that ties have been severed) (citing

Holy Land Found., 333 F.3d at 162).  Kadi also does not rebut OFAC's observation that Osama

Bin Laden referred to a close relationship with Julaidan in a 1999 interview on Al-Jazeera TV,

where Bin Laden reportedly said: "We are all in one boat, as is known to you, including our

brother Wa'el Julaidan," when referring to the assassination of al-Qaida "co-founder" Abdullah

Azzam.  AR 5.

    Ultimately, OFAC concluded that Kadi's explanation for why he transferred $1.25

million to Julaidan, and conveyed other financial benefits to Julaidan, should not be credited, and

that his continued designation was warranted on the basis of his support of and relationship with

SDGT Julaidan.  OFAC also rejected Kadi's excuse that he knew Julaidan before he was

designated, and his plea that transactions or activities he engaged in with Julaidan prior to

Julaidan's designation should be disregarded.  AR 7-8, 11-12, 14 & 22.   OFAC's conclusions

were substantially supported by the record, both classified and unclassified, and are consistent

with the caselaw in this Circuit.  See, e.g., Holy Land Found., 333 F.3d at 162; Islamic Am.

Relief Agency, 477 F.3d at 734.

    b.      Chariq Ayadi

Ayadi was designated a SDGT on October 12, 2001 -- the same day as Kadi.  He was

hired by Kadi to run Muwafaq's European operations, based on Julaidan's recommendation.

Ayadi oversaw Muwafaq's European operations from 1992 to around 1995 or 1996.  Kadi

acknowledged transferring significant sums to Ayadi's personal bank account during that time.

As with Julaidan, Kadi maintained that these transfers were solely for charitable purposes.  AR 8

& 98-99.  Kadi also entrusted Ayadi with other aspects of his business.  In early 1996, Kadi

purchased a majority holding in the now-closed Sarajevo-based Depositna Bank.  Kadi

designated Ayadi the "nominee" for the shares.  AR 1377 .  He explained that he chose Ayadi as

his representative because Ayadi was of Bosnian nationality, and under local law, shareholders of

a bank must be of Bosnian nationality.  AR 770.  OFAC regarded Depositna Bank as suspect for

other reasons.  It "has been associated with Islamic extremists," including serving as the site for

planning sessions for an attack against a U.S. facility in Saudi Arabia in the mid-1990s.  AR 11.

As previously stated, Ayadi was also one of three shareholders, along with Julaidan and Kadi, in

KA Stan.  AR 772.  OFAC also cited to Ayadi's expulsion from Tunisia for his involvement in

the Tunisian Islamic Front.

        As with Julaidan, Kadi admitted to transferring the funds to Ayadi's personal accounts,

but claimed they were intended for legitimate charitable purposes.  He also claimed that he knew

Ayadi nine years prior to his designation and had never heard of the Tunisian Islamic Front or

any allegations linking Ayadi to the organization until he was designated a SDGT in October

2001.  In short, Kadi maintained that he had no knowledge of Ayadi's involvement with the

Tunisian Islamic Front or terrorist activities.  AR 1375, 1388.

c.    *Muhammad Salah*

Kadi also admitted to transferring funds to Muhammad Salah, who was designated a SDT on July 27, 1995 pursuant to Executive Order 12,947, and a SDGT on October 31, 2001 pursuant to EO 13,224.  Defs.' Mot. at 19; AR 299.  Salah is a self-declared Hamas operative. Yet again, as with Julaidan and Ayadi, Kadi claimed that the transfer of funds he made to Muhammad Salah was for legitimate and charitable reasons.  Opp'n at 57.

OFAC's March 2004 Memorandum and its motion to dismiss focus a great deal on an $820,000 land deal involving Salah.  <u>See</u> AR 16-20;  Defs.' Mot. at 21.  The details of the land deal are complicated and muddled, but the most salient facts that OFAC considered can be summarized briefly.  In July 1991, Kadi, via his company Qadi International, wired $820,000 from the Swiss branch of Faisal Finance to the Quranic Literacy Institute (QLI) in Chicago.  The money was used to purchase and develop land in Woodridge, Illinois.  Salah, a QLI "employee"/volunteer, was involved in the flow of money that followed the land deal.  He was arrested by the Israeli government on January 25, 1993, around the time Kadi was wiring money to him, and pled guilty to illegally channeling funds for Hamas in Israeli military court in January 1995.

Kadi did not dispute that the deal occurred, nor did he dispute that he was transferring money to Salah.  <u>See, e.g.</u>, AR 299-308.  Kadi admitted that although he only met Salah on two or three occasions "at the most," AR 300,  in less than a one-year period he transferred $167,000 directly to Salah's personal account. AR 301.  He maintained that the money was intended for various QLI expenses "and mainly to support individuals working for QLI."  AR 299.  He claimed that he sent the money to Salah personally at the request of another individual, Dr. Zaki, with whom he had longstanding ties.  AR 299.  Kadi presented extensive documentation (and

briefing) in support of his interpretation of the deal as legitimate.  He claimed he had no idea that Salah was involved in Hamas.

The breakdown of money transferred by Kadi directly to Salah was as follows: (1) $27,000 on March 16, 1992; (2) $30,000 on July 3, 1992; (3) $50,000 on October 7, 1992; and (4) $60,000 around February 1993.  AR 301.  Upon learning that Salah was arrested in January 1993, Kadi instructed his bank to stop the last transfer but, according to Kadi, the transfer proceeded regardless.  AR 303.  Kadi claimed that he ceased making transfers to Salah after he was arrested, but admitted that he continued to transfer funds to QLI.  AR 304.  In 1994, QLI sold the Woodridge land, but did not repay the $820,000 "loan" to Kadi.

In 1999, the Government brought a civil forfeiture action against QLI, Muhammad Salah, and his wife in federal court in the Northern District of Illinois, which included allegations against Kadi.  The proceeds of the land deal were tied up in that litigation.  On a motion to dismiss, the district judge concluded, based in part on the 1998 affidavit of FBI Special Agent Robert Wright, that "the circumstances surrounding the Woodridge land deal, the relationship between QLI and Salah, and the efforts of QLI to provide financial support to Salah all raise the inference that QLI ordered Kadi to transmit the money used to purchase the Woodridge land with the intent that it would be used to support Salah in his activities on behalf of Hamas."  United States v. One 1997 E35 Ford Van, 50 F. Supp. 2d 789, 805-06 (N.D. Ill. 1999).

Kadi spent much time refuting the assertions made in the Wright affidavit submitted in the forfeiture action, and maintained that he never intended to obfuscate the details of the land purchase or his involvement in it.  AR 310-35.  He claimed that in April 2005 Wright "was under investigation for disciplinary conduct, was suspended and his employment was subsequently terminated by the FBI."  Opp'n at 57-58.  However, Kadi did not contend that

31

Wright's problems were probative of the reliability of his statements contained within the administrative record.  Moreover, those problems occurred in April 2005, subsequent to OFAC's March 2004 decision challenged by Kadi here, and are therefore not part of the administrative record.  See, e.g., Jifry v. Federal Aviation Admin., 370 F.3d 1174, 1181 (D.C. Cir. 2004) ("The court's review is limited . . . to the administrative record that was before the [agency].");  Islamic Am. Relief Agency, 477 F.3d at 733 ("we shall limit our review of the designation to the administrative record"); see also Al Haramain I, 585 F. Supp. 2d at 1250 (review of OFAC's SDGT determination is limited to the administrative record, subject to narrow exceptions).  Once again, Kadi claims that all the transfers he made were to support legitimate charitable objectives, not terrorism.  Here too, based on the evidence in the classified and unclassified records, including the findings in the forfeiture action and the Wright affidavit, OFAC reasonably rejected Kadi's explanation for why he was transferring funds to SDGT Salah's personal accounts, and the overall structuring of the deal, as well as Kadi's contention that he had no knowledge of Salah's affiliation with Hamas or other terrorist activities.

4.     Financial Support and Ties to Bin Laden

Kadi disputed having ties to Osama Bin Laden, and contended that he neither managed money nor businesses for Osama Bin Laden directly, or for his benefit.  AR 15; AR 1372.  Kadi also asserted that Bin Laden, in turn, had no financial interest in any of Kadi's businesses. AR 1372.  Kadi claimed that he met Bin Laden on a few occasions ending in 1993, but that those encounters did not involve or concern terrorism.  AR 1373-74.  However, OFAC reasonably relied on other evidence in the record, which indicated that Kadi's ties with Osama Bin Laden may have continued, including reference to a letter found in 2002 that was addressed to Bin Laden and referred to Kadi as "managing money for Bin Lad[e]n in Sudan."  AR 15.  OFAC

noted that Kadi opened up a Muwafaq office in Sudan around the same time Bin Laden was

based in the country.  AR 12.  The letter, according to OFAC, also appeared to generally refer to

Kadi as one of Bin Laden's "former managers."

     5.    <u>Other Acts of Financial Support and Investment</u>

OFAC pointed to other acts of financial support and investments by Kadi with individuals

who have ties to terrorist activities, although OFAC did not appear to rely on these ties directly in

applying the criteria of EO 13,224 to Kadi.  The OFAC Memorandum described Kadi's

involvement in BMI, Inc. as further support for Kadi's ties to terrorists.  OFAC claimed that one

of Kadi's co-investors in BMI was a SDT named Mousa Abu Marzook, a Hamas leader also

associated with Muhammed Salah.   Kadi maintained that his investment in BMI was "passive"

and "entirely innocent."  He claimed that he was not aware of a relationship between BMI and

Marzook.  AR 784.  OFAC also concluded that Kadi made use of entities other than Muwafaq to

send money to extremists and identified SDGT Asbat al-Ansar as one such recipient.  According

to OFAC, acting through "an unspecified Albania-based Islamic group," Kadi "promised fund

transfers to an official of the al-Qa'ida supported terrorist group Asbat al-Ansar," which was

designated on September 23, 2001.  AR 14.  Kadi contended that he did not know of the

organization Asbat al-Ansar.  AR 1380.

        \*   \*   \*

The Court has carefully reviewed both the classified and unclassified records and finds

that the administrative record as a whole amply supports OFAC's findings and its determination

to continue Kadi's designation.  OFAC reasonably concluded that Kadi provided financial

support -- primarily through the Muwafaq Foundation, but also through other means -- to many

persons who were designated SDGTs.  It also had good reason to reject Kadi's explanations that

his numerous financial transfers to these SDGTs were legitimate, or that they were, in every instance, made without Kadi's knowledge of their affiliations with terrorist groups and activities. OFAC reasonably concluded that these claims were simply too incredible, in light of the totality of the evidence before it.

Ultimately, Kadi's arguments attacking the sufficiency of the evidence before OFAC are without merit.  OFAC relied on more information than Kadi's own voluminous statements and submissions, although it is evident that OFAC seriously considered his explanations, asked follow-up questions, and requested additional information in order to address continuing areas of concern.  And Kadi's claim that the two-page fax, and the articles cited and the sources represented therein, contained deficiencies, is besides the point.  While providing Kadi a window into OFAC's reasoning, these items do not represent the whole picture -- the information relied on by OFAC that Kadi attacks as unsubstantiated is further supported by the classified record, which confirms Kadi's financial transactions and relationships with SDGTs.

The Court fully acknowledges and is sympathetic to Kadi's argument that he is at somewhat of a disadvantage in being unable to review the whole administrative record, in particular the classified record.  See Islamic Am. Relief Agency v. Unidentified FBI Agents, 394 F. Supp. 2d 34, 45 (D.D.C. 2005).  And admittedly, OFAC's unclassified Memorandum draws heavily from Kadi's own statements and submissions, as well as "information available to the U.S. Government," without elaborating in that public record as to what the source of this information might be.  Hence, the March 2004 OFAC Memorandum, standing alone, may be somewhat unsatisfying to Kadi.  However, "[a]n agency's decision need not be 'a model of analytic precision to survive a challenge,' and '[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Zarmach, 750 F. Supp. 2d at

154 (quoting Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995). And, as previously stated, it was wholly proper for OFAC to rely on classified material in making its determination. See, e.g., IEEPA, 50 U.S.C. § 1702(c) ("[I]f the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera"); Holy Land Found., 333 F.3d 156, 164 (D.C. Cir. 2003) ("'due process require[s] the disclosure of only the unclassified portions of the administrative record'") (quoting People's Mojahedin Org. of Iran, 327 F.3d at 1242 (emphasis in original)); Nat'l Council of Resistance of Iran, 251 F.3d at 208-09 (holding that the "opportunity to be heard at a meaningful time and in a meaningful manner" does not include access to the classified record) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976));  Order, ECF No. 39 (denying Kadi's motion to preclude defendants from relying on classified evidence). And as also previously addressed, there are compelling reasons why portions of the record must remain classified. The Court has carefully reviewed both the classified and unclassified records, and finds that there is substantial evidence to support OFAC's conclusion that Kadi's continued designation as a SDGT was warranted. Accordingly, the Court finds that OFAC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action . . . including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

## C.  Other APA Arguments

Kadi halfheartedly argues in a footnote in his opposition that "OFAC's designation process is arbitrary and capricious because it lacks adequate substantive and procedural safeguards." Opp'n at 47 n. 45. He claims that the IEEPA "sets forth no substantive criteria for 'terrorists' at all," and that the criteria in EO 13,224 are "vague and overbroad." He also argues that the designation process itself lacks basic procedural safeguards, including the lack of criteria

for the timing or content of notices or information about the burden of proof.  According to Kadi, these are "by definition arbitrary and capricious."  The Government does not address these arguments with respect to the APA, instead saving them for discussion with the constitutional claims Kadi raises.  In any event, Kadi's contention is unavailing.  OFAC's conduct did not exceed its statutory or regulatory authority under the IIEPA, EO 13,224, or their implementing regulations.  See Islamic Am. Relief Agency, 477 F.3d at 734-35 (noting that in EO 13,224, "the President described the types of conduct that could subject an entity to blocking of its assets, such as providing financial support to terrorists" and "authorized the Treasury Department to designate additional entities that it determines are within the purview of the Order"); see also Zarmach, 750 F. Supp. 2d at 156 ("IEEPA provides the President with broad authority to block 'property in which a ny foreign county or a national thereof has *any interest*.") (emphasis in original).  The Court will address the remainder of Kadi's arguments in the discussion of his constitutional claims below.

## II.    Constitutional Claims

In reviewing Kadi's constitutional claims, the Court has consulted materials outside the pleadings, including the exhibits attached by both parties to their pleadings, as well as the administrative record.  Because the parties have been given the opportunity to present additional evidence with their submissions, the Court will convert defendants' motion to dismiss Kadi's constitutional claims into one for summary judgment.  See Holy Land Found., 333 F.3d at 165-66 (noting that because the district court reviewed the administrative record in considering constitutional claims relating to a SDGT designation, summary judgment was the applicable standard).  Given the Court's determination that substantial evidence supports OFAC's conclusion that Kadi should remain designated as a SDGT, the merits of Kadi's constitutional

36

claims stand on weak footing.  Indeed, as previously expressed, some of these constitutional claims -- including Kadi's argument that OFAC exceeded its statutory authority -- parallel the arguments raised by Kadi relating to his APA claim.  See Zarmach, 730 F. Supp. 2d at 155 n. 3 ("Because the Court finds that the OFAC's actions do not violate the Constitution and thus should not be vacated under the APA, the constitutional claims necessarily must fail as well.").

## A.  Ability to Raise Constitutional Claims

To begin with, the Government argues that all of Kadi's constitutional claims must be dismissed because Kadi is a non-resident alien with no substantial connections to this country and hence he lacks the ability to assert any rights under the United States Constitution.  See Defs.' Mot. at 26-34.[12]  In arguing to the contrary, Kadi claims that because the blocking and freezing of his assets in the United States occurred as a result of action initiated by the United States itself, he should be entitled to raise constitutional claims in response to those actions.  Opp'n at 15-17.  Alternatively, without conceding the accuracy of OFAC's claims as to his contacts with the United States, Kadi argues that he satisfies the standards to raise due process claims.[13]

There is no clear path to resolving these arguments.  The D.C. Circuit has not explicitly addressed what criteria this Court should apply in considering whether a foreign national residing outside the United States can satisfy the "substantial connection" test to raise rights under the

---

[12] The Government contends that Kadi's connections here should be assessed as of March 2004, rather than any present-day contacts Kadi may have acquired, although it does not appear to the Court that Kadi has acquired additional relevant contacts subsequent to that time.  See Tr. 10:15-22 & 11:3-5.

[13] Kadi does not make this argument with respect to any of his other constitutional claims.

U.S. Constitution related to the blocking or freezing of his assets.  Nor has the D.C. Circuit addressed whether such rights turn on the presence of property in the United States, or whether Kadi can raise certain constitutional claims, but not others.  See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 264-66 (1990) (plurality opinion suggesting that certain rights under the First and Fourth Amendments inure to the benefit of only those with sufficient connections to the United States).  Some cases in this jurisdiction provide guidance, but no case provides definitive answers.  In several cases, the D.C. Circuit has addressed whether foreign nationals have rights under the U.S. Constitution in the context of cases involving the designation of Foreign Terrorist Organizations ("FTOs").  See Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 200-03 (D.C. Cir. 2001); People's Mojahedin of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 2003); 32 County Sovereignty Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002).  These cases have looked to the presence of property as the benchmark for satisfying the "substantial connections" test, and whether a party has the ability to raise constitutional claims, at least with respect to that property.

In National Council of Resistance of Iran, the D.C. Circuit held that two Iranian organizations designated as FTOs were entitled to due process protections under the Fifth Amendment because they had "developed substantial connections with this country."  251 F.3d at 202.  The court pointed to the designated organizations' "overt presence within the National Press Building" and "claim[ ] [of] an interest in a small bank account."  Id. at 201.  In People's Mojahedin of Iran, the D.C. Circuit held that "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise,"  182 F.3d at 22, and that plaintiffs there lacked substantial connection to the United States.  The court stated: "We put to one side situations in which an organization's bank deposits were seized as a result of

38

the Secretary's designation.  Neither  . . . [petitioner] suffered that fate, presumably because no

United States financial institutions held any of their property."  182 F.3d at 22.  Hence, the court

found that People's Mojahedin of Iran could not raise constitutional claims because it had no

property in the United States, nor any other substantial connections.  Id.  Ultimately, events had

evolved such that two organizations -- National Council of Resistance of Iran and People's

Mojahedin of Iran -- were found to be alter egos.  Hence, the D.C. Circuit concluded that

People's Mojahedin of Iran, via National Council of Resistance of Iran's connections, had

sufficient connections to bring a constitutional claim.  In analyzing "substantial connections" to

the United States, the court remained focused on property rather than physical presence, stating:

> [T]here is before us at least a colorable allegation that at least one of the
> petitioners has an interest in a bank account in the United States. . . . We have no
> idea of the truth of the allegation . . . but for the present purposes, the colorable
> allegation would seem enough to support their due process claims.  Russian
> Volunteer Fleet v. United States, 282 U.S. 481, 491-92 (1931), makes clear that a
> foreign organization that acquires or holds property in this country may invoke the
> protections of the Constitution when that property is placed in jeopardy by
> government intervention.

Nat'l Council of Resistance of Iran, 251 F.3d at 204.

In 32 County, which also involved a challenge to an organization's FTO designation, the

D.C. Circuit concluded that "[t]he Secretary therefore did not have to provide 32 County . . . with

any process before designating them as [FTOs]" because  it was not shown "that either

organization possessed any controlling interest in property located within the United States, nor

do they demonstrate any other form of presence here."  292 F.3d at 799.  Taken together, then,

these cases at least imply that a foreign national with property in the United States has a

sufficient connection to the United States to raise at least *some* constitutional claims.[14]

Further obfuscating matters, however, and subsequent to the briefing in this case, the Southern District of New York dismissed claims against Kadi for lack of personal jurisdiction in litigation relating to the September 11 terrorist attacks.  See In re Terrorist Attacks on September 11, 2001, 740 F. Supp. 2d 494, 507-08 (S.D.N.Y. 2010).  In that case, plaintiffs attempted to secure personal jurisdiction over Kadi by arguing that he had sufficient contacts with the United States.  They claimed that Kadi had incorporated a branch of Muwafaq in Delaware in 1992, which remained operational until 1997, and that he made financial transfers to individuals in the United States who then transferred the money for use for terrorist purposes.  See id. at 508.  They also claimed that he was involved in real estate investments in Massachusetts and Pennsylvania. See id.  Considering these allegations, the court concluded that Kadi lacked sufficient contacts with the United States for personal jurisdiction.  Id.  Neither party has asserted that this Court should rely on the analysis applied by In re Terrorist Attacks on September 11, 2001 to resolve whether Kadi has substantial connections sufficient to raise his constitutional claims here.  And that case, in light of the caselaw in this Circuit, does not necessarily bar Kadi from raising at least some of his constitutional challenges to the designation and continued blocking of his assets, provided that Kadi has some property here.

Another case, Al-Aqeel v. Paulson, 568 F. Supp. 2d 64 (D.D.C. 2008), also indicates that the ruling in In re Terrorist Attacks on September 11, 2001  does not dispositively address Kadi's

---

[14] Although Kadi may be able to raise a due process challenge based on any property or assets he has in the United States, it is less clear whether Kadi can also raise a First Amendment or Fourth Amendment claim.  No party has cited to caselaw or facts that explicitly lead to the conclusion that Kadi, as a non-resident alien, should be permitted to raise such challenges.

ability to raise constitutional claims.  Al-Aqeel, like Kadi, was a citizen and resident of Saudi

Arabia, who sought to challenge his SDGT designation.  And like Kadi, Al-Aqeel had also been

named in September 11-related litigation in the Southern District of New York.  The

Government argued that Al-Aqeel lacked insufficient connections to the United States to raise

any constitutional claims, and pointed to Al-Aqeel's arguments regarding lack of personal

jurisdiction in an earlier case then pending in the Southern District of New York, Burnett v. Al

Baraka Inv. & Dev. Corp., 03-cv-9849 (S.D.N.Y.).  Rejecting those arguments, the court

observed that the issue in Burnett was whether Al-Aqeel, *as a defendant*, had purposefully

availed himself of the protections of the law of the forum -- the State of New York -- for the

court there to exercise personal jurisdiction over him.  Al-Aqeel, 568 F. Supp. 2d at 70 (emphasis

added).  The court reasoned that the question before it was whether Al-Aqeel, *as a plaintiff*, had

sufficient connections with the United States as a whole to have standing to raise claims under

the United States Constitution.  Id. (emphasis added).  Ultimately, the court concluded that Al-

Aqeel had established sufficient contacts in the United States, through his frequent visits to the

United States, his position as an officer of a United States corporation, and his involvement in

helping the organization acquire property in the United States, to raise "at least his due process

claims under the Fifth Amendment." Id.  However, the court also concluded that Al-Aqeel had no

standing to raise a Fourth Amendment claim, because the assets blocked were overseas and he

was a citizen of Saudi Arabia.  Id. at 70-71.

There is arguably a factual dispute over whether Kadi does, indeed, have sufficient

connections to the United States, which may hinge on what importance is placed on the assets

which have been blocked here.  Kadi's complaint does not clearly indicate where his assets have

been frozen, and if any of those assets were located in the United States.  Instead, he simply complains generally that his assets have been seized.  At the hearing, the Government either could not or would not identify whether Kadi had any assets within the United States that had been blocked or frozen.  See Tr. 12-13.  Kadi also could not enumerate which assets have been, in fact, blocked, although he emphasized that his claim to the $820,000 "loan" he provided to QLI should be considered an asset.  Tr 54:10-17.[15]

The administrative record indicates that it is likely that Kadi may have had some property in the United States.  Kadi recites several connections to the United States, see Opp'n at 15, including the following: (1) he was a director of Global Diamond Resources, a U.S. company, and his shares and ownership interests in the company were frozen and blocked under the Notice of Blocking sent to Kadi "care of" Global Diamond Resources, see AR 2785; and (2) he wired $820,000 to QLI in 1992, and the proceeds of that transaction had initially been tied up in the civil forfeiture litigation in Illinois.  Although Kadi's claim to the $820,000 at the time of the challenged action is dubious, he does nevertheless claim that he has property interests in the United States that were frozen as a result of the designation.

Ultimately, the issue of standing regarding Kadi's constitutional claims necessarily implicates the validity of OFAC's blocking order on which Kadi's constitutional claims rest.  This goes to the merits question of whether the blocking order itself was valid.  In those

---

[15]  Kadi states that his "claim to $820,000 has been blocked as a result of the freeze." Opp'n at 16.  Presumably, this refers to the "loan" he provided QLI as part of its land sale, that was part of the forfeiture proceeding in U.S. District Court for the Northern District of Illinois. Subsequently, the court in the forfeiture proceeding rejected Kadi's claim of interest to the $820,000, finding that the claim was untimely because the parties had already stipulated to its forfeiture to the Government.  See Mem. Op. & Order, ECF Nos. 121-22, Mar. 22, 2010 in USA v. 1997 E35 Ford Van, 98-cv-3548 (N.D. Ill.).

circumstances, if the jurisdictional facts "are inextricably intertwined with the merits of the case," the issue of standing need not be conclusively resolved, but instead the court should "defer its jurisdictional decision until the merits are heard." Zarmach, 750 F. Supp. 2d at 155-56 n. 4 (quoting Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 198 (D.C. Cir. 1992)); see also, Jifry, 370 F.3d at 1183 ("We need not decide whether or not [plaintiffs] are entitled to constitutional protections because, even assuming that they are, they have received all the process that they are due."). Even assuming Kadi does have standing, all of his arguments on the merits of his constitutional claims are nonetheless unavailing for the reasons explained below.

### B.  Fifth Amendment Due Process Claim

Kadi makes a host of arguments in support of his claim that defendants violated his right to due process. Specifically, he contends that defendants failed to give him adequate notice of the charges, or a "thorough statement of reasons" for the decision, adequate time to respond, or an opportunity to cross-examine witnesses or to plead his case before "any independent tribunal." Compl. ¶ 57. He also claims that the Government improperly relied on classified evidence without providing him access. These arguments are all unavailing.

The D.C. Circuit in Holy Land Foundation squarely rejected the proposition that due process requires most of the protections requested by Kadi. The court held that notice and a meaningful opportunity to be heard are satisfied by the provision of a post-deprivation administrative remedy and the opportunity to submit written submissions to OFAC, even where (as here) the initial designation provided no notice or opportunity to be heard. Holy Land Found., 333 F.3d  at 163-64; see also Global Relief Found. v. O'Neill, 315 F.3d 748, 754 (7th Cir. 2002) (concluding that no notice or pre-seizure hearing was required under the Constitution

regarding OFAC's interim blocking order and designation as SDGT).  The <u>Holy Land Foundation</u>

court also stated that there was no automatic right to access classified evidence, to confront and

cross-examine witnesses, or to obtain procedures which approximate a judicial trial.  333 F.3d at

164.

 Here, Kadi was provided with even more post-deprivation process than was provided to

Holy Land Foundation.  Kadi's opportunity to be meaningfully heard is evidenced by the

extensive submissions he made to challenge his continued designation.  He submitted three

lengthy witness statements and numerous exhibits.  AR 92-280, 281-505, 689-1067.  Moreover,

Kadi's lawyers had at least four face-to-face meetings with OFAC over the 2002-2003 time

frame.  AR 4-5, 2752, 2765 (referring to meetings with counsel on January 15, 2002;  August 1,

2002;  February 28, 2003;  and September 8, 2003).  OFAC also sent Kadi a five-page letter with

detailed questions about twelve continued areas of concern -- "the answers to which will help us

issue a determination on the petition."  AR 1352-56.  Kadi provided a forty-one page response to

the questionnaire.  AR 1352-1394.  He also availed himself of the opportunity to rebut the

evidence he considered erroneous, including the allegations in the Wright affidavit regarding

Kadi's involvement with QLI and the Illinois land deal, sources cited in the two-page fax, and

newspaper articles referred to in the record.  Accordingly, even if he did not receive the full

unclassified administrative record prior to the March 2004 decision, he did receive an

opportunity, in substance, to rebut the evidence found in the unclassified administrative record

through his own submissions to OFAC, as well as the opportunity to respond robustly to OFAC's

follow-up questions addressing previous statements Kadi had made and identifying specific facts

and areas of concern relevant to the designation decision.  This case is unlike <u>People's</u>

Mojahedin Org. of Iran v. U.S. Dep't of State, 613 F. 3d 220, 228 (D.C. Cir. 2010), where the court expressed concern that it was unable to discern what facts were relied on and what conclusions Treasury had drawn from the record to support the FTO re-designation.  There is no such confusion here.  The March 2004 OFAC Memorandum and the administrative record, including the back and forth exchanges with Kadi, show that OFAC considered all of Kadi's submissions and explained its assessment of the evidence.  Therefore, it is clear that the requirements of due process were satisfied.[16]

## C.  Fifth Amendment - Takings Claim

Kadi next contends that OFAC's freezing of his assets has deprived him of use of his property, and that the deprivation is "permanent" because "[t]he provisions of IEEPA, E.O. 13,224, and the implementing regulations provide no mechanism for Mr. Kadi to further contest his designation or the blocking of his assets."  Compl. ¶¶ 59-61.  As a threshold matter, the allegation that there is no "mechanism . . . to further contest his designation" is untrue.  OFAC

---

[16] Kadi relies heavily on Al Haramain I to support his due process claim. See Opp'n at 20-21.  However, this reliance is unavailing, as both the District of Oregon and the Ninth Circuit subsequently held that any due process violation found in Al Haramain I was harmless error.  See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, 07-cv-1155, 2009 WL 3756363, at *6-8 (D. Ore. Nov. 5, 2009) ("Al Haramain II"); Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury, --- F.3d ----, 2012 WL 603979, at * 18-20 (9th Cir. Feb. 27, 2012) ("Al Haramain III").  Similarly, to the extent that there was any violation of Kadi's due process rights in October 2001, it clearly was harmless in light of all the subsequent process he received.  Kadi's case is also distinguishable from Kindhearts for Charitable Humanitarian Dev. v. Geithner, 647 F. Supp. 2d 857 (N.D. Ohio 2009) ("Kindhearts I").  There, the notice received by plaintiff had inadequately disclosed the basis of the provisional designation because it merely listed all the designation criteria.  The court also considered OFAC's numerous delays, failures to respond, and misplacing of plaintiff's submissions without any further explanation in concluding that plaintiff did not receive an adequate post-deprivation hearing. Id. at 901-07. Kadi, in contrast, met and communicated with OFAC numerous times and had opportunities to exchange information regarding his request for reconsideration.

provides for a reconsideration process that Kadi, in fact, used.

In any event, courts in this jurisdiction that have considered similar "takings" challenges under the Fifth Amendment have rejected them. See Islamic Am. Relief Agency, 394 F. Supp. 2d at 51 ("[T]o the extent that the plaintiff seeks to challenge the blocking of assets pursuant to an Executive Order, such an order is not, as a matter of law, a taking within the meaning of the Fifth Amendment."); Holy Land Found., 219 F. Supp. 2d at 78 ("The case law is clear that blockings under Executive Orders are temporary deprivations that do not vest the assets in the Government. Therefore, blockings do not, as a matter of law, constitute takings within the meaning of the Fifth Amendment . . . . [C]ourts have consistently rejected these claims in the IEEPA and TWEA context.") (citing cases); see also Nielsen v. Sec'y of the Treasury, 424 F.2d 833, 844 (D.C. Cir. 1970) ("The temporary blocking or freezing of the accounts of aliens within the territory of a state, suspending the right of withdrawal but not affecting ownership, does not appear to have been regarded as a taking of property.").

Even if the Notice of Blocking constituted a "taking," pursuant to the Tucker Act,  28 U.S.C. § 1491, jurisdiction would rest in the Court of Federal Claims, not here.  See Islamic Am. Relief Agency, 394 F. Supp. 2d at 51; Holy Land Found., 219 F. Supp. 2d at 78 n.32;  Global Relief Found., 315 F.3d at 754 ("GRF's takings claim not only is premature -- it must await decision on the validity of the global terrorist designation . . . but also is in the wrong court.  It belongs to the Court of Federal Claims under the Tucker Act.").  Kadi characterizes his claim as not being subject to the Tucker Act because he does not seek money damages. Opp'n at 25.  But that characterization is contradicted by his complaint, which labels Count Three as a "Right to Just Compensation."  Compl. ¶¶ 58-61.  Moreover, the Seventh Circuit has suggested that "just

compensation" is the only remedy available for a takings violation.  See Global Relief Found., 315 F.3d at 754 ("Opportunity to obtain recompense under the Tucker Act, 28 U.S.C. § 1491(a), if the blocking turns out to be invalid, provides the private party with the very remedy that the Constitution names: just compensation.").

Accordingly, the Court lacks jurisdiction to resolve Kadi's takings claim.  And, even if the Court had jurisdiction, the Court agrees with other courts that have found that the blocking of assets does not constitute a taking under the Fifth Amendment.[17]

**D.  First Amendment - Speech and Association**

Kadi claims that the SDGT designation and blocking order substantially interfere with his rights to freedom of speech and freedom of association.  He contends that his designation prohibits him from making humanitarian contributions to "legitimate charitable organizations" and states that he "does not have a knowing affiliation with any terrorist group or individual including Osama Bin Laden or Al-Qaeda . . . and does not have a specific intent to further the illegal aims of any terrorist group or individual."  Compl. ¶¶ 62-66; see also Opp'n at 31.  As previously stated, it is doubtful that Kadi, as a non-resident alien with unclear ties to the United States, can even raise a challenge to OFAC's action under the First Amendment.  But assuming he could, his First Amendment claims fail.

---

[17] The district court in Holy Land Foundation opined that "[p]laintiff may . . . some day have a credible argument that the long-term blocking order has ripened into a vesting of property in the United States."  219 F. Supp. 2d at 78.  But no court has reached this issue and Kadi does not persuasively argue that the blocking order here has ripened into a permanent taking.  As defendants point out, SDGTs can have their designations removed, and can ultimately be de-listed.  The Notice of Blocking also advised Kadi that OFAC regulations provide designees the right to engage in limited authorized transactions involving blocked property. AR 2784-85 ("Should you seek a license to engage in any transaction involving blocked property, please refer to the licensing procedures set forth [in] . . . 31 C.F.R. Part 501.").

1.    <u>Freedom of Speech</u>

The Court's starting point in considering Kadi's First Amendment claims must address the parties' arguments over the proper analytical framework.  The Government urges intermediate scrutiny because EO 13,224 and its implementing regulations are content-neutral.  Def.'s Supp. Mem. at 8 (characterizing EO 13,224 as a "content netural regulation based on conduct, not speech").  Kadi, for his part, asserts that strict scrutiny applies because EO 13,224 and the OFAC blocking order infringe on his right to make humanitarian contributions thereby suppressing the "symbolic act of contributing."  <u>See</u> Opp'n at 32 n. 27.  He also relies on the Supreme Court's recent decision in <u>Humanitarian Law Project IV</u>, 130 S. Ct. 2705 (2010), a case involving a challenge to a statute, 18 U.S.C. § 2339B, banning the provision of material support to foreign terrorist organizations (FTOs).[18]

Intermediate scrutiny has been applied in reviewing First Amendment challenges "when the 'regulation . . . serves purposes unrelated to the content of expression.'"  <u>See</u> <u>Islamic Am. Relief Agency</u>, 394 F. Supp. 2d at 52 (citing <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)).  In other words, intermediate scrutiny is considered the proper test for so-called "content-neutral" regulations, and "Government regulation of expressive activity is content-neutral so long as it is 'justified without reference to the content of the regulated speech.'"  <u>Emergency Coalition to Defend Educ. Travel v. U.S. Dept. of the Treasury</u>, 545 F.3d 4, 12 (D.C. Cir. 2008) (citing <u>Ward</u>, 491 U.S. at 791.  Whether a regulation is content neutral "centers on the

---

[18] Although <u>Humanitarian Law Project</u> was decided subsequent to the original briefing in the case, at the Court's request, the parties provided supplemental memoranda on whether that case altered their positions as to which type of scrutiny this Court should apply. <u>See</u> Order, ECF No. 52 (Jan. 17, 2012); Pl.'s Supp. Mem., ECF No. 53 (Feb. 6, 2012);  Def.'s Supp. Mem.. ECF No. 54 (Feb. 6, 2012).

purpose of the government regulation, that is, whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Id. (internal quotations and citations omitted). Under the test set forth in United States v. O'Brien, 391 U.S. 367 (1968), governmental action passes intermediate scrutiny if (1) "it is within the constitutional power of the Government"; (2) "it furthers an important governmental interest"; (3) the governmental interest is unrelated to the suppression of expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377.   The D.C. Circuit has explained that, "[i]n sum, 'content-neutral regulations that have an incidental effect on First Amendment rights will be upheld if they further 'an important or substantial government interest.'" Emergency Coalition to Defend Educ. Travel, 545 F.3d at 12 (citing Walsh v. Brady, 927 F.2d 1229, 1235 (D.C.Cir.1991)).

Strict scrutiny is a more exacting standard that applies to content-based regulations of speech.  See R.A.V. v. St. Paul, 505 U.S. 377, 385-86 (1992). Whether strict scrutiny applies depends on whether the regulation was issued "to disfavor certain messages or ideas."  See Cablevision Sys. Corp. v FCC, 649 F.3d 695, 717-18 (D.C. Cir. 2011) (distinguishing between strict and intermediate scrutiny).  In order for a content-based regulation to survive strict scrutiny, a statute must be narrowly tailored to advance a compelling government interest.  FEC v. Wisconsin Right to Life, Inc., 551 U.S. 449, 464 (2007).

Not many cases have considered what level of scrutiny applies to First Amendment challenges prompted by SDGT designations and blocking orders under EO 13,224 and its implementing regulations.  However, two cases in this jurisdiction, prior to the Supreme Court's decision in Humanitarian Law Project IV, concluded that the appropriate test is intermediate

scrutiny.  See Holy Land Foundation, 219 F. Supp. 2d at 81; Islamic Am. Relief Agency, 394 F.

Supp. 2d at 52.  Neither court explicitly characterized EO 13,224 and the implementing

regulations as content-neutral, nor characterized the provisions as "regulating conduct" as the

Government suggests, but both cases nevertheless concluded that intermediate scrutiny applied to

the same SDGT designation regime and type of blocking order that Kadi challenges here.  Both

courts also rejected outright the claim that strict scrutiny applied, reasoning that intermediate

scrutiny applied where the funds at issue were used (or were sought to be used) for charitable and

humanitarian aid, as opposed to funds used to make political contributions or to support any

other form of political speech.  See Islamic Am. Relief Agency, 394 F. Supp. 2d at 52-53

(distinguishing between restrictions on political contributions, which merit strict scrutiny, and

charitable contributions, which do not); Holy Land Found., 219 F. Supp. 2d at 81-82 n. 37

("[C]haritable contributions do not involve political expression, and therefore do not warrant

strict scrutiny"); cf. Citizens United v. FEC, 558 U.S. ----, 130 S. Ct. 876, 898 (2010) ("Laws that

burden political speech are subject to strict scrutiny.") (internal quotations and citations omitted).

Both Holy Land Foundation and Islamic American Relief Agency were affirmed on appeal, but

the D.C. Circuit did not explicitly address which First Amendment test applied.  Instead, that

court took a broader view, reasoning that "there is no constitutional right to fund terrorism" and

that "where an organization is found to have supported terrorism, government actions to suspend

that support are not unconstitutional."  Islamic Am. Relief Agency, 477 F.3d at 735; Holy Land

Found., 333 F.3d at 165.

    Kadi claims that the recent decision by the Supreme Court in Humanitarian Law Project

IV supports his view that strict scrutiny applies.  That case involved a challenge to 18 U.S.C. §

2339B, which imposes criminal penalties for the provision of material support to terrorist

organizations.  The plaintiffs in Humanitarian Law Project IV sought to provide material support

to two designated FTOs in the form of speech.  130 S. Ct. at 2724.  The support at issue involved

activities such as providing training to members of the FTO on using law and political advocacy

to resolve disputes and to negotiate peace agreements.  Id. at 2716-17.  Under section 2339B,

"material support" included imparting a specific skill, or communicating advice "derived from

specialized knowledge," whereas speech "[was] not barred if it impart[ed] only general or

unspecialized knowledge."  Id. at 2724.  The Supreme Court observed that while the material

support statute could be "described as directed at conduct [,] . . . as applied to plaintiffs the

conduct triggering coverage under the statute consists of communicating a message."  Id.  The

Court reasoned that "[p]laintiffs want to speak to the [FTOs], and whether they may do so under

§ 2339B depends on what they say.  If plaintiffs' speech imparts a 'specific skill' or

communicates advice derived from 'specialized knowledge' -- then it is barred . . . . [O]n the

other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized

knowledge."  Id. at 2723-24.  Accordingly, because the Supreme Court found that the material

support statute "regulate[d] speech on the basis of its content," strict scrutiny was the applicable

test with respect to the activities plaintiffs sought to undertake there.  See id.

Nevertheless, the Supreme Court found that the material support statute -- as applied to

the activities plaintiffs sought to undertake -- survived strict scrutiny because the prevention of

terrorism was a compelling governmental interest.  Id. at 2730-31.  Moreover, it found that

2339B was narrowly tailored because even material support that was intended to "promot[e]

peaceable, lawful conduct . . . can further terrorism by foreign groups in multiple ways . . . .

[S]uch support frees up other resources within the organization that may be put to violent ends."
Id. at 2725.  A plurality of the Supreme Court, in finding that the statute was narrowly tailored,
also relied on the fact that the statute prevented coordinated advocacy, rather than independent
advocacy.  Id.

More recently, and after the Supreme Court decided Humanitarian Law Project IV, the
Ninth Circuit has applied strict scrutiny in considering a challenge under a different section of
EO 13,224, which prohibits United States persons or persons located in the United States from
providing contributions of services, goods, or funds to a SDGT.  See Al Haramain III, 2012 WL
603979, at * 27-28 (assessing EO 13,224 § 2(a)).  That case concerned "pure speech" activities
that a domestic non-profit organization sought to undertake on behalf of a domestic SDGT,
including speaking to the press through press conferences and press releases, holding
demonstrations, communicating with the Government, and organizing public education activities.
See id. at *27 & *31-32 (characterizing activities as "pure speech" and OFAC's prohibitions of
those activities as "content-based").  However, apart from similarly adopting strict scrutiny as the
proper test, the Al Haramain III court distinguished  Humanitarian Law Project IV, which it
concluded "involved wholly foreign organizations currently at war with a United States ally . . .
[and] specific evidence concerning the continuing terrorist activities of those organizations and
[their] ability . . . to mis-use the support offered by the plaintiffs."  Id. at *31.  In contrast, Al
Haramain III involved an organization that was a "domestic branch of an international
organization with little evidence that the pure-speech activities proposed . . .  on behalf of the
domestic branch will aid the larger international organization's sinister purposes."  Id.  Hence,
although both the Ninth Circuit in Al-Haramain III and the Supreme Court in Humanitarian Law
Project IV applied strict scrutiny, each took pains to limit its holding to situations that are

ultimately inapposite and inapplicable to Kadi's claims.

The Court therefore agrees with the Government that intermediate scrutiny is the appropriate test here.  Simply put, Kadi complains that he is barred from making financial transfers to organizations or individuals that have been designated as SDGTs.  He makes no claim that he seeks to donate to these entities or individuals for political reasons, and he makes no claim that he seeks to engage in any other activities of the type that were at issue in Humanitarian Law Project IV or Al Haramain III.  And applying intermediate scrutiny, the Court considers it beyond question that the Government has the authority to designate Kadi as a SDGT and to freeze or block assets that fall under U.S. jurisdiction.  See Holy Land Found., 219 F. Supp. 2d at 82.  It is also beyond dispute that blocking or freezing assets that may be used to support terrorists and/or terrorist activities furthers an important government interest -- "combating terrorism by undermining its financial base." Holy Land Found., 333 F.3d at 161 (citing Holy Land Found., 219 F. Supp. 2d at 81-82).  Moreover, the designation of Kadi as a SDGT and the blocking of his assets merely restricts his ability to make financial transfers to other SDGTs, not his ability to express his views generally.  Any incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the strong governmental interest. See Holy Land Found., 219 F. Supp. 2d at 82 ("Money is fungible, and the Government has no means of ensuring that even charitable contributions to a terrorist organization are actually used for legitimate purposes."); see also  Humanitarian Law Project IV, 130 S. Ct. at 2725-26 (adopting same principle in strict scrutiny analysis).

Kadi has no satisfactory response to the arguments raised by the Government. He also has no good response to the pre-Humanitarian Law Project IV cases that applied intermediate scrutiny or concluded that there was no constitutional right to support terrorism.  Instead, Kadi

declares them inapposite because those courts "had already determined that the non-movants [i.e., recipients of the funds] provided support to terrorists" while such a judicial finding is lacking here.  Opp'n at 33.  But having now held that OFAC's SDGT designation of Kadi is valid under the APA, that argument -- and the reasoning in Al-Haramain III in reliance on the lack of evidence regarding organizational ties to terrorist activities -- is no longer available to Kadi.  He provides no sound reason to depart from the D.C. Circuit's clear instructions that there is no constitutional right to fund terrorism and that, where a finding has been made that an entity or individual has supported terrorism, "government actions to suspend that support are not unconstitutional."  Islamic Am. Relief Agency, 477 F.3d at 735; Holy Land Found., 333 F.3d at 165.

Furthermore, even if the Court found Humanitarian Law Project IV applicable here  and applied strict scrutiny review, the same result would still be reached.  Given the sensitive interests of national security and foreign affairs at stake,  and because all contributions to foreign terrorist organizations (regardless of any benign intent) could further terrorism, the Government has a compelling interest in ensuring that such support not reach these organizations.  See Humanitarian Law Project IV, 130 S. Ct. at 2727 (noting its own conclusions based on the evidence that all contributions to FTOs further terrorism, and stating that the Executive's views reaching the same conclusion are "entitled to deference").  EO 13,224 and its implementing regulations prohibiting the financial transfers Kadi seeks to make are narrowly tailored to advance that compelling government interest, under the reasoning in Humanitarian Law Project IV.  Because money is fungible, even allowing for good-intentioned financial support to organizations and individuals involved in terrorism would be problematic, as organizations could free up other resources to be used towards violent terrorist objectives.  Id. at 2725.  In addition,

EO 13,224 and the implementing regulations construct a regime that provides for the listing of a

limited number of SDGTs, permits entities and individuals to contest their designations, and

allows the Government to delist individuals and entities and remove their SDGT designations.

See id. at 2726 (reasoning that the restriction was only on "*material* support coordinated with or

under the direction of a *designated* foreign terrorist organization", which indicated that

"Congress . . . [had] settled on a natural stopping place" for the reaches of the statute) (emphasis

added).  This carefully constructed government regime for designating SDGTs, which takes into

consideration the concerns regarding the fungibility of money and resources described above,

satisfies the "narrowly tailored" prong of the strict scrutiny test.

    2.    <u>Freedom of Association</u>

Kadi's freedom of association claim fares no better.  The Government contends that

Kadi's designation was not based on mere membership, but instead was based on his financial

support of terrorist groups.  Defs.' Mot. at 39.  Kadi responds that he "is completely prohibited

from making contributions, and thus barred from engaging in a critical form of associational

activity."  Opp'n at 34.  He also argues that such a prohibition cannot be sustained "in the absence

of a specific intent to further the organization's unlawful ends."  <u>Id.</u>

This Circuit comprehensively addressed this issue in <u>Islamic American Relief Agency</u>,

and held that a SDGT blocking order does not violate freedom of association because it does not

prohibit associational activity; rather, it targets the financial support of terrorism.  477 F.3d at

736-37; <u>see also</u> <u>Humanitarian Law Project IV</u>, 130 S. Ct. at 2730-31 (affirming rejection of

freedom of association claim because the material support statute did not penalize mere

association, but instead prohibited the act of providing material support).  Moreover, the D.C.

Circuit has squarely rejected the "intent" requirement proposed by Kadi.  <u>Islamic Am. Relief</u>

Agency, 477 F.3d at 735-36 (rejecting argument that showing of intent was necessary and agreeing with other courts that intent to aid unlawful acts was inapplicable in the context of donations to terrorist groups "because the money could be used for unlawful activities regardless of donor intent"). So, too, here Kadi was designated primarily on the basis that he provided funding to terrorist organizations. Hence, his First Amendment freedom of association claim is foreclosed.

**E.   Fourth Amendment**

Kadi claims that freezing or blocking his assets "constitute[s] an unreasonable search and seizure without probable cause." Compl. ¶ 71. He alleges that "[d]efendants initially froze or blocked [Kadi's] assets in October 2001, without reasonable suspicion, probable cause or warrant and without specifying their reasons for doing so." Compl. ¶ 69. He further asserts that "[d]efendants continue to freeze or block [Kadi's] assets without providing him with the information in the administrative record upon which OFAC made its determination that [Kadi] is a 'terrorist,' any summary of the allegedly 'classified' information, or any specification of any charges against him to which he might have responded." Compl. ¶ 70.

Defendants argue that the Fourth Amendment is inapplicable to blocking and seizure orders of this nature. They also contend that "blocking actions pursuant to E.O. 13224 are *per se* reasonable under the Fourth Amendment and thus should not be subject to a 'probable cause' standard or warrant requirement." Defs.' Mot. at 45. Finally, defendants argue that blocking actions fall under the "special needs" exception to the warrant and probable cause requirements.

As discussed above, subsequent to the initial briefing in this case Al Haramain III was decided by the Ninth Circuit. Al Haramain III found in relevant part that the Government had violated the Fourth Amendment rights of Al Haramain Islamic Foundation, Oregon ("AHIF-

Oregon").[19]   There, the Government had also argued that the special needs exception to the

warrant and probable cause requirement under the Fourth Amendment applied, and that the

blocking orders, in any event, were *per se* reasonable.  The Ninth Circuit rejected those

arguments, and concluded that OFAC violated AHIF-Oregon's Fourth Amendment right to be

free of unreasonable seizures.  Al Haramain III, 2012 WL 603979, at * 25.  The court reasoned

that the exigent circumstances exception to the Fourth Amendment's warrant requirement may

have applied to the initial designation and blocking, but once the Government had blocked the

assets to foreclose any asset flight concerns, it could have obtained a warrant with respect to the

specific assets identified.  Id. at * 23.  The court rejected the Government's argument (also raised

here) that obtaining warrants would be unduly burdensome or impractical. Id.; see also Defs.'

Mot., Ex. B, Decl. of Adam J. Szubin ("Szubin Decl.") ¶¶ 19-20.

The Government urges this Court not to follow the Ninth Circuit's decision in Al

Haramain III, but instead to adopt the approach of other district courts in this jurisdiction in

finding that blockings of this nature do not constitute seizures.  See, e.g., Zarmach, 750 F. Supp.

2d at 160; Islamic Am. Relief Agency, 394 F. Supp. 2d at 48; Holy Land Found., 219 F. Supp. 2d

at 78-79.[20]  Outside this jurisdiction, some courts have taken a different view, finding that

blocking orders are "seizures" under the Fourth Amendment. See Al Haramain III, at * 24 n. 17

---

[19] In light of the Government's prior pronouncement that, with the exception of one district court, no court had ever held that the Fourth Amendment applied to such blocking orders, see Defs.' Mot. at 42, the parties were given an opportunity to provide supplemental briefing on what persuasive effect Al Haramain III should have here.  In those briefs, the Government informed the Court that it had petitioned for rehearing en banc, but subsequently the Ninth Circuit denied the request for rehearing and issued an amended opinion on February 27, 2012.

[20] The D.C. Circuit did not address the Fourth Amendment issue in Islamic American Relief Agency and Holy Land Foundation because neither appeal involved a challenge to those rulings.

(declining to follow Islamic Am. Relief Agency and Holy Land Foundation);  KindHearts I, 647 F. Supp. 2d at 871-72 (same).  This Court, as well, has expressed some reluctance to find that, categorically, blocking orders could *never* be "seizures" under the Fourth Amendment. See Tr. 38:21-24.

However, the Court need not resolve the issue, nor need it decide as a general matter whether blocking orders categorically fall within one of the enumerated exceptions to the Fourth Amendment warrant requirement.  Even assuming that the blocking order at issue here constituted a "seizure," having already concluded above that OFAC's decision to maintain the SDGT designation of Kadi was supported by substantial evidence, it follows that the blocking order was not issued unreasonably or without probable cause.[21]  Indeed, the courts in Islamic American Relief Agency and Holy Land Foundation concluded that because the Government had the authority to issue the blocking order under IEEPA and EO 13,224, and because the courts had already determined in each instance that OFAC's decision to issue a blocking order was not arbitrary and capricious, the plaintiffs in those cases could not state a cognizable Fourth

_____

[21]  The Court does not suggest that warrantless seizures in other contexts, including criminal cases, could be ex post facto supported by probable cause.  Instead, the Supreme Court has repeatedly instructed that the ultimate touchstone of the Fourth Amendment remains reasonableness. See, e.g., Kentucky v. King, 131 S. Ct. 1848 (2011) (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)); Soldal v. Cook County, Ill., 506 U.S. 56, 71 (1992).  As already stated, this Court is highly skeptical whether Kadi could even assert claims under the Fourth Amendment, and Kadi has not argued persuasively that he has sufficient connections to raise such a claim. See Verdugo-Urquidez, 494 U.S. at 264-66; Al-Aqeel, 568 F. Supp. 2d at 70-71. And, as the Government points out, it is not even clear that requiring a warrant in this case would even have much effect, given that Kadi is a Saudi Arabian citizen with substantial assets overseas.  Accordingly, in this situation at least, given the substantial governmental interest in combating terrorism, the Court's determination that the continued freezing and blocking of Kadi's assets was proper, and the other concerns addressed in this Memorandum Opinion, "the safeguard of a warrant would only minimally advance Fourth Amendment interests," to the extent Kadi even has any Fourth Amendment protections.  See United States v. Jacobsen, 466 U.S. 109, 125 (1984).

Amendment claim. See Islamic Am. Relief Agency, 394 F. Supp. 2d at 48; Holy Land Found., 219 F. Supp. 2d 78-79. So, too, here, the Court has concluded that substantial evidence in the administrative record supports OFAC's decision to block Kadi's assets; hence, there was no Fourth Amendment violation, either at the time of the initial blocking or as a result of the denial of reconsideration in March 2004.[22]

Al Haramain III is actually consistent with this ruling. The Ninth Circuit balanced the interests of a domestic organization to be free from blocking orders, and reasoned that "the number of designated persons located within the United States appears to be very small. The warrant requirement will therefore be relevant in only a few cases." Al Haramain III, 2012 WL 603979 at * 23. The court, in fact, explicitly stated: "We address only the facts of this case: OFAC's seizure of assets of a United States entity located within the United States. We do not address the requirements under the Fourth Amendment for other situations including, for example, designations of foreign entities or designations by executive order." Id. at * 25 n. 18. Here, of course, a foreign entity/individual was designated pursuant to EO 13,224. Given these limitations as stated by the Ninth Circuit, confining its holding to circumstances not present in this case, Kadi's reliance on Al Haramain III is unpersuasive.

Moreover, the Government's concerns about the practicability of obtaining warrants seem

---

[22] Even assuming that there was a Fourth Amendment violation, it is not entirely clear what remedy Kadi would have beyond a review as to whether the seizure was supported by probable cause. In Kindhearts for Charitable Humanitarian Development, Inc., 710 F. Supp. 2d 637, 648-49 (N.D. Ohio 2010) ("Kindhearts II"), the court, after finding a Fourth Amendment violation in the blocking of assets pending investigation, rejected a claim that the proper remedy was the return of assets. Instead, it concluded that a post-hoc showing of probable cause would remedy the Fourth Amendment violation. Id. at 650, 652. In the interim, the government could continue the freeze on the organization's assets. Id. at 652. That court correctly observed that the scope of the Fourth Amendment was "more limited in the context of foreign relations and national security than in typical criminal investigations and administrative actions." Id. at 647.

well-founded.  See Szubin Decl. ¶ 20 ("Injecting a requirement that a magistrate judge review the evidentiary memorandum and issue a warrant before each blocking can go forward could significantly prolong and undermine the designation process, curtailing OFAC's ability to take immediate action . . . and increasing the risk that assets may be exported to dangerous actors abroad.").  Given the concerns raised by the Government in securing warrants, this Court would be reluctant to apply Al Haramain III to the present situation, where the designated person is a foreign national, with significant overseas ties and assets.  For all these reasons, Kadi's Fourth Amendment claim will be denied.

### F.  **Vagueness and Overbreadth**

In Counts Six and Seven, Kadi asserts that the SDGT designation violated his First and Fifth Amendment rights because the designation criteria are unconstitutionally vague and overbroad, both on their face and as applied to him individually.  Compl. ¶¶ 72-76.  Count Six maintains that the EO 13,224 criterion "otherwise associated with" other designated persons or entities allows designation "without regard to the character or intent of the association or support." Compl. ¶ 73.  Kadi contends that his Count Six challenge to "otherwise associated with" encompasses a challenge to the terms "material support" and "services," which are incorporated by reference into the definition of "otherwise associated with."  See Opp'n at 36-37 (citing 31 C.F.R. § 594.316(b)).  Count Seven asserts that IEEPA, EO 13,224, and the implementing regulations suffer from vagueness and overbreadth flaws "because they do not define such critical terms as 'terrorist organization', 'specially designated global terrorist' or 'any other term related to terrorism'" Compl. ¶ 75; Opp'n at 40.  The complaint does not indicate which specific provision of IEEPA Kadi is challenging here.  Presumably, he challenges the language in Sections 1(c) and (d) of EO 13,224, which authorize the designation of persons who

provide various kinds of support for "acts of terrorism."  The regulatory language at issue is apparently in 31 C.F.R. § 594.310, which defines a SDGT as "any foreign person or persons listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."

The Supreme Court has instructed that a statute is unconstitutionally overbroad only where the overbreadth is "substantial . . . relative to the statute's plainly legitimate sweep." United States v. Williams, 553 U.S. 285, 292-93 (2008).  Moreover, "[i]nvalidation for overbreadth is 'strong medicine' that is not to be casually employed." Id. at 293 (internal quotations and citations omitted).  A law that does not reach constitutionally protected conduct, and therefore passes muster under the overbreadth test, may still be challenged on grounds that it is unduly vague in violation of due process.  See Village of Hoffman Estates v. Flipside, 455 U.S. 499, 497 (1982).  However, a law is unconstitutionally vague on its face only if it is "impermissibly vague in all its applications." Id.  The Supreme Court has instructed that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Id. at 498.  Laws must also "provide explicit standards for those who apply them" to prevent "arbitrary and discriminatory enforcement." Id. "[G]reater tolerance" is given to "enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Id.  at 498-99; see also Kindhearts I, 647 F. Supp. 2d at 889.  If, however, a law threatens to inhibit the exercise of constitutionally protected rights, such as the right of free speech or of association, then "a more stringent vagueness test should apply." Village of Hoffman Estates, 455 U.S. at 499.  But, still, a plaintiff who "engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Id. at 495.

Although Kadi's complaint mounts both vagueness and overbreadth challenges to IEEPA

and EO 13,224, he focuses on vagueness and does not really address the overbreadth claims, nor does he respond to the Government's arguments on overbreadth.  Hence, the Court will focus here on Kadi's vagueness arguments as well.[23]  Even if Kadi had developed his overbreadth arguments, his claim would fail because IEEPA and EO 13,224 have a plainly legitimate sweep - - to prevent terrorist attacks by foreclosing financial and other support to terrorists and terrorist organizations.  See Global Relief Found. v. O'Neill , 207 F. Supp. 2d 779, 805-06 (N.D. Ill. 2002), aff'd on other grounds, 315 F.3d 748 (7th Cir. 2002) (rejecting claims that EO 13,224 is overbroad because it "governs financial arrangements and other types of conduct" to "prevent additional terrorist attacks" and "its effects on speech, if any, are incidental").  Moreover, "[IEEPA] is designed to give the President means to control assets that could be used by enemy aliens."  Global Relief Found., 315 F.3d at 753; see also Holy Land Found., 333 F.3d at 162-63 (citing with approval the Seventh Circuit's reasoning in Global Relief Foundation that the Executive Branch has authority to define property interests broadly in the context of IEEPA and EO 13,224).

    1.       "Otherwise Associated With"

Kadi argues that the provision of EO 13,224 allowing designation on the basis that one is "otherwise associated with" another SDGT is impermissibly vague because it "could encompass First Amendment protected speech and association."  Opp'n at 36-37.  He contends that EO 13,224 permits persons who have never engaged in or supported terrorism or terrorist acts to be

---

[23] Kadi argues for the first time in his opposition brief that IEEPA itself is unconstitutionally vague because it grants the President "virtually limitless" authority to designate an individual as a global terrorist.  Opp'n at 39.  This point was not raised in his complaint; accordingly, he is foreclosed from raising it for the first time through an opposition brief.  Moreover, the claim is unavailing because the President's authority to designate individuals pursuant to IEEPA is well-established.

designated based on mere "association" with or "support" of a SDGT.  The Government, for its

part, responds that Kadi's challenge has been mooted by the new definition of "otherwise

associated with" at 31 C.F.R. § 594.316(b).[24]  Kadi counters that OFAC's 2007 definition of

"otherwise associated with" had not been promulgated at the time of Kadi's designation.  Opp'n at

37 n. 34.  In addition, although Kadi acknowledges that the term "otherwise associated with" has

been subsequently defined in the regulations, he maintains that the newly defined phrase remains

constitutionally infirm because the terms incorporated within the new definition -- specifically,

"material support" and "services" -- are themselves impermissibly vague because no showing of

knowledge or intent that the support or services were directed to a designated entity is required.

Opp'n at 38-39.

Kadi's challenge to the term "otherwise associated with" -- including the incorporated

terms "material support" and "services" -- fails.  As an initial matter, Kadi cannot bring a facial

vagueness challenge to these terms because the basis for his designation was his financial support

to other SDGTs -- conduct that is "clearly proscribed" under the law.  See Village of Hoffman

Estates, 455 U.S. at 495 (a plaintiff who "engages in some conduct that is clearly proscribed

cannot complain of the vagueness of the law as applied to the conduct of others").  But even if he

could raise a facial challenge to EO 13,224, the newly defined term, promulgated at 31 C.F.R. §

---

[24] The Government also urges  that because summary judgment is not being sought on the basis of Kadi's designation under the "otherwise associated with" criterion, the Court need not consider Kadi's challenge to that term. See Defs.' Mem. at 53; see also Reply at 37 ("It is clear that Kadi was designated for providing *financial* support, so the Court need not and should not consider whether the terms "material support" or "services" might be unconstitutionally applied to another party.") (emphasis added).  The March 2004 OFAC Memorandum certainly does focus on Kadi's financial support of terrorism.  Still, OFAC emphasizes that it took a "totality of the circumstances" approach to designating Kadi.  Arguably, then, this encompasses other forms of "support" beyond financial support, although the Court agrees that financial support is the primary reason for the designation.

594.316(b), remedies any deficiencies that might have existed.  The term "otherwise associated with" is now defined to mean:

> (a) [t]o own or control; or
> (b) [t]o attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to.

The district court in <u>Kindhearts I</u> rejected a similar challenge in the context of EO 13,224 and the implementing regulations relating to the designation of SDGTs.  <u>See</u> <u>Kindhearts I</u>, 647 F. Supp. 2d at 893-96.  That court reasoned that the phrase "otherwise associated with" had been clarified by the newly adopted definition and, in any event, limited any applicability the phrase might have to protected speech and conduct.  <u>Id.</u> at 896. It further stated that neither "material support" nor "services" as used in the definition of "otherwise associated with" rendered the term unconstitutionally vague.  <u>Id.</u>   Moreover, in rejecting an attack on "material support" and its underlying terms on vagueness grounds, the Supreme Court in <u>Humanitarian Law Project IV</u> reasoned that "a person of ordinary intelligence would understand the term 'service' to cover [the activities] performed in coordination with, or at the direction of, a foreign terrorist organization." <u>See</u> 130 S. Ct. at 2722.  The courts that have addressed vagueness and overbreadth challenges to the term "otherwise associated with" have ultimately rejected them.  <u>See</u> <u>Al Haramain I</u>, 585 F. Supp. 2d 1233, 1267, 1270 (D. Ore. 2008) (rejecting overbreadth challenge to "otherwise associated with" phrase); <u>Humanitarian Law Project II</u>, 484 F. Supp. 2d at 1106-07 (rejecting overbreadth challenge to "otherwise associated with" and embedded term "services" ); <u>see also</u> <u>Humanitarian Law Project III</u>, 578 F.3d at 1145 n. 10, 1148 (affirming district court's decision on "otherwise associated with" and rejecting challenge to "services").

The case is even more compelling here, where Kadi's conduct involves providing

financial support to designated entities and individuals.  See Humanitarian Law Project III, 578 F.3d at 1148 ("As [EO 13,224] is not aimed at speech and does not cover a substantial amount of it, the ban on "services" to SDGTs is not facially overbroad.").  Although Kadi claims that basing a designation on being "otherwise associated with" other SDGTs  could include First Amendment protected speech and association and that "services"  could encompass activities that are pure speech or advocacy, no such activities are at issue here.  As previously discussed, it is clear from Kadi's complaint that he does not claim that he has sought to engage in those kinds of activities, but was foreclosed or chilled from doing so.  As the Government points out, the term "otherwise associated with" applies to specific types of conduct beyond mere association, and the basis for Kadi's designation is focused on the provision of financial support to SDGTs and terrorist organizations. Hence, his vagueness challenge to the term "otherwise associated with" cannot succeed.

2.      "SDGT," "Terrorist Organization," and "Any Other Term Related to Terrorism"

Kadi's challenges on vagueness grounds to the terms "SDGT," "terrorist organization" and, as a catch-all, "any other term related to terrorism" are even more attenuated.  He argues that the IEEPA, EO 13,224, and the implementing regulations are vague both on their face and as applied to him, because they fail to define these terms.  Opp'n at 39.  His challenge is unpersuasive.

Kadi is wrong that the regulations fail to define these terms.  The term "SDGT" is defined at 31 C.F.R. § 594.310(b) to mean "any foreign person or persons listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."  The term "terrorism" is

defined at 31 C.F.R. § 594.311 and includes specific acts constituting terrorism.[25]   Moreover,

Kadi's argument that the Court should find impermissibly vague "any other term related to

terrorism" casts too wide a net for the Court to seriously consider it.  Kadi responds that the

definition of SDGT at § 594.310(b) does not cure the vagueness problem because it is circuitous

and self-referential -- that is, "the only way to know with certainty what qualifies as a [SDGT] is

for OFAC to designate an individual or entity as an SDGT."  Opp'n at 40.  But Kadi's contention

identifies no deficiency in the definition, and at least one court has rejected a similar argument.

See Humanitarian Law Project, 463 F. Supp. 2d at 1065-66 (reasoning that the terms "specially

designated global terrorist" and "specially designated terrorist group" are "nothing more than

shorthand for groups or individuals designated under the EO" and hence are not vague).

Accordingly, this vagueness challenge fails as well.

## G.  Bill of Attainder

Finally, Kadi contends that E.O. 13,224 violates his constitutional rights as a bill of

attainder "on its face and as applied" because "EO 13,224 inflicts punishment without requiring

an adequate and independent tribunal to determine a SDGT's guilt and takes away the life, liberty

or property of a particular named or easily ascertainable person or group of persons."  Compl. ¶¶

77-78.  In essence, this claim is made under the bill of attainder clause.  See U.S. Const. Art. I, §

---

[25] The term "terrorism" means an activity that:
> (a) Involves a violent act or an act dangerous to human life, property, or infrastructure; and
> (b) Appears to be intended:
>> (1) To intimidate or coerce a civilian population;
>> (2) To influence the policy of a government by intimidation or coercion; or
>> (3) To affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

31 C.F.R. § 594.311.

9.[26]  However, the Court finds that this claim must be dismissed because (1) the bill of attainder

clause does not apply to acts taken by a regulatory agency and (2) even if it did, the clause is not

triggered here, because there was no action constituting "punishment."[18]

As far as this Court is aware, no case has held that a bill of attainder claim can be

maintained on a SDGT designation.  The district court in Global Relief Foundation set forth a

comprehensive and persuasive analysis of a bill of attainder claim brought by a SDGT and

rejected it on two separate grounds: (1) the Constitution's prohibition against bills of attainder

applies only to legislative acts, "not to regulatory actions of administrative agencies"; and (2)

neither the designation of a person as a SDGT nor the blocking of assets constitutes

"punishment."  Global Relief Found., 207 F. Supp. 2d at 798-800.   The Seventh Circuit affirmed

and summarily rejected the bill of attainder claim. See Global Relief Found., 315 F.3d at 755

("Application of the IEEPA is not a bill of attainder; implementation of the statute is in the hands

of the Executive and Judicial Branches, while a bill of attainder is a decision of guilt made by the

Legislative Branch.") (citing United States v. Lovett, 328 U.S. 303, 315 (1946)).  The D.C.

Circuit has not explicitly addressed whether a SDGT designation or blocking of assets constitutes

a bill of attainder, but one district court in this jurisdiction has held that, with respect to an

analogous designation ("specially designated narcotics traffickers"), a blocking order issued by

OFAC did not constitute a bill of attainder.  See Cooperativa Multiactiva de Empleados de

Distribuidores de Drogas v. Newcomb, C.A. No. 98-0949, slip op. at 10 (D.D.C. Mar. 29, 1999),

---

[26] Kadi's complaint, however, alleges his bill of attainder claim as a violation of his First
Amendment rights.  See Compl. ¶¶ 77-78.

[18] Moreover, as this Court has already stated, it is not even clear that Kadi, as a non-
resident alien whose connections to the United States are in question, could even raise this claim.

aff'd on other grounds, 221 F.3d 195 (D.C. Cir. 2000) (table).  The court found that the

prohibition on bills of attainder applies only to "legislative" actions, but rested its holding

primarily on the "punishment" element.  Id., slip op. at 10-12.  It is clear that OFAC's designation

or blocking order does not involve the "punitive confiscation of property," but instead furthers

legitimate purposes by preventing terrorist activities.  Kadi neither alleges nor demonstrates that

he has been designated "for any reason but to curb activities considered to be harmful to national

interests." Id., slip. op. at 12 (citing Bell South Corp. v. FCC, 144 F.3d 58, 67 (D.C. Cir. 1998)).

Kadi's claim that EO 13,224 is a bill of attainder thus has no merit.

### III.    Kadi's Motions to Amend the Complaint and for Rule 56(f) discovery

Kadi has filed two motions, a motion to amend the complaint and a motion for Rule 56(f)

discovery.  He seeks to assert an additional cause of action under Bivens v. Six Unknown Named

Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971), for violations of the First, Fourth,

and Fifth Amendments and to name additional defendants.  However, having determined that

Kadi's constitutional claims fail in their entirety, amendment of the complaint at this point to

allow Kadi to raise Bivens claims against defendants in their individual capacities for

constitutional violations would be futile.  James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085,

1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the

proposed claim would not survive a motion to dismiss."); see also Foman v. Davis, 371 U.S. 178,

182 (1962) (listing "futility of amendment" as a reason for not granting leave to amend).  The

Court has already denied Kadi's motion for Rule 56(f) discovery with respect to the APA claim.

Having now considered and rejected all of Kadi's constitutional claims as well, the Court finds

that the Rule 56(f) claim with respect to discovery on those co nstitutional claims must also fail.

## CONCLUSION

For the foregoing reasons, the Court will grant the defendants' motion for summary judgment in its entirety and will deny Kadi's motion to amend his complaint and for Rule 56(f) discovery.  A separate order accompanies this memorandum opinion.


**SO ORDERED**.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:   <u>March 19, 2012</u>